UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-cv-020583-GAYLES/Otazo-Reyes

CHRISTINE KESSLER,
a resident of the State of Pennsylvania,

   *Plaintiff*,

vs.

NCL (BAHAMAS) LTD, a Bermuda Company d/b/a
NORWEGIAN CRUISE LINES,

   *Defendant*.

_____/

## DEFENDANT'S MOTION TO STRIKE/*DAUBERT* MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS FRANCISCO DE CASO

   Defendant, NCL (BAHAMAS) LTD. ("NCL"), pursuant to this Court's Order [DE 42], hereby files its Motion to Strike/*Daubert* Motion to Exclude Plaintiff's Expert Witness Francisco De Caso and states as follows:

## I. INTRODUCTION

   Plaintiff, CHRISTINE KESSLER, alleges she was injured when she fell entering the thermal spa aboard the M/V *N. Breakaway*. [DE 1]. Plaintiff retained Francisco De Caso to render opinions about the safety of the location of her fall. De Caso inspected the subject area, reviewed limited evidence, and rendered a variety of findings and opinions, none of which is admissible at trial under Federal Rules of Evidence 702 and/or 403. De Caso, a materials scientist who specializes in studying the durability/longevity of materials (such as steel, concrete, etc.) as it relates structural engineering, is not qualified to opine on most of the topics he wishes to address. His opinions are also unreliable for various straightforward reasons, and many are

unhelpful as they fail to consider relevant record evidence and/or concern matters that are not at issue.   Similar opinions rendered by De Caso have been found inadmissible in this district numerous times in the past.   Here, De Caso repeats past errors and fails to adhere to the accepted methods he normally uses.   As shown below De Caso's opinion testimony is inadmissible under Rule 702 and/or Rule 403.

## II.   LEGAL STANDARD

### A.   Fed. R. Evid. 702 and *Daubert* Analysis

The district court's role [policing the admissibility of expert opinion testimony] is especially significant since [an] expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it."

*US v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 US 579, 594–95 (1993)).   "[D]etermining the admissibility of expert testimony under Rule 702, [involves] a rigorous three-part inquiry" (*Id.*) that assesses whether

(1) the expert is **qualified** to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently **reliable** as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony **assists the [jury]**, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert*, 509 US at 589).   The Eleventh Circuit calls these "qualification, reliability, and helpfulness" requirements.   *Frazier*, 387 F.3d at 1260.   The party offering expert testimony bears the burden of laying a proper foundation for admissibility by a preponderance of the evidence.   *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

### 1.   The Qualification Requirement

The qualifications requirement prevents admission of expert opinion testimony when the expert is not qualified to testify competently about the subject matters of the proposed testimony.

*See Daubert*, 509 US at 589; *Frazier*, 387 F.3d at 1260; *City of Tuscaloosa*, 158 F.3d at 562. Expert witnesses must be credentialed (education, formal training, certification, etc.) and/or experienced in the specialty subject matter they intend to address.  However, qualifications alone do not redeem otherwise inadmissible expert opinions. In addition, where an expert relies mainly on experience as the basis for an opinion, "the witness *must explain* [1] how that experience leads to the conclusion reached, [2] why that experience is a sufficient basis for the opinion, and [3] how that experience is reliably applied to the facts." *Payne v. C.R. Bard, Inc.,* 606 Fed.Appx. 940, 942-943 (11th Cir. 2015) (emphasis supplied) (quoting *Frazier,* 387 F.3d at 1258 (11th Cir. 2004). The specific details of the experience and how it informs the opinion must be explained adequately by the expert to provide a foundation for admissibility.  District courts must "separate[…] expert opinion evidence based on 'good grounds' from subjective speculation […] masquerad[ing] as scientific knowledge." *Presley v. Laekwood Eng'g & Mfg. Co.*, 553 F.3d 638 (8th Cir. 2009) (citations omitted); *US v. Masferrer*, 367 F.Supp.2d 1365, 1372 (S.D. Fla. 2005) ("The trial court [cannot] simply tak[e] the expert's word for it.").

### 2.  The Reliability Requirement

Policing the reliability of expert opinions prevents "speculative [and/or] unreliable expert testimony [from] reach[ing] the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Daubert*, 509 U.S. at 589; *Rink v. Cheminova, Inc*., 400 F.3d 1286, 1291 (11th Cir. 2005) (quoting *McCorvery v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002)).  Expert opinions are reliable under Rule 702 only when they are based on sufficient facts/data, they result from the use of reliable principles and methods, and the principles and methods are appropriately applied to relevant facts of the case.  Fed. R. Evid. 702.

### a.  Reliability - Factual Bases

"Expert evidence based on a *fictitious set of facts* is just as unreliable as evidence based on *no research at all*." *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1330 (5th Cir. 1996) (emphasis supplied).  Moreover, "to be permissible, the expert *must be in possession of the necessary facts which will allow the expert to form an accurate conclusion*." *D & D Assoc., Inc. v. Bd. Of Educ. Of N. Plainfield*, 411 F.Supp. 2d 483, 488 (D.N.J. 2006) (emphasis supplied); *see also Guidroz-Brault v. Mo. Pac. R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2001) ("It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record."); *Greenwell v. Boatright*, 184 F.3d 492, 497 (6th Cir. 1999) (expert opinions are "inadmissible when the facts upon which the expert bases his testimony contradict the [record] evidence.").  Expert testimony is also not admissible when its factual bases are not adequately explained.  *Cook v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1111 (11th Cir. 2005).

### b.   Reliability – Methods

Expert witnesses must also apply a reliable methodology to the particular facts of the case.  Assessing the reliability of an expert's methods involves considering many factors, including but not limited to:  any known or potential rate of error, whether the method is generally accepted within the expert's field, and whether the method has been subjected to peer review, publication, and/or testing.  *See Daubert*, 509 U.S. at 593–94; *see also Hendrix*, 609 F.3d at 1194 (citations omitted).  If the "methodology" employed is no more than the expert's own *ipse dixit,* without further explanation, then the testimony is not admissible at trial.  *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).  *Hoff v. Steiner Transocean, Ltd.*, 2014 WL 273075, at *2 (S.D. Fla. 2014) ("An […] unexplained assurance that opinions rest on accepted principles" is inadequate.) (citing *Furmanite v. Williamson*, 506 F.Supp.2d 1126, 1130 (M.D. Fla. 2007); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir.2005)).  As a

gatekeeper, "[a] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from […] unscientific speculations offered by a genuine scientist." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996).

### 3.  The Helpfulness Requirement

Rule 702 requires expert testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue."  This means that "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 US at 591–92 (quoting J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶702[02], p. 702–18 (1988)) (citing *US v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985) ("An additional consideration under Rule 702 — and an[…] aspect of relevancy — is whether expert testimony proffered […] is sufficiently tied to the facts of the case [to] aid the jury in resolving a factual dispute").  This consideration is referred to as "fit." *Downing*, 753 F.2d at 1226.  Helpfulness "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 592.

### B.  Fed. R. Evid. 403

In addition, exclusion under Rule 403 is appropriate if the probative value of otherwise admissible expert opinion testimony is substantially outweighed by its potential to confuse or mislead the jury.  *See U.S. v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).  *Daubert* emphasizes that Rule 403 is important to "expert testimony admissibility analysis [because] expert testimony could be 'both powerful and quite misleading because of the difficulty in evaluating it.'" *Allison*, 184 F.3d at 1310 (*citing* 509 US at 595).  "The judge in weighing possible prejudice against probative force under Rule 403 […] exercises more control over experts than over lay witnesses." *Masferrer*, 367 F.Supp.2d at 1374 (citing *Salem v. US Lines Co.*, 370 US 31, 35 (1962)).  "Simply put, expert testimony may be assigned talismanic significance in the eyes of

lay jurors, and therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier*, 387 F.3d at 1263.

### III.   ARGUMENT AND LAW

#### A.  De Caso is Not Qualified to Offer Most of His Proposed Opinions

Review of De Caso's credentials reveals no education, training, or experience in safety-related design.  *See, generally,* De Caso c.v. (attached at Exhibit A).  In addition, De Caso testified that he is not a naval-architect or naval-engineer.  De Caso Dep. (1/11/19) 12:21-13:1 (attached at Exhibit B).  De Caso has expertise in materials sciences related to structural engineering (Ex A), but is not qualified to opine on any other specialized subject matters.

De Caso testified that he is not an expert in human factors – a specialty field that requires training in safety, ergonomic design, and human sciences such as biomechanics, cognitive science, anthropology, and/or public health.  *See* Ex B at 15:7-8, 122:10; De Caso Dep. (6/2/17) 13:12-24, 24:8-25:11 (attached at Exhibit C).  De Caso has been prevented from testifying about human factors topics in the past.

> [De Caso] is not a human factors engineer.  Nor is there an indication that he has any experience or education in human factors […].  [….]  The Court finds that [De Caso] is not qualified to offer expert [human factors] opinions regarding what Plaintiff, or some other reasonable person, would have seen and how they would have reacted to it.  [….]  The Court is not persuaded that [De Caso]'s review of a scholarly article qualifies him to offer expert testimony on a subject with which he apparently has no other [qualifications].

*Padula v. Carnival Corp.*, 16-cv-23862, 2017 WL 7792714, at *5 (S.D. Fla. Oct. 13, 2017).  In *Padula*, De Caso proposed to testify to the following human factors opinions:

- "There is a high likelihood that the incident was preventable by a reasonable person..."
- "The Plaintiff[] failed to use reasonable care when walking through the incident area...."
- When a person slips on a wet floor, "[t]here's a high likelihood that they failed to use reasonable care."

- "The presence of a permanent high visibility caution sign prior to the location of the incident should have been visible and obvious by any reasonable person...."

- "[A]ny reasonable person should have been able to see that sign...."

- "...the danger of a wet floor was visible, open and obvious to a reasonable person exercising care."

- "Upon realizing that the floor is wet, you approach with care and caution in any surface."

*Padula*, 2017 WL 7792714 at *5. The *Padula* court found that all the above "conclusions are grounded in […] human factors opinions [De Caso] is unqualified to offer." *Id.* Here, many of De Caso's opinions concern expert subject matters that he is not qualified to address at trial.

**B. De Caso's Opinions About Gait Are Inadmissible**

De Caso opines that Plaintiff has a stable, balanced, and/or regular gait. *See* Expert Report pp19-20 (attached at Exhibit D); Ex B at 119:24-122:11. Either way, he concludes, her gait was not a cause of her shipboard fall. *Id.* De Caso's gait opinion is properly offered by an expert in human factors[1], biomechanics, medicine, or a related field. De Caso testified that he has no relevant expertise in the human sciences that qualify him to opine on gait. *See* Ex B at 15:4-8 (no degrees, no expertise in human factors); 14:21-24, 122:10 (no education or expertise in medicine), 14:16-18 (no expertise in biomechanics); *see also* Ex C at 13:12-24, 24:8-25:11 (testifying he lacks qualifications to discuss "intrinsic factors" such as "the ability [to] locomote."). De Caso is not qualified under Rule 702 to testify about Plaintiff's gait at trial.

De Caso testified that this gait opinion is based only on viewing "[a] couple of seconds" of CCTV footage. Ex B at 117:4-7. Of course, a few seconds of low-quality CCTV video is an unreliable basis for opinions about gait, even when reviewed by experts with relevant

---

[1] "[Human factors] experts possess the **unique scientific background** that is needed to help explain the complexities of perception, attention **and gait** that may make the seemingly effortless act of walking go so wrong […]." Laughery, K.R. et al, 'What Do Human Factors/Ergonomics Experts Have to Tell Juries That They Don't Know – But May Think They Know?', *Proc. of the Human Factors & Ergon. Soc. 55th Ann. Mtg.* p.604 (2011) (emphasis supplied).

qualifications.  De Caso testified he has not seen any other footage of Plaintiff (*id*. at 21:24-22:2), did not review her medical records or medical history (22:8-10), did not review her Social Security disability file or know that Plaintiff was found totally and permanently disabled (22:12-14), and has never met or spoken to Plaintiff (22:3-7).  Significantly, Plaintiff's medical records show she had balance and gait problems before she fell in the spa.  *Id*. at 118:11-17, 126:12-17.  She also testified that she was found permanently and totally disabled prior to the subject incident and, despite claiming to have reviewed her testimony, De Caso was unaware of this.  *Id*. at 22:19-23:5.  De Caso failed consider all this relevant evidence.  *See Downing*, 753 F.2d at 1242 (3rd Cir. 1985) ("A[…] consideration under Rule 702 […] is whether expert testimony […] is sufficiently tied to the facts of the case [to] aid the jury in resolving a factual dispute").

In *Randall Moon v. Carnival Corp.*, expert opinion was inadmissible under analogous circumstances.  *See* 2019 WL 5784689 (S.D. Fla. Nov. 6, 2019).  There, a medical expert opined on life expectancy using only life expectancy tables from a public website and without reviewing relevant medical records or medical history.  *Id*. at *5.  The court found the opinion unreliable under Rule 702 as it was "based on insufficient facts and data."  *Id*.; *see also Rinker v. Carnival Corp.*, 2012 WL 37381, at *2 (S.D. Fla. Jan. 6, 2012) (excluding opinion because expert did "not provide[] any reasoning or methodology to support his [opinion]" and finding "that his estimates are nothing more than his own *ipse dixit*."); *Cook,* 402 F.3d at 10 (district courts may exclude expert testimony when its factual basis is inadequately explained).  In addition, the life expectancy tables in *Randall* did not "concern matters beyond the understanding of the average layperson," making the excluded opinion unhelpful under Rule 702.  2019 WL 5784689 at *6.  Here, like the excluded opinions in *Rinker* and *Randall*, De Caso's gait opinion fails to consider Plaintiff's relevant medical records and medical history.  Also like *Randall*, De Caso offered no

reasoning to support his opinion and based it on a short video clip that any layperson can review. De Caso's gait opinion fails to meet <u>any</u> of Rule 702's admissibility requirements. *See Rosen*, 78 F.3d at 318 ("A district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific [or just] unscientific speculations offered by a [...] scientist.").

In addition, this opinion is inadmissible under Rule 403. This is because the language[2] De Caso uses to discuss Plaintiff's gait will confuse the jury about an issue he cannot help clarify because his pseudo-scientific speculation has no probative value.

### C. De Caso's Handrail Testimony is Inadmissible

De Caso has no qualifications in engineering specific to safe design of marine environments or naval architecture. Ex B at 15:10-16:4, 18:6-16. He did not review any architectural or engineering drawings for the spa. *Id*. at 33:2-15. Despite this, De Caso criticizes the design of the subject spa because the entrance lacks a handrail. Ex D, §4.1.5 p16; Ex B at 144:2-153:11. De Caso claims that handrails are "mandated [...] by recommendations" contained in the IMO's MSC/Circ. 735 and that "[i]t's typically a best practice to install a handrail in [the] location." Ex D, §4.1.5 p16; Ex B at 146:2-4. De Caso lacks qualifications to offer any opinions about how a handrail would affect passenger safety or comply with the marine safety guidance in IMO MSC/Circ. 735.[3] *See* Ex B at 15:4-8 (no degrees, no expertise in human

---

[2] De Caso tries to frame assessment of gait in terms of "[v]ectors, which can be represented by arrows, [and which] are in essence a quantity having direction as well as magnitude, with a position of one point in space relative to another." Ex D, p19. This attempt to repackage gait as something properly assessed by materials scientists or engineers is nonsensical. De Caso has testified repeatedly that he lacks qualifications to opine on gait and, despite the loquacious description of vectors in his report, De Caso did not assign vectors to Plaintiff's movements as seen in the brief, poor-quality, oblique angle CCTV video showing Plaintiff entering the spa.

[3] This circular provides guidance for "design [...] of passenger ships to respond to elderly and disabled persons' needs" "in emergency situations" when "passengers are expected to [...] evacuate themselves from the passenger accommodations to the embarkation deck." IMO MSC/Circ. 735  pp1,3  < https://docs.imo.org/Shared/Download.aspx?did=29816 >  (retrieved

factors), 14:16-18 (no expertise in biomechanics), 18:5-16 (has not designed a cruise ship, any part of one, or any type of boat or vessel whatsoever); Ex C at 13:12-24, 24:8-25:11 (testifying he cannot assess "intrinsic factors" related to safety such as "the ability of [people] to move[,] operate, locomote.").  In addition, because he lacks relevant qualifications he cannot offer expert testimony as to whether a handrail could have averted or reduced the effects of Plaintiff's fall.

Next, De Caso's opinion that IMO MSC/Circ. 735 recommends a handrail in the subject area is unreliable.  His methods are unclear, unexplained, and inconsistent.  He criticizes NCL for not following the circular's guidance on handrails, but then recommends alternative designs of the spa flooring that clearly violate IMO MSC/Circ. 735.

> 4.1.5. [….]  Handrail are mandated by the I[MO MSC/Circ.] 735.
> 4.1.6. <u>The inspected drainage system, was found to be **inadequate** [for safe passenger ambulation] **due to the [floor's] lack of slope**</u> to provide adequate self-draining […].

Ex D p16.  This juxtaposition of the citation to the IMO circular and De Caso's floor slope opinion in his report are remarkable as IMO MSC/Circ. 735 states, in relevant part, "<u>[d]ecks and **floors should be level**</u> […]."  IMO MSC/Circ. 735[4] Annex ¶14 p5 (emphasis supplied).  As is clear, De Caso's safe design opinions are unreliable under Rule 702.

In addition, De Caso's handrail opinions are unhelpful.  Plaintiff has not alleged a claim for negligent design ([DE 1]) and there is no record evidence as to who designed/specified the subject area.  As such, these opinions do not help clarify evidence or resolve a disputed fact.

> Having found that the record does not support a finding that RCCL was responsible for the design of the subject stairway, […] De Caso[]'s testimony regarding the alleged design failure is […] irrelevant.

---

11/12/19).  It concerns the design of "escape routes to muster stations" for safe use by many passengers at the same time during emergencies that require evacuation at sea.  *Id*. at 3.

[4] *See* note 3, *supra* pp9-10.

*Marshall v. Royal Caribbean Cruises Ltd.*, 0:16-CV-21140-KMM, 2017 WL 5308902, at *8 (S.D. Fla. Jan. 6, 2017) (citing *Rodgers v. Costa Crociere, S.P.A.*, 410 Fed.Appx. 210, 212 (11th Cir. 2010) (holding that neither the facts nor the law supported plaintiff's negligent design claim where there was no evidence that the defendant designed the area where the plaintiff fell).  As there is no evidence as to who designed the subject area[5], De Caso's handrail opinions are unhelpful[6] under Rule 702 and inadmissible under Rule 403.

### D.  De Caso's Signage and Visibility Opinions are Inadmissible

De Caso also opines that "the specific area next to the drainage trench was not adequately marked as a hazard area...."  Ex D §4.1.11 p17; Ex B at 158:5-159:19, 160:12-161:19.  The effective design and placement of signage is a stereotypical human factors topic.  Indeed, the U.S. Coast Guard – who recommends using human factors experts for marine safety design and vessel inspections – uses label/sign design and placement as an exemplar human factors subject matter.  *See* USCG NVIC 4-89[7] pp5-7, Enclosure (1) Ch3 pp6-18.  As discussed above, De Caso lacks qualifications in human factors or related human sciences.  Saliently here, in *Padula* De Caso's opinions on the placement, visibility, and/or effectiveness of shipboard warning signs we found inadmissible.  *See supra* p7; 2017 WL 7792714, at *5.  De Caso is not qualified to offer these opinions under Rule 702 and these opinions are inadmissible under Rule 403 because they lack probative value and will confuse the issues.

---

[5] There is record testimony that the tile covering the spa entrance is designed to be safe when used on spa or shower floors, and that NCL is responsible for maintaining the spa flooring, but there is no evidence as to the process of specifying any design features of the spa entrance area.

[6] In addition, De Caso's handrail opinions are unhelpful because they apply an unclear and inapplicable standard of care.  De Caso's faults NCL for allegedly failing to adhere to "best practices."  Ex B at 146:2-4 ("It's […] a best practice to install a handrail in that location.").  This is not the same as breaching a duty of reasonable care under the circumstances.

[7]  <  https://www.dco.uscg.mil/Portals/9/DCO%20Documents/5p/5ps/NVIC/1989/n4-89.pdf  > (retrieved 11/12/19)

FOREMAN FRIEDMAN, PA, 2 S. Biscayne Blvd., Suite 2300, Miami, FL  33131  Tel: 305-358-6555/Fax: 305-374-9077

In addition, De Caso opines that the "high contrast caused between relatively dark and light spaces can lead to temporarily reduced visual capacity […].  This [sic] conditions […] may have [caused] difficulty by [Plaintiff] to discern wet areas from dry areas on the floor surface." Ex D, §4.1.3 p16.  This opinion is inadmissible under Rule 702 as De Caso "is not qualified to offer expert opinions regarding what [someone] would have seen and how they would have reacted to it."  *Padula*, 2017 WL 7792714, at *5.

De Caso took no light readings during his vessel inspection.  Ex B at 141:17-21.  He normally uses a light meter during vessel inspections.  *See Milbrath v. NCL (Bahamas) Ltd.*, 17-cv-22071 [DE 65-3, p12-16], 2017 WL 9854411 (S.D. Fla. Feb. 9, 2018) ("[Light] levels […] were measured […] using a […] light meter, Model LT40 by Extech Instruments."); *Goldstein v. MSC Cruises, S.A.*, 18-cv-61348 [DE 96-1, p15] (S.D. Fla. Jul. 8, 2019) (same).  This means his visibility/contrast opinion is based on naked eye observations made under <u>different conditions</u> than those at the time of Plaintiff's fall.  *See* Ex B at 141:17-143:22 (testifying he took no light measurements, inspected in different lighting conditions, at a different time of day); *see also Marshall*, 2017 WL 5308902 at *8 (De Caso's "opinion regarding […] illumination […] is excluded because he did not inspect the lighting […] during a similar time of day and thus his opinion is speculative at best and lacks probative value.") (citing *Allison*, 184 F.3d at 1311-12. De Caso's visibility/contrast opinion also lacks probative value or relevancy as Plaintiff did not testify she had difficulty seeing the spa floor.  De Caso merely speculates that there was water that Plaintiff could not see.  This opinion is inadmissible under Rule 702 and/or Rule 403.

### E.  De Caso is Not Qualified to Opine on Cleaning and/or Spa Maintenance

De Caso offers a variety of opinions about the adequacy of NCL's training, staffing, equipment, equipment storage, practices, and policies related to the cleaning and maintenance of

the spa area where Plaintiff fell.  Ex D, pp16-19.  He lacks qualifications to offer any of these opinions at trial.  De Caso testified that he has no experience or expertise in working on cruise vessels, housekeeping, cleaning, utility or janitorial work, public health, or using a squeegee outside a laboratory.  Ex B at 15:23-18:2, 157:11-158:1, 176:7-21.  When deposed, De Caso also admitted his cleaning-related opinions were based on record evidence that any layperson can assess.  *Id*. at 176:7-21.  As such, De Caso is not qualified to offer the following opinions:

- "…Mr. Collantes failed to implement established procedures to dry the floor using a rag to wipe the floor after the squeegee was used…"  Ex D, §4.1.11 p17.

- "…the method of squeegee was not used adequately, where the squeegee is partly dragged…"  *Id*. at §4.1.13 p17.

- "Those in control of the maintenance of the Spa facility failed to properly train and ensure adequate known floor drying procedures by crew…"  *Id*. at §4.1.14 p17.

- "It is […] unknown if [Defendant] ha[s] processes and/or policies on maintaining and replacing the squeegee to ensure its effectiveness when used to dry the floor and achieve a contaminant-free surface that results in a reasonably safe condition."  *Id*. at §4.1.15 p17.

- "The inspected squeegee had a significant level of wear and accumulation of contaminant matter […].  [… I]t was not possible to determine if the floor surface would result in a dry condition free of contaminates, or simply spread [contaminents] throughout the surface."  *Id*. at §4.1.15 p17.[8]

- "The conditions of the Spa and inspected area at the time of the incident are more likely than not, not equivalent to those at the time of [Plaintiff]'s incident, given [it is] likely cleaning and disinfecting activities took place prior the inspection as part of routine maintenance, necessary to ensure public health. This is supported by use of *Oasis Enforce*, a chlorinated alkaline cleaner used on the Spa floor."  *Id*. at 4.1.2 p16.

In addition, De Caso is not a chemist, so he lacks qualifications to opine that the subject area had recently been cleaned with a "chlorinated alkaline cleaner."  This opinion, last in the above list, is also inadmissible under Rule 403 as De Caso suggests, without basis, that the spa entrance was not clean at the time Plaintiff fell.  De Caso testified he does not know what the conditions of the floor were when Plaintiff fell, so his suggestion that the spa floor was dirty when Plaintiff fell is

---

[8] De Casso did not inspect the same squeegee used at the time of the incident and even assuming that it was the same squeegee, he conceded it would not have been in the same condition as it was on the date of the subject incident.  Ex D at 165:4-6.

unreliable, unhelpful, confusing, of no probative value, and highly prejudicial to NCL.  It is inadmissible under Rule 702 and/or Rule 403.

### F.  De Caso's Lay Opinions About the Subject CCTV Footage are Inadmissible

De Caso offers a number of opinions based on the limited CCTV footage of the subject incident that he reviewed.  De Caso lacks qualifications in forensic video analysis and did not perform any analysis of the CCTV footage beyond the abilities of laypeople.

The most problematic of De Caso's opinions based on the CCTV footage is his claim that "the floor conditions were wet at the time of the subject incident."  Ex B at 54:18-19.  The basis for this opinion is claimed to be "stills that came from the CCTV, as well as the supporting deposition of the crew members [working in the spa] at the time" of the subject incident.  *Id*. at 55:2-3.  Despite this claim, De Caso admits "it's not possible to tell" whether there is "any water […] where [Plaintiff] fell before she fell" from the CCTV footage.  *Id*. at 55:20-24, 63:2-19.  In addition, the "supporting deposition of the crew members" De Caso cites directly contradict his claim that the floor was wet.  The spa attendant present at the time of Plaintiff's fall testified that a floor discoloration in the CCTV video is "a shadow from the big windows" and "not water."  Collantes Dep. (7/21/19) 48:18-50:10, 60:19-20 (attached at Exhibit E).  The same attendant also testified repeatedly that the spa entrance was dry when Plaintiff fell.  *Id*. at 29:16-19, 56:3-4, 60:19, 79:24-80:1, 80:9-15.  Despite claiming it as a basis for this finding, De Caso later admitted he discounted this contradictory testimony for unexplained and unclear reasons.  Ex B at 171:17-23.  De Caso's wet floor claim meets none of the *Daubert* requirements, is not probative of any issues in a way that goes beyond the abilities of laypeople, and confuses perhaps the most important issue in dispute; whether the spa floor was actually wet.

### G.  De Caso's Drainage Opinions Are Just Speculative Assumptions

De Caso offers a variety of opinions related to the adequacy of the drainage in the spa entrance area.  These opinions are based on assumptions inconsistent with record evidence, so they have insufficient and unreliable bases and fail to assist the jury.  They are also the product of unreliable methods, leading De Caso to recommend violating the safety guidelines cited in his own expert report.  Last, these opinions are unhelpful and irrelevant as there is no evidence NCL designed the subject area nor does Plaintiff allege a claim for negligent design.  [DE 1]

De Caso opines that "[t]he inspected drainage system[] was found to be inadequate due to the lack of slope to provide adequate self-draining capabilities."  Ex D, §4.1.6 p16.  This opinion is remarkable as IMO MSC/Circ. 735, cited in his report and discussed above, prohibits sloped floors.  IMO MSC/Circ. 735[9] Annex ¶14 p5 ("[d]ecks and floors should be level...").  De Caso recommends NCL violate this guidance because he assumes, erroneously, that the spa floor should be self-draining.  This assumption is contradicted by record evidence; at the time Plaintiff fell, the spa entrance was being monitored and maintained by two crewmembers charged with keeping it dry.  De Caso's drainage opinions rely on assumptions contradicted by the evidence, use unexplained methods, and recommend violations of IMO guidance he purports to rely on.

Next, De Caso opines that, "water was clearly observed not to drain when [...] placed directly into the drain, resulting in overflowing the drainage trench, and water spilling over and flowing down the ramp <u>towards the other drainage trench located next to the slip and fall incident</u>."  Ex D, §4.1.7 p16 (emphasis supplied).  This opinion is so unreliable and unrelated to the issues presented that it is unclear why De Caso wishes to offer it at trial.  First, De Caso testified that the conditions of the drains at the time of the inspection are likely not the same as those at the time of the subject incident (Ex B at 155:16-156:2), rendering these opinions

---

[9] *See* note 3, *supra* pp9-10.

speculative and irrelevant.  *See Marshall*, 2017 WL 5308902, at *8 (De Caso's "opinion […] is excluded because he did not inspect the [vessel under like conditions,] thus his opinion is speculative […] and lacks probative value.").  Next, his test involved pouring more than a gallon of water into the drains and seeing if it drained.  Despite this, he admitted there is no evidence the drains needed to deal with gallons of water at a time.  Ex B at 155:16-156:2.  De Caso's tests did not show what volume of liquid can be drained during any unit of time.  This unreliable method is not approved or used by professional engineers.  Last, the drain De Caso found problematic is not near the subject area, rendering his finding unhelpful under Rule 702.  Ex D, §4.1.7 p16 (overflowing water described "spilling […] down [a] ramp <u>towards</u> [an]other drainage trench […] <u>next</u> to" the subject area).  This opinion should be excluded at trial.

De Caso's opinion that there is "inadequate and defective drainage [that] can [cause a] dangerous condition [and t]hose in control of the […] Spa facility, should have been aware of th[is]" lacks probative value and confuses various issues including the safety of the spa and the need for a self-draining floor.  Ex D, §4.1.7 p16.  It should be excluded under Rule 403.

### H.  De Caso's Opinions About the Subject Floor Tiles Are Speculative Assumptions

De Caso opines that "[t]he slip resistance rating [of the floor tile provided by the manufacturer] is […] considered inadequate for [use in] a Spa.[10]  Those in control of the vessel and Spa […] failed to use a safe floor surface for an area that is known to be wet or very wet."  Ex D, §4.2.2 - 4.2.4 p18.  This opinion is based on the assumption that the subject area is a "wet [or] very wet area," and not a "transitional area that can occasionally become wet."  *Id*.  This assumption is directly contradicted by record evidence that the tiles are safe for use on the spa

---

[10] Again, De Caso is not qualified to opine as to the design of the spa as he is not an architect, let alone a naval architect or marine engineer, with any training or experience designing any part of a cruise ship, maritime vessel, or spa.

FOREMAN FRIEDMAN, PA, 2 S. Biscayne Blvd., Suite 2300, Miami, FL  33131  Tel: 305-358-6555/Fax: 305-374-9077

and shower floors.  *See* Tile Specs (attached at Exhibit F).  If shower floors can safely be tiled with the same tiles, then the spa entrance should not be deemed a "wet or very wet" area.  De Caso classified the spa entrance as a "wet or very wet" area based on "the available CCTV and […] deposition [testimony of] Mr. Berman."  Ex D at 4.2.2 p18.  Neither of these bases provides any support for classifying the spa entrance as a "wet or very wet" area.  In addition, the slip-resistant properties of the area when Plaintiff fell are not clarified by speculative assumptions about the surface properties of the tiles when new.  Last, (again) there is no record evidence as to who selected the tiles or a claim for negligent design, making this opinion unhelpful.  *See Marshall*, *supra* p10, 2017 WL 5308902, at \*8.

## I. De Caso's Uses Unreliable Methods to Arrive at His Slip-Resistance Opinions

In the course of his shipboard inspection, De Caso took measurements of the slip-resistance of the tile flooring in the subject area using an English XL slip meter ("XL").  Ex D, p12.  As a threshold matter, any such opinions are unreliable as he conceded that De Caso does not know if the floor as tested was in the same condition as it was at the time of the subject incident and it "might have been different."  Ex D at 46:20-47:1.  He claims the XL is ideal for such testing as it "mimics significant biomechanical parameters of the human walking gait."  Ex D 3.2 p12.  However, De Caso testified that he lacks qualifications in biomechanics to make claims like this.  Ex C at 13:12-24, 24:8-25:11, 68:21-70:4.  He has also previously testified under oath that the XL is unreliable due to "precision issues" and because "the operator can influence the result."  *Id*. at 67:20-68:13.  Previously, De Caso has used a BOT 3000 slip meter and the ANSI B101.3 (2012) safety standard to assess the slip-resistance of cruise vessel walking surfaces.  *Id*. at 110:4-20.  Then, he testified that a coefficient of friction (COF) of 0.42 or higher when wet indicates "high slip resistance" for level walking surfaces, ruling out a stairway whose

Case No. 19-cv-020583-GAYLES/Otazo-Reyes

treads had COFs of 0.46 and 0.48 when wet as a cause of a slip and fall.  *Id.* at 93:25-94:21, 110:4-20, 113:9-13.  Elsewhere, De Caso has testified that "a wet […] COF range between 0.30 and 0.42 is […] 'acceptable'[, providing] 'moderate traction'…"  *See Perry v. Oceania Cruises, Inc.*, 16-cv-23944 [DE 44-2, p18], 2017 WL 3316072 (S.D. Fla. May 2, 2017).  De Caso has criticized the ASTM F1166, the standard he used here, and the XL, the slip meter he used here, explaining that "the[ ASTM F 1166 does]n't state [] how to determine that 0.6 slip resistance factor" and that the XL "does not […] provide a coefficient of friction."  Ex C at 112:18-25.  He also testified that ASTM F1166 is unreliable because "a standard that requires you to meet a certain criteria but doesn't tell you how to measure for that criteria […] leaves room for interpretation."  *Id.* at 113:1-15.  Notably, the ASTM F1166 standard itself states that De Caso lacks the qualifications needed to reliably use it to assess marine design safety.[11]

De Caso's testimony about the XL, the ASTM F1166 standard, and the threshold for safe walking surfaces in terms of COFs when wet in the instant matter directly contradict his past under oath testimony.  Here, he uses the ASTM F1166 and the XL machine, both of which he testified are unreliable.  Here, he opines that a COF of 0.57 when wet measured with an XL is evidence that a level walking surface is unsafe for normal passenger use.  Ex D, pp12-13,18.  Previously, he opined that a shipboard stairway tread with a COF of 0.42 or higher when wet indicates "high slip resistance" and is safe for normal passenger use.  Ex C at 93:25-94:21.  De Caso's opinions on these topics clearly result from uninformed and fluctuating assumptions and unclear methods that generate wildly inconsistent results.  Within the safety industry, 0.50 COF

---

[11] "[I]t is important that assistance be provided by **trained human factors […] professionals** familiar with this, and other, maritime-oriented design guidelines and standards and experienced in the application of these guidelines to the design of ships and maritime structures."  *See* ASTM F 1166-07 (2013), §4.8 < https://www.astm.org/Standards/F1166.htm > (retrieved 11/15/19) (emphasis supplied).

FOREMAN FRIEDMAN, PA, 2 S. Biscayne Blvd., Suite 2300, Miami, FL  33131  Tel: 305-358-6555/Fax: 305-374-9077

when wet is the generally accepted threshold for safe, slip-resistant walking surfaces.[12]   De Caso's testimony shows that he believes the threshold widely accepted by pedestrian safety professionals is too high (0.42 indicates "high slip resistance") or too low (0.57 indicates inadequate slip-resistance).  As is clear, De Caso's opinions on this topic are just his *ipse dixit*.

This unreliability is consistent with scientific studies of slip meters that indicate that, "to evaluate slipperiness in field situations, the performance of [the BOT 3000 and XL] slip meters […] need[s] to improve."[13]   Moreover, De Caso failed to follow the proper procedure for using the XL, as specified in the user's manual.[14]  Field tests should assess the slip rating using the XL under wet and dry conditions.  *Id.* at 18-21.  De Caso performed no dry tests.  Ex D, pp12-15. This lack makes De Caso's testimony highly prejudicial if offered at trial before the jury has resolved central disputes of fact such as whether there actually was water/liquid on the spa floor when Plaintiff fell.  This dispute of fact is significant, and De Caso's methods deviate from his normal practice of doing both dry and wet tests.  As he has explained, "[t]he assumption is that she slipped on a wet surface, and that's why tests were done wet as well as dry.  I cannot believe anything.  I can only attain to the evidence I collected and make conclusions from that evidence." Ex C at 94:16-21.  As is clear, De Caso has not used that method here.  Rather, he set out to find that the spa entrance was unsafe.

Last, De Caso not only failed to do dry tests, he also failed to take more than four measurements at each test location.  In the past, De Caso has done as many as 32 dry and 16 wet tests to assess slip resistance.  *See Marshall*, 16-cv-21140 [DE 51-3 p27], 2016 WL 9441364

---

[12] *See* William English, 'Should the Threshold of Safety Be .50?' (collecting, summarizing many US and international standards) < http://englishxl.com/point5.html > (retrieved 11/5/19).
[13] 'Comparison of Three Different Slip Meters under Various Contaminated Conditions,' *Journal of Safety and Health at Work*, Vol. 3, No. 1 pp22-30, 30 (Mar. 2012).
[14] English XL User Guide v.4, p21
< http://www.exceltribometers.com/uploads/download/XLUserGuide.pdf > (retrieved 11/12/19).

(S.D. Fla. Nov. 4, 2016).  In addition, the XL manual states that "[i]f there is variability of results, take more than four readings on each spot and average for an acceptable confidence factor.  Six or eight readings per surface test are recommended."[15]   At the location where Plaintiff fell, De Caso got variable results (N 0.59, E 0.58, **S 0.49**, W 0.57).  Ex D, p13.  Despite this, he did not do additional tests and even emphasized the outlying lower value in his Rule 26 report.  *Id*. at §4.2.5 p18 ("in the direction and location that [Plaintiff] slipped and fell, the slip resistance […] was found to be below the necessary [value] needed to ensure [safety].").  It is likely that neither he nor anyone could repeat or replicate these results.  De Caso could have reduced this unreliability by following the methods set out in the XL manual but he did not.  Conspicuously in this context, De Caso provides margins of error for all the measuring devices he used except for the XL.  *Compare* Ex D pp7, 12-13.  The XL manual states its margin of error is "+/- 0.05 for slip resistance readings equal to or greater than 0.50."[16]   De Caso likely omitted this because his average of 0.57 is within +/- 0.05 of ASTM F1166's 0.60 recommendation.

Many red flags indicating unreliability under *Daubert* are present in De Caso's methods for assessing the slip resistance of the spa entrance flooring where Plaintiff fell.  These opinions are unreliable and should be excluded.  Alternatively, the probative value of his findings is outweighed by the confusion and prejudice caused by the lack of dry measurements.  The wetness of the spa floor at the time Plaintiff fell is one of the central disputes of fact to be resolved at trial.  These opinions should be excluded under Rule 403.

**WHEREFORE**, for the reasons adduced herein, DEFENDANT, NCL (BAHAMAS) LTD., respectfully requests this Honorable Court preclude Francisco De Caso from offering expert opinion testimony during the trial of this matter.

---

[15] English XL User Guide v.4, *supra* n12, at p23.
[16] *Supra* n13.

Case No. 19-cv-020583-GAYLES/Otazo-Reyes

Dated: November 15, 2019
       Miami, Florida

Respectfully submitted,

**FOREMAN FRIEDMAN, PA**

BY:    */s/Michael Gordon*
       Jeffrey E. Foreman, Esq. (FBN 0240310)
       jforeman@fflegal.com
       Michael C. Gordon, Esq. (FBN 149284)
       mgordon@fflegal.com
       Frank E. Carrasco, Esq. (FBN 1006810)
       fcarrasco@fflegal.com
       One Biscayne Tower, Suite 2300
       2 South Biscayne Boulevard
       Miami, FL  33131
       Phone: 305-358-6555/Fax: 305-374-9077
       *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of November, 2019, I electronically filed the foregoing document with the Clerk to the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

By: */s/Michael Gordon*_____
       Michael C. Gordon, Esq.

## <u>SERVICE LIST</u>

| | |
|---|---|
| Nicholas I. Gerson, Esq. | Jeffrey E. Foreman, Esq. |
| ngerson@gslawusa.com | jforeman@fflegal.com |
| ibrito@gslawusa.com | mfonticiella@fflegal.com |
| Philip M. Gerson, Esq. | Michael C. Gordon, Esq. |

Case No. 19-cv-020583-GAYLES/Otazo-Reyes

pgerson@gslawusa.com
filing@gslawusa.com
Gerson & Schwartz, P.A.
1980 Coral Way
Miami, FL  33145
Tel: 305-371-6000/Fax: 305-371-5749
*Attorney for Plaintiff*

mgordon@fflegal.com
iortiz@fflegal.com
narguella@fflegal.com
Frank E. Carrasco, Esq.
fcarrasco@fflegal.com
iortiz@fflegal.com
FOREMAN FRIEDMAN, PA
One Biscayne Tower – Suite #2300
2 South Biscayne Boulevard
Miami, Florida 33131
Tel: 305-358-6555/ Fax: 305-374-9077
*Attorney for Defendant*