1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2
                         MIAMI DIVISION
3
                    CASE NO. 19-cv-20583-Gayles
4
                     AT LAW AND IN ADMIRALTY
5

6     CHRISTINE KESSLER, a resident
      of the State of Pennsylvania,
7
               Plaintiff,
8
      vs.
9
      NCL (BAHAMAS) LTD, a Bermuda
10    company, d/b/a, NORWEGIAN
      CRUISE LINE,
11
               Defendant.
12    _____/

13
                              Foreman Friedman, P.A.
14                            One Biscayne Tower
                              Suite 2300
15                            2 South Biscayne Boulevard
                              Miami, Florida  33131
16                            Friday November 1, 2019
                              12:13 p.m. - 4:38 p.m.
17

18

19

20        DEPOSITION OF FRANCISCO DE CASO, PH.D

21

22        Stenographically taken before

23    RHONDA BONNER, RPR, FPR, Notary Public in and

24    for the State of Florida at Large, pursuant to

25    Re-Notice of Taking Deposition Duces Tecum.



JEANNIE REPORTING (305) 577-1705

2

```
 1     APPEARANCES:

 2

 3          NICHOLAS I. GERSON, ESQUIRE
            GERSON & SCHWARTZ, P.A.
            1980 CORAL WAY
 4          MIAMI, FLORIDA 33145
            ngerson@gslawusa.com
 5          ON BEHALF OF THE PLAINTIFF.

 6

 7          MICHAEL C. GORDON, ESQUIRE
            FRANK CARRASCO, ESQUIRE
 8          FOREMAN FRIEDMAN, P.A.
            2 SOUTH BISCAYNE BOULEVARD
 9          MIAMI, FLORIDA
            mgordon@fflegal.com
10          ON BEHALF OF THE DEFENDANT.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 JEANNIE REPORTING (305) 577-1705

1                        I N D E X

2

3    EXAMINATIONS                                    PAGE

4    FRANCISCO DE CASO, PH.D.

5    DIRECT EXAMINATION                                5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



JEANNIE REPORTING (305) 577-1705

1                     E X H I B I T S

2

3      FOR IDENTIFICATION          DESCRIPTION          PAGE

4      Exhibit 1          Subpoena                        6

5      Exhibit 2          Retainer Agreement              8

6      Exhibit 3          Expert Report                  18

7      Exhibit 4          Breathalyzer Test Result       26

8      Exhibit 5          Still photograph of            48
                          Ms. Kessler
9
       Exhibit 6          "American National             76
10                        Standard Test Method for
                          Measuring Dynamic
11                        Coefficient of Friction
                          Hard Surface Flooring
12                        Materials."

13     Exhibit 5A         Duplicate of Exhibit 5         91

14     Exhibit 7          Photographs contained in       93
                          link provided by
15                        Mr. Gerson's office

16     Exhibit 8          Dr. Schwartz Medical          123
                          Record, January 12, 2017
17
       Exhibit 9          De Caso's Invoices            185
18
       Exhibit 10         De Caso's Notes               186
19
       Exhibit 11         CCTV on Thumb Drive           187
20
       Exhibit 12         Exhibit 1 to Mr. Naik's       188
21                        deposition

22
        *Exhibits 10 & 11 to be provided by the witness to
23     Mr. Gerson

24

25



JEANNIE REPORTING (305) 577-1705

```
1   THEREUPON:
2                THE COURT REPORTER:  Raise your right
3           hand, please.
4                Do you swear the testimony you're
5           about to give is the truth, the whole
6           truth, and nothing but the truth, so help
7           you God?
8                THE WITNESS:  I do.
9   THEREUPON:
10               FRANCISCO DE CASO, PH.D.
11  was called as a witness by the Defendant and, after
12  having been first duly sworn, was examined and
13  testified as follows:
14                  DIRECT EXAMINATION
15  BY MR. GORDON:
16       Q.   Good afternoon.
17            Can you please state your full name
18  for us.
19       A.   Francisco Jose De Caso Basalo, D-E,
20  space, C-A-S-O, space, B-A-S-A-L-O.
21       Q.   How are you employed, sir?
22       A.   Pardon me?
23       Q.   How are you employed?  Where do you
24  work?
25       A.   At the University of Miami.
```

```
 1              Q.    What's your position?

 2              A.    Principal scientist.

 3              Q.    Do you have any other employment other

 4    than that?

 5              A.    As an independent expert.  That's all.

 6              Q.    What's your occupation?

 7              A.    I'm a principal scientist, engineer by

 8    trade -- structural material science.

 9              Q.    What's your business address?

10              A.    5804 Leonardo Street, Coral Gables,

11    Florida 33146.

12                    (Exhibit 1 was marked for

13              identification purposes.)

14                    MR. GORDON:  I'm having the subpoena

15              marked as Exhibit 1.

16    BY MR. GORDON:

17              Q.    Sir, I'm showing you what we've marked

18    as Exhibit 1.  It's a subpoena for today's

19    deposition.

20                    Have you brought with you all of the

21    items that was requested in the subpoena?

22              A.    I have them electronically.

23              Q.    You don't have anything on your --

24                    MR. GERSON:  We sent you a link with

25              the -- with access to everything so that --
```



| | |
|---|---|
| 1 | MR. GORDON:  When did you send it? |
| 2 | MR. GERSON:  Today. |
| 3 | MR. GORDON:  When? |
| 4 | MR. GERSON:  Probably just a few |
| 5 | minutes ago. |
| 6 | MR. CARRASCO:  I haven't got anything. |
| 7 | MR. GORDON:  I haven't got it either. |
| 8 | BY MR. GORDON: |
| 9 | **Q.**   Who retained you in this case, sir? |
| 10 | **A.**   Can you repeat? |
| 11 | **Q.**   Who retained you in this case? |
| 12 | **A.**   In this case, it was Gerson law |
| 13 | office. |
| 14 | **Q.**   And they represent Ms. Kessler in this |
| 15 | case; is that correct? |
| 16 | **A.**   That's correct. |
| 17 | **Q.**   When were you retained in this case? |
| 18 | **A.**   I can't recall the exact date. |
| 19 | **Q.**   Okay.  Is there something you can |
| 20 | review to tell us when you were specifically |
| 21 | retained in this case? |
| 22 | **A.**   Yes.  I can tell you right now.  It |
| 23 | was -- it's part of the electronic case documents. |
| 24 | The agreement, consultant agreement.  And if you |
| 25 | give me 30 seconds. |

1       Q.    Sure.

2       A.    That would have been August 1st, 2019.

3       Q.    Is there a formal retainer agreement

4   signed?

5       A.    Yes.

6       Q.    Can we please marked that as

7   Exhibit 1, and then I guess at some point we'll --

8       A.    Exhibit 2, I assume.

9       Q.    Sorry.  Exhibit 2.  You're correct.

10          And we'll figure out how to get these

11  to the court reporter after the deposition.

12              (Exhibit 2 was marked for

13              identification purposes.)

14  BY MR. GORDON:

15      Q.    What were you specifically asked to do

16  in this case, sir?

17      A.    To perform an inspection and provide

18  opinions related to the plaintiff's incident.

19      Q.    Is there anything that you have

20  reviewed that is not contained in your electronic

21  file which you brought with you today?

22      A.    Yeah.

23      Q.    Other than the ship inspection,

24  obviously.

25      A.    All the case documents and additional

1    documents, photographs, is all contained within the

2    case file.

3              **Q.**    Have you been retained by the Gerson

4    Schwartz law firm in any other matters other than

5    this one?

6              **A.**    I have not.

7              **Q.**    What percent of your income is derived

8    as serving as an expert witness in litigation

9    related matters?

10             **A.**    I'd say maybe about 20 percent.

11             **Q.**    And of the cases in which you're

12   retained for litigation related matters, what

13   percent of those cases are on behalf of the

14   plaintiff as opposed to the defendant?

15             **A.**    Probably a couple out of 30.

16             **Q.**    I'm sorry?

17             **A.**    Two out of the 30, I said.

18             **Q.**    Two out of 30 being what?

19             **A.**    Cases where I've been retained.

20             **Q.**    Okay.  I'm not sure I understand.

21             You do --

22             **A.**    Percentage wise --

23             **Q.**    Yes.

24             **A.**    -- 5 percent.

25             **Q.**    5 percent being the plaintiff or

10

1   defense?

2         A.   For the defendant.

3         Q.   Okay.  95 percent for the plaintiff?

4         A.   For the plaintiff, correct.

5         Q.   Okay.  Have you provided a prior

6   testimony list, I believe, with your CV, which was

7   submitted to us in this case?

8         A.   That's my understanding, together with

9   the report.

10              THE COURT REPORTER:  I'm sorry.  Speak

11         up.

12              MR. GERSON:  Yeah.  We need to speak

13         up on the question side, too.

14   BY MR. GORDON:

15         Q.   I'll just read you the cases and you

16   can tell me if these are correct or if there's

17   anything that has to be added.  Okay?

18         A.   Cases of what?

19         Q.   Where you've given testimony.

20         A.   Okay.

21         Q.   Aurelia Smith versus Carnival

22   Corporation.  Donna Padula versus Carnival

23   Corporation.  Soo Ko versus MSC Cruises.

24   Judith Sololow versus Latin House Grill.

25   Diane Williford versus Carnival.  Susan Goldstein



JEANNIE REPORTING (305) 577-1705

1   versus MS Cruises.  Sara Bostic versus Royal

2   Caribbean Cruises.

3              Is there any other case in the last

4   four years in which you've given testimony?

5        A.   To my knowledge, that sounds about

6   right.

7        Q.   Did you ever give testimony in a case

8   called Marshall?

9        A.   Marshall?

10       Q.   Yes.

11       A.   I would need to recall my files.

12            Do you know who was the opposite --

13       Q.   Marshall versus Royal Caribbean

14   Cruises.

15            Spencer Aronfeld was the attorney for

16   Marshall.

17       A.   Was this maybe 2006?

18       Q.   I think it's around 2016-17.

19            MR. GERSON:  The question is whether

20        you gave testimony, not whether you

21        consulted or you know about the case.

22            Did you give testimony?

23            THE WITNESS:  I can't recall right

24        now.  I can't recall to my best knowledge

25        at this moment.



JEANNIE REPORTING (305) 577-1705

```
1    BY MR. GORDON:
2          Q.    Have any of your opinions in any case
3    ever been excluded by a court?
4          A.    They have not, to my best knowledge.
5          Q.    Are you aware of any of your opinions
6    being excluded in the Marshall versus
7    Royal Caribbean matter?
8          A.    Not to my knowledge.
9          Q.    Well, you state not to your knowledge.
10   Do you know for a fact one way or the other if they
11   have been excluded or were excluded?
12         A.    As I said, not to my knowledge.
13         Q.    Okay.  How about Padula versus
14   Carnival Corporation, were any of your opinions
15   excluded or limited in that case?
16         A.    Not to my knowledge.
17         Q.    Okay.  If they were, would you have
18   any reason to dispute that?
19         A.    I would need to check with the law
20   firm that hired me and follow up.
21         Q.    You're not a naval architect; is that
22   correct?
23         A.    That's correct.
24         Q.    You're not a naval engineer; is that
25   correct?
```

```
1          A.     That's correct.

2          Q.     You're not an accident

3     reconstructionist; is that correct?

4          A.     Define what an "accident

5     reconstructionist" skills are required.

6          Q.     Do you have any specialized training

7     in accident reconstruction?

8          A.     Within the engineering skills that are

9     required that involve that process, in parts, yes.

10         Q.     Okay.  Have you ever given testimony

11    as an expert in accident reconstruction?

12         A.     I have not.

13         Q.     Do you hold yourself out as an

14    accident reconstructionist?

15         A.     I beg your pardon?  Can you repeat?

16         Q.     Do you hold yourself out as an

17    accident reconstructionist?

18         A.     Depending on the type of accident and

19    the figure mode to be investigated, that would be

20    the case, yes.

21         Q.     What types of accidents do you think

22    you're an expert accident reconstructionist in?

23         A.     Structural based accidents or

24    incidents involving material failure.

25         Q.     Such as building collapses?
```

1        **A.**     Or element or any structure that has

2     materials involved in it.

3        **Q.**     Right.  That for some reason failed;

4     correct?

5               MR. GERSON:  Form.

6               THE WITNESS:  Or whatever the

7               deficiency or issue might be.

8     BY MR. GORDON:

9        **Q.**     But that's not the same as

10    reconstructing an accident; correct?

11       **A.**     Well, you can reconstruct it based on

12    the failure mode, yes.

13       **Q.**     And to be clear, you've never given

14    opinions in a court of law about that; correct?

15       **A.**     As you asked before, I did not, yes.

16       **Q.**     You're not a biomechanical engineer;

17    correct?

18       **A.**     I am not.

19       **Q.**     Not a biomedical engineer; correct?

20       **A.**     I'm not.

21       **Q.**     You're not a medical doctor; correct?

22       **A.**     I'm not a medical doctor.

23       **Q.**     You have no formal medical education.

24    Would that be correct?

25       **A.**     That's correct.



```
 1            Q.    You're not a toxicologist; correct?
 2            A.    That's correct, I'm not a
 3    toxicologist.
 4            Q.    You don't hold any degrees in human
 5    factors; correct?
 6            A.    No.
 7            Q.    You're not a human factors expert;
 8    correct?
 9            A.    I'm not a human factors expert, no.
10            Q.    You've never worked for a cruise line;
11    is that correct?
12            A.    I have not.
13            Q.    You've never been employed by a cruise
14    line; correct?
15            A.    Only for one case, yes.
16            Q.    As an expert?
17            A.    Yes.
18            Q.    In what capacity?
19            A.    As an expert witness.
20            Q.    But you've never actually been
21    employed by a cruise line other than that; correct?
22            A.    That's correct.
23            Q.    You've never been a crew member on a
24    cruise ship; correct?
25            A.    That's correct.
```

1          **Q.**    You've never been employed by a cruise

2    line in the capacity as someone like an executive

3    housekeeper; correct?

4          **A.**    I have not.

5          **Q.**    Or any in any capacity as a cleaner or

6    utility person; correct?

7          **A.**    I have not.

8          **Q.**    Do you have any personal experience as

9    a janitor?

10          **A.**    Can you elaborate?

11          **Q.**    You know what janitors are; correct?

12          **A.**    I understand, yes.

13          **Q.**    Do you know what cleaning companies

14    are?

15          **A.**    I understand what cleaning companies

16    are, yes.

17          **Q.**    Have you ever been employed by a

18    cleaning company?

19          **A.**    I have not been employed by a cleaning

20    company, no.

21          **Q.**    Have you been employed by a janitorial

22    company?

23          **A.**    I have not been employed by a

24    janitorial company, no.

25          **Q.**    Have you ever worked in a job that



JEANNIE REPORTING (305) 577-1705

```
 1    required the use of a squeegee?

 2            A.   I would say, yes.

 3            Q.   What?

 4            A.   Just in the lab where I work.

 5            Q.   What did you squeegee in your lab?

 6            A.   The surface.

 7            Q.   Of what?

 8            A.   Of the concrete floor.

 9            Q.   For what purpose?

10            A.   To remove whatever substance was on

11    it.

12            Q.   And that would be on occasion;

13    correct?

14            A.   Depending when the testing is needed,

15    yes.

16            Q.   You weren't squeegeeing the floors on

17    the lab everyday, were you?

18            A.   I was not, no.

19            Q.   You weren't doing that -- strike that.

20                 You weren't squeegeeing floors to

21    clean or dry them in your capacity?

22            A.   Can you rephrase?

23            Q.   I'll rephrase the question.

24                 You've never had a job where your only

25    responsibility was to clean floors using a
```



JEANNIE REPORTING (305) 577-1705

1    squeegee; would that be correct?

2         **A.**    That would be accurate.

3         **Q.**    You used a squeegee incidental to your

4    responsibilities as an engineer?

5         **A.**    That would be correct.

6         **Q.**    Have you ever designed a cruise ship?

7         **A.**    I have not.

8         **Q.**    Have you ever designed any part of a

9    cruise ship?

10         **A.**    I have not.

11         **Q.**    Have you ever designed any type of

12    maritime vessel?

13         **A.**    I have not.

14         **Q.**    Have you ever designed any part of a

15    maritime vessel?

16         **A.**    I have not.

17         **Q.**    You generated a report in this case;

18    is that correct?

19         **A.**    That would be correct.

20         **Q.**    We just got the link from the

21    plaintiff's attorney's firm.  But in the interest

22    of saving time, I've got a copy, we can mark that

23    as 3.

24              (Exhibit 3 was marked for

25              identification purposes.)



JEANNIE REPORTING (305) 577-1705

```
1    BY MR. GORDON:
2         Q.    Dr. De Caso, I marked as Exhibit 3 --
3         A.    Thank you.
4         Q.    -- your expert report; is that it?
5         A.    That's correct.
6         Q.    Does page 5 of your report list the
7    materials you have reviewed in this case?
8         A.    That would be correct.
9         Q.    You referenced that you reviewed CCTV
10   footage from two angles; is that accurate?
11        A.    That's correct.
12        Q.    Did you review the entirety of the
13   CCTV footage in this case?
14        A.    The portion that was available -- that
15   was made available to me, yes.
16        Q.    When you say "that was made
17   available," what does that mean?
18        A.    It was, like, four minutes, or
19   something like that.
20        Q.    Okay.  So the totality of the CCTV was
21   four minutes that you were provided?
22        A.    To my best recollection, yes.
23        Q.    As you sit here today, you don't know
24   if that is the entirety of the CCTV footage that
25   was made available to the plaintiff in this case,
```

1    do you?

2           **A.**    To my understanding, that was what was

3    available -- made available to me.

4           **Q.**    The question is, you don't know if

5    that's the totality of the CCTV in existence;

6    correct?

7           **A.**    I wouldn't know, yes.

8           **Q.**    You would not know?

9           **A.**    That's correct.

10          **Q.**    Do you have any sort of timestamp that

11   would indicate the time of the footage that you

12   were provided which you reviewed in this case?

13          **A.**    I wouldn't have it available now, no.

14   But if I were to review the footage, I would -- I

15   would need to open the footage and view it.

16          **Q.**    Let me ask it this way.

17                 Do you have the CCTV footage with you

18   today?

19          **A.**    I don't have it with me today.

20          **Q.**    You were asked to bring your entire

21   file; correct?

22          **A.**    Which was made electronically

23   available, yes.

24          **Q.**    Okay.  You said you have your file

25   electronically in front of you.



JEANNIE REPORTING (305) 577-1705

```
1          A.    Not all of it.  I've got part of it.

2     The report and part of the case documents to help

3     me throughout the deposition.  All the files were

4     made through a link.

5          Q.    As you sit here today, can you tell me

6     what part of the CCTV footage you reviewed?

7          A.    As I said, it was a couple minutes

8     before the incident and several seconds after the

9     incident.

10         Q.    Can you give me specifics in terms of

11    time?

12         A.    I can't.  To my best recollection, I

13    can't recall at this moment.

14         Q.    You would agree that the CCTV has

15    timestamps on it; correct?

16         A.    I would agree.  As I said, if those

17    are made available, I would review them and I would

18    be able to recall.

19         Q.    As you sit here today, can you tell me

20    what the timestamps are in terms of the CCTV you

21    reviewed in this case?

22         A.    Since I don't have it in front of me,

23    I cannot.

24         Q.    Have you reviewed any video footage of

25    Ms. Kessler, other than what's depicted in the
```



```
 1    CCTV?

 2            A.    I have not.

 3            Q.    Have you ever spoken to Ms. Kessler

 4    ever?

 5            A.    I have not.

 6            Q.    Have you ever met with her in person?

 7            A.    I have not.

 8            Q.    Am I correct that you have not

 9    reviewed any medical records pertaining to

10    Ms. Kessler?

11            A.    That's correct.

12            Q.    Did you ever review Ms. Kessler's

13    Social Security Administration disability file?

14            A.    No.

15            Q.    Did you ever listen to the audio

16    testimony from Ms. Kessler's Social Security

17    disability hearing in Pennsylvania?

18            A.    I did not.

19            Q.    Are you aware that Ms. Kessler was

20    declared to be totally and permanently disabled by

21    Social Security prior to the subject incident on

22    the BREAKAWAY?

23            A.    I was not.

24            Q.    Did you read her deposition?

25            A.    She mentioned it in the deposition,
```

1    yes.

2          **Q.**    Did you review the entirety of

3    Ms. Kessler's deposition or just portions of it?

4          **A.**    I went through it.  I reviewed all of

5    it, but not in detail.

6          **Q.**    Let me back up.

7                You were provided with certain

8    deposition transcripts; am I correct?

9          **A.**    That's correct.

10          **Q.**    And they're listed on page 5 of your

11    report; yes?

12          **A.**    That is correct.

13          **Q.**    Were you provided with the total or --

14    strike that.

15                Were you provided with the entirety of

16    each transcript or just certain portions of the

17    testimony?

18          **A.**    The entirety of the transcript.

19          **Q.**    Okay.  For each one?

20          **A.**    That's correct.

21          **Q.**    So as far as the deposition of

22    Ms. Kessler, did you review the entire transcript?

23          **A.**    Yes.

24          **Q.**    Okay.  I thought you just said you

25    reviewed parts of it.  Maybe I misunderstood.

```
1              A.    I reviewed all of it, yes.
2              Q.    Okay.  And did you review the entirety
3         of the other depositions referenced on page 5 of
4         your report?
5              A.    That's correct.
6              Q.    Okay.  Did you take notes when you
7         reviewed the depositions?
8              A.    Yes.
9              Q.    Do you have the notes with you?
10             A.    The notes were transferred onto the
11        report, summarized as within the report.
12             Q.    Right.
13                   But did you actually --
14             A.    Annotate the document?
15                   No, I did not.
16             Q.    Okay.  So if you reviewed
17        Ms. Kessler's deposition transcript, you're aware
18        that she testified that she had been involved in
19        prior fall accidents; correct?
20             A.    That's correct.
21             Q.    All right.  Did you review the alcohol
22        breathalyzer test results involving Ms. Kessler?
23             A.    Yes, I did.
24             Q.    Where is that referenced on page 5?
25             A.    I think it was provided as part of
```

```
 1    exhibits on the depositions.

 2           Q.    Okay.  Were you ever provided with the

 3    additional breathalyzer reports that were produced

 4    in this case?

 5           A.    If they were provided as exhibits,

 6    that's what I reviewed.

 7           Q.    So you reviewed whatever was attached

 8    to Ms. Kessler's deposition as an exhibit?

 9           A.    Right.

10                 And one of them was a breathalyzer

11    report, yes.

12           Q.    Okay.  So you would agree that

13    Ms. Kessler's breathalyzer test result was .056 at

14    10:14 p.m. on the date of the incident?

15                 MR. GERSON:  I object to the form of

16           the question.  He can't agree or disagree.

17           He's not a toxicologist.

18                 MR. GORDON:  Counsel --

19                 MR. GERSON:  You're just way off the

20           mark.

21                 Why are you doing this?  Ask him about

22           his expertise and his inspections.

23                 MR. GORDON:  Excuse me.  Please don't

24           do that again.

25                 MR. GERSON:  Don't tell me what to do.
```

```
 1    BY MR. GORDON:

 2             Q.    You reviewed it; correct?

 3             A.    If it was an exhibit provided, I

 4    reviewed it.

 5             Q.    So you've reviewed it, and you're

 6    aware, are you not, that she blew a .056 at

 7    10:14 p.m. on the date of the incident?

 8                  MR. GERSON:  Object to the form.

 9                  THE WITNESS:  I can't recall the exact

10             details since I don't have that document in

11             front of me.

12                  (Exhibit 4 was marked for

13             identification purposes.)

14    BY MR. GORDON:

15             Q.    Let me show you what is marked as

16    Exhibit 4.

17                  And you reviewed the breathalyzer test

18    result marked as Exhibit 4?

19             A.    Yes.

20             Q.    And you can see it's .056 at 22:14 and

21    32 seconds?

22             A.    That's correct.

23             Q.    That's 10:14 p.m.; correct?

24             A.    That's correct.

25                  MR. GERSON:  For the record, the
```

1          witness and the questioner are reading from

2          the document that has been marked.

3     BY MR. GORDON:

4          Q.   She was given a second test at 22:31

5     and 9 seconds, and it was read at .051; correct?

6          A.   Based on the Exhibit 4 presented in

7     front of me, yes, that's what can be inferred.

8          Q.   Well, it's not inferred.  It's what it

9     says.  Correct?

10         A.   Based on the document that's in front

11    me, yes.

12         Q.   Correct.

13              Have you reviewed the report of NCL's

14    expert toxicologist, Dr. Forney?

15         A.   I did not.

16         Q.   Did you take any photographs during

17    your ship inspection?

18         A.   I did.

19         Q.   How many did you take?

20         A.   Several.

21         Q.   Well, was there a number?

22         A.   Yes --

23         Q.   How many?

24         A.   -- there was a number.

25         Q.   How many?



JEANNIE REPORTING (305) 577-1705

```
 1              A.    I can't recall right now.

 2              Q.    Is it on your computer in front you?

 3              A.    Yeah.

 4              Q.    I'll move on.  We're going to get the

 5      link printed.

 6                    So did you take any video during your

 7      inspection?

 8              A.    I did.

 9              Q.    Okay.  And is that contained in your

10      electronic file?

11              A.    Yes.

12              Q.    And did you --

13              A.    The video is a summary of the

14      pictures, basically.

15                    MR. CARRASCO:  I don't think there's

16              videos in the file.

17                    MR. GERSON:  You only respond to his

18              questions and ignore the cross-talk.

19                    Are you identified on the record?

20                    MR. CARRASCO:  Yes.

21                    MR. GERSON:  Tell me your name.

22                    MR. CARRASCO:  Frank Carrasco.

23                    MR. GERSON:  Frank?

24                    MR. CARRASCO:  Yeah.  Nice to meet

25              you.
```

BY MR. GORDON:

        **Q.**    You took video during the inspection?

        **A.**    So the camera automatically stitches photographs created in order to put them as a video.  So that was the video that was generated.

        **Q.**    Okay.  To your knowledge, was that video transmitted to us on this link?

        **A.**    Probably not, since the photographs are provided as a PDF file.

        **Q.**    So the video was not provided to us?

        **A.**    The stitched photographs is automatically generated by the camera, creating a video.  It was probably not included.

        **Q.**    Is there a reason why not?

        **A.**    Because the photographs were provided as individual PDF -- in a PDF file.

        **Q.**    Okay.  Does the video exist in some sort of video format?

        **A.**    If it's still in the camera, yes. It's a very heavy file, so that's why I don't include it.

        **Q.**    But it exists; correct?

        **A.**    If it's still in the camera, yes.

        **Q.**    Why wouldn't it be in the camera?

        **A.**    So the photographs, the individual



1    photographs that are taken, are automatically

2    stitched in a video.  That video was not taken by

3    me, as I mentioned.  It was automatically generated

4    by the camera.

5              So in answering your question, did I

6    take any video, the answer would be no.  It was

7    automatically generated by the camera.

8         Q.   Okay.  And has that been deleted, what

9    you just described?

10        A.   It might have, yes.

11        Q.   Okay.  Was that deleted intentionally

12   or inadvertently, or did it do it automatically?

13        A.    It's inadvertently because it remains

14   in the SD card of the camera.  So it -- it will

15   probably format the videos after transferring all

16   the -- sorry.  I format the SD card after using the

17   card.

18        Q.   Okay.  Do you have any audio

19   recordings that you did during the ship inspection?

20        A.   Not to my knowledge.

21        Q.   Did you not speak into some sort of

22   device during your inspection?

23        A.   In the phone, then, maybe.  Yes.

24        Q.   Does that still exist?

25        A.   So -- I think that might have been the



JEANNIE REPORTING (305) 577-1705

```
1    camera.  So that would have been the -- I would

2    need to -- do you have an internet connection?

3    Because I'm unable to access because of that.

4               MR. GORDON:  Off the record.

5               (Thereupon, a discussion was held

6          off the record.)

7    BY MR. GORDON:

8          Q.   Back on.

9               Have you reviewed any design drawings

10   for the Norwegian BREAKAWAY?

11         A.   Sorry.  Answering your previous

12   question, I do still have those video files.

13         Q.   Okay.  Just so we're clear on the

14   record, the video files you referenced, you do have

15   them?

16         A.   Yes, I do.  They were not deleted.

17         Q.   Did you look at some sort of website?

18   What are you looking at to give me that answer?

19         A.   It's the online file that I have.

20         Q.   Okay.

21         A.   With the shared pictures -- with the

22   shared files.

23         Q.   We would ask that you send those to

24   Mr. Gerson's office and he can transmit those to

25   us.
```

```
 1              A.    Yes.

 2              Q.    Did you review any design drawings for

 3      the Norwegian BREAKAWAY?

 4              A.    There was some plans provided as part

 5      of the case documents, yes.

 6              Q.    What plans?

 7              A.    Plans of the area of the spa.

 8              Q.    Is that a schematic or architectural

 9      or design drawings?

10              A.    Well, they're not detailed from an

11      architectural point of view.

12              Q.    Right.

13              A.    They're not a schematic either.  So

14      generic plans of the area showing the different

15      spaces, some of the light positions, and other MEP

16      features.  I would assume these are MEP plans.

17              Q.    You're an architect; correct?

18              MR. GERSON:  Object to the form.

19              THE WITNESS:  I am not an architect.

20      BY MR. GORDON:

21              Q.    You're not an architect?

22              A.    I'm not an architect, no.

23              Q.    What's your occupation?

24              A.    I'm a principal scientist.  I'm a

25      civil and structural engineer.  I'm a material
```

1    scientist.

2            **Q.**   You know what sealed architectural

3    drawings are; correct?

4            **A.**   Yes.  These were not sealed

5    architectural drawings.

6            **Q.**   You know what sealed engineering

7    drawings are; correct?

8            **A.**   I'm familiar with those, yes.

9            **Q.**   Have you reviewed any sealed

10    architectural or engineering drawings for the

11    Norwegian BREAKAWAY?

12            **A.**   I have not.

13            **Q.**   And specifically with respect to the

14    Mandara Spa.

15            **A.**   I have not.

16            **Q.**   Do you have whatever it is you

17    testified to that you did review in terms of a

18    drawing of the spa?

19            **A.**   I could try to find it.

20            **Q.**   Okay.

21            **A.**   Would you like me to?

22            **Q.**   Yes, sir.

23            Who designed the Norwegian BREAKAWAY?

24            **A.**   I'm unaware of that.

25            **Q.**   Who designed the Mandara Spa in the

```
 1    Norwegian BREAKAWAY?

 2           A.    I'm unaware of that information.

 3           Q.    Okay.  What day did you inspect the

 4    Mandara Spa on the Norweigian BREAKAWAY in this

 5    case?

 6           A.    Sorry.  Can you repeat that?

 7           Q.    Yeah.

 8                 What day did you inspect the Mandara

 9    Spa on the Norwegian BREAKAWAY in this case?

10           A.    That was --

11                 MR. GERSON:  You can consult your file

12           or your report or any of the marked

13           exhibits.

14                 THE WITNESS:  Of course.  It was on

15           Sunday, August 25th, 2019.

16    BY MR. GORDON:

17           Q.    All right.  What time did you inspect

18    the vessel?

19           A.    Approximately, 9:00 a.m.

20           Q.    Until when?

21           A.    10:30.

22           Q.    Had you ever been on the Norwegian

23    BREAKAWAY prior to August 25, 2019?

24           A.    I have not.

25           Q.    Have you been on it subsequent to
```

1    August 25, 2019?

2         **A.**    I have not.

3         **Q.**    You state on page 7 of your report the

4    average air temperature was 77 degrees Fahrenheit;

5    isn't that correct?

6         **A.**    That's correct.

7         **Q.**    How did you come to the calculation?

8         **A.**    From a thermometer.

9         **Q.**    You had a thermometer on you?

10        **A.**    At the time of the inspection, yes.

11        **Q.**    How many times did you take a reading

12   of the air temperature when you were at the

13   inspection?

14        **A.**    It's the average of -- throughout the

15   entire inspection.

16        **Q.**    Right.

17             But I mean, did you -- strike that.

18             Did you take notes of the air

19   temperature calculations you obtained that day?

20        **A.**    No.  The device automatically records

21   them at a frequency of, I think, one per minute and

22   then provides the average maximum and minimum for

23   the given period of time.

24        **Q.**    So is it on a timer?  How does that

25   work?



1          **A.**    You press the button, and then you let

2     it record.

3          **Q.**    Okay.  So at some point -- strike

4     that.

5                    How often are you checking the machine

6     to see the temperature?

7          **A.**    It will collect the data and then

8     provide the average automatically.

9          **Q.**    At what point did it provide you with

10    the average temperature?

11         **A.**    Throughout -- it's the average

12    temperature from the beginning of inspection until

13    the end of inspection.

14         **Q.**    Is that captured somewhere?

15         **A.**    In the report.

16         **Q.**    Well, what I just read on page 7?

17         **A.**    Uh-huh.

18         **Q.**    Yes?

19         **A.**    Yes.

20         **Q.**    But is there an actual reading of

21    instrument you can point to and show me?

22         **A.**    The instrument that I had at the time.

23         **Q.**    Okay.  Do you have a photograph of it?

24         **A.**    I do not, no.

25         **Q.**    Okay.  So other than what's stated on

 JEANNIE REPORTING (305) 577-1705

```
1    page 7 of your report --
2            A.    Yes.
3            Q.    -- can you point to me anything that
4    supports -- strike that.
5                 Can you point to me anything that
6    supports that the average air temperature is
7    77 degrees?
8            A.    The reading from the device.
9            Q.    Okay.  Can you show me any specific
10   photographs or printed data from that device?
11           A.    The notes during the inspection.
12           Q.    Your notes?
13           A.    Correct.
14           Q.    Okay.  Other than that?
15           A.    No.
16           Q.    You are aware, are you not, from
17   reviewing the testimony of the Norwegian crew
18   members that the thermal spa in the Mandara Spa --
19   strike that.
20                You're aware from reviewing the
21   testimony of the Norwegian crew members that the
22   area where Ms. Kessler fell was heated; correct?
23           A.    That's my understanding.
24           Q.    Okay.  What is the temperature of the
25   area in the spa when it is heated?
```

1      **A.**    I'm not aware what the specifications

2      are.  It will depend on people that are around, the

3      temperature of the pool, the operation, many other

4      factors of the specific temperature.  I don't know.

5      **Q.**    So, as you sit here, you don't know if

6      the average air temperature was 77 degrees at the

7      time of Ms. Kessler's fall; correct?

8      **A.**    That's correct.

9      **Q.**    And you don't know what the average

10     air temperature was at the time of Ms. Kessler's

11     fall; correct?

12     **A.**    That's correct.

13     **Q.**    You don't know what the air

14     temperature was at the time of Ms. Kessler's fall;

15     correct?

16     **A.**    That's correct.

17             If you want to go back to the deck

18     plan -- I found it.  It's part of the request, the

19     RFP docs that were provided.

20     **Q.**    Sure.

21             Do you have it in front you?

22     **A.**    It would be this one.  It's page 37 of

23     44 on one of the case documents.

24     **Q.**    You can just turn it around.  I just

25     want to see generally what you're referring to.

1          **A.**    It's a partial.  It's cut off.

2          **Q.**    Hold on one second.  There's a Bates

3     number.  For the record, the witness -- hold on.

4               For the record, the witness is showing

5     Bates stamp 123.

6               Thanks.  I appreciate it.

7               You would agree that the specific air

8     temperature may impact evaporation of water;

9     correct?

10         **A.**    I would agree.

11         **Q.**    You also made reference in your

12    report -- I believe it's on page 13 -- regarding

13    the surface temperature.

14         **A.**    Yes.

15         **Q.**    So when you say "surface temperature,"

16    what are you referring to?

17         **A.**    The surface temperature of the floor

18    where the tests were conducted.

19         **Q.**    Okay.  And that's -- strike that.

20              You tested where you believe

21    Ms. Kessler fell; correct?

22         **A.**    I tested where I indicated the

23    location as marked in the report, yes.

24         **Q.**    Right.

25              It is locations 10 through 14; right?

1        **A.**    That would be correct.

2        **Q.**    And it gives a corresponding surface

3    temperature?

4        **A.**    That's correct.

5        **Q.**    How did you measure the surface

6    temperature?

7        **A.**    Through a laser based document, a

8    noncontact instrument.

9        **Q.**    An instrument?

10       **A.**    Yes, an instrument, a noncontact

11   instrument.  You basically shoot at the surface in

12   order to determine its temperature.

13       **Q.**    Okay.  And do you have any printouts

14   from those readings?

15       **A.**    Again, they would be on the notes.

16       **Q.**    Your notes?

17       **A.**    That's correct, as I said before.

18       **Q.**    Okay.  Do you have any photographs of

19   what the readings were as you took them that day?

20       **A.**    No.

21       **Q.**    Okay.  Any video?

22       **A.**    No.

23       **Q.**    As you sit here today, you don't know

24   if the surface temperatures, as indicated on

25   page 13 of your report, from locations 10 through

1    14, were the same as they were at the time of

2    Ms. Kessler's fall; correct?

3         **A.**    That's correct.  Those are the

4    temperatures at the time of the inspection.

5         **Q.**    All right.  Did you take an average

6    reading of the surface temperature or just a

7    one-shot temperature reading?

8         **A.**    You hold it for about 30 seconds and

9    the equipment gives you that average temperature

10   during that period of time.

11        **Q.**    Is it similar to what you described

12   earlier about the air temperature?

13        **A.**    No.

14        **Q.**    How is it different?

15        **A.**    Air temperature uses an average

16   throughout the period of time that was recording.

17   This one was a solid surface instead of air

18   temperature, and therefore you're interested on the

19   specific temperature of that location.  Solids

20   don't vary in temperature as much as the air does.

21   It's two different instruments.

22        **Q.**    You don't know what the surface

23   temperature was at the time of Ms. Kessler's fall;

24   correct?

25        **A.**    You asked before, and I replied



JEANNIE REPORTING (305) 577-1705

1    before, that's correct.  I only know the

2    temperatures at the time of the inspection.

3          **Q.**    What type of instrument did you use to

4    test the slip resistance of the floor?

5          **A.**    It was a variable incident tribometer

6    English XL.

7          **Q.**    Why did you use that instrument?

8          **A.**    That instrument mimics closely the

9    biomechanics of a person striking the floor with

10   the heel and therefore reproduces that motion in

11   order to understand the properties between the heel

12   striking the surface and the surface.

13         **Q.**    You're aware there are other

14   instruments that measure slip resistance; correct?

15         **A.**    There are other devices that do

16   measure slip resistance.  Yes, I'm aware.

17         **Q.**    Why did you use the English XL versus

18   other instruments to do your testing in this case?

19         **A.**    I just mentioned, it mimics the

20   biomechanics of a person striking the floor with

21   the heel.

22         **Q.**    But there are other instruments that

23   can be used to measure slip resistance; correct?

24         **A.**    As I answered before, yes.

25         **Q.**    Okay.  Is the English XL the only

1    instrument you used to measure slip resistance in

2    this case?

3          **A.**    That's correct.

4          **Q.**    When did you become certified to use

5    the English XL?

6          **A.**    I took a certification course in 2018,

7    last year.

8          **Q.**    Do you know when specifically?

9          **A.**    I think it was the summer.  I don't

10   remember the date.

11         **Q.**    Summer of 2018?

12         **A.**    That's correct.

13         **Q.**    Do you own your own English XL device?

14         **A.**    I do.

15         **Q.**    How long have you owned it for?

16         **A.**    For a year and a half.

17         **Q.**    When was the last time it had been

18   calibrated relative to August 25, 2019?

19         **A.**    I think it's April 2019.

20         **Q.**    Who calibrated it?

21         **A.**    English XL.

22         **Q.**    How many times did you use the

23   instrument between April 2019, when it was last

24   calibrated, up to August 25, 2019?

25         **A.**    I would not know at this time.

1      **Q.**    Why not?

2      **A.**    Because I would need to go back and

3   review the number of times.  From the top of my

4   head, I can't remember.

5      **Q.**    When was the test foot on your

6   English XL last changed relative to August 25,

7   2019?

8      **A.**    Can you be more specific when you say

9   "changed"?

10     **Q.**    Yeah.

11            You know there's a Neolite test foot

12   on the machine; correct?

13     **A.**    I'm aware of that, yes.

14     **Q.**    Is that the original test foot that

15   came with the instrument when you bought it?

16     **A.**    That's correct.

17     **Q.**    You've never changed it?

18     **A.**    It gets reconditioned; right?  Before

19   each test you recondition the surface so it meets

20   the requirements.

21     **Q.**    You test it with a test tile; correct?

22     **A.**    Yes.  Or whatever other surface you're

23   striking against.

24     **Q.**    Let me just back up.

25            The test foot on your XL --

```
 1              A.    Yes.

 2              Q.    -- is it the original test foot?

 3              A.    That came with the device, yes.

 4              Q.    Do you have any documentation

 5     regarding when the machine was calibrated by the

 6     manufacturer?

 7              A.    Yes.

 8              Q.    Okay.  Did you sand the machine before

 9     using it on August 25th?

10              A.    The machine or the test foot?

11              Q.    The test foot.

12              A.    The test foot was conditioned

13     according to the manufacturer, as stated in the

14     report.

15              Q.    How did you -- did you use sandpaper?

16              A.    A specific sandpaper and a fixture in

17     order to insure homogeneousness.

18              Q.    How old was the sandpaper that you

19     used to sand the test foot?

20              A.    I don't know when it was manufactured,

21     the sandpaper.

22              Q.    Well, was it the original sandpaper

23     you had, or was it replaced?

24              A.    No.  It was replaced.

25              Q.    Do you know when?
```

1       **A.**     I don't recall.

2       **Q.**     Do you know how many passengers and

3    crew members the Norwegian BREAKAWAY holds?

4       **A.**     Based on the public available

5    information, I think it's a total of 3,963

6    passengers and a complement of crew 1,657, as

7    stated on page 6 of the report.

8       **Q.**     Do you know how many people walked

9    over the same surface area where you did your test

10   in between Ms. Kessler's incident and the date of

11   your testing?

12      **A.**     I do not know.

13      **Q.**     You would agree that a floor surface

14   can change over time; correct?

15      **A.**     Depending on the floor surface, yes.

16   That might be the case.

17      **Q.**     That would be true with respect to the

18   floor surface where Ms. Kessler fell; correct?

19      **A.**     That would be correct, yes.

20      **Q.**     As you sit here today, you don't know

21   if the floor surface where Ms. Kessler fell was in

22   the same exact condition at the time of your

23   testing as it was at the time of the fall; correct?

24      **A.**     That's correct.  I wouldn't know if

25   it's the same.  In fact, it might have been

```
 1    different.

 2              Q.    All right.

 3              A.    As stated in the report.

 4              Q.    How did you determine where to do your

 5    test location, sir?

 6              A.    By cross-referencing the CCTV footage

 7    with -- and the exhibits provided in the

 8    depositions with the location that I selected.

 9              Q.    Which exhibits specifically are you

10    referencing?

11              A.    There's snapshots of those CCTV

12    footage in the -- what do you call that? -- Naik

13    exhibit.

14                    MR. CARRASCO:  N-A-I-K.

15                    THE WITNESS:  Yeah.  Thank you.

16                    The Tellez depo.  There were some

17              stills there as well.  And the CCTV itself.

18    BY MR. GORDON:

19              Q.    So am I correct that you tried to

20    determine where Ms. Kessler slipped by referring to

21    the CCTV and various photographs of the area?

22              A.    Correct.  Still photographs of the

23    area and from that CCTV.

24              Q.    What about this still photo that was

25    marked as an exhibit to Ms. Kessler's deposition?
```

```
 1            A.    That's correct.

 2                  (Exhibit 5 was marked for

 3            identification purposes.)

 4    BY MR. GORDON:

 5            Q.    I will mark the still of Ms. Kessler

 6    as Exhibit 5 to your deposition.

 7                  Is there one document in particular

 8    you looked at to determine where she slipped, or

 9    you just looked at all of them to try to make that

10    determination?

11            A.    That's correct.

12            Q.    Which?  Everything?

13            A.    The combination of photos.

14            Q.    Which foot of Ms. Kessler slipped

15    first?

16            A.    The left foot slipped first.

17            Q.    And looking at your report, you

18    believe that test location 10 is the area where

19    Ms. Kessler's left foot first slipped?

20            A.    Between 11 and 12, yes.

21            Q.    Well, is it between 11 and 12, or is

22    it number 10, specifically?

23            A.    Number 10 would be the test location.

24            Q.    Just so I'm clear, is it your opinion

25    that Ms. Kessler's left foot specifically slipped
```

```
 1    at location number 10?

 2           A.    In that area, yes.

 3           Q.    Okay.  So you don't know if it's

 4    specifically exactly where you have the number 10

 5    in your report?

 6           A.    Correct.

 7           Q.    That's correct?

 8           A.    Yes.

 9           Q.    Okay.  I mean, you can't tell with

10    certainty that her foot slipped exactly where you

11    tested at number 10; correct?

12           A.    That's correct.  That's what I'm

13    trying to infer.

14           Q.    Okay.  What time did Ms. Kessler fall?

15           A.    Can you show me that exhibit again,

16    please.

17           Q.    Exhibit 5?

18           A.    Yes, please.

19                 Based on the exhibit, it would be --

20    the time indicating on the lower part of Exhibit 5

21    is 3:53 p.m. local time, I'm assuming.

22           Q.    Do you know if that's real time or

23    ship time?

24           A.    As I said, it's what's available in

25    front of me.  I wouldn't know if it's ship time or
```

1    any other standard time.

2         **Q.**   Okay.  Well, did you review

3    Ms. Kessler's written statement provided to

4    Norwegian where she said she slipped at about

5    4:30 p.m.?

6         **A.**   The complaint, yes -- I mean, the

7    report, yes.

8              At the end.  I think it was four --

9    4:45, she reported, something like that.

10        **Q.**   But she also said that she fell at

11   around 4:30 p.m.; correct?

12        **A.**   Yes.

13        **Q.**   So on page 6 of your report, where you

14   say that this incident occurred just before

15   4:00 p.m. UTC, you're referring to the CCTV still.

16   Would that be accurate?

17        **A.**   That would be accurate.

18        **Q.**   All right.  So you talked about test

19   location 10.

20             Can you tell me how you determined

21   your other test locations.

22        **A.**   The other test locations are meant to

23   be representative for comparison purposes adjacent

24   to that strip where she was walking and slipped.

25        **Q.**   So why did you determine to test at

JEANNIE  REPORTING  (305)  577-1705

```
1    location 11 and 12?

2         A.    In order to provide a comparison of

3    and provide an average and a sampling of the floor.

4         Q.    Okay.  But why those two specific

5    locations?

6         A.    Because those are adjacent to the

7    neighborhood where she slipped.

8         Q.    Is there any industry literature that

9    states that's the area where you should have

10   tested?

11        A.    There are many different, what we

12   call, sampling particles when we're deciding to

13   test and how many tests to conduct and how to

14   conduct them.  So it's general research best

15   practices.

16        Q.    Okay.  What specifically are you

17   referring to?

18        A.    In terms of?

19        Q.    Yeah.  I'm just trying to find out if

20   there's any authoritative literature that states

21   that what you just described is the proper manner

22   of determining test locations.

23        A.    So there's literature out there based

24   on research best practices that relate to sampling.

25   And when you need to determine how many samples to
```

1      get on given type of test, then you can follow

2      those.  There's a lot of literature out there.

3             **Q.**    Can you name me one specifically with

4      respect to the testing that you did in this case?

5             **A.**    Not now, no.

6             **Q.**    Okay.  How about number 14, test

7      location 14, how did you determine to test that

8      specific location?

9             **A.**    That's a control reference.  That is

10     in the middle of the access way to the spa.  And

11     it's meant to provide a control reference.

12            **Q.**    Again, is there any specific

13     authoritative literature that you can point to to

14     tell me that's where you should have tested it?

15            **A.**    Again, there's plenty of literature

16     available in order to make sure that you also

17     provide a control test.

18            **Q.**    Can you name me one specifically?

19            **A.**    I can't at this time.

20            **Q.**    And how many polls did you do for each

21     of the locations?

22            **A.**    Can you repeat that?  I didn't hear

23     you.

24            **Q.**    How many times did you test each test

25     location?

1      **A.**   Each test location was tested in four

2    orthogonal directions; northeast, southwest,

3    front-back, side-side.

4      **Q.**   What type of substance did you put on

5    the floor when you did your wet testing?

6      **A.**   Water available from the vessel,

7    regular tap water.

8      **Q.**   Okay.  The crew members made that

9    available to you?

10      **A.**   Yes.  Actually, I took it from the

11    restroom.

12      **Q.**   Did you apply any other substance on

13    the floor other than the tap water?

14      **A.**   I did not.

15      **Q.**   And the average result was what?

16      **A.**   That would be provided in Table 1 of

17    the report.

18      **Q.**   Okay.  What was the average test when

19    it was wet?

20      **A.**   For which location?

21      **Q.**   Well, I'm on page 13.  It looks like

22    you did an overall average; correct?

23      **A.**   That was reported in the report, yes.

24      **Q.**   That was .57?

25      **A.**   That's correct.

1      **Q.**    Did you test the area dry?

2      **A.**    I did not.

3      **Q.**    Is there a reason why not?

4      **A.**    Since the incident was provided in

5    the -- the incident occurred with a wet floor

6    surface, this was comparing it to the conditions

7    during the incident.

8      **Q.**    Okay.  You'll agree that the

9    literature states you should also test it dry;

10   correct?

11     **A.**    If needed, yes, based on what you want

12   to obtain.

13     **Q.**    Okay.  Well, you would agree it would

14   be relevant to know how the floor tests dry to

15   compare it to how it tests wet; would it not?

16     **A.**    Not for the case.

17     **Q.**    Why not?

18     **A.**    Because the floor conditions were wet

19   at the time of the incident.

20     **Q.**    And why do you say the floor

21   conditions were wet at the time of the incident?

22     **A.**    Based on the exhibits, as well as the

23   depositions provided as part of the case

24   documentation.

25     **Q.**    What exhibits are you referring to?

```
 1              A.    The videos and the -- sorry.  The
 2       stills that came from the CCTV, as well as the
 3       supporting deposition of the crew members at the
 4       time.
 5              Q.    Okay.  You reviewed the CCTV; right?
 6              A.    Yes.
 7              Q.    Or at least certain portions of it;
 8       correct?
 9              A.    That's correct.
10              Q.    Is there anything that you've looked
11       at to give us more information as to what
12       specifically you reviewed?
13                   MR. GERSON:  Object to the form.
14              Asked and answered.
15                   THE WITNESS:  Yes.  So in the Tellez
16              deposition, Exhibit 1, also shows how a
17              crew member is placing squeegeed water in
18              the area that was tested.
19       BY MR. GORDON:
20              Q.    The CCTV footage of the incident that
21       you were provided to review, did you see any water
22       in the area where Ms. Kessler fell before she fell?
23              A.    It's not possible to tell clearly due
24       to the contrast --
25              Q.    Okay.
```

1          **A.**     -- with certainty.

2          **Q.**     Okay.  So you don't -- strike that.

3                 You can't tell us for certain that you

4     actually observed water on the floor at the time

5     Ms. Kessler fell.  Would that be a true statement?

6                 MR. GERSON:  Object to the form.

7                 THE WITNESS:  If I can rephrase the

8                 statement, it would be that a crew member

9                 can be seen squeegeeing water on the

10                surface to that location.

11    BY MR. GORDON:

12         **Q.**     My question is, the CCTV that you

13    reviewed --

14         **A.**     Yes.

15         **Q.**     You reviewed it, right?

16         **A.**     As I said before, yes.

17         **Q.**     You gave opinions in your report about

18    Ms. Kessler's gait before the incident; correct?

19         **A.**     That's correct.

20         **Q.**     Which we'll get to.

21                You see a still of Ms. Kessler; right?

22         **A.**     Yes.

23         **Q.**     Exhibit 5.

24                And you reviewed the video of her

25    coming into the spa area; correct?



JEANNIE REPORTING (305) 577-1705

1       **A.**    That's correct.

2       **Q.**    Okay.  Did you see any water on the

3    floor in the area right before Ms. Kessler fell?

4       **A.**    I saw water being deposited in that

5    area before by crew members.

6       **Q.**    Did you actually see the water on the

7    floor with your own eyes?

8       **A.**    Since I wasn't there, I'm not able to

9    say that I did.

10       **Q.**    Okay.  But of the video evidence that

11    you've been provided, specifically looking at

12    Exhibit 5, do you see any water on the floor where

13    she fell?

14       **A.**    Again, on the quality of the printed

15    document, it's not possible to tell.

16       **Q.**    Well, do you see any water on

17    Exhibit 5?

18            MR. GERSON:  Objection.  Asked and

19         answered.

20            Please move on.

21    BY MR. GORDON:

22       **Q.**    Go ahead.

23       **A.**    Once again, on the Exhibit 5 that is

24    provided, it's seems a little cracked and bent on

25    the bottom part, and the top right corner is

JEANNIE REPORTING (305) 577-1705

```
 1    curled.  And based on the quality, it's not

 2    possible to infer if there's water.

 3          Q.    We'll get a better copy of the

 4    photograph.

 5                MR. GORDON:  Can you please get me

 6        one:

 7                THE WITNESS:  Thank you.

 8    BY MR. GORDON:

 9          Q.    You'll agree that Ms. Kessler

10    testified that she did not see any water on the

11    floor before she fell; correct?

12          A.    To my best recollection, I remember

13    she stating something along those lines, yes.

14          Q.    Well, that's what she testified to;

15    correct?

16          A.    I don't remember verbatim that's the

17    case, but yes.  I remember she testified that she

18    did not see any water on the surface.

19          Q.    And she didn't see any water on the

20    floor after she fell; correct?

21          A.    Again --

22                MR. GERSON:  Object to the form.

23                You may answer.

24                THE WITNESS:  Thank you.

25                From my best recollection, that's what
```



```
1              she mentioned, yes.

2       BY MR. GORDON:

3              Q.    And Ms. Kessler testified at her

4       deposition that she didn't see any substance on the

5       floor before she fell; true?

6                   MR. GERSON:  Object to the form.

7                   THE WITNESS:  To my best recollection,

8              that's the case, yes.

9       BY MR. GORDON:

10             Q.    And she didn't see any substance on

11      the floor after she fell; correct?

12                  MR. GERSON:  Object to the form.

13                  THE WITNESS:  That's correct.

14      BY MR. GORDON:

15             Q.    Okay.

16             A.    I do remember that she said that she

17      felt it was wet after she fell.

18             Q.    And she didn't know where it came

19      from; correct?

20             A.    That's true, yes.

21             Q.    And you reviewed the deposition

22      testimony of Michael Collantes?

23             A.    Yes.

24             Q.    Jemalyn Lenoso?

25             A.    Yes.
```



JEANNIE REPORTING (305) 577-1705

1          **Q.**    Okay.  And your understanding is,

2     those were the two crew members responsible for

3     maintaining the area; correct?

4          **A.**    At the time of Ms. Kessler's incident,

5     yes.

6          **Q.**    And both of those crew members

7     testified the area was dry; correct?

8               MR. GERSON:  Object to the form.

9               THE WITNESS:  I'm not sure if they

10          said explicitly the area where she fell was

11          dry, but the area where they were working,

12          they were drying the surface.

13     BY MR. GORDON:

14          **Q.**    Okay.

15          **A.**    Can you point me to the specific area

16     in the -- that you're referring to in the

17     deposition of those crew members, please?

18          **Q.**    Well, you're testifying today that the

19     crew members testified the area was wet.

20               So can you tell me where they said it

21     was wet --

22               MR. GERSON:  Object to the form.

23     BY MR. GORDON:

24          **Q.**    -- in the area where she fell?

25          **A.**    Yeah.  Give me a moment.  I can pull

```
 1    out the --
 2            Q.    Sure.
 3            A.    I'm reviewing -- rereviewing the
 4    document for Collantes.  I don't recall him stating
 5    that the floor was dry.  Just on the methods used
 6    in order to dry the floor and how he was
 7    squeegeeing the area to dry the floor.
 8            Q.    Okay.  You don't recall him testifying
 9    it was dry?
10            A.    With those words, no.
11            Q.    Look at page 90, he said it's dry.
12    Page 92, he said it's dry.
13            MR. GERSON:  Object to the form.
14            You may answer.
15            THE WITNESS:  I' scrolling to the
16        page.
17    BY MR. GORDON:
18            Q.    Okay.
19            A.    "It's already -- no, I'm squeegeeing,
20    but it's already dry."
21            That would be page 90, line 3.
22            Q.    Right.
23            And page 89, "Question:  Okay.  So you
24    now have the squeegee on the ground at 3:47;
25    correct"?
```

```
1              A.    Right.

2              Q.    "Yeah.  But the floor is not wet.

3    It's not wet.  It's dried, the floor, already."

4              A.    I understand that.

5                    We're referring to the area

6    immediately where Ms. Kessler fell; right?

7              Q.    Correct.

8              A.    That was the question.

9              Q.    My question to you is, can you point

10   to me to any testimony where someone testified that

11   the floor where Ms. Kessler fell was wet right

12   before she fell?

13                   MR. GERSON:  Objection.  Asked and

14             answered.

15                   THE WITNESS:  To my best recollection

16             right now, I can't.

17   BY MR. GORDON:

18             Q.    Okay.  Did you ever take the CCTV

19   footage you were provided by Ms. Kessler's

20   attorneys and do any sort of forensic examination

21   of the footage to see if you can see any water on

22   the floor where she fell?

23             A.    Can you repeat, please?

24             Q.    Okay.  You received certain CCTV

25   footage; correct?
```



```
 1          A.    That's correct, yes.

 2          Q.    Did you ever take the footage and do

 3    any sort of forensic examination to see if you

 4    could observe any water in the area right before

 5    she fell in the location where she fell?

 6          A.    By officially reviewing the CCTV and

 7    the different contrasts, I was trying to determine

 8    if there was water explicitly there.

 9                But due to the quality of the CCTV

10    that I was provided and the lighting conditions,

11    it's not possible with a degree -- with a high

12    degree of certainty.

13          Q.    Okay.  But did you attempt to do any

14    sort of forensic examination to assist you in that

15    regard?

16          A.    I think I just answered that by

17    reviewing it visually.

18          Q.    You personally reviewed it?

19          A.    Right.

20          Q.    Did you send it to somebody else, like

21    an outside vendor, to do any sort of in-depth

22    analysis?

23          A.    I did not.

24          Q.    You cite various articles in your

25    report that you believe are authoritative; correct?
```

```
 1                    MR. GERSON:  Object to the form.
 2                    THE WITNESS:  That I believe are
 3               relevant to the matter being discussed,
 4               yes.
 5    BY MR. GORDON:
 6          Q.    Well, you believe they're
 7    authoritative; right?
 8                    MR. GERSON:  Object to the form again.
 9                    THE WITNESS:  I think they bring
10               relevance to the matter being discussed,
11               yes.
12    BY MR. GORDON:
13          Q.    Well, would you site articles that
14    aren't authoritative?
15                    MR. GERSON:  Object to form, again.
16                    THE WITNESS:  Can you define
17               authoritative?
18    BY MR. GORDON:
19          Q.    Well, you're the expert; right?
20          A.    I think so, yes.
21          Q.    And you provided and cited in your
22    report various articles; correct?
23          A.    That is correct.
24          Q.    And the reason you did that is because
25    you believe they support your opinions; correct?
```

1          **A.**     As I said, yes.

2          **Q.**     Therefore, you believe they would be

3     authoritative articles; correct?

4          **A.**     I think they would provide valuable

5     background to the case being discussed, yes.

6          **Q.**     Otherwise you wouldn't have cited

7     them; correct?

8          **A.**     Correct.

9          **Q.**     You reference and cite in your report

10    an article entitled, "Slip and Fall Accident

11    Prevention, A Review of Research, Practice and

12    Regulations," written by Lee-Jean Lin, Fu-Tien

13    Chiou, and H. Harvey Cohen; correct?

14         **A.**     Yes.

15         **Q.**     And you'll agree that on page 210 it

16    references that a static coefficient of friction of

17    .5 would be considered a reasonably safe

18    measurement for slip resistance; correct?

19         **A.**     For that specific case under the

20    conditions that was reviewed that are non marine

21    based applications, yes.

22         **Q.**     We'll get there.

23              But .5, according to that article, was

24    deemed to be sufficient; correct?

25         **A.**     Again, it's an average, as it was

**JEANNIE REPORTING (305) 577-1705**

1    stated on the publication.

2            **Q.**    Right.

3                    You're aware of who William English

4    is; correct?

5            **A.**    Yes.

6            **Q.**    He invented the XL tribometer that you

7    used?

8            **A.**    That's correct.

9            **Q.**    Are you familiar with his publication,

10   "Pedestrian Slip Resistance, How to Measure It and

11   How to Improve It, Second Edition"?

12           **A.**    Yes.

13           **Q.**    Published in 2003?

14           **A.**    That's correct.

15           **Q.**    You would agree that's authoritative;

16   correct?

17           **A.**    I would agree with that, yes.

18           **Q.**    And he discusses that a measure of .5

19   static coefficient of friction would be sufficient

20   in terms of wet testing; correct?

21           **A.**    He does state that, yes.

22           **Q.**    Sorry.  I couldn't hear you.

23           **A.**    I recall that that's what he states.

24   I don't know exactly what page of the document --

25   of the book you're referring to, but yes.

1    **Q.**   All right.  And you make reference to

2   ASTM F-1166; is that accurate?

3         **A.**   As well as other references, yes.

4         **Q.**   Okay.  Well, that's one of the ones --

5   that is the reference you make to determine that

6   the floor purportedly did meet appropriate slip

7   resistance; is it not?

8         **A.**   To the recommendations provided by

9   that standard practice, yes.

10        **Q.**   That's really the only one that you're

11   relying on for that statement; correct -- or that

12   opinion; right?

13        **A.**   That would be incorrect.

14        **Q.**   That's incorrect?

15        **A.**   Yes.

16        **Q.**   Is there any other literature that

17   you're referencing or reference that says the

18   minimum slip resistance should be .6?

19        **A.**   So the manufacturer for the tile does

20   provide a range, as it was specified.  It varies

21   from .04 to .7 for R11 -- right? -- which is

22   supposedly -- so the manufacturer specifications in

23   terms of safety, as well.  And the corresponding

24   DIN, which is the European standard for tile

25   testing, also provides different ranges or

1    R values.

2              And the reference in this case that

3    you are incorrect that I'm not citing is the

4    DIN 55130 does provide that R values 13 and 12 for

5    wet or very wet areas should be used, which result

6    in a higher coefficient variance that would be

7    higher than .7.

8         Q.   Okay.  First of all, the tile

9    manufacturer you said had a range?

10        A.   So the tile manufacturer, the

11   specification that was provided as part of the

12   specifications, it was R11.  And R11 varies, from

13   my understanding, from .4 to .7, based on DIN,

14   D-I-N, the standard.

15        Q.   Well, you say a range.  So anything

16   between .4 and a .7?

17        A.   That would be a performance spec.

18        Q.   Is that specific to a wet surface?

19        A.   That's specific not for wet or very

20   wet areas.  For wet or very wet areas, the

21   recommendation is that you use R12 or R11 -- 13,

22   pardon me.

23              So in terms of the reference that I'm

24   providing, I'm providing the reference of the DIN

25   standard for wet or very wet surfaces.  Tile should

1    meet an R12 or R13, which corresponds to higher

2    coefficient of friction values.

3         **Q.**   How do you spell "DIN"?

4         **A.**   D-I-N.  Capital letters.

5         **Q.**   Is that the name of a person or?

6         **A.**   It's the Deutsch Institute of -- it's

7    the German institute of standards, just like ASTM

8    for American, the DIN is for European.

9         **Q.**   German Institute of Standards?

10        **A.**   It's translated to it.  I don't know

11   the -- my German is not that good, I should say.

12        **Q.**   Okay.  And there's nothing you can

13   point to that says that that DIN standard is

14   applicable to a cruise ship, can you?  Or this

15   particular cruise ship, the BREAKAWAY?

16        **A.**   Well, that's -- the tile that they

17   used references that specification as part of the

18   case documents.  So that was the material being

19   used in the incident location.

20        **Q.**   Okay.  My question is, is there

21   anything you can point to to show me that this DIN

22   standard is allegedly applicable to a cruise ship?

23        **A.**    It's applicable as it's stated to the

24   tile that was placed on that cruise ship.  It

25   doesn't matter where the tile is placed.  You can

1    place it in the moon, as far as the DIN is

2    concerned.  The DIN doesn't look at the location of

3    the tile.  It just looks at the surface itself.

4              Q.    That's a German?

5              A.    That is a German based standard, yes.

6    Typically referred to as European.  It's called the

7    ramp test, R-A-M-P.

8              Q.    Is there anything authoritative you

9    can point to that says that that German standard

10   would be applicable in this country?

11             A.    So a lot of the tile manufacturers use

12   it.  It is an international recognized standard.

13   Many tile manufacturers use it as a specification

14   standard.

15             Q.    Can you point me to any authoritative

16   literature supporting what you just said?

17             A.    Yes.  If you look at the practical

18   handbook of Di Pilla, D-I, space, P-I-L-L-A, the

19   handbook discusses in depth all of the different

20   methodologies that there are to test coefficient of

21   friction, as well as the applicability to the

22   different type of things.

23             Q.    Do you have that with you?

24             A.    I don't have the handbook with me, no.

25   But you have the reference, and you're welcome to

 1   buy it and review it.

 2          **Q.**   Do you have it amongst the materials

 3   you have here today?

 4          **A.**   Well, there's a copyright issue, so I

 5   cannot just photocopy the book and provide it.

 6          **Q.**   Well, do you personally have it?

 7          **A.**   I have an electronic version of it,

 8   yes.

 9          **Q.**   Have you provided it with your

10   materials?

11          **A.**   No.  It's a copyright issue.  I cannot

12   provide it.

13              Just like you looked up the other

14   references that you looked up.  By providing a

15   reference and in order to not breach any copyright

16   issues, you have access to that information.

17          **Q.**   Can you show me exactly in writing

18   anything to support what you just said about the

19   DIN being applicable on this ship at the time of

20   Ms. Kessler's fall?

21              MR. GERSON:  Object to the form.

22              THE WITNESS:  So to answer your

23              question, the DIN is applicable to the

24              floor surface that was installed in the spa

25              area on that boat; and, therefore, the DIN

```
 1                  specifications are applicable because the
 2                  tile is in the boat.
 3       BY MR. GORDON:
 4              Q.    Okay.  Who chose the tile that was put
 5       into the spa?
 6              A.    I'm afraid I don't know that.
 7              Q.    Do you know what the classification
 8       society is?
 9              A.    The classification society?  There's
10       many type of classification societies.
11              Q.    Have you done any research regarding
12       that in connection with this ship, BREAKAWAY?
13              A.    When you talk about classification
14       societies, can you be more explicit?
15              Q.    Yeah.
16                    After a ship is built, it gets
17       inspected, does it not, by the appropriate
18       authorities?
19              A.    Okay.  You're talking about the
20       overall ship, how the ship is classified.
21              Q.    Yes.
22              A.    There's materials classification.
23       That's why I'm trying -- we're talking about tile
24       and your ship.  You're now jumping to the
25       classification of the overall ship; yes?
```



1          **Q.**    People inspect the ship before it gets

2     put into use; correct?

3          **A.**    Yeah.  The classification that you're

4     referring to, if I'm incorrect, it's about the

5     tonnage and the size; is that correct?  Is that the

6     type?

7          **Q.**    I'm asking you.

8          **A.**    Since you are not stating the exact

9     classification, I'm trying to understand what you

10    refer by "classification."

11              So is it the classification of the

12    size of the boat based on tonnage, or is there

13    another classification that you're referring to?

14         **Q.**    I'm referring to the ship itself.  It

15    gets inspected, does it not, before it sets sail?

16              MR. GERSON:  Object to the form.

17         Argumentative.

18    BY MR. GORDON:

19         **Q.**    By applicable authorities?

20         **A.**    There's many different types of --

21    types of quality control and inspections of the

22    overall ship in totality, yes.

23         **Q.**    Are you aware of anything anywhere

24    stating that it was inappropriate tile be put into

25    the Norwegian BREAKAWAY in the Mandara Spa?

```
 1                    MR. GERSON:  Object to the form.

 2                    THE WITNESS:  I don't have access to

 3            those documents.

 4    BY MR. GORDON:

 5            Q.   So is the answer no?

 6            A.   I don't know.  The answer is I don't

 7    know.

 8            Q.   All right.  You will agree ASTM F-1166

 9    does not mention whether the .6 is static or

10    dynamic coefficient of friction; correct?

11            A.    It talks about coefficient of

12    friction, yes.

13            Q.    It doesn't specifically state whether

14    it's static coefficient of friction or dynamic

15    coefficient of friction; right?

16            A.    Correct.  The standard just refers to

17    COF, coefficient of friction, as defined in the

18    standard.

19            Q.   Right.

20                 And there's a difference between the

21    two; correct?

22            A.   That is correct, yes.

23            Q.   And F-1166 does not provide for a

24    testing protocol; correct?

25            A.   That's correct.  It only is a
```

1    performance based spec.

2              MR. GORDON:  Okay.

3              Want to take a two-minute break?

4              THE WITNESS:  We can continue.

5              (Thereupon, a brief recess was

6         taken @ 1:35 p.m.)

7              (Proceedings were resumed @

8         1:43 p.m.)

9    BY MR. GORDON:

10        Q.   Dr. De Caso, is this the retainer

11   agreement, just so we can get that marked?

12        A.   That's correct.

13        Q.   All right.  We can mark this as

14   Exhibit 2.

15             You are familiar with what ANSI

16   standards are; correct?

17        A.   Not all of them, but I understand.

18   I'm familiar with the organization that provides

19   those standards, yes.

20        Q.   American National Standards Institute.

21   Are you familiar with that organization?

22        A.   I'm familiar with them, yes.

23        Q.   It's similar to ASTM; correct?

24        A.   That's correct.

25        Q.   Are you familiar with ANSI standard

1    A326.3-2017, which was released January 2018?

2            A.    That number, from the top of my head,

3    I'm afraid I wouldn't be able to recall.  But I

4    think I will soon find out.

5                  (Exhibit 6 was marked for

6            identification purposes.)

7    BY MR. GORDON:

8            Q.    Well, it's entitled, "American

9    National Standard Test Method for Measuring Dynamic

10   Coefficient of Friction Hard Surface Flooring

11   Materials."

12           A.    Probably use the BOT, the binary

13   output tribometer, I'm assuming.

14           Q.    I'll show you a copy of it.

15                 Are you familiar with this ANSI

16   standard?

17           A.    I'm familiar with this standard, yes.

18           Q.    You are?

19           A.    I'm familiar.  I'm not going to be

20   able to recite it, if that's what you're going to

21   ask.  But I am familiar with it, yes.

22           Q.    That ANSI standard specifically

23   discusses the test method for measuring the slip

24   resistance of hard surface flooring materials,

25   which include tile; correct?



JEANNIE REPORTING (305) 577-1705

1          **A.**    Like using a BOT for short and using,

2     if I recall correctly, SLS substance instead of

3     water.

4          **Q.**    Okay.  In any event, this ANSI

5     standard deals with testing slip resistance for

6     hard tile; correct?

7          **A.**    Yes.

8          **Q.**    And this standard requires the use of

9     the BOT-3000 machine; correct?

10         **A.**    Correct.  The BOT.

11         **Q.**    You did not use the BOT machine;

12    correct?

13         **A.**    That's correct.

14               As we discussed previously, the

15    English XL was the only device used to measure the

16    properties of the floor surface.

17         **Q.**    Why did you not use the BOT-3000 in

18    addition to the English XL during your testing in

19    this case?

20         **A.**    As I mentioned previously, the

21    English XL best mimics the biomechanics of the heel

22    striking the surface and therefore provides for

23    this case, a human slip case, a methodology in

24    which to determine the characteristics of the

25    floor.



1          **Q.**    But does the ANSI standard require the

2    use of the BOT and not the English XL; correct?

3          **A.**    This specific standard, Exhibit 6,

4    talks about the dynamic coefficient of friction for

5    hard floor materials and it does reference the BOT,

6    which is a different device and therefore computes

7    differently the COF.

8          **Q.**    It also requires the use of a certain

9    solution when you do the testing with the BOT-3000;

10   correct?

11         **A.**    That is not water; correct.  It's kind

12   of like a soapy material.

13         **Q.**    Which you didn't do in your testing.

14         **A.**    Not in my testing.  But I previously

15   used this equipment, so I'm very familiar with the

16   process.

17         **Q.**    Just to be clear, you just used tap

18   water with nothing in it?

19         **A.**    That's correct.

20         **Q.**    Do you own a BOT-3000?

21         **A.**    I do not.

22         **Q.**    Is there a reason why you did not --

23   strike that.

24                Is there any reason why you don't own

25   a BOT-3000?

1          **A.**    Not any particular that I can think of

2     but...

3                It's a very generic question.  If you

4     could maybe be more explicit, I'd appreciate it.

5          **Q.**    Well, you've already testified there's

6     more than just the English XL in terms of equipment

7     that can measure slip resistance; is that correct?

8          **A.**    That's correct.

9          **Q.**    And the BOT-3000 is another type of

10    device; correct?

11         **A.**    That's correct.

12         **Q.**    So you never used anything but the

13    English XL; correct?

14         **A.**    For the case.  I have used a BOT in

15    the past, yes.

16         **Q.**    Okay.

17         **A.**    Depending on the case and depending on

18    the circumstances, one device might be better than

19    the other.

20         **Q.**    So what, in your opinion, would be a

21    circumstance where the BOT-3000 would be better to

22    be used?

23         **A.**    For quality control purposes, if you

24    want to assess and monitor a surface and how that

25    surface changes with time or -- especially after

```
1     applying a condition in order to it might change

2     the characteristics of that floor, it's a good

3     monitoring tool in order to explicitly address the

4     properties of that tile before and after.

5               Q.    You would agree that walking is a

6     dynamic event; correct?

7               A.    In terms of the definition for dynamic

8     coefficient of friction, walking can be classified

9     as a dynamic event when you strike a heel with a

10    floor.  That would be correct.

11              Q.    You strike a heel on the floor when

12    you walk; correct?

13              A.    That's correct.

14              Q.    That's what Ms. Kessler was doing;

15    correct?

16              A.    That would -- so there are nuisance.

17    We can get technical.  There is a nuisance.  So

18    let's get technical.  So that coefficient of

19    friction -- just starting with a basic definition

20    of that -- is the ratio between horizontal force

21    and a vertical force.  And that's the generic

22    definition.

23              So the ASTM that you've been

24    mentioning before, F-116, talks about the ratio of

25    those forces.  And those forces are static,
```

1    meaning, let's assume you've got this cup of coffee

2    on the table and it's sitting on the coffee {sic},

3    the static coefficient of friction will be the

4    force that would require the cup to start

5    displacing and moving itself after applying, in

6    this case, a horizontal force.

7             Dynamic coefficient of friction, on

8    the other hand, is, that as I -- this cup is

9    approaching from my hand that I'm grabbing and I'm

10   placing it as it moving on the table, it starts

11   already with a movement, and it would be the force

12   of that moving object striking parallel to the

13   other surface.  And that's very important because

14   coefficient of friction basically is a force

15   perpendicular to the other.

16            And the BOT in this case, a heel

17   doesn't really strike perpendicular to it, you have

18   a rotational motion, and therefore there's a

19   nuisance of definition.  So it's not really when

20   you walk a dynamic per se, because you're not

21   striking perfectly parallel to the surface.

22       **Q.**   Well --

23       **A.**   I hope that helps.

24       **Q.**   -- in any event, you've already agreed

25   that the ASTM F-1166 does not make a distinction



1    between static or dynamic coefficient of friction.

2        **A.**    That's correct.

3        **Q.**    Okay.

4        **A.**    It's the ratio of those forces.

5        **Q.**    Okay.

6        **A.**    In any case, it wouldn't matter if

7    it's static or dynamic.  The whole point is that

8    any type of striking between two surfaces should be

9    .6.

10           When you read the ASTM -- I don't know

11    if you had a chance to read it in detail -- that's

12    why you don't need to discriminate between forces

13    because you to make sure that it's always above .6.

14        **Q.**   But it doesn't state whether it should

15    be testing static coefficient of friction or

16    dynamic coefficient of friction; correct?

17        **A.**    Again, it says that the coefficient of

18    friction shall be .6 or greater when measured wet.

19        **Q.**    It doesn't say specifically if it's

20    static coefficient of friction or dynamic

21    coefficient of friction.

22           MR. GERSON:  Object to the form.

23           Asked and answered three times now.

24    BY MR. GORDON:

25        **Q.**   Correct?


JEANNIE REPORTING (305) 577-1705

1        **A.**     Correct.  It says that any type of

2    coefficient of friction.  In other words, the ratio

3    between those forces I was trying to explain

4    before.  And given that I'm the expert, maybe I can

5    provide clarification on that on how standards are

6    written.

7             If you needed a specific type of

8    coefficient of friction, then it would explicitly

9    state if it's static or dynamic.  That's not the

10   case.  So therefore any type of coefficient of

11   friction shall be greater than .6.

12       **Q.**     Did you write the standard F-1666?

13       **A.**     No.  But I'm subscribed to the

14   committee, and I do listen and hear a lot of the

15   technical conversations that go on this

16   peer-reviewed committees.

17       **Q.**     You did not write the standard;

18   correct?

19       **A.**     No.  The standard is a peer-reviewed

20   process that requires a collaborative approach.

21   Many people partake in the process.  Also there's

22   public comment where you can provide opinions about

23   the writing for that.

24       **Q.**     Did you provide public comments?

25       **A.**     No, since it was published some time



JEANNIE REPORTING (305) 577-1705

1    ago.

2              **Q.**    You were referencing earlier about R11

3    tile, the rating of the tile.

4              **A.**    I did, yes.

5              **Q.**    I believe you were saying that this

6    specific tile in the spa is R11?

7              **A.**    That's what was provided based on the

8    case documentation, yes.

9              **Q.**    And you state in your report, "An R11

10   value" -- I'm reading on page 18 -- "An R11 value

11   is known to be suitable for transitional areas that

12   can occasionally become wet."

13              Correct?

14              **A.**    That's correct.

15              **Q.**    You mentioned there's an R12?  What

16   was the other tile you referenced?

17              **A.**    I didn't mention any other tile.  I

18   mentioned the specifications R12 and R13, which are

19   those subsequent to R11 based on the DIN standard.

20              **Q.**    I'm sorry.  Say that again.

21              **A.**    It's in the report.  I'll go ahead and

22   pull it out so we're all on the same page.

23              **Q.**    Sure.

24              **A.**    I mentioned that R11 is the

25   specification provided by the tile.  And that same

```
1   specification standard, R12 and R13, is the

2   specification for tiles for wet or very wet

3   surfaces.

4           Q.    Just so I understand, R11 is the tile

5   specification for this specific tile in the spa;

6   correct?

7           A.    Correct.

8           Q.    And is there another specification

9   called R12 and R13?

10          A.    That's within the same spec, meaning

11  the DIN standard.

12                You have different types of ratings.

13  R for rating.  The rating for this tile is R11.

14  There are other ratings, 12 and 13.

15          Q.    Okay.  I'm just trying to understand

16  what you're saying.  That's all.

17          A.    I hope I'm clarifying that.

18          Q.    I think so.

19                So is it your testimony that you

20  believe that there should have been an R12 or R13

21  specification tile instead of R11?

22          A.    Right.

23                Based on the DIN -- and I'm trying to

24  pull the report open.  One second.  The -- R12 is

25  for wet or very wet surfaces.  Since you have the
```

1      paper document, let me jump directly to that

2      section.

3                    This is Exhibit 3.  It's the report

4      that I issued.

5                    If I remember correctly, on page 18,

6      in the Section 4.2, surface evaluation.  "Surfaces

7      specified with a higher R value will" --

8            **Q.**    Sorry.  Where you reading from?

9            **A.**    Yes.

10                   Section 4.2.  And jumping directly to

11     4.2.3.  And I'm going to provide you two sections.

12     So maybe I'll start with the previous one, 4.2.2.

13                   "R11 value is known to be suitable for

14     transitional areas that can occasionally become

15     wet," as you just stated.

16           **Q.**    And that's the tile that was in place.

17           **A.**    That's correct.

18                   In comparison, as I read from the

19     report, "R values R12 and R13 are suitable for wet

20     and very wet areas, respectively."

21           **Q.**    That's coming from where?

22           **A.**    From the DIN standard, which was used

23     to classify the tile that was placed in the spa at

24     the Norwegian BREAKAWAY.

25           **Q.**    So if I understand what you're saying,

JEANNIE REPORTING (305) 577-1705

```
1    R12 and R13 are suitable for wet and very wet

2    areas.

3              A.    R12 for wet and R13 for very wet.

4              Q.    And what's considered wet or very wet?

5              A.    Right.  That's where an expert might

6    come in.  And if you consult the DIN definitions,

7    spa areas and pool areas lie within the R12 and R13

8    ratings.

9              Q.    Where specifically are you getting any

10   support that the tile in the Mandara Spa should

11   have been either rated R12 or R13?

12                   MR. GERSON:  Object to the form.

13                   THE WITNESS:  Based on the definitions

14              that DIN provides for the different

15              ratings, and the description and the

16              definition for those ratings, a spa area

17              would not classify under an R11 tile

18              rating.  It would be more suitable for an

19              R12 or R13.

20   BY MR. GORDON:

21              Q.    Can you show me what you're referring

22   to?

23              A.    The DIN, the 511 standard.

24              Q.    Do you have it in front of you?

25              A.    I don't.  I don't have it.  It's the
```



1    51130 is the testing of coverings and within that

2    gives you the definitions for the different

3    ratings.

4         Q.   What I'm trying to find out is what's

5    the definition for wet or very wet, as you state in

6    page 18 of your report.

7         A.   For wet and very wet, it is derived

8    from the DIN, as I just mentioned.  And if you read

9    those, it gives you examples.  It's a lot of

10   literature that might give you what an R11 is and

11   can be provided if it makes any use.

12        Q.   I'm asking if you know right now, as

13   we sit here.

14        A.   Again, I can't quote a -- I can quote

15   a specific test standard has definitions for those

16   different R values.

17        Q.   Okay.

18        A.   And the test standard itself provides

19   additional references that will explicitly state

20   what classifies as a wet or very wet or

21   transitional areas.

22        Q.   And you're saying that these are

23   copyrighted or something?

24        A.   So the document that I have is for my

25   personal use and I cannot distribute it.  Those are



**JEANNIE REPORTING (305) 577-1705**

1    the conditions for which that standard is done.

2              Since you have the reference, you can

3    go to the DIN website and download it.

4         Q.    In any event, as you sit here today,

5    can you tell me how wet or very wet is specifically

6    defined?

7         A.    It's defined as an R12 and R13 rating.

8         Q.    I got that.

9              But what do they mean by wet or very

10   wet, as opposed to occasionally can become wet?

11        A.    So I don't have it in front me, as I

12   said.  But if I were to reproduce the DIN standard

13   and the references that it contains and -- it's a

14   matter of definition.

15        Q.    Exactly.  I'm trying to find out what

16   those definitions are.

17        A.    You shall find them in the standard,

18   if you look at them.

19        Q.    I'm asking you now as the expert for

20   the plaintiff.

21        A.    Right.

22              So if I'm answering you, wet surface

23   can be a spa area, as example, in the Norwegian

24   BREAKAWAY can be considered as an R12.  Pool areas

25   are considered R13.  Showers are considered R13.


JEANNIE REPORTING (305) 577-1705

1    Bathtubs are conditions R13.

2              So you have an example list of

3    explicit areas.  Lobbies, for instance, depending

4    if they're covered or not covered, can also be

5    considered R12 or R13.  So there's different

6    definitions.

7              When you look at those definitions and

8    you compare them with the spa area that you have,

9    and I was able to physically inspect and be there,

10   that would lie either as a R12 at minimum or most

11   likely an R13.

12        Q.   Are you saying that this tile rating

13   has a specific coefficient of friction requirement?

14        A.   I'm saying that this is an R11 tile.

15        Q.   I got that part.

16             But is there anything from the DIN

17   standard that discusses what the acceptable slip

18   resistance should be for the R11, R12, or R13 tile?

19        A.   There's different ranges of

20   coefficient of friction for the different tiles.

21        Q.   What are they?

22        A.   Again, I can't recall the table from

23   the top of my head.

24        Q.   So you don't know, as you sit here?

25        A.   I can't recall the -- I can't read the

```
 1     standards since I don't have it in front of me, the

 2     table of specific ranges that those tiles lie on.

 3            Q.    Okay.  Here, before I forget, I have

 4     printed a better copy of Exhibit 5.  I would like

 5     to mark it as Exhibit 5A.

 6                  (Exhibit 5A was marked for

 7                  identification purposes.)

 8     BY MR. GORDON:

 9            Q.    I'm showing you, Dr. De Caso, 5A.

10     Does that look like a better copy of the

11     photograph?

12            A.    It seems a little smaller, but that's

13     okay.  Yes.

14            Q.    Do you see any water on the floor in

15     5A in the area where Ms. Kessler fell?

16            A.    As part of the review of the CCTV,

17     when looking at it, you can see that there's a

18     contrast in the area where she's stepping and

19     slipping.  We're talking about this before.  I

20     didn't sub to any individual -- sub the work,

21     subcontract the work.

22                  But you can see, there's an area of

23     contrast.  And, in fact, you can even see how the

24     grout line between the tiles changes contrast, and

25     it could be inferred that that's a wet area.
```



1    Again, with a degree of -- not with a high degree

2    of certainty, as I mentioned before.

3            **Q.**    You're just assuming it could be

4    water; correct?

5            **A.**    Well, after having inspected and

6    making wet the area, and also seeing the change of

7    color grout when it becomes wet and seeing the

8    water coming down the grout line, it is possible

9    that it could be wet from the CCTV footage.

10           **Q.**    Can you positively state with

11   certainty that there was any water that you

12   observed in the area where Ms. Kessler fell on the

13   CCTV?

14              MR. GERSON:  Object to the form.

15              THE WITNESS:  Based on -- based on the

16              CCTV, prior Exhibit 5A, and having seen

17              crew squeegeeing the surface, I'm assuming

18              they were squeegeeing it because it had

19              water on that area.  And placing it at the

20              location where she slipped, it is possible

21              to infer that there could have been water,

22              with a low degree of certainty.

23              MR. GORDON:  Move to strike the

24              answer.

25                         ///

JEANNIE REPORTING (305) 577-1705

1   BY MR. GORDON:

2          Q.   I'm not asking you to infer.  I'm

3   asking you, do know for a fact that you saw water

4   on the floor in the CCTV in the area where

5   Ms. Kessler fell?

6               MR. GERSON:  Object to the form.

7               THE WITNESS:  It's not possible to

8          tell that --

9   BY MR. GORDON:

10         Q.   Okay.

11         A.   -- if it's 100 percent water in that

12  location.

13         Q.   Let's do this.  What are we on now?

14              (Exhibit 7 was marked for

15         identification purposes.)

16  BY MR. GORDON:

17         Q.   Dr. De Caso, what I'm doing now is I'm

18  marking the photographs that were contained in the

19  link that was provided by Mr. Gerson's office.

20              Can you just confirm for me that these

21  contain all the photographs you took during your

22  inspection, please.

23         A.   I would assume that all the pictures

24  are contained within here.  Yes.  It looks about

25  right.

1    **Q.**    I'm sorry?

2    **A.**    It looks about right.

3    **Q.**    Okay.  Thank you.

4            On page 12 of your report, you make

5    reference to drainage slope?

6    **A.**    Drainage slope.

7    **Q.**    Page 12, 3.25.

8    **A.**    Yeah.

9    **Q.**    Are you with me?

10   **A.**    I'm with you.

11   **Q.**    What were you referring to as part of

12   your report?

13   **A.**    I'm referring to that same section in

14   figure 12 of the report.  And just as we were

15   discussing before, Exhibit 5A, about is there water

16   or not on that surface and how I was comparing the

17   CCTV with the actual inspection and the contrast

18   changes of the floor surface, as well as the grout

19   line, and how the water slopes down.  Down, because

20   it has to go down because gravity pulls it down.

21           So even though it may not feel like

22   there's a slope on that floor surface, in fact,

23   there was, as the water was sloping away from the

24   drainage and the tested area.  And you can see also

25   the contrast change of the grout line.

1           So when I refer in Section 3.25 of the

2    report, surface drainage slope refers to how the

3    surface drains itself due to the natural slope.

4           Q.    Okay.  And it says, "To this end,

5    water was deposited at location number 10 and 11."

6           Is this something different than when

7    you did your slip resistance testing?

8           A.    That would be the water that was

9    deposited there for what is being for the picture

10   shown.  And then there was other additional water

11   deposited to test the drain.

12          Q.    Right.

13          So is this referring to the part of

14   the inspection where you tested the drains or when

15   you tested -- in the slip resistance tested?

16          A.    In this explicit case, the water

17   deposited was the water deposited during the test.

18          Q.    The slip resistance testing?

19          A.    That's correct.

20          Q.    Okay.

21          A.    Yeah.  We're on the same page.

22          Q.    When you did the slip resistance

23   testing, how much water did you put on the surface?

24          A.    I think it's about a seven-ounce

25   bottle, if I remember correctly.  So that would

1  probably be half of that.  So three and a half

2  ounces.

3       **Q.**   You put three and a half ounces of tap

4  water in the location?

5       **A.**   Give or take.

6       **Q.**   Is that consistent with all the test

7  locations?

8       **A.**   More or less, yes.  There was only --

9  since the same tests were performed.  However, as

10  you do different tests, if you don't reach, you

11  know, the strike-off at the given time, maybe it

12  would have been more water deposited so.  So the

13  amount of water might vary specifically from test

14  to test.

15            Again, the intent of Figure 12 and the

16  comment -- the intent of Section 3.25, and to

17  answer your question, that paragraph explicitly

18  tries to evaluate where the water would flow from

19  that position onwards.

20            And it was possible to tell, as it can

21  been seen in Figure 12, that it was flowing away

22  from the drain and away across the spa entrance.

23       **Q.**   Did you measure the area from the door

24  that enters into the thermal spa area until the

25  location where Ms. Kessler fell?



1      **A.**    The door entry that's located -- if

2   you're looking at picture 12 towards the right-hand

3   side at the end of the corridor?

4      **Q.**    Picture 12?

5      **A.**    Figure 12.  In that direction.

6      **Q.**    Well, I don't see it in the

7   photograph.

8      **A.**    No.  It's not in the picture.  But the

9   direction of the picture is the door that we

10  entered into the spa.

11     **Q.**    You know what I'm talking about.  You

12  enter from the locker room area --

13     **A.**    Yes.

14     **Q.**    -- there's a door.  Then you go from

15  the door to get to the area where Ms Kessler fell.

16            All right.  Just let me just finish

17  the question, and then you can answer.

18     **A.**    Of course.

19     **Q.**    You know what I'm referring to;

20  correct?

21     **A.**    I'm just making sure we're talking

22  about the same door, yes.

23     **Q.**    Yeah.  There's a door where you open

24  up and leads into the thermal area of the spa;

25  correct?

```
1          A.     If you don't open it, you would bang
2     onto the door.  That's correct.
3          Q.     Okay.  Did you measure from the
4     entryway of that door up until the point where
5     Ms. Kessler fell?
6          A.     The distance between the door and that
7     point?  I did not measure that distance.
8          Q.     Looking on page 16 of your report, on
9     your 4.1.2.  And when you're there, let me know.
10          A.     4.1.2.
11          Q.     Yes.
12          A.     Right there.
13          Q.     Okay.  You say, "Most likely, cleaning
14     and disinfecting activity took place prior to the
15     inspection, as part of routine maintenance
16     necessary to insure public health."
17               Do you see that?
18          A.     Yes.
19          Q.     Do you know for a fact whether any
20     cleaning or disinfecting activities took place
21     right prior to you inspecting the spa?
22          A.     So based on the microscopic evaluation
23     of the tile, it's possible to infer that it was
24     disinfected since there's no typical deposits of
25     dirt and contaminants that you would see when
```

1    you -- when the surface is being used.

2           **Q.**    Okay.  Do you know for a fact when the

3    tile surface you tested was last cleaned?

4           **A.**    Based on deposition statement, they do

5    it routinely.  So I would assume -- I don't know

6    for a fact.

7           **Q.**    That's what I'm asking.

8           **A.**    I don't know for a fact.

9           **Q.**    What was the purpose of you doing a

10   microscopic inspection of the tile?

11          **A.**    To look at the surface porosity, the

12   conditions, imperfections, wear, tear,

13   contaminants, et cetera, et cetera.

14          **Q.**    Was there wear and tear?

15          **A.**    Not to -- define wear and tear.

16          **Q.**    I'm trying to find out why you did the

17   microscopic -- what did you call it?

18          **A.**    Microscopic imaging.

19          **Q.**    Why did you do it and what were your

20   findings?  How they relate to your opinions in this

21   case?

22          **A.**    Why do I do it?  It's a good practice

23   and it's a good visual evaluation of any floor

24   surface.

25                    What I was able to find from this is


**JEANNIE REPORTING (305) 577-1705**

1    that there's a relative smoothness to the tile.  So

2    the surface deformations that there are are

3    relatively smooth.  The surface deformations that

4    can be seen, as you're looking down on to the tile,

5    are relatively smooth.

6              There was a small level of surface

7    porosity, which you can see in the kind of little

8    dots of the Figure 11 in the report.  And it was

9    relatively homogeneous, again, from a surface point

10   of view.

11             If you had areas with more or less --

12   so if it was less homogeneous from a contaminant

13   point of view, it would show lack of cleaning or

14   maintenance.  That was not the case.  It was quite

15   homogeneous, from the evaluation.

16        Q.    It looked like it was well-maintained

17   tile?

18        A.    It looked like it was cleaned, yes.

19        Q.    And did you observe this with your own

20   eyes or with some sort of instrument?

21        A.    This was using a USB microscope and

22   with a magnification of 50, whatever it was.

23        Q.    Have you done any testing of this type

24   of tile outside of the BREAKAWAY?

25        A.    I have not, no.

1          Q.    Have you ever tested this specific

2     type of tile in the past, other than this tile?

3          A.    I'm not aware of other tiles that I

4     have tested that are from the same manufacturer.

5     I'm not sure.

6          Q.    R11 tile has -- strike that.

7                You make reference on page 18 of

8     4.2.4.  "Those in control of the vessel and spa

9     should have been aware of the inadequate and

10    deficient selected type of tile, and thus failed to

11    use a safe floor surface for an area that is known

12    to be wet or very wet."

13               Do you see that?

14         A.    I see that.

15         Q.    What's the basis for that statement?

16         A.    Well, the basis is that it's part of

17    the case documentation.  The tile is classified as

18    an R11 tile.  And for the application that it was

19    applied to, the spa, an R12 or R11 would have been

20    the proper tile to be -- the proper rating for the

21    tile to be installed.

22         Q.    That's your opinion; correct?

23         A.    It is the opinion of the DIN, the

24    Deutsch institute that provides those reports as

25    well, yes.

1      Q.   And is there any evidence in this case

2   that anyone from Norwegian was aware that this

3   report -- this tile was purportedly the incorrect

4   rated tile?

5            MR. GERSON:  Object to the form.

6            THE WITNESS:  Obviously, they didn't

7        know, otherwise they would have changed it.

8            But so when you procure a boat, you

9        know, you specify all the different things,

10       engines, interior color, finishes, et

11       cetera.  And, you know, part of that, I'm

12       sure, maybe the interior designer or the

13       architect might have specified that.

14       Ultimately, you know, you buy something

15       with your specs, and you would want to make

16       sure your specs are met.

17  BY MR. GORDON:

18       Q.   You don't know who selected the tile;

19   correct?

20       A.   As we said before, I don't know who

21   selected the tile.  But ultimately Norwegian buys

22   the boat, not from the manufacturer, from the

23   vessel, and they specify what they want.

24       Q.   But you don't know in this case with

25   respect to this ship who selected that specific



JEANNIE REPORTING (305) 577-1705

```
 1    tile for the Mandara Spa; correct?

 2         A.    That's why I refer as to those in

 3    control of the vessel and the spa.

 4         Q.    You don't know who specifically

 5    selected the tile in the Mandara Spa; correct?

 6         A.    I don't.

 7              MR. GERSON:  Objection.  Asked and

 8              answered three times.

 9    BY MR. GORDON:

10         Q.    Correct?

11         A.    Correct.  I don't.  And that's why I

12    referred to a third term based, those in control of

13    the vessel and the spa.  If I knew who it was,

14    maybe I would have included it in the report.

15         Q.    Do you have a copy of the SOLAS

16    Chapter 2-2, Part D, Regulation 13?

17         A.    Can you say that again?

18         Q.    I was just reading off your report.

19    Under 4.2.7, you made reference to SOLAS.

20         A.    4.2 point?

21         Q.    You make reference to SOLAS

22    Chapter 2-2, Part D?

23         A.    Yes.

24         Q.    Do you have a copy of that with you?

25         A.    It's probably provided in the
```

1    documents or --

2          **Q.**    I didn't see it but --

3          **A.**    It's a public document.  If you Google

4    it, you will be able to.

5          **Q.**    What's your opinion in this regard?

6          **A.**    As stated in the report, the means of

7    egress, which the entrance to the spa area was one,

8    since in order to exit in case of an emergency you

9    have to walk through there, that spa corridor does

10   not meet the International Convention for the

11   Safety of Life at Sea, SOLAS, in which it states

12   that floor surfaces must be slip-free under foot.

13   And it's indicated explicitly on that section.

14         **Q.**    Is there anything in that SOLAS

15   chapter you cite which references specific

16   coefficient of friction measurements?

17         **A.**    It refers to a slip-free under foot.

18   And there's a definition given by it.

19         **Q.**    What's the definition?

20         **A.**    That it shall be slip-free under foot.

21   There's a section for definitions in the earlier

22   part that I don't have with me.  So I cannot quote

23   verbatim what that definition is.

24         **Q.**    But does it make specific reference to

25   a slip resistance number, a minimum?

```
 1              A.    Not to my recollection.
 2              Q.    Okay.  And the word "slip-free," is
 3      there any specific definition for that at all?
 4              A.    There's a definition within the --
 5      within the SOLAS.  Again, I don't have that with
 6      me.
 7              Q.    All right.  We're on page 19, if you
 8      want to follow with me.
 9              A.    Yeah.
10              Q.    4.2.8.  You start making reference to
11      floor surface drainage.
12              A.    Yes.
13              Q.    You state, "When evaluating the floor
14      surface, water remained stagnant and when it
15      drained it did so away from the drainage points."
16              A.    That's correct.
17              Q.    Then you make reference to, "An
18      accumulation of water at the slip-and-fall location
19      of Ms. Kessler did not drain from this location
20      when deposited by crew."
21                    Correct?
22              A.    That's correct.
23              Q.    What are you referring to specifically
24      there?
25              A.    I'm referring to the CCTV footage that
```

1  was provided by the -- I'll get the name right --

2  the Tellez transcript, deposition transcript, that

3  you can see a crew member squeegeeing the floor and

4  depositing the water that was squeegeed in that

5  area.

6       **Q.**   Okay.  First of all, Tung Tellez is a

7  security officer; correct?

8       **A.**   He is.  I'm referring to the exhibit

9  that was provided in that depo.

10      **Q.**   Okay.  You'll agree Tung Tellez wasn't

11 responsible for maintaining the floor in the spa on

12 the day of Ms. Kessler's incident; correct?

13      **A.**   I would agree with that.  I think I'm

14 not making any reference to that.  I'm only making

15 reference to the exhibit that I happened to have

16 open, which has also been provided in other

17 deposition transcripts, on the still images from

18 the CCTV that show the crew member squeegeeing the

19 floor and depositing it, whatever surface floor

20 water he was squeegeeing in that area.

21      **Q.**   In what area?

22      **A.**   In the area where Ms. Kessler slipped

23 and fell.

24      **Q.**   Okay.  So your testimony is that a

25 crew member squeegeed water in the area when



1    Ms. Kessler fell?

2          **A.**    So based on the CCTV image, as a

3    squeegeed area, and that was the area where water

4    was deposited during the inspection, that water

5    during the inspection remained stagnant.

6          **Q.**    I want to first get to the point that

7    supports your opinion that somebody pushed water in

8    the area where Ms. Kessler fell before she fell.

9    What's that based on?

10          **A.**    Based on the CCTV images reviewed as

11    part of the case.

12          **Q.**    And you reviewed the actual crew

13    member depicted in the CCTV with the squeegee;

14    correct?

15          **A.**    That's correct, yes.

16          **Q.**    And he testified he did not squeeze

17    water in the area where Ms. Kessler fell; correct?

18               MR. GERSON:  Object to the form.

19               THE WITNESS:  That's what he

20               testified, I assume, yes.

21    BY MR. GORDON:

22          **Q.**    Well, it's not what you assume.

23    That's what he testified to.  Right?

24               MR. GERSON:  Object to the form.

25               THE WITNESS:  Again, I don't have --

```
 1            we need to open it, but yes.
 2   BY MR. GORDON:
 3        Q.   So you're just assuming based on your
 4   observation of a video that someone pushed water on
 5   the floor?
 6        A.   So there was a CCTV image that
 7   depicted the fall.  And prior to the fall and even
 8   several minutes before the fall, you can see the
 9   same crew member kind of squeegeeing the floor
10   backwards and forwards as other guests are using
11   the facilities, tracking water around.  You can
12   clearly see that they are wet.
13            And then he appears to come under
14   where the video position camera is and kind of
15   curving around with the squeegee and stopping,
16   holding the towel in his hand.
17        Q.   Is it your testimony that you can see
18   a crew member pushing water with a squeegee in the
19   area where Ms. Kessler fell?
20        A.   I can see the crew member squeegeeing
21   the floor and stopping at the area -- I'm answering
22   your question so --
23        Q.   Okay.
24        A.   -- what I'm alluding to is, I can see
25   the crew member squeegeeing the surface.  And since
```

1    the same crew member testified that he only

2    squeegees areas where there's water, it can be

3    inferred that there was water while he was

4    squeegeeing that area -- let me finish.  Thank you.

5         **Q.**   Go ahead.  I'm not going to yell.

6         **A.**   And therefore he placed that water

7    over there.  Thank you.

8         **Q.**   My question is, did you see actual

9    water being squeegeed by the crew member on the

10   video?  Not whether he's using a squeegee, whether

11   he's actually squeegeeing water that you observed

12   on the CCTV.

13        **A.**   I was not there at the time of

14   incident; so it's not possible to see.

15        **Q.**   Right.

16             You testified you reviewed CCTV;

17   correct?

18        **A.**   That's correct.

19        **Q.**   Did you see on the CCTV a crew member

20   actually push water on the video in the area where

21   Ms. Kessler fell?

22        **A.**   Based on the testimony provided by the

23   crew member saying that he squeegees water in order

24   to dry the surface when it's wet, then it can be

25   inferred that, as he was conducting his job, he was



JEANNIE REPORTING (305) 577-1705

1    squeegeeing the surface -- which should have had

2    water, that's what he testified -- finalizing and

3    stopping in the area where Ms. Kessler fell.

4                MR. GORDON:  Move to strike the

5           answer.  I'll ask it again.

6    BY MR. GORDON:

7           Q.    Did you personally observe with your

8    own eyes on the CCTV that you viewed a crew member

9    push water in the area where Ms. Kessler fell

10   before the incident?

11               MR. GERSON:  Objection.  Asked and

12          answered three or four times.

13               I'm going to let him answer one more

14          time.  Then we're going to stop this.

15   BY MR. GORDON:

16          Q.    Go ahead.

17          A.    Again, I see a member that is

18   squeegeeing the surface.  And based on the

19   deposition transcript, that member only squeegees

20   the surface when it's wet.  So it can be inferred

21   that he's squeegeeing water to that location.

22          Q.    You're inferring it, but you didn't

23   actual see with your own eyes; correct?

24          A.    As I said --

25               MR. GERSON:  Object to the form.  It



JEANNIE REPORTING (305) 577-1705

```
 1                 shows what it shows.
 2                      MR. GORDON:  It does.  It shows no
 3                 water.
 4                      MR. GERSON:  Whatever it shows, it
 5                 shows.
 6                      What are you arguing with him for?
 7                      MR. GORDON:  I'm not arguing.  I want
 8                 him to answer the question because --
 9                      MR. GERSON:  He just answered it four
10                 times.
11                      MR. GORDON:  He hasn't answered it.
12      BY MR. GORDON:
13           Q.   Ask it again.  Okay?  It's very
14      simple.
15                      Did you personally see on the video a
16      crew member squeegee water on the video before
17      Ms. Kessler fell in that same area?
18           A.   Can I answer?
19           Q.   You haven't answer it yet, but go
20      ahead.
21                      MR. GERSON:  Object.  Move to strike
22                 counsel's characterization.  He's answered
23                 it four times already.
24                      THE WITNESS:  What can be seen, that I
25                 personally saw with my own eyes, both of
```

JEANNIE REPORTING (305) 577-1705

1                    them, the CCTV footage, that the crew

2                    member is performing his duties, which as

3                    he testifies in the deposition is to

4                    squeegee the floor when wet.  And he can

5                    been seen going backwards, forwards,

6                    squeegeeing the floor several times, and

7                    then squeegees the floor towards that area,

8                    stopping at the location where Ms. Kessler

9                    fell.

10     BY MR. GORDON:

11            Q.    Okay.  Did you see water on the floor

12     in the video?

13            A.    Based on the review of Exhibit 5A and

14     5, as mentioned before, and comparing to what was

15     undertaken during the inspection, and understanding

16     the difference in contrast with the tile, with a

17     low degree of certainty, it might be possible to

18     state that there's water at that location.

19            Q.    And you're just assuming that there

20     might be water there; correct?

21            A.    Again, based on the evidence and the

22     transcripts that I reviewed, yes.  Unfortunately, I

23     wasn't there at the time of the incident to see it

24     with my two eyes.

25            Q.    You didn't see it with your own two



JEANNIE REPORTING (305) 577-1705

1    eyes on the video you were provided; correct?

2              MR. GERSON:  Object to the form.

3         Asked and answered five times now or

4         perhaps more.

5              THE WITNESS:  As I said, I saw -- in

6         fact, you could even tell that the angle of

7         the crew member with -- you know, at a

8         certain point is showing your back.  So

9         tracking the water along.

10             So unless I have X-ray vision to be

11        able to see through him, it would be -- I'm

12        saying, as he's turning around.  Right?

13        So -- so it would be difficult.

14   BY MR. GORDON:

15        Q.   Difficult for what?

16        A.   To see him tracking that water as he's

17   turning around in front of the camera,

18   squeegeeing --

19        Q.   So you didn't actually see the water.

20        A.   As I said, I see the crew member

21   performing -- maybe this is the last time I will

22   answer -- his duties that he states he squeegees

23   wet floors.  And that's exactly what he's doing.

24        Q.   He also testified, Mr. Collantes said

25   he was not squeegeeing water in the area where

```
 1    Ms. Kessler fell; correct?

 2              MR. GERSON:  Object to the form.

 3              THE WITNESS:  That's correct.

 4    BY MR. GORDON:

 5         Q.   Do you have the timestamp of this

 6    video that you mentioned regarding this crew member

 7    who you think was squeegeeing water?

 8         A.   Yes, I do.

 9         Q.   What is it?

10         A.   3:47:06.257 p.m.

11         Q.   You said 3:47?  I'm sorry.

12         A.   3:47:06.

13         Q.   Okay.  Thanks.

14              And in the CCTV that you were provided

15    and which you reviewed, did you also see other

16    people walking in the same location as Ms. Kessler

17    prior to Ms. Kessler's fall?

18         A.   I recall seeing other guests in this

19    case, yes.  And crew.

20         Q.   How many?

21         A.   I can't recall.  I don't have the

22    video in front of me.

23         Q.   It was more than three, correct?

24         A.   As I said, I don't have the video, so

25    I can't recall.
```

1    **Q.**    You only had four minutes of CCTV,

2    which you testified earlier; right?

3           **A.**    More or less, yes.

4           **Q.**    Okay.  So you really don't know how

5    many people walked through there within the last, I

6    don't know, ten minutes before Ms. Kessler;

7    correct?

8           **A.**    I can only attest to what was provided

9    to me.

10          **Q.**    In that four minutes, did you see any

11   other person slip and fall in the same area where

12   Ms. Kessler fell?

13          **A.**    Not possible to tell exactly the same

14   area where she fell, as we discussed before.  I

15   wouldn't know if they walked exactly in the same

16   location where she fell, those individuals that

17   walked through the area.

18          **Q.**    Sir, you refer to this area

19   corridor -- correct? -- in Exhibit 5 or 5A?

20          **A.**    Yes.

21          **Q.**    You saw other people walking in that

22   area before Ms. Kessler fell; correct?

23          **A.**    In the corridor, yes.

24          **Q.**    You call it a corridor; correct?

25          **A.**    Yeah.



1          Q.     Right?

2          A.     That's what we are calling it, yes.

3    That's what I refer to it in the report.

4          Q.     Did you see anybody else other than

5    Ms. Kessler slip and fall prior to her in the

6    immediate area?

7          A.     Based on the CCTV evidence that was

8    provided to me, I did not.

9          Q.     And your testimony about -- the

10   testimony that you had regarding observing a crew

11   member squeegeeing water from Tung Tellez's

12   deposition, I believe you said it was an exhibit?

13         A.     Right.  It was the exhibit that I had

14   open.  That same exhibit has been presented in

15   other depos, yeah.

16         Q.     Is that a video or still shot of the

17   video?

18         A.     It's a still shot of the video, as I

19   mentioned before.

20         Q.     Do you know what the exhibit number

21   is, by any chance?

22         A.     I think it's Exhibit 1.

23         Q.     All right.  Thanks.

24                You have a reference on page 19 of

25   your report regarding Ms. Kessler's gait.

1            **A.**    Yes.

2            **Q.**    Okay.  And your evaluation -- strike

3      that.

4                  Your evaluation of Ms. Kessler's gait

5      was based on the video footage of her walking down

6      what you describe as the corridor?

7            **A.**    Yes.

8            **Q.**    Okay.  And you've never reviewed any

9      footage of Ms. Kessler's gait prior to that ever;

10     correct?

11           **A.**    That's correct.

12           **Q.**    You don't know what her gait was like

13     before she walked through that door into that CCTV

14     range; correct?

15           **A.**    Only what was available made to me,

16     yes.

17           **Q.**    And that was how many seconds?

18           **A.**    A couple of seconds.

19           **Q.**    How many?

20           **A.**    A couple of seconds.

21           **Q.**    It was under ten seconds?

22           **A.**    Probably, yes.  A couple tends to be

23     two.  So that would be less than ten.

24           **Q.**    Okay.  So the totality of your opinion

25     regarding Ms. Kessler's gait was based on those few

1    seconds of CCTV footage?

2         **A.**    So they can be clearly seen in figure

3    13 prior to her incident.

4         **Q.**    Okay.

5         **A.**    That's what I'm basing the gait in as

6    is referenced in the report.

7         **Q.**    You also state that you don't think

8    that the incident was based on her -- or her fall

9    was not based on her gait or her balance?

10        **A.**    Her balance; correct.

11        **Q.**    And you have not reviewed any of

12   Ms. Kessler's medical records; correct?

13        **A.**    That's correct.

14        **Q.**    Okay.  And therefore you would agree

15   that you don't know what her medical history was;

16   correct?

17        **A.**    Except for what she testified.

18             MR. GERSON:  This has all been covered

19        already.

20             Why are you doing this?

21   BY MR. GORDON:

22        **Q.**    Go ahead.

23        **A.**    Except for what she's testified, as we

24   reviewed before.

25        **Q.**    Okay.  And -- you don't know whether

1    Ms. Kessler had any issues with her gait as

2    described by a medical doctor; correct?

3            **A.**   Can you define "gait," please.

4            **Q.**   Well, it's in your report; correct?

5            **A.**   I know, but I want to make sure we

6    talk about the same thing.

7            **Q.**   What's your definition of "gait"?

8            **A.**   So in the case of the report, the gait

9    that I'm trying to compare is immediately before

10   and after the incident.

11           Maybe bring some background reference,

12   as it's stated, Oberg, et.al, and Lee Grimson, you

13   might have an inadequate or a strange gait.  Gait

14   being the sort of rhythm that a person walks.  And

15   as long as that rhythm is consistent, even for the

16   awkwardness that one may have of a nonregular gait

17   cycle, the intent here is to compare the gait

18   before and after.

19           So the gait cycle that was being

20   compared, it's not about any medical history, since

21   I don't have that one, or after the incident, it's

22   about the gait cycle, meaning that rhythm that she

23   has as she's walking prior to the incident.

24           And it is possible -- thank you for

25   letting me finish, appreciate it.  It was possible,

1    based on Figure 13, as we stated before, that that

2    cycle was stable and balanced.  And that's the

3    opinion that I'm making.

4          Q.    Based on the few seconds of video

5    footage?

6          A.    The cycle prior to the incident, yes.

7    Her gait cycle prior to her gait cycle after the

8    incident.

9          Q.    Which is based on the video.

10         A.    This is what we've been saying from

11   the beginning.  So we reiterate that Figure 13

12   talks about the CCTV provided, the few seconds

13   prior to her incident, and we're comparing the gait

14   cycle prior and after in order to determine the

15   onset of the slip and what might have caused it.

16         Q.    You would agree that you are not -- or

17   strike that.

18               You would agree that you do not know

19   what Ms. Kessler's medical condition was in terms

20   of her ability to walk; correct?

21               MR. GERSON:  Objection.  Asked and

22         answered over and over again.

23               Why are you doing this?

24   BY MR. GORDON:

25         Q.    Go ahead.



1          **A.**    Again, I'm comparing the gait cycle

2     before or after the incident.

3          **Q.**    You would agree that a medical

4     condition could affect someone's ability to walk;

5     correct?

6          **A.**    So even -- as I was trying to mention

7     when I asked about the definition -- even if your

8     gait cycle is altered in any way, it's altered or

9     changed in any way, the important thing -- again,

10    what I'm doing in the report is to compare before

11    and after.

12             So even though you might have an

13    awkward cycle, as I mentioned before, if that cycle

14    is steady, stable, and balanced, that's the purpose

15    of what was being done here.

16         **Q.**    Okay.

17         **A.**    Context matters.  That's what I'm

18    maybe trying to summarize.

19         **Q.**    It does.  And you would agree that

20    someone with a medical condition, that may affect

21    their ability to walk; correct?

22         **A.**    Depends on -- I mean, it's a very

23    broad statement.  But as long as that medical

24    condition results in a steady and stable gait,

25    that's still okay.  It shows a balance and steady

1   gait.

2            The point being that the analysis that

3   is provided in the report, Figure 13, Figure 14, is

4   the comparison of the gait cycle before and after

5   the incident.  I think I mentioned it a couple of

6   times before.

7       Q.   My question is, someone with a medical

8   condition, that could affect their ability to walk;

9   correct?

10      A.   I'm not a medical doctor, so I don't

11  know how to answer that question.  It depends on

12  the condition.  It depends on many things.  It's a

13  very broad statement.

14            Even somebody without a medical

15  condition can affect their ability to walk.  Okay?

16  The opposite is true.  I'm just trying to give you

17  some context.

18      Q.   You're the one who's providing

19  opinions on gait.  So I'm just asking questions.

20      A.   Right.  I understand.

21      Q.   So you would agree that someone with a

22  medical condition, that may make them more

23  susceptible to falling; correct?

24      A.   And the opposite would be true.  They

25  could have a medical condition and not be



```
 1    susceptible.
 2              Please define the medical condition
 3    and be more explicit when asking the question.
 4         Q.   As a general statement, you would
 5    agree, sir, that a medical condition may make
 6    someone more susceptible to falling; correct?
 7         A.   Its depends.  That would be my answer.
 8         Q.   Depends on what?
 9         A.   On the medical condition.
10         Q.   Right.
11              And you're not a medical doctor;
12    correct?
13         A.   That's correct.
14         Q.   You didn't review the medical records?
15         A.   That's correct, as we stated before.
16         Q.   And to be clear, for an example, I
17    will show a medical record from Dr. Schwartz dated
18    January 12, 2017.
19              What are we on?
20         A.   Eight.
21              (Exhibit 8 was marked for
22         identification purposes.)
23              THE WITNESS:  This is number 8?
24    BY MR. GORDON:
25         Q.   Yes, sir.
```

```
 1              A.    Thank you.

 2                    MR. GERSON:  I object to the form.

 3     BY MR. GORDON:

 4              Q.    Okay.  That's fine.

 5                    Sir, showing you Exhibit 8, you would

 6     agree that according to this record from

 7     Dr. Schwartz -- can I see it real quick?

 8              A.    Sure.

 9              Q.    It's January 12, 2017.  Ms. Kessler

10     reported gait abnormality and balance difficulty;

11     correct?

12                    MR. GERSON:  Object to the form.

13                    THE WITNESS:  Could you point out in

14          the report where it's located at?

15     BY MR. GORDON:

16              Q.    Sure.

17                    Page 2 under "Neurologic:  Balance

18     difficulty, admits.  Gait abnormality, admits."

19              A.    Thank you.

20              Q.    Correct?

21              A.    Can I review it?

22              Q.    All right.

23              A.    We're reviewing a document.  So this

24     is review of the symptoms.  This is provided by her

25     opinion.
```



```
 1              Q.    It's provided by her medical doctor?

 2              A.    Right.  I'm just trying to see, okay,

 3      review.  This is first time I see this document.

 4      So if you can give me some time to review it, I

 5      appreciate it.

 6              Q.    Sure.

 7              MR. GERSON:  What's the question?

 8      BY MR. GORDON:

 9              Q.    You want to read it first and let me

10      know when you're ready.

11              A.    Yes.  Page 2 of Exhibit 8 under

12      "Neurologic" states, and I quote, "Balance

13      difficulty, admits."

14                    I'm assuming that that's coming from

15      her rather than an assessment by the doctor.

16                    "Gait abnormality, admits," meaning

17      that's provided by the patient.

18                    "Seizures, denies."

19              MR. GERSON:  Okay.  For the record,

20              the witness is simply reading what's on a

21              document he's never seen before.

22              MR. GORDON:  It's a speaking

23              objection.

24              MR. GERSON:  And it's outside his

25              expertise.
```

JEANNIE REPORTING (305) 577-1705

```
 1                    MR. GORDON:  It's a speaking
 2          objection.
 3                    MR. GERSON:  You bring this to the
 4          attention of the court --
 5                    MR. GORDON:  You want to stipulate --
 6                    MR. GERSON:  -- and let the court
 7          evaluate what you're doing now, which is
 8          totally wrong.
 9                    MR. GORDON:  That's an inappropriate
10          objection.
11     BY MR. GORDON:
12          Q.   Dr. De Caso, Ms. Kessler herself
13     admitted, according to those records, that she had
14     a balance difficulty -- she had balance
15     difficulties and a gait abnormality; correct?
16          A.   Based on this document dated
17     January 12, 2017, that's -- appears to be correct.
18          Q.   Okay.
19          A.   Which is two years prior to the
20     incident, I think, if I'm not mistaken.
21          Q.   Right.
22          A.   Thank you.
23          Q.   You would agree that alcohol
24     consumption can affect a person's balance; correct?
25          A.   Again --
```



1              MR. GERSON:  Object to the form.

2              THE WITNESS:  Again, in a generic

3         statement -- again, in context, it depends

4         on the amount, the person, the type of

5         alcohol, concentration, the food that you

6         might have had.

7              I'm not a medical doctor, but I think

8         these are common knowledge regarding

9         alcohol, the effects of alcohol.

10   BY MR. GORDON:

11        Q.   So the answer is yes; correct?

12        A.   It depends.  The answer is, it

13   depends.

14              You could have alcohol and not be

15   impaired; right?  And you could have alcohol and be

16   impaired.  It depends.

17        Q.   As a general statement, you would

18   agree that alcohol consumption can affect someone's

19   balance; correct?

20        A.   It depends on the quantity of the

21   alcohol, on the individual, how big you are, if you

22   had lunch or dinner before, if you have an empty

23   tummy.

24              My wife, for instance, she's terrible.

25   She smells a glass of wine, and forget about it.

1    She's a cheap date, I should say.

2            MR. GERSON:  Let's not speculate about

3        things outside your expertise.

4            THE WITNESS:  Sorry.

5            MR. GERSON:  And let's not ask

6        questions that are totally wrong and force

7        us to move for protective order, because

8        this witness has no opinions to give on

9        toxicology or the effects of alcohol on the

10       plaintiff at the time of the incident.

11           MR. GORDON:  Counsel, if you want to

12       object to form, that's fine.

13   BY MR. GORDON:

14       **Q.**   Dr. De Caso --

15       **A.**   Yes.

16       **Q.**   -- you would agree that --

17           MR. GERSON:  I'm objecting because

18       this is harassment.  This has nothing to do

19       with this witness.

20           MR. GORDON:  Sure it does.  He has

21       opinions on balance and gait.

22   BY MR. GORDON:

23       **Q.**   Dr. De Caso, you would agree that

24   alcohol consumption can cause a person to fall;

25   correct?



```
 1              A.    It depends.

 2              Q.    Depends on what?

 3              A.    Once again, it depends on the person,

 4     the amount of alcohol consumed, and they had lunch

 5     before and whatnot.

 6              Q.    Okay.  As a general statement, you

 7     would agree that alcohol consumption may cause

 8     someone to fall?

 9                    MR. GERSON:  As a lay person, is it

10              possible?

11                    THE WITNESS:  It could be possible.

12     BY MR. GORDON:

13              Q.    In fact, the article -- one of the

14     articles you provided, which is cited in your

15     report --

16              A.    Yes.

17              Q.    -- "Falls and Working Individuals,

18     Role of Extrinsic and Intrinsic Factors," written

19     by Gauchard, Chau, Mur, and Perrin.

20                    You're familiar with that article;

21     right?

22              A.    Yes.

23              Q.    You cited it; right?

24              A.    That's correct.  It's 2010 -- yes.

25              Q.    You would agree that in that article
```

1    that you cite in your own report it specifically

2    references alcohol as being a factor that can

3    disturb the different levels of postural regulation

4    and cause a fall; correct?

5         **A.**   It can, yes.

6         **Q.**   I'm reading right out of page 1332 of

7    that article.

8         **A.**   Okay.

9         **Q.**   And I'm just quoting from that same

10   article which states "The most frequent etiology of

11   these cerebellar syndromes is alcohol consumption."

12              You're familiar with that --

13              MR. GERSON:  Object to the form.

14   BY MR. GORDON:

15        **Q.**   -- in your own article -- strike that.

16              You're familiar with that reference in

17   this article; correct?

18              MR. GERSON:  Object to the form.

19              THE WITNESS:  I am.  That's provided

20         as a generic sample -- as a general

21         reference in order to provide information

22         about conditions.

23              If you probably review the report,

24         it's not explicitly referenced within a

25         given section to form opinions.

```
 1    BY MR. GORDON:
 2          Q.    It's an article you cited in your
 3    expert report in this case; correct?
 4          A.    Yes.  In order to differentiate
 5    between extrinsic and intrinsic factors that affect
 6    a slip-and-fall accident.  One of the many things
 7    that are evaluated in that report, it talks about
 8    alcohol.
 9          Q.    Right.
10          And assuming that Ms. Kessler was
11    intoxicated and impaired, that could have caused
12    her to fall; correct?
13                MR. GERSON:  Object to the form.
14                THE WITNESS:  Assuming that she was
15          intoxicated and impaired to a degree, I'm
16          assuming due to the alcohol?
17    BY MR. GORDON:
18          Q.    Yes.
19          A.    Right.  You didn't ask that.
20          Then, yes, that would cause her, as
21    you quoted of the -- on the report, it can provide
22    her inability to walk and therefore cause a slip.
23          Q.    Okay.  And you reviewed the testimony
24    of Ms. Kessler; right?
25          A.    Yes.
```

1     Q.    And you read where she testified she

2     consumed alcohol earlier that day; correct?

3     A.    She did say something along those

4     lines, yes.

5     Q.    And at 4.2.12 on page 19, you make

6     reference again to CCTV, deposition testimony,

7     regarding, I'm quoting, "The significant

8     accumulation of liquid/contaminants deposited by

9     the crew with the squeegee."

10           Do you see that part of the report?

11    A.    On page?

12    Q.    Page 19, 4.2.12.

13    A.    Uh-huh.

14    Q.    Yes?

15    A.    Yeah.

16    Q.    I mean, I don't want to go into this

17    again, if you already talked about it.  Is this

18    the -- is the basis for that statement what you

19    talked about earlier regarding Mr. Tong's

20    deposition exhibit?

21    A.    That's correct.

22    Q.    Okay.  So there's nothing else other

23    than that?

24    A.    That's correct.

25           MR. GERSON:  Well, it speaks for

```
 1              itself in references.
 2                   MR. GORDON:  Well, counsel, object to
 3              form.  I mean, if you want to ask him
 4              questions --
 5                   MR. GERSON:  Why would you distort
 6              something that's right there in plain
 7              English?
 8                   MR. GORDON:  You want me to go over it
 9              again?
10                   MR. GERSON:  No.  I'm not asking you
11              to do anything except ask relevant
12              questions and complete the deposition in an
13              expeditious way.
14                   MR. GORDON:  Okay.
15  BY MR. GORDON:
16         Q.   You make reference on page 19 at
17  4.2.13 to other or prior slip-and-fall incidents.
18         A.   4.2.13 to other slip-and-fall cases?
19  Yes, as part of priors that were reported in the
20  case documentation, the request for evidence.
21         Q.   Let me just ask you a couple questions
22  before that.
23              You've never been employed in any sort
24  of risk management position, have you?
25         A.   Depends.  I have risk management
```

1    responsibilities as part of my position.

2         Q.   Have you worked as a risk manager?

3         A.   Define "risk management."  Risk

4    management is part of my -- of my responsibilities

5    and roles.

6         Q.   Have you worked as a risk manager?

7              MR. GERSON:  Object to the form.

8         Asked and answered.

9    BY MR. GORDON:

10        Q.   Not whether it's one of your roles;

11   whether it is your title.

12        A.   I've never been employed with the

13   title "risk manager," if that's the question that

14   you've asking.  No, I have not.

15        Q.   Yes.

16             What are you referring to for these

17   prior slip-and-fall incidents?

18        A.   This is part of the interrogatories.

19        Q.   I'm trying to look for them in the

20   documents that were provided on the link.

21        A.   It was in a deposition.  So in

22   reviewing the Berman.

23        Q.   As you look, is there anything

24   specific in your file that will elicit the

25   information?



JEANNIE REPORTING (305) 577-1705

1        **A.**     I'm looking at the deposition

2    transcripts.  I remember there's an RFP -- the RFP

3    box, I think maybe it was in that one.  It was a

4    table with priors.  I'm trying to recall.

5        **Q.**     Well, you make reference about prior

6    slip-and-fall incidents.  I'm just trying to ask

7    you questions about it so --

8        **A.**     I know.  And I'm trying to respond to

9    the question.

10            Can you repeat the question, please.

11       **Q.**     Yeah.

12            My question is -- before I get to my

13    question, I want to make sure you're ready to

14    answer them.  So is there something --

15       **A.**     I don't know.  You need to ask it

16    first.

17       **Q.**     Well, my question is, what is the

18    basis for your -- I guess it's an opinion on

19    page 19 at 4.2.13 regarding, "Prior slip-and-fall

20    incidents that occurred on equivalent spa floor

21    surface type, both at the BREAKAWAY vessel and the

22    GETAWAY, are further evidence about -- are further

23    evidence that the levels of the spa floor surface

24    traction may have been inadequate."

25            That's your statement in your report;

1    correct?

2           **A.**    You've read it correctly, yes.

3           **Q.**    I'm just trying to find the basis for

4    that statement.  That's all I'm trying to find out.

5           **A.**    So there was prior slip-and-fall cases

6    reported as part of the case documentation and

7    making reference to what was provided in the case

8    documentation.

9           **Q.**    Okay.  So what specific prior

10   slip-and-fall incidents are you referring to to

11   support that statement in your report?

12          **A.**    Right.

13                 If you give me a second, I will look

14   through the case documentation.

15          **Q.**    That's what I was -- okay.

16                 (Thereupon, a brief recess was

17          taken @ 2:59 p.m.)

18                 (Proceedings were resumed @

19          3:08 p.m.)

20   BY MR. GORDON:

21          **Q.**    Sir, did you find the information you

22   were looking for?

23          **A.**    Yes.  This would be the Defendant's

24   Second Supplemental Answers to Plaintiff's Initial

25   Interrogatories.

1        Q.    Okay.  Is there any specific prior

2    incidents you're referencing?

3            A.    So the answer to, I guess,

4    Question 12.

5        Q.    Okay.

6            A.    It's provided items on the BREAKAWAY.

7        Q.    Right.

8            A.    And the GETAWAY.

9        Q.    Are you relying on any specific prior

10   incident to support your statement or opinions in

11   this case?

12           A.    Those that share the same -- those

13   that occurred in the spa deck on the same type of

14   surface.

15       Q.    Which one?

16           A.    So it would be Carolyn Anne.  It said

17   it was unknown.  Carolyn Anne Bellai, B-E-L-L-A-I,

18   said it was unknown.  Could be one or the other.

19       Q.    So it's unknown whether that occurred

20   on the same tile floor surface as Ms. Kessler;

21   correct?

22           A.    Yes.

23       Q.    What other incident are you relying

24   on?

25           A.    Helen Grey.



JEANNIE REPORTING (305) 577-1705

```
 1              Q.    Okay.

 2              A.    Patricia Urbina.  It doesn't

 3    explicitly state it was the same floor, but deck

 4    15, all of it, as seen in the inspection, including

 5    the area extending to the steam room also had

 6    shared the same tile surface.

 7              Q.    Ms. Urbina's incident happened by the

 8    steam room; correct?

 9              A.    Right.

10              Q.    That's not the same location where

11    Ms. Kessler fell; correct?

12                    MR. GERSON:  Object to the form.

13                    THE WITNESS:  That's correct.  But it

14              shares the same type -- if I can answer --

15    BY MR. GORDON:

16              Q.    Go ahead.

17              A.    -- before you start nodding and

18    answering to my question.

19                    I'm talking about the -- referring

20    back to Section 4.2.13 fall incident.  And I quote

21    from the report, "Fall incident that occurred on

22    equivalent spa floor surface type."

23                    So I'm not at any point stating that

24    it occurred at the same exact spot where

25    Ms. Kessler fell.  I'm talking about sharing the
```

1    same tile surface.

2          **Q.**    Okay.  You never tested the area by

3    the steam room; correct?

4          **A.**    Correct.

5          **Q.**    With your English XL; correct?

6          **A.**    That's correct.

7          **Q.**    And Ms. Grey's incident happened near

8    the swimming pool; correct?  Or beside the swimming

9    pool; correct?

10         **A.**    Again, I refer to it as the end of the

11   corridor, the spa entrance.

12         **Q.**    Well, Helen Grey, her incident,

13   according to the interrogatory answers, "occurred

14   while walking towards the thermal suite located in

15   the spa area beside the swimming pool."

16               Correct?

17         **A.**    Right.  Which shares the same type of

18   surface floor as that scene where Ms. Kessler fell.

19         **Q.**    Did you ever test the exact location

20   where Ms. Grey fell?

21         **A.**    I'm unaware on the exact location

22   where she fell.  My understanding, again, is that

23   she fell on the same or the equivalent tile as the

24   one where Ms. Kessler fell.

25         **Q.**    I should say where Ms. Grey slipped.



```
1      I don't know if she fell or not.

2              A.    Thank you for that.  Slipped.

3              Q.    But regardless, you never tested the

4      exact same location where Ms. Grey slipped;

5      correct?

6              A.    That's correct.

7              Q.    And Ms. Grey was wearing flip-flops at

8      the time of the incident?

9              A.    Pardon me?

10             Q.    Ms. Grey was wearing flip-flops at the

11     time of the incident?

12                   MR. GERSON:  Object to the form.

13                   THE WITNESS:  I don't have the full

14             details, but that's what's stated on the

15             supplementary answers.

16     BY MR. GORDON:

17             Q.    Ms. Kessler was barefoot --

18     correct? -- at the time of the incident?

19             A.    Ms. Kessler was barefoot, yes.

20             Q.    If we can actually go back -- I want

21     to go back to page 16 of your report.

22             A.    Yes.

23             Q.    Okay.  You make reference to -- you

24     make reference on page 16 to high contrast caused

25     between relatively dark and light spaces can lead
```

1    to temporarily reduce visual capacity; correct?

2            A.    Correct.

3            Q.    And then you say --

4            A.    This is 4.1.13, yes.

5            Q.    I think it's 4.1.3.

6            A.    3.  Sorry.

7            Q.    That's what you state; correct?

8            A.    That's correct.

9            Q.    And then you say, "These conditions

10   were present when entering the spa corridor may

11   have resulted in increased difficulty by

12   Ms. Kessler to discern wet areas and dry areas on

13   the floor surface."

14            Correct?

15            A.    That's correct.  That's what's stated

16   on the report.

17            Q.    All right.  First of all, let me ask

18   you whether you did any sort of measurements

19   concerning the lighting in the Mandara Spa in the

20   area where Ms. Kessler fell.

21            A.    I did not.

22            Q.    Okay.  And you tested -- strike that.

23            Your ship inspection occurred at

24   9:00 a.m. to 10:30 a.m.; right?

25            A.    That's correct.



JEANNIE REPORTING (305) 577-1705

```
 1        Q.   Okay.  And what were the weather
 2   conditions outside?
 3        A.   At the Port of Miami.
 4        Q.   Do you recall what the weather
 5   conditions were like?
 6        A.   I think I state that it was sunny and
 7   overall -- let me get back to the report.
 8             Relatively sunny, partially overcast.
 9        Q.   All right.  And Ms. Kessler's
10   incident, according to her, happened at
11   approximately 4:30 p.m.; correct?
12        A.   Correct.  In another location that was
13   not Port of Miami.
14        Q.   Right.
15             Where was the ship at the time of
16   Ms. Kessler's incident?
17        A.   I haven't reviewed the ship logs to
18   determine the location and orientation location of
19   the ship.
20        Q.   So you don't know.
21        A.   That's correct.
22        Q.   So you don't know if the lighting
23   conditions, as you saw them during your ship
24   inspection, were the same as those at the time of
25   Ms. Kessler's incident; correct?
```

1       **A.**    Correct.

2       **Q.**    And there's no testimony from

3    Ms. Kessler that she had any problems observing

4    anything in the spa at the time of the incident;

5    correct?

6       **A.**    The reference I'm alluding to, these

7    are high contrast, as you go into one area to

8    another, so you wouldn't consciously think about --

9    like becoming blind so -- but in her statement

10   there's no -- I don't think she was asked about

11   that either.

12      **Q.**    Is there any reference in her

13   testimony that she couldn't observe anything in the

14   spa?

15      **A.**    She was not asked anything to that

16   extent; so therefore there's no evidence to that

17   extent.

18      **Q.**    Okay.  Let me ask it this way.

19             Is there any evidence in this case

20   that Ms. Kessler had an issue with the lighting in

21   the spa at the time right before her fall?

22      **A.**    Not to my knowledge.

23      **Q.**    All right.  You make reference on

24   page 16 at 4.15 regarding there not being a

25   handrail in the entrance of the spa?

1      **A.**    That's correct.

2      **Q.**    Okay.  And you cite an IMO circular --

3    correct? -- to support your opinion that you

4    believe there should have been a handrail?

5      **A.**    To support that the recommendations

6    provided by that circular document, circular 735,

7    that there should have -- the recommendation is to

8    provide handrails.

9      **Q.**    You're relying on a circular; correct?

10     **A.**    As stated on 4.15, yes.

11     **Q.**    You'll agree that the circulars put

12   out by the IMO are nonbinding; correct?

13     **A.**    Correct.  It's a recommendation, as

14   also stated on the report.

15     **Q.**    Okay.  It's not binding; correct?

16     **A.**    It's a recommendation.  It's not a

17   mandatory -- correct? -- as stated in the report.

18     **Q.**    And you make reference about there not

19   being a handrail in the entrance of the spa

20   corridor.  What's the definition of "corridor"?

21     **A.**    As I define it in the report, it's --

22   the spa entrance is essentially a corridor, a means

23   of egress to -- a means of egress from one area to

24   another that you transfer -- that you're transiting

25   would be classified as a "corridor."

```
 1            Q.    Is that defined specifically by the

 2     IMO in this circular?

 3            A.    The IMO only refers to corridors.

 4            Q.    Does it define what a corridor is?

 5            A.    Not on that circular, but other

 6     documents define what a corridor itself --

 7            Q.    My question --

 8            A.    -- would be.

 9            Q.    My question is specifically is whether

10     the IMO in the circular defines what a corridor is.

11            A.    It just says to the word "corridor."

12            Q.    Does it define it?

13            A.    It's defined as corridor.  There's no

14     definitions for anything else.  It doesn't define a

15     handrail either.

16            Q.    Okay.  Is it your opinion that there

17     should have been a handrail -- sorry, hold on one

18     second.

19                  Is it your opinion that there should

20     have been a handrail in the entire location where

21     Ms. Kessler walked into the thermal area of the

22     spa?

23            A.    As seen in many other vessels that

24     I've been on and different areas of that same

25     vessel, corridors are installed with handrails
```

1    following the recommendations by the IMO circular.

2                    So answering your question, yes.  It's

3    typically a best practice to install a handrail in

4    that location.

5                    That would be my opinion.  I'm answer

6    your question.

7         Q.    But is it your testimony or your

8    opinion in this case that there should be a

9    handrail in the entire area where people walk in

10   that door through the area where Ms. Kessler fell?

11        A.    Again, you're asking my opinion.  I'm

12   answering that based on the recommendations by the

13   International Maritime Organization, and in that

14   circular, and having inspected other vessels,

15   including this one, for instance, the corridor

16   leading out of the spa, that door that we talked

17   about before, has a handrail, and there's handrails

18   in other corridors.

19                   So my opinion, based on best practices

20   and recommendations, is that there should have been

21   a handrail.

22        Q.    Okay.  My question is whether you

23   think there should have been a handrail that went

24   the entire length of that passage way where --

25        A.    I just said, based on the



1    recommendations and having seen similar corridors

2    in that same vessels and other vessels, that would

3    be correct.  It would be a good recommendation to

4    put a handrail there throughout the entire length.

5         Q.   But it's not mandatory; correct?

6         A.   It's a recommendation, as it's stated

7    in report, yes.

8         Q.   But not the mandatory?

9         A.   Correct.

10             MR. GERSON:  Object to the form.

11             THE WITNESS:  You do not need

12        handrails in any part of any corridor of

13        the vessel.  But, in fact, they're placed

14        because it's a best practice for safety to

15        put them on vessels.

16   BY MR. GORDON:

17        Q.   Okay.  So --

18        A.   And therefore my recommendation would

19   have been that, as I've seen in other places, is to

20   have handrail the full length of that entrance

21   corridor to the spa.

22        Q.   What other place?

23        A.   What do you mean "what other place"?

24        Q.   You said "I've seen them in other

25   places."  What other places are you referring to?

1       **A.**    The corridor leading prior to the spa

2  has, for instance, handrails.  Other spas that I've

3  visited in vessels also have handrails in corridor

4  entrances.

5       **Q.**    Which other spas?

6       **A.**    I've been on Disney -- I forget the

7  name.  I've been on other; Norwegian, Carnival.

8       **Q.**    What ships?

9       **A.**    I can't recall at this time the

10  different -- VALOR is, I think, a recent one that

11  I --

12       **Q.**    Carnival VALOR?

13       **A.**    Yeah.

14       **Q.**    Okay.  Any others?

15       **A.**    I can't recall right now.  I would

16  need to look at my case files.

17            But answering your question, yes, it

18  is my recommendation that based on the guidelines

19  and other areas in that ship, there should have

20  been a handrail for the entire length of that

21  entrance corridor.

22       **Q.**    Even assuming there was a handrail

23  where you believe there should have been one --

24       **A.**    It's a recommendation.  You're taking

25  my words out of context.

1          **Q.**    You didn't let me finish the question.

2          **A.**    I apologize.

3          **Q.**    Even assuming that there was a

4     handrail where you believe there should have been

5     one, that doesn't mean that Ms. Kessler would have

6     held on to the handrail at the time of this

7     incident; correct?

8          **A.**    And the opposite could be true, that

9     it could have been that she could have held on.

10         **Q.**    Right.

11         **A.**    I'm talking about the context.  Again,

12    4.15.  I'm not talking about Ms. Kessler.  I'm not

13    inferring anything else.  I'm just saying that that

14    circular recommends having handrails in corridor

15    and access areas.  And this specific area where she

16    fell is considered corridor and entrance, means of

17    egress, and therefore the recommendation is that a

18    handrail should be installed.

19         **Q.**    Okay.  And even assuming there was a

20    handrail there --

21         **A.**    Yes.

22         **Q.**    -- and even assuming Ms. Kessler

23    grabbed on to the handrail --

24         **A.**    Yeah.

25         **Q.**    -- she still could have slipped;

1    correct?

2          **A.**    That is a possibility.  The important

3    things -- again, talking about expert and why

4    handrails are provided -- is that they can

5    mitigate, even reduce the, you know, damage that

6    you can cause to somebody when they slip.

7                So even if she did slip, it might have

8    not resulted in, you know, whatever injuries she

9    might have had.  So there's many possibilities, but

10   handrails are good things to have, as recommended

11   by the circular.

12         **Q.**   What's the basis for you to say that

13   someone who falls using a handrail would not suffer

14   a more significant injury?

15         **A.**    Well, Di Pilla, if you look at the

16   practice handbook, states why handrails are

17   designed at the level and the way and the shape

18   that they are explicitly for that.

19                So there's a lot of -- again, it's

20   stated in the report -- on why we use handrails and

21   how they help in slip, trip, and fall.

22         **Q.**   Have you personally done any testing

23   with respect to handrails and slip resistance?

24         **A.**    Yes, I have.

25         **Q.**    Where?



JEANNIE REPORTING (305) 577-1705

1          **A.**     At different ships.

2          **Q.**     Have you done it on the Norwegian

3    BREAKAWAY?

4          **A.**     No, not on the Norwegian BREAKAWAY.

5          **Q.**     Specifically in the Mandara Spa of the

6    Norwegian BREAKAWAY?

7          **A.**     I have not, no.  There was no

8    handrail.

9          **Q.**     Well, did you even attempt to recreate

10    something similar to the handrail?

11          **A.**     I would not.  From an expert point of

12    view, that wouldn't make sense.

13          **Q.**     You didn't do anything like that, did

14    you?

15          **A.**     I did not, no.

16          **Q.**     Well, there's a handrail on the

17    opposite side by the pool; correct?

18          **A.**     Yeah.  That handrail was measured.

19          **Q.**     Did you do anything other than measure

20    it?

21          **A.**     No.

22          **Q.**     Did you do any testing regarding

23    whether or not that handrail would have benefitted

24    someone during a slip?

25          **A.**     Well, that handrail met the

JEANNIE REPORTING (305) 577-1705

1    requirements or recommendations -- in some cases

2    requirements -- for the average height that it was

3    located at.

4              Q.   Did you do any testing regarding

5    whether it would have affected someone's ability

6    or -- strike that.

7              Did you do any testing regarding

8    whether it would have made any difference if

9    someone was slipping?

10             A.   In what location?

11             Q.   By the hot tub.

12             A.   I'm -- okay.

13             MR. GERSON:  There's no handrail there

14        to test.

15             MR. GORDON:  Sure there is.

16             MR. GERSON:  Object to the form of the

17        question.

18             THE WITNESS:  He's talking -- we're

19        talking about the other handrail located on

20        the other side of the entrance.

21             MR. GERSON:  Oh, okay.  All right.  I

22        stand corrected.

23             THE WITNESS:  So that handrail was

24        measured.  So the testing is that if that

25        handrail meets the geometric requirements

```
1                    for safety design.
2        BY MR. GORDON:
3             Q.    Other than measuring it, did you do
4        any other sort of testing?
5             A.    That was the evaluation that was done.
6        In this case, it was just the height at which it
7        was located.
8             Q.    Other than that, did you do anything
9        else with regard to the handrail?
10            A.    No.  That was the only thing.  It was
11       measured, the height.
12            Q.    You make reference of 4.16 regarding
13       the drainage system --
14            A.    Okay.
15            Q.    -- correct?
16            A.    Yes.
17            Q.    You inspected the drains; correct?
18            A.    Uh-huh.
19            Q.    In the Mandara Spa; yes?
20            A.    Yes, I did.
21            Q.    And you found it to be inadequate?
22            A.    What section are you referring to?
23            Q.    Page 16.  I'm just trying to get into
24       your opinions regarding the drainage.  Okay?
25            A.    Understand.
```



1        Q.    You were out there, you were

2    inspecting the drains; correct?

3        A.    Uh-huh.

4        Q.    Yes?

5        A.    Yes.

6        Q.    Okay.  And you were pouring water into

7    the drains; correct?

8        A.    That's correct.

9        Q.    All right.  How much water were you

10   pouring into the drains?

11       A.    It was about a quarter of a bucket

12   that was 1.2 gallons.

13       Q.    1.2 gallons?

14       A.    Yes.

15       Q.    And you poured that where?  Which

16   drain?

17       A.    Directly over each of the drains

18   identified in the report.

19       Q.    That would be the drain --

20       A.    And the drain trench at the beginning

21   of the drainage system.

22       Q.    That would be the drain in front of

23   the hot tub?

24       A.    Correct.  At the end of the ramp that

25   goes up to the hot tub.

1    **Q.**    I'm sorry.  You said --

2    **A.**    The drain trench that is located at

3    the bottom of the ramp leading to the hot tub.  If

4    you refer to Figure 12, it would be at location

5    mark number 1.

6    **Q.**    You said it was 1.2 gallons of water

7    you put in the drain.

8    **A.**    About there.

9    **Q.**    Is there any evidence in this case

10   that there was 1.2 gallons of water that was put

11   into the drain right before Ms. Kessler's incident?

12   **A.**    No.  The intent of the test context is

13   a matter of depositing a known quantity of water

14   and see how it flows and drains.  And that was

15   performed.

16   **Q.**    Okay.  Is there any evidence that that

17   amount of water is ever deposited in that drain?

18   **A.**    I wouldn't know.  I'm not at the

19   location on an ongoing basis to monitor that.

20   **Q.**    So you don't know?

21   **A.**    I don't know.

22   **Q.**    And the drainage system that you

23   inspected, you would agree that you cannot say with

24   certainty that it was in the same condition on the

25   date of your inspection as it was on the date of



JEANNIE REPORTING (305) 577-1705

1    Ms. Kessler's incident; correct?

2         **A.**    That would be correct.

3         **Q.**    Did you do any testing using the Oasis

4    On Force cleaner with respect to this specific tile

5    in the Mandara Spa?

6         **A.**    I did not.

7         **Q.**    On page 17 of your report at 4.19 --

8         **A.**    Yes.

9         **Q.**    -- did you make reference regarding,

10   "It was observed on the CCTV that numerous

11   occasions Crew Collantes is seen squeegeeing the

12   floor surface around the end of the spa corridor."

13            Do you see where I'm reading from?

14        **A.**    Yes.

15        **Q.**    We've already talked about that --

16   correct? -- regarding what that statement is based

17   upon?

18        **A.**    Correct.

19        **Q.**    If I'm wrong, let me know.  I don't

20   want to ask the same questions over again.

21        **A.**    Please.

22        **Q.**    That's based upon your review of --

23        **A.**    The CCTV -- it was observed from the

24   CCTV, as stated in 4.19.

25        **Q.**    Okay.  That's what you talked about

1    earlier regarding Mr. Tellez's deposition exhibit?

2         **A.**    That's correct.

3         **Q.**    Okay.  At 4.1.11, you discuss an

4    opinion regarding, "Based on the CCTV, it is

5    evident that Mr. Collantes failed to implement

6    established procedures to dry the floor, using a

7    rag to wipe the floor after the squeegee was used."

8              Do you see that?

9         **A.**    Yes.  That's correct.  Stated as in

10   the report.

11        **Q.**    Okay.  Again, that's -- strike that.

12             You have no experience as a

13   housekeeping person; correct?

14        **A.**    As we established at the beginning of

15   the depo, yes.  Thank you.

16        **Q.**    Specifically a housekeeping individual

17   on a cruise ship; correct?

18             MR. GERSON:  Object to the form.

19        Asked and answered.

20             THE WITNESS:  Other than just a lay

21        person in housekeeping activities that I

22        might do.

23   BY MR. GORDON:

24        **Q.**    But you've never been employed as a

25   housekeeper on a cruise ship; correct?

```
 1              A.    We established that before.

 2                    MR. GERSON:  Objection.  Asked and

 3              answered.

 4    BY MR. GORDON:

 5              Q.    You say, "Moreover, the specific area

 6    next to the drainage trench was not adequately

 7    marked as a hazard area where water accumulated."

 8                    Do you see that?

 9              A.    Yes.

10              Q.    Where specifically are you

11    referencing?

12              A.    Where the crew deposited or finished

13    squeegeeing.

14              Q.    Yes?

15              A.    Right.

16              Q.    You're saying there should have been a

17    what?

18              A.    With that specific area, it would be

19    good to have indicated as -- as the exact area that

20    was wet.

21              Q.    Where the drain is?

22              A.    On that area, yes.  If we have --

23    maybe we can bring out Exhibit 5 from Collantes'

24    deposition.

25              Q.    Do you have it in front you?
```

1          **A.**    Yes.

2          **Q.**    You're showing me, for the record,

3     Exhibit 5 for Mr. Collantes' deposition; correct?

4          **A.**    That's correct.

5          **Q.**    And, first of all, that black arrow

6     you see there, that was written by plaintiff's

7     attorney; correct?

8          **A.**    I think so.  That's correct.

9          **Q.**    Okay.

10         **A.**    Yeah.

11         **Q.**    So what are you showing me?

12         **A.**    So as part of marking hazardous wet

13    areas, typically you place the caution sign that

14    might alert the issue of slipness at the location

15    or the source of -- that you might have water

16    accumulated.  So.

17              What I'm stating there is that it

18    would be more appropriate to place that sign where

19    the water is being deposited by the squeegee.

20         **Q.**    We've already talked about this.  You

21    think that individual, Mr. Collantes, is pushing

22    water; correct?

23         **A.**    I'm assuming that, as he reported in

24    his depo, he's doing his job and squeegeeing the

25    wet floor.

1      **Q.**   Well, he testified it was dry.  We've

2      already talked about it --

3            **A.**   Right.  He also testifies that he was

4      squeegeeing when it's wet.

5            **Q.**   His testimony is his testimony;

6      agreed?

7            **A.**   I agree.  He says it clearly on the

8      testimony that he squeegees when the floor surface

9      is wet.

10           **Q.**   Regardless of what you believe his

11     testimony is or not, there is a warning -- strike

12     that -- there is a caution sign in the area where

13     Ms. Kessler was walking to or toward; correct?

14           **A.**   On the opposite side of the entrance

15     corridor, yes.

16           **Q.**   In fact, it's in the direction where

17     she was walking; correct?

18           **A.**   On the other side of the corridor,

19     yes, as seen in Exhibit 5.

20           **Q.**   Yes.  Exhibit 5 and 5A, you can see

21     the same yellow floor caution sign in the area

22     where Ms. Kessler fell; correct?

23           **A.**   In Exhibit 5A that we currently have

24     marked; yes.

25           **Q.**   Have you done any research regarding

1    whether there may be too many warning signs --

2         **A.**    In what context?

3         **Q.**    -- or caution signs?

4         **A.**    In what context?

5         **Q.**    In the context of people will not look

6    at them or give them any meaning or just ignore

7    them if there's 35 or 50 caution signs everywhere.

8              MR. GERSON:  Object to the form.

9              THE WITNESS:  Di Pilla does talk about

10            the effectiveness of placement and geometry

11            and size and contrast of the use of

12            cautionary signs.

13   BY MR. GORDON:

14        **Q.**    Okay.

15        **A.**    What I'm stating in the report, again,

16   just to be clear in context and making sure that

17   you are inferring correctly what is written in the

18   report, is not adding additional caution signs but

19   the placement of the caution sign.

20            MR. GORDON:  Can you read back the

21            last answer?

22            (Thereupon, the answer was read

23            back by the reporter as above recorded.)

24   BY MR. GORDON:

25        **Q.**    You also make reference on page 17 of

1    your report at 4.1.12 that the inspected squeegee

2    had a significant level of wear and accumulation of

3    contaminant matter, as observed in Figure 8;

4    correct?

5         **A.**    Correct.

6         **Q.**    The squeegee that you observed on

7    August 25, 2019, you don't know if that's the same

8    exact squeegee Mr. Collantes was using on the date

9    of Ms. Kessler's incident; correct?

10        **A.**    During the inspection, it was my

11   understanding that that's the one that was used.

12        **Q.**    Based on what?

13        **A.**    Or similar.

14             Based on what I asked at the time.  I

15   think you were there.  I said, "Is this the same

16   squeegee?"

17        **Q.**    My question is, you don't know whether

18   or not that the squeegee you inspected during your

19   inspection was the same exact squeegee that

20   Mr. Collantes used on the date of Ms. Kessler's

21   incident; correct?

22             MR. GERSON:  Objection.  Asked and

23        answered.

24             MR. GORDON:  No, it's not.

25   BY MR. GORDON:



JEANNIE REPORTING (305) 577-1705

```
1              Q.    Go ahead.

2              A.    To my knowledge, that was the same

3    squeegee being used.

4              Q.    Based on what?

5              A.    Based on what I was told during the

6    inspection.

7              Q.    Told by whom?

8              A.    I asked, "Is this is the same squeegee

9    used?"

10             Q.    That's not true, sir.

11             A.    It might have been informally asked.

12   So other than that --

13                   MR. GERSON:  Object to the form.  Move

14             to strike Counsel's comment.

15                   The witness has answered the question

16             that you, Mike Gordon, told him it was the

17             same one.  You can testify at some other

18             time.

19                   MR. GORDON:  I'm not testifying.  His

20             opinions are going to be subject

21             to Daubert.

22   BY MR. GORDON:

23             Q.    I want to know if you can tell me for

24   a fact whether the squeegee you inspected was the

25   same as the one used by Mr. Collantes on the date
```

1    of incident involving Ms. Kessler.

2              MR. GERSON:  Objection.  Asked and

3         answered.

4              THE WITNESS:  That's what I was told,

5         that it was the same one.

6    BY MR. GORDON:

7         Q.   You were provided with an exemplar

8    squeegee, sir; correct?

9              MR. GERSON:  Object to the form.

10   BY MR. GORDON:

11        Q.   Not the same exact squeegee.

12        A.   I was provided with a squeegee at the

13   time of the incident, yes, that I understood was

14   the same one at the time of the incident.

15        Q.   Okay.

16        A.   The one used in the spa area.

17        Q.   All right.  You would agree that --

18   strike that.

19              Even assuming if it was the same exact

20   squeegee --

21        A.   Yes.

22        Q.   -- that Mr. Collantes was using on the

23   date of the incident --

24        A.   Yes.

25        Q.   -- you would agree that you don't know

1    if it was in the same exact condition on the date

2    of your inspection as it was on the date of

3    Ms. Kessler's incident; correct?

4          **A.**    Assuming it's been used since the date

5    of the incident, then obviously it would not be in

6    the same condition.

7          **Q.**    Okay.  And you never tested -- or

8    strike that.

9                You never used or applied the squeegee

10   to squeeze water on the floor; is that accurate?

11         **A.**    I was prohibited from doing that.

12   Remember, you mentioned, you cannot use the

13   squeegee at the time of the incident.

14         **Q.**    All right.  Did you ever ask or go to

15   court to do that?

16         **A.**    It was during the inspection.  I was

17   handed this and I was told I could not use it by

18   yourself, that I could only see it.  So I did not

19   use it.

20         **Q.**    Okay.  You have opinions in your

21   report about it, do you not?

22         **A.**    Based on the visual inspection, but

23   not based on its performance, as it's stated in the

24   report.

25         **Q.**    Okay.  So you never tested a squeegee



JEANNIE REPORTING (305) 577-1705

1    on the same surface as the Mandara Spa; correct?

2         **A.**   I was prohibited from doing that; so

3    therefore I was not able to test -- to apply the

4    squeegee on the surface to test its performance.  I

5    was only able to visually inspect it, as is stated

6    on the report.

7         **Q.**   Did you ever test a squeegee outside

8    the ship on any type of surface?

9         **A.**   I have not.

10        **Q.**   Anything stop you from doing that?

11        **A.**   I have not.

12        **Q.**   Has anything prevented you from

13   purchasing a similar squeegee or the same squeegee

14   and performing testing on your own outside the

15   context of the ship?

16             MR. GERSON:  Object to the form.

17             THE WITNESS:  Even if I knew the exact

18        manufacturer that did it, you know, the

19        context matters, and ideally you would want

20        to use it on the one that is used in the

21        facilities.  So it was not performed, given

22        that it would not be valuable information.

23   BY MR. GORDON:

24        **Q.**   Okay.  So you didn't do any testing on

25   your own?


JEANNIE REPORTING (305) 577-1705

1          **A.**     I have not, no.

2          **Q.**     And you knew the type of tile that

3     there was on the spa; correct?

4          **A.**     I beg your pardon?

5          **Q.**     You knew the type of tile that was in

6     the spa?

7          **A.**     That's correct, yes.

8          **Q.**     You could have obtained the tiles

9     yourself; correct?

10          **A.**     I could have contacted the

11     manufacturer, yes.

12          **Q.**     Okay.  You've read the testimony from

13     the crew members, Mr. Naik, Mr. Collantes and

14     Ms. Lenoso, that the tile floor dries quickly

15     because it's a heated area; correct?

16          **A.**     That's correct.

17          **Q.**     Did you do any sort of testing at all

18     concerning how fast the floor would dry in those

19     same conditions as existed at the time of

20     Ms. Kessler's incident?

21          **A.**     During the testing and during the time

22     that the water was deposited and drained out, you

23     could see that still part of the water remained

24     even after 20 minutes before we finished the

25     testing.

1      **Q.**    First of all, you were dumping buckets

2    of water on the floor; correct?

3              MR. GERSON:  Object to the form.

4              THE WITNESS:  So we'll step back.  The

5          buckets of water were not being dumped on

6          the floor.  They were being dumped on the

7          drains.

8              The tests that I'm alluding for are

9          referenced in Figure 12 for the water that

10         was deposited during the English XL tests

11         and seeing that water drain back.

12   BY MR. GORDON:

13     **Q.**    Sir, I'm going to show you what was

14   marked as Exhibit 1 to Mr. Naik's deposition on

15   September 5, 2019 -- sorry, on September 15, 2019.

16   That's you in the picture; right?

17     **A.**    That is me in the picture.  This is

18   Exhibit 1 on Naik's.

19     **Q.**    There is a bucket of water on the

20   floor next to you; right?

21     **A.**    There is a gray bucket located, yes.

22     **Q.**    You dumped a bucket of water or

23   portion of the bucket of water on the floor, did

24   you not?

25     **A.**    This was outside the steam room in



1    order to determine slope and drainage as part of

2    the -- what was reported in the report.

3              **Q.**    So you did dump buckets of water on

4    the floor when you were out there; correct?

5              **A.**    Yes.  I stated that from the

6    beginning.

7              **Q.**    Okay.  You just stated you didn't.

8              **A.**    No.  Okay.  Can you rephrase this --

9    can you repeat this question again?  On the water,

10   please?  On the dumping buckets of water and my

11   answer.  And the previous before that.  Because we

12   were talking about if I did any tests on the -- how

13   that surface performed.

14              "Question:  Did you do any sort of

15   testing at all concerning how fast the flow would

16   have dry away those same conditions how existed."

17              Right?  You're not asking about

18   buckets of water.

19              My answer is "During the testing and

20   during the time that the water was deposited,

21   drains out, you can see part of the water remained

22   even after 20 minutes before we finished the

23   testing."

24              MR. GERSON:  For the record, there's

25              Realtime transcript here on an iPad in

1            front me, and the witness was reading from

2            the iPad testimony.

3                 THE WITNESS:  You're not asking me if

4            I dumped buckets of water.

5                 MR. GERSON:  Let him ask another

6            question.  The record speaks for itself.

7                 MR. GORDON:  I'll ask it again.  I'm

8            not trying to make it difficult.

9   BY MR. GORDON:

10           **Q.**    Looking at Exhibit 1 to Mr. Collantes'

11   deposition, you did dump a bucket of water on the

12   floor; correct?

13           **A.**    I dumped several buckets of water in

14   order to test the drainage capabilities of the spa

15   facility.

16           **Q.**    Is there any evidence in this case

17   that there was that amount of water on the floor

18   anywhere in the spa at the time of Ms. Kessler's

19   incident?

20                MR. GERSON:  Object to the form.

21   BY MR. GORDON:

22           **Q.**    As depicted to Exhibit 1 to Mr. Naik's

23   deposition?

24           **A.**    Maybe I'd like to pull out exhibit --

25   Mr. Collantes -- this one.

1          I'm trying to open an exhibit from

2    Collantes' deposition to answer the counsel's

3    question.  This would be Exhibit 3 of Collantes.

4    C-O-L-L-A-N-T-E-S.

5          Q.   Okay.  What are you showing me?

6          A.   So this is Exhibit 3.

7          Q.   Yes, sir.

8          A.   Which shows a picture of the

9    surveillance report.  You can also see the contrast

10   surface with water around.

11          Now, if you were to ask me, is the

12   same level of the amount of water volume of water

13   deposited there, I cannot answer that, but I can

14   see and infer from the picture that there was

15   significant amounts of water in the area throughout

16   the spa when it was being used.

17          Q.   Mr. Collantes, along with the other

18   crew members, stated that was a shadow, not water;

19   correct?

20          A.   That's part of what they were saying.

21   But that would not correspond to other -- having

22   been there and looking at that contrast of the

23   inspection.

24          Q.   That's what their testimony was;

25   right?

JEANNIE REPORTING (305) 577-1705

1        **A.**    I understand.

2        **Q.**    You're discounting their testimony and

3   just assuming there's water there; correct?

4        **A.**    I'm just inferring from the inspection

5   and what I saw and comparing it to the pictures I

6   took from the inspection having deposited water.

7        **Q.**    So you're now doing some sort of

8   analysis of photographs?

9        **A.**    So the question is "Was that volume of

10  water deposited there?"  I'm not able to answer

11  that question.  I don't know.

12       **Q.**    Okay.  And getting back to my original

13  question, the area where Ms. Kessler fell, did you

14  do any testing to see how quickly it would dry up

15  in the same conditions as it existed at the time of

16  her incident?

17       **A.**    Since we don't know the same

18  conditions at the time of the incident, I was not

19  able to reproduce that.  But what I did do, that is

20  stated also on Figure 12, is that the water that

21  was deposited as part of the surface evaluation,

22  the period of time that occurred, you can see how

23  the water is still there, and it did not evaporate.

24  That, together with the known temperature of the

25  surface, if needed, additional analysis could be



JEANNIE REPORTING (305) 577-1705

1    done to determine evaporation rates.

2         **Q.**    You didn't do that.

3         **A.**    I didn't do it, no.

4         **Q.**    What you just described about

5    evaporation rates, you were doing it at a different

6    temperature than how it existed at the time of

7    Ms. Kessler's incident; true?

8         **A.**    As we said several times today, that's

9    correct.  We don't know the exact conditions.  And

10   the conditions within the report are limited to

11   those during the inspection.

12        **Q.**    You've reviewed the testimony of the

13   crew members, and they each testified that the

14   floor would dry quickly because of the heat of the

15   spa; correct?

16        **A.**    After it's been squeegee yes.

17        **Q.**    You didn't do that or test that --

18             MR. GERSON:  Object to the form of the

19             last question.

20             THE WITNESS:  I was not able to use

21             the squeegee, correct, so I wasn't able to

22             test that.

23   BY MR. GORDON:

24        **Q.**    Okay.  But even if you did use a

25   squeegee, you still couldn't test anything because



1  it wasn't the same temperature as it was at the

2  time of Ms. Kessler's incident; correct?

3              MR. GERSON:  Object to the form.

4              THE WITNESS:  Again, we don't know

5          what the temperature was at the time of her

6          incident, but we can compare.

7  BY MR. GORDON:

8      Q.   Well, it wasn't the same as when you

9  were out there; correct?

10     A.   We don't know what the temperature

11 was, right.

12     Q.   Of when?

13     A.   Of the floor surface during

14 Ms. Kessler's incident.

15     Q.   Correct.

16          If it was a heated spa, more likely

17 than not it would have been a different temperature

18 than when you inspected it; correct?

19     A.   Actually, at 81 Fahrenheit, that's of

20 the floor surface, if I remember correctly on

21 average, inspected, it's already heated.

22     Q.   How do you know?

23     A.   Because heated floor surfaces operate

24 around that temperature.

25     Q.   What's the basis for that statement?

1          **A.**    You asked me how do I know that heated

2     floors, because heating floors operate around that

3     temperature.

4          **Q.**    Do you know if the heat was on in the

5     spa, or do you know if it was the sun blaring

6     through the glass?

7          **A.**    Right.  The sun was not hitting that

8     location.  It was further in.  The air temperature

9     condition throughout an hour and a half of the

10    inspection was 77.  That means it's cooler than

11    what was measured on the floor.

12              So do I know if it was on?  No, I

13    don't know if it was on.  But what I know is that

14    the temperature of the floor was an average of

15    81 Fahrenheit.

16         **Q.**    You don't know if it was the same

17    temperature at the time of the incident we were

18    discussing?

19         **A.**    Right.

20         **Q.**    You can't rule out that what

21    Ms. Kessler allegedly slipped on was just

22    perspiration under her foot, can you?

23         **A.**    I would not be able to rule that out,

24    no.

25         **Q.**    You make reference on page 17 at

1    4.1.14 regarding, "Those in control of the

2    maintenance of the spa facility failed to properly

3    train and insure adequate known floor drying

4    procedures by crew."

5               I won't read the rest --

6         **A.**    Yes.

7         **Q.**    -- but again, you've never been in a

8    position to train or monitor or supervise any sort

9    of housekeeping personnel on the cruise ship;

10   correct?

11              MR. GERSON:  Object to the form.

12         Asked and answered.

13              THE WITNESS:  Correct.  I'm making

14         those assumptions based on the roles and

15         responsibility of those crew member

16         positions, as well as the policies

17         described during the depositions on how

18         they should -- what is the policy to clean

19         and dry the floors, and the policies did

20         not match with what was observed in the

21         CCTV; therefore, the statement made.

22   BY MR. GORDON:

23         **Q.**    The what?  Four minutes of CCTV that

24   you reviewed?

25         **A.**    Whatever amount that was reviewed,



JEANNIE REPORTING (305) 577-1705

1   yes.

2          Q.   You talk about on the bottom of

3   page 17 at 4.1.15, "It is also unknown if those in

4   control of the maintenance of the spa had processes

5   and or policies," I'm sorry," and/or policies on

6   maintaining and replacing the squeegee."

7          A.   Correct.  I did not see on those

8   manuals that were referenced or statements if they

9   controlled the squeegee.  Only the use of the

10  squeegee and the process of using it with a towel.

11         Q.   So you don't know one way or the other

12  what the policy is regarding maintenance and/or

13  replacing the squeegees that they use; correct?

14         A.   It is unknown, yes.

15              (Thereupon, a brief recess was

16         taken @ 4:00 p.m.)

17              (Proceedings were resumed @

18         4:06 p.m.)

19  BY MR. GORDON:

20         Q.   Just so I understand what your opinion

21  is regarding the drain -- the drainage, can you

22  just clarify for me.

23         A.   The drainage?

24         Q.   Yeah.

25              You have opinions regarding drainage;



JEANNIE REPORTING (305) 577-1705

```
1    correct?

2           A.    Correct.

3           Q.    I want to make sure I understand what

4    your opinion is.

5           A.    So the drainage was found to be able

6    to drain the water when it was deposited with the

7    bucket, as stated, in exact 4, location 4, where

8    the drainage was clogged and did not work.

9           Q.    One second.  Where is location 4?

10          A.    Drainage 4 is section 3.1.11, the

11   bottom of page 7, located at the top of the pool

12   access ramp area.  Provided in Figure 7.

13          Q.    All right.  I'm sorry.  Looking at

14   page 11.  It's where?

15          A.    Yeah.  Let me scroll down.  It would

16   be Figure 7.

17          Q.    Correct.

18          A.    Top right the corner.  It says 444 on

19   there.

20          Q.    All right.

21          A.    Yes.  Right there.

22          Q.    Upper right picture?

23          A.    Right next to the number 4; correct.

24          Q.    And your opinion is that drain what?

25          A.    Was not draining.
```



1        **Q.**    First of all, that drain is not in the

2   area that Ms. Kessler fell; correct?

3        **A.**    That would be correct.

4        **Q.**    Okay.  So how much water did you put

5   down that specific drain at location 4?

6        **A.**    Again, about a gallon, gallon and a

7   quarter.

8        **Q.**    A gallon and a quarter?

9        **A.**    Deposited in order to determine how

10  much -- if it drains or not.  This was done in all

11  the drains at the drain inlets or outlets,

12  depending which way you're seeing it.  And that was

13  not draining.

14            In fact, the picture shows how before

15  testing it there was already stagnant water in the

16  drain.

17        **Q.**    Was it not draining at all or just

18  draining slowly?

19        **A.**    It was not -- okay.  When we define

20  drainage, then it's not draining.  It's not doing

21  its function.

22            Did it eventually drain?  Yes.  It

23  obviously is not -- it's clogged.

24        **Q.**    How long did it take for that drain to

25  drain that 1.2 gallons of water?

```
1              A.    In fact, the water -- most of the

2     water flooded and spilled around the area and then

3     probably took over two minutes in order for the --

4     or more -- again, I can't -- for the flooded area

5     to start to sink in and drive away.  But in terms

6     of performance of the drainage, it's considered

7     clogged.  It's not draining.

8              Q.    All right.  You don't know if that

9     drain, as you tested it on that day, was in the

10    same condition as it was on the date of

11    Ms. Kessler's incident; correct?

12             A.    Correct.  I don't know.

13             Q.    Other than that drain -- strike that.

14                   Were there any other drains other than

15    that one at location 4 that did not properly drain?

16             A.    So the drains did -- the other drains

17    did drain at each outlet where the water was

18    deposited.  But when looking at the trench drain,

19    in other words, when the water was deposited by

20    number 1, the flow of water was seen to go and

21    bypass the drain located at the corner due to the,

22    I guess, lack of grinding around the area.

23             Q.    I'm sorry.  Which photograph?  Can you

24    point to me in your report?

25             A.    Yeah.  Let me scroll to the -- so this
```

1    would be drain number 2, drain outlet number 2.

2            **Q.**    Is there a page on your report that

3    you can --

4            **A.**    Yeah.  Figure 5 on page 10.

5            **Q.**    Figure 5 on page 10.  Which specific

6    number on the yellow markers on the floor?

7            **A.**    Number 2.  Most of the water was seen

8    to bypass, in other words, flow around the drain,

9    since the outlet of the drain was slightly

10   elevated.

11           **Q.**    So how much water did you put at that

12   drain at number 2?

13           **A.**    So it was two types of evaluations

14   made.  Number 1 was when water was placed directly

15   on the drain; and number 2, when water was placed

16   at location number 1, which is the beginning of the

17   trench location, that should flow down to location

18   2 and location 3 and ongoing on that trench.

19                    So when water was placed on

20   location 1, it was observed to mostly bypass drain

21   number 2 because that drain was slightly elevated

22   at the surface of the water.  So that would not be

23   ideal, since it's not performing its duties as a

24   drain.  It's not flush with the drainage floor

25   surface.

1   **Q.**   Let me just back up.

2        How much water did you put into the

3   drain, which is marked number 1 on page 10?

4   **A.**   Right.  The beginning of the drain

5   trench, about a gallon, gallon and a quarter.

6   **Q.**   Okay.  There's no evidence that that

7   much water was put into that drain right before

8   Ms. Kessler's incident; correct?

9   **A.**   Correct.  The purpose of applying a

10  quantity of water is to see the flow of water.  If

11  you were to place less water, you might not be able

12  to see how the water flows directly.  So you want

13  to see the performance.

14        This, in a sense, is a conservative

15  approach, because if you have more water, you have

16  more water flow, and it's easier for it to drain.

17  So it's a best-case scenario from a drainage point

18  of view.

19  **Q.**   Well, if there's not much water being

20  pushed into the drain, there's not going to a

21  drainage problem, is there?

22  **A.**   There's obviously drains there.  And

23  the drains are used to drain water.  So I'm sure

24  that part of the design of the spa is envisioned

25  that those drains need to perform.

1                   If you have a drain, the drain needs

2        to meet performance and they need to be able to

3        drain water.  That's what was trying to be

4        evaluated.

5             Q.    Right.

6                   But, first of all, you don't know if

7        the drain at location 1, 2, and 3 were in the same

8        condition on the day of the incident involving

9        Ms. Kessler as on the day of your inspection;

10       correct?

11            A.    That's correct.

12            Q.    Okay.  Hypothetically, if you're going

13       to push a little bit or a speck a water into that

14       drain, that's not going to cause some sort of

15       drainage problem, is it?

16            A.    When looking, for instance, at Figure

17       6, which shows the plan view of drain number 2 and

18       drain number 3, when you talk about problems of

19       drainage, regardless of the amount of water, you

20       can see the accumulation on the drain wall of

21       number 3 compared to number 2 that is significantly

22       more.

23                  That is evidence that shows that drain

24       two drains less water than drain three due to the

25       accumulation.  And that's what was being tested.



1       Q.    Right.

2             But if you're only going to, let's

3       say, hypothetically squeegee in the amount of water

4       the size of your thumbnail --

5       A.    Yes.

6       Q.    -- is that going to have any affect,

7       even assuming the drains were in the condition as

8       you saw them on date of your inspection?

9             MR. GERSON:  Object to the form.

10            THE WITNESS:  Again, the evaluation is

11            not about the volume of water; it's about

12            the performance of the drain.

13      BY MR. GORDON:

14      Q.    I understand.

15      A.    Okay.

16      Q.    But --

17      A.    So if you have a speck of water with a

18      thumb, that speck of water probably would go around

19      drain two and end up in drain three or further

20      down.  That's what was trying to be evaluated.  It

21      is the flow of water from the initial part of the

22      trench drain to its outlet and how that flowed.

23      Q.    What are your rates which you were

24      charging for your services in this case?

25      A.    Let me get the invoice.

```
 1              Q.    Is this it?

 2              A.    Yes.  That is correct.

 3                    (Exhibit 9 was marked for

 4              identification purposes.)

 5    BY MR. GORDON:

 6              Q.    We will have that marked Exhibit 9.

 7                    Are those your complete invoices in

 8    this case?

 9              A.    They're the same.  This is the last

10    invoice.  This is the copy of the same document.

11              Q.    How much have you charged the

12    plaintiff's attorneys in the case?

13              A.    $3,190.10.

14              Q.    Is this current to today?

15              A.    To the best of my knowledge, yes.

16              Q.    What are your hourly rates for

17    performing expert work?

18              A.    165 per hour.

19              Q.    And is that for review of materials

20    and testimony?

21              A.    No.  It's different to testimony.

22              Q.    What's the difference?

23              A.    I think it's 250 for testimony.

24              Q.    Per hour?

25              A.    Yes.  Correct.
```

```
 1            Q.    What about trial testimony?

 2            A.    Same.

 3                  Yeah.  250.  Just pulling my fee

 4      sheet.

 5            Q.    You mentioned you had notes that you

 6      wrote down.  I don't see them in the stack of

 7      materials that we printed off the link.

 8            A.    No?  It would have been like a blank

 9      page.

10            Q.    A blank page?

11            A.    Like a white page.

12            Q.    Do you have it in your computer?

13            A.    It might not have synced from my

14      desktop.

15            Q.    Can you access it or not?

16            A.    No.  It's not there.

17            Q.    It means you have it accessible at

18      home or at your office?

19            A.    In the, yeah, the desktop computer.

20            Q.    Can you send it to the plaintiff's

21      attorney so they can send it to us?

22                  (Exhibit 10 was marked for

23                  identification purposes.)

24      BY MR. GORDON:

25            Q.    We'll mark that as 10 once we get it.
```

1          **A.**    Okay.

2          **Q.**    Just to be clear, the CCTV that you

3     reviewed, do you have that at your office?

4          **A.**    It was given to me in a pen drive.

5          **Q.**    Do you have it?

6          **A.**    I think it's connected on the desktop,

7     the full pen drive.

8               Yeah.  I don't have that pen drive

9     with me.

10         **Q.**    Do you have it at your office?

11         **A.**    Yeah.  On my desktop.

12         **Q.**    Can you make arrangements to make a

13    copy of that and send it to Mr. Gerson and we'll

14    have it marked as an exhibit?

15         **A.**    Sure.  It has several files.  I'll

16    send that as -- I'll send the files.  We can mark

17    this as Exhibit 11.

18               (Exhibit 11 was marked for

19               identification purposes.)

20               MR. GERSON:  You send everything to

21               me, then I send it to counsel or the

22               reporter.

23               MR. GORDON:  You can send to the

24               reporter.  That's fine.

25               MR. GERSON:  Any more questions?

```
 1              MR. GORDON:  Yeah.  Just checking my
 2        notes, wrapping it up.
 3              (Exhibit 12 was marked for
 4        identification purposes.)
 5              MR. GORDON:  So we will mark that
 6        Exhibit 1 to Mr. Naik's deposition as
 7        Exhibit 12 to this deposition.
 8              (Pause.)
 9              MR. GERSON:  Come on, Mike.  We been
10        sitting here.
11              MR. GORDON:  You can't give me two
12        minutes to check my notes?
13              MR. GERSON:  I've given you more than
14        two minutes.
15              MR. GORDON:  Come on.  This is my
16        chance.
17              That's all I have.
18              MR. GERSON:  No cross.  The witness
19        will read.
20              If it's ordered, I would like an
21        E-tran only.  Thank you.
22              THE COURT REPORTER:  Are you ordering?
23              MR. GORDON:  I'd like it expedited.
24              (Deposition concluded @ 4:35 p.m.
25        reading and signing were not waived.)
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
1                          CERTIFICATE OF OATH

2

3      STATE OF FLORIDA          )

4      COUNTY OF MIAMI-DADE      )

5

6               I, Rhonda Bonner, Registered Professional

7      Reporter, Florida Professional Reporter, Notary

8      Public, State of Florida, certify that

9      FRANCISCO DE CASO, PH.D. personally appeared before

10     me on November 1, 2019, and was duly sworn.

11               WITNESS my hand and official seal this

12     5th day of November, 2019.

13

14                    _____

15                    RHONDA BONNER
                      REGISTERED PROFESSIONAL REPORTER
16                    NOTARY PUBLIC - STATE OF FLORIDA
                      MY COMMISSION #DD806306
17                    MY COMMISSION EXPIRES 10-15-20

18

19

20

21

22

23

24

25
```

JEANNIE REPORTING (305) 577-1705

```
1                REPORTER'S DEPOSITION CERTIFICATE

2

3      STATE OF FLORIDA              )

4      COUNTY OF MIAMI-DADE          )

5

6              I, RHONDA BONNER, Registered Professional

7      Reporter, Florida Professional Reporter, certify

8      that I was authorized to and did stenographically

9      report the deposition of FRANCISCO DE CASO, PH.D.;

10     that a review of the transcript was requested; and

11     that the foregoing transcript, pages 1 through 190,

12     is a true and complete record of my stenographic

13     notes.

14             I further certify that I am not a

15     relative, employee, attorney, or counsel of any of

16     the parties, nor am I a relative or employee of any

17     of the parties' attorney or counsel connected with

18     the action, nor am I financially interested in the

19     action.

20             Dated this 5th day of November, 2019.

21

22     _____

23     RHONDA BONNER
       REGISTERED PROFESSIONAL REPORTER
24     FLORIDA PROFESSIONAL REPORTER

25
```

JEANNIE REPORTING
28 West Flagler Street
Suite 610
Miami, Florida 33130

November 1, 2019

FRANCISCO DE CASO, PH.D.
c/o
    NICHOLAS I. GERSON
    GERSON & SCHWARTZ, P. A.
    1980 CORAL WAY
    MIAMI, FLORIDA 33145

IN RE: CHRISTINE KESSLER, a resident of the State
of Pennsylvania v. NCL (BAHAMAS) LTD, a Bermuda
company d/b/a NORWEGIAN CRUISE LINE

        With reference to the examination of
YOURSELF, deponent in the above-styled cause, taken
on November 1, 2019, under oath, please be advised
that the transcript of the Deposition has been
transcribed and is awaiting your signature.

        Please arrange to conclude this matter at
your earliest convenience. We would suggest that
you telephone this office and arrange an
appointment suitable for all concerned.

        However, if this has not been taken care of
by the date of the governing rules related to this
matter, we shall conclude the reading and signing
of said deposition has been waived and shall then
proceed to file the original of the said transcript
with the party who took the deposition without
further notice to any parties.

                    Sincerely,

                    Rhonda Bonner

via email:
ngerson@gslawusa.com
mgordon@fflegal.com

1                         ERRATA SHEET

2       F.R.C.P. RULE 1.310 PROVIDES IN PART:
            (e)"...Any changes in form or substance that the
3       witness wants to make shall be entered upon a
        separate correction page by the officer with a
4       statement of the reasons given by the witness for
        making them..."

5

6       PAGE/LINE          CHANGE/CORRECTION          REASON

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18

19      I, _____, do hereby certify that I

20      have read the foregoing transcript of my

21      deposition, given on November 1, 2019, and that

22      together with any additions or corrections made

23      herein, it is true and correct.

24                          _____

25                          FRANCISCO DE CASO, PH.D.

## $

**$3,190.10** [1] - 185:13

## 0

**04** [1] - 67:21
**051** [1] - 27:5
**056** [3] - 25:13, 26:6, 26:20

## 1

**1** [19] - 6:12, 6:15, 6:18, 8:7, 53:16, 55:16, 116:22, 155:5, 168:14, 168:18, 170:10, 170:22, 180:20, 181:14, 181:16, 181:20, 182:3, 183:7, 188:6
**1,657** [1] - 46:6
**1.2** [5] - 154:12, 154:13, 155:6, 155:10, 179:25
**10** [15] - 39:25, 40:25, 48:18, 48:22, 48:23, 49:1, 49:4, 49:11, 50:19, 95:5, 181:4, 181:5, 182:3, 186:22, 186:25
**100** [1] - 93:11
**10:14** [3] - 25:14, 26:7, 26:23
**10:30** [2] - 34:21, 141:24
**11** [8] - 48:20, 48:21, 51:1, 95:5, 100:8, 178:14, 187:17, 187:18
**12** [22] - 48:20, 48:21, 51:1, 68:4, 85:14, 94:4, 94:7, 94:14, 96:15, 96:21, 97:2, 97:4, 97:5, 123:18, 124:9, 126:17, 137:4, 155:4, 168:9, 172:20, 188:3, 188:7
**123** [1] - 39:5
**13** [11] - 39:12, 40:25, 53:21, 68:4, 68:21, 85:14, 103:16, 118:3, 120:1, 120:11, 122:3
**1332** [1] - 130:6
**14** [5] - 39:25, 41:1, 52:6, 52:7, 122:3
**15** [2] - 138:4, 168:15
**16** [5] - 98:8, 140:21,

140:24, 143:24, 153:23
**165** [1] - 185:18
**17** [4] - 156:7, 161:25, 175:25, 177:3
**18** [4] - 84:10, 86:5, 88:6, 101:7
**19** [6] - 105:7, 116:24, 132:5, 132:12, 133:16, 135:19
**1:35** [1] - 75:6
**1:43** [1] - 75:8
**1st** [1] - 8:2

## 2

**2** [16] - 8:8, 8:9, 8:12, 75:14, 124:17, 125:11, 181:1, 181:7, 181:12, 181:15, 181:18, 181:21, 183:7, 183:17, 183:21
**2-2** [2] - 103:16, 103:22
**20** [3] - 9:10, 167:24, 169:22
**2003** [1] - 66:13
**2006** [1] - 11:17
**2010** [1] - 129:24
**2016-17** [1] - 11:18
**2017** [3] - 123:18, 124:9, 126:17
**2018** [3] - 43:6, 43:11, 76:1
**2019** [12] - 8:2, 34:15, 34:23, 35:1, 43:18, 43:19, 43:23, 43:24, 44:7, 162:7, 168:15
**210** [1] - 65:15
**22:14** [1] - 26:20
**22:31** [1] - 27:4
**25** [6] - 34:23, 35:1, 43:18, 43:24, 44:6, 162:7
**250** [2] - 185:23, 186:3
**25th** [2] - 34:15, 45:9
**2:59** [1] - 136:17

## 3

**3** [12] - 18:23, 18:24, 19:2, 61:21, 86:3, 141:6, 171:3, 171:6, 181:18, 183:7, 183:18, 183:21
**3,963** [1] - 46:5
**3.1.11** [1] - 178:10
**3.25** [3] - 94:7, 95:1, 96:16

**30** [5] - 7:25, 9:15, 9:17, 9:18, 41:8
**32** [1] - 26:21
**33146** [1] - 6:11
**35** [1] - 161:7
**37** [1] - 38:22
**3:08** [1] - 136:19
**3:47** [2] - 61:24, 114:11
**3:47:06** [1] - 114:12
**3:47:06.257** [1] - 114:10
**3:53** [1] - 49:21

## 4

**4** [13] - 26:12, 26:16, 26:18, 27:6, 68:13, 68:16, 178:7, 178:9, 178:10, 178:23, 179:5, 180:15
**4.1.11** [1] - 157:3
**4.1.12** [1] - 162:1
**4.1.13** [1] - 141:4
**4.1.14** [1] - 176:1
**4.1.15** [1] - 177:3
**4.1.2** [2] - 98:9, 98:10
**4.1.3** [1] - 141:5
**4.15** [3] - 143:24, 144:10, 149:12
**4.16** [1] - 153:12
**4.19** [2] - 156:7, 156:24
**4.2** [3] - 86:6, 86:10, 103:20
**4.2.12** [2] - 132:5, 132:12
**4.2.13** [4] - 133:17, 133:18, 135:19, 138:20
**4.2.2** [1] - 86:12
**4.2.3** [1] - 86:11
**4.2.4** [1] - 101:8
**4.2.7** [1] - 103:19
**4.2.8** [1] - 105:10
**44** [1] - 38:23
**444** [1] - 178:18
**4:00** [2] - 50:15, 177:16
**4:06** [1] - 177:18
**4:30** [3] - 50:5, 50:11, 142:11
**4:35** [1] - 188:24
**4:45** [1] - 50:9

## 5

**5** [27] - 9:24, 9:25, 19:6, 23:10, 24:3, 24:24, 48:2, 48:6,

49:17, 49:20, 56:23, 57:12, 57:17, 57:23, 65:17, 65:23, 66:18, 91:4, 112:14, 115:19, 158:23, 159:3, 160:19, 160:20, 168:15, 181:4, 181:5
**50** [2] - 100:22, 161:7
**511** [1] - 87:23
**51130** [1] - 88:1
**55130** [1] - 68:4
**57** [1] - 53:24
**5804** [1] - 6:10
**5A** [10] - 91:5, 91:6, 91:9, 91:15, 92:16, 94:15, 112:13, 115:19, 160:20, 160:23

## 6

**6** [11] - 46:7, 50:13, 67:18, 74:9, 76:5, 78:3, 82:9, 82:13, 82:18, 83:11, 183:17

## 7

**7** [11] - 35:3, 36:16, 37:1, 67:21, 68:7, 68:13, 68:16, 93:14, 178:11, 178:12, 178:16
**735** [1] - 144:6
**77** [4] - 35:4, 37:7, 38:6, 175:10

## 8

**8** [5] - 123:21, 123:23, 124:5, 125:11, 162:3
**81** [2] - 174:19, 175:15
**89** [1] - 61:23

## 9

**9** [3] - 27:5, 185:3, 185:6
**90** [2] - 61:11, 61:21
**92** [1] - 61:12
**95** [1] - 10:3
**9:00** [2] - 34:19, 141:24

## A

**a.m** [3] - 34:19, 141:24
**A326.3-2017** [1] - 76:1
**ability** [6] - 120:20,

**121**:4, 121:21, 122:8, 122:15, 152:5
**able** [18] - 21:18, 57:8, 76:3, 76:20, 90:9, 99:25, 104:4, 113:11, 166:3, 166:5, 172:10, 172:19, 173:20, 173:21, 175:23, 178:5, 182:11, 183:2
**abnormality** [4] - 124:10, 124:18, 125:16, 126:15
**acceptable** [1] - 90:17
**access** [8] - 6:25, 31:3, 52:10, 71:16, 74:2, 149:15, 178:12, 186:15
**accessible** [1] - 186:17
**accident** [10] - 13:2, 13:4, 13:7, 13:11, 13:14, 13:17, 13:18, 13:22, 14:10, 131:6
**Accident** [1] - 65:10
**accidents** [3] - 13:21, 13:23, 24:19
**according** [6] - 45:13, 65:23, 124:6, 126:13, 139:13, 142:10
**accumulated** [2] - 158:7, 159:16
**accumulation** [5] - 105:18, 132:8, 162:2, 183:20, 183:25
**accurate** [6] - 18:2, 19:10, 50:16, 50:17, 67:2, 165:10
**activities** [2] - 98:20, 157:21
**activity** [1] - 98:14
**actual** [5] - 36:20, 94:17, 107:12, 109:8, 110:23
**added** [1] - 10:17
**adding** [1] - 161:18
**addition** [1] - 77:18
**additional** [6] - 8:25, 25:3, 88:19, 95:10, 161:18, 172:25
**address** [2] - 6:9, 80:3
**adequate** [1] - 176:3
**adequately** [1] - 158:6
**adjacent** [2] - 50:23, 51:6
**Administration** [1] - 22:13
**admits** [4] - 124:18,

125:13, 125:16
**admitted** [1] - 126:13
**affect** [8] - 121:4, 121:20, 122:8, 122:15, 126:24, 127:18, 131:5, 184:6
**affected** [1] - 152:5
**afraid** [2] - 72:6, 76:3
**afternoon** [1] - 5:16
**ago** [2] - 7:5, 84:1
**agree** [36] - 21:14, 21:16, 25:12, 25:16, 39:7, 39:10, 46:13, 54:8, 54:13, 58:9, 65:15, 66:15, 66:17, 74:8, 80:5, 106:10, 106:13, 118:14, 120:16, 120:18, 121:3, 121:19, 122:21, 123:5, 124:6, 126:23, 127:18, 128:16, 128:23, 129:7, 129:25, 144:11, 155:23, 160:7, 164:17, 164:25
**agreed** [2] - 81:24, 160:6
**agreement** [4] - 7:24, 8:3, 75:11
**ahead** [9] - 57:22, 84:21, 109:5, 110:16, 111:20, 118:22, 120:25, 138:16, 163:1
**air** [13] - 35:4, 35:12, 35:18, 37:6, 38:6, 38:10, 38:13, 39:7, 41:12, 41:15, 41:17, 41:20, 175:8
**alcohol** [18] - 24:21, 126:23, 127:5, 127:9, 127:14, 127:15, 127:18, 127:21, 128:9, 128:24, 129:4, 129:7, 130:2, 130:11, 131:8, 131:16, 132:2
**alert** [1] - 159:14
**allegedly** [2] - 69:22, 175:21
**alluding** [3] - 108:24, 143:6, 168:8
**altered** [2] - 121:8
**American** [3] - 69:8, 75:20, 76:8
**amount** [9] - 96:13, 127:4, 129:4, 155:17, 170:17,

166:3
**applying** [3] - 80:1, 81:5, 182:9
**appreciate** [4] - 39:6, 79:4, 119:25, 125:5
**approach** [2] - 83:20, 182:15
**approaching** [1] - 81:9
**appropriate** [3] - 67:6, 72:17, 159:18
**April** [2] - 43:19, 43:23
**architect** [6] - 12:21, 32:17, 32:19, 32:21, 32:22, 102:13
**architectural** [5] - 32:8, 32:11, 33:2, 33:5, 33:10
**area** [96] - 32:7, 32:14, 37:22, 37:25, 46:9, 47:21, 47:23, 48:18, 49:2, 51:9, 54:1, 55:18, 55:22, 56:25, 57:3, 57:5, 60:3, 60:7, 60:10, 60:11, 60:15, 60:19, 60:24, 61:7, 62:5, 63:4, 71:25, 87:16, 89:23, 90:8, 91:15, 91:18, 91:22, 91:25, 92:6, 92:12, 92:19, 93:4, 94:24, 96:23, 96:24, 97:12, 97:15, 97:24, 101:11, 104:7, 106:5, 106:20, 106:21, 106:22, 106:25, 107:3, 107:8, 107:17, 108:19, 108:21, 109:4, 109:20, 110:3, 110:9, 111:17, 112:7, 113:25, 115:11, 115:14, 115:17, 115:18, 115:22, 116:6, 138:5, 139:2, 139:15, 141:20, 143:7, 144:23, 145:21, 146:9, 146:10, 149:15, 158:5, 158:7, 158:18, 158:19, 158:22, 160:12, 160:21, 164:16, 167:15, 171:15, 172:13, 178:12, 179:2, 180:2, 180:4, 180:22
**areas** [20] - 68:5, 68:20, 84:11, 86:14,

86:20, 87:2, 87:7, 88:21, 89:24, 90:3, 100:11, 109:2, 141:12, 145:24, 148:19, 149:15, 159:13
**arguing** [2] - 111:6, 111:7
**argumentative** [1] - 73:17
**Aronfeld** [1] - 11:15
**arrangements** [1] - 187:12
**arrow** [1] - 159:5
**article** [10] - 65:10, 65:23, 129:13, 129:20, 129:25, 130:7, 130:10, 130:15, 130:17, 131:2
**articles** [5] - 63:24, 64:13, 64:22, 65:3, 129:14
**assess** [1] - 79:24
**assessment** [1] - 125:15
**assist** [1] - 63:14
**assume** [7] - 8:8, 32:16, 81:1, 93:23, 99:5, 107:20, 107:22
**assuming** [19] - 49:21, 76:13, 92:3, 92:17, 108:3, 112:19, 125:14, 131:10, 131:14, 131:16, 148:22, 149:3, 149:19, 149:22, 159:23, 164:19, 165:4, 172:3, 184:7
**assumptions** [1] - 176:14
**ASTM** [7] - 67:2, 69:7, 74:8, 75:23, 80:23, 81:25, 82:10
**attached** [1] - 25:7
**attempt** [2] - 63:13, 151:9
**attention** [1] - 126:4
**attest** [1] - 115:8
**attorney** [3] - 11:15, 159:7, 186:21
**attorney's** [1] - 18:21
**attorneys** [2] - 62:20, 185:12
**audio** [2] - 22:15, 30:18
**August** [9] - 8:2, 34:15, 34:23, 35:1, 43:18, 43:24, 44:6, 45:9, 162:7

**Aurelia** [1] - 10:21
**authoritative** [10] - 51:20, 52:13, 63:25, 64:7, 64:14, 64:17, 65:3, 66:15, 70:8, 70:15
**authorities** [2] - 72:18, 73:19
**automatically** [8] - 29:3, 29:12, 30:1, 30:3, 30:7, 30:12, 35:20, 36:8
**available** [19] - 19:14, 19:15, 19:17, 19:25, 20:3, 20:13, 20:23, 21:17, 46:4, 49:24, 52:16, 53:6, 53:9, 117:15
**average** [20] - 35:4, 35:14, 35:22, 36:8, 36:10, 36:11, 37:6, 38:6, 38:9, 41:5, 41:9, 41:15, 51:3, 53:15, 53:18, 53:22, 65:25, 152:2, 174:21, 175:14
**aware** [15] - 12:5, 22:19, 24:17, 26:6, 37:16, 37:20, 38:1, 42:13, 42:16, 44:13, 66:3, 73:23, 101:3, 101:9, 102:2
**awkward** [1] - 121:13
**awkwardness** [1] - 119:16

## B

**B-A-S-A-L-O** [1] - 5:20
**background** [2] - 65:5, 119:11
**backwards** [2] - 108:10, 112:5
**balance** [10] - 118:9, 118:10, 121:25, 124:10, 124:17, 126:14, 126:24, 127:19, 128:21
**Balance** [1] - 125:12
**balanced** [2] - 120:2, 121:14
**bang** [1] - 98:1
**barefoot** [2] - 140:17, 140:19
**Basalo** [1] - 5:19
**Based** [1] - 157:4
**based** [55] - 13:23, 14:11, 27:6, 27:10, 40:7, 46:4, 49:19, 51:23, 54:11, 54:22,



58:1, 65:21, 68:13, 70:5, 73:12, 75:1, 84:7, 84:19, 85:23, 87:13, 92:15, 98:22, 99:4, 103:12, 107:2, 107:9, 107:10, 108:3, 109:22, 110:18, 112:13, 112:21, 116:7, 117:5, 117:25, 118:8, 118:9, 120:1, 120:4, 120:9, 126:16, 146:12, 146:19, 146:25, 148:18, 156:16, 156:22, 162:12, 162:14, 163:4, 163:5, 165:22, 165:23, 176:14

**basic** [1] - 80:19

**basing** [1] - 118:5

**basis** [8] - 101:15, 101:16, 132:18, 135:18, 136:3, 150:12, 155:19, 174:25

**Bates** [2] - 39:2, 39:5

**bathtubs** [1] - 90:1

**become** [4] - 43:4, 84:12, 86:14, 89:10

**becomes** [1] - 92:7

**becoming** [1] - 143:9

**beg** [2] - 13:15, 167:4

**beginning** [7] - 36:12, 120:11, 154:20, 157:14, 169:6, 181:16, 182:4

**behalf** [1] - 9:13

**Bellai** [1] - 137:17

**BELLAI** [1] - 137:17

**benefitted** [1] - 151:23

**bent** [1] - 57:24

**Berman** [1] - 134:22

**beside** [2] - 139:8, 139:15

**best** [16] - 11:24, 12:4, 19:22, 21:12, 51:14, 51:24, 58:12, 58:25, 59:7, 62:15, 77:21, 146:3, 146:19, 147:14, 182:17, 185:15

**best-case** [1] - 182:17

**better** [5] - 58:3, 79:18, 79:21, 91:4, 91:10

**between** [16] - 42:11, 43:23, 46:10, 48:20, 48:21, 68:16, 74:20, 80:20, 82:1, 82:8,

82:12, 83:3, 91:24, 98:6, 131:5, 140:25

**big** [1] - 127:21

**binary** [1] - 76:12

**binding** [1] - 144:15

**biomechanical** [1] - 14:16

**biomechanics** [3] - 42:9, 42:20, 77:21

**biomedical** [1] - 14:19

**bit** [1] - 183:13

**black** [1] - 159:5

**blank** [2] - 186:8, 186:10

**blaring** [1] - 175:5

**blew** [1] - 26:6

**blind** [1] - 143:9

**boat** [5] - 71:25, 72:2, 73:12, 102:8, 102:22

**book** [2] - 66:25, 71:5

**Bostic** [1] - 11:1

**BOT** [8] - 76:12, 77:1, 77:10, 77:11, 78:2, 78:5, 79:14, 81:16

**BOT-3000** [7] - 77:9, 77:17, 78:9, 78:20, 78:25, 79:9, 79:21

**bottle** [1] - 95:25

**bottom** [4] - 57:25, 155:3, 177:2, 178:11

**bought** [1] - 44:15

**box** [1] - 135:3

**breach** [1] - 71:15

**break** [1] - 75:3

**BREAKAWAY** [21] - 22:22, 31:10, 32:3, 33:11, 33:23, 34:1, 34:4, 34:9, 34:23, 46:3, 69:15, 72:12, 73:25, 86:24, 89:24, 100:24, 135:21, 137:6, 151:3, 151:4, 151:6

**breathalyzer** [5] - 24:22, 25:3, 25:10, 25:13, 26:17

**brief** [3] - 75:5, 136:16, 177:15

**bring** [5] - 20:20, 64:9, 119:11, 126:3, 158:23

**broad** [2] - 121:23, 122:13

**brought** [2] - 6:20, 8:21

**bucket** [7] - 154:11, 168:19, 168:21, 168:22, 168:23, 170:11, 178:7

**buckets** [7] - 168:1,

168:5, 169:3, 169:10, 169:18, 170:4, 170:13

**building** [1] - 13:25

**built** [1] - 72:16

**business** [1] - 6:9

**but..** [1] - 79:2

**button** [1] - 36:1

**buy** [2] - 71:1, 102:14

**buys** [1] - 102:21

**BY** [92] - 5:15, 6:16, 7:8, 8:14, 10:14, 12:1, 14:8, 19:1, 26:1, 26:14, 27:3, 29:1, 31:7, 32:20, 34:16, 47:18, 48:4, 55:19, 56:11, 57:21, 58:8, 59:2, 59:9, 59:14, 60:13, 60:23, 61:17, 62:17, 64:5, 64:12, 64:18, 72:3, 73:18, 74:4, 75:9, 76:7, 82:24, 87:20, 91:8, 93:1, 93:9, 93:16, 102:17, 103:9, 107:21, 108:2, 110:6, 110:15, 111:12, 112:10, 113:14, 114:4, 118:21, 120:24, 123:24, 124:3, 124:15, 125:8, 126:11, 127:10, 128:13, 128:22, 129:12, 130:14, 131:1, 131:17, 133:15, 134:9, 136:20, 138:15, 140:16, 147:16, 153:2, 157:23, 158:4, 161:13, 161:24, 162:25, 163:22, 164:6, 164:10, 166:23, 168:12, 170:9, 170:21, 173:23, 174:7, 176:22, 177:19, 184:13, 185:5, 186:24

**bypass** [3] - 180:21, 181:8, 181:20

---

# C

**C-O-L-L-A-N-T-E-S** [1] - 171:4

**calculation** [1] - 35:7

**calculations** [1] - 35:19

**calibrated** [4] - 43:18, 43:20, 43:24, 45:5

**camera** [11] - 29:3, 29:12, 29:19, 29:23, 29:24, 30:4, 30:7, 30:14, 31:1, 108:14, 113:17

**cannot** [8] - 21:23, 71:5, 71:11, 88:25, 104:22, 155:23, 165:12, 171:13

**capabilities** [1] - 170:14

**capacity** [5] - 15:18, 16:2, 16:5, 17:21, 141:1

**capital** [1] - 69:4

**captured** [1] - 36:14

**card** [3] - 30:14, 30:16, 30:17

**Caribbean** [3] - 11:2, 11:13, 12:7

**Carnival** [6] - 10:21, 10:22, 10:25, 12:14, 148:7, 148:12

**Carolyn** [2] - 137:16, 137:17

**Carrasco** [1] - 28:22

**CARRASCO** [6] - 7:6, 28:15, 28:20, 28:22, 28:24, 47:14

**case** [78] - 7:9, 7:11, 7:12, 7:15, 7:17, 7:21, 7:23, 8:16, 8:25, 9:2, 10:7, 11:3, 11:7, 11:21, 12:2, 12:15, 13:20, 15:15, 18:17, 19:7, 19:13, 19:25, 20:12, 21:2, 21:21, 25:4, 32:5, 34:5, 34:9, 38:23, 42:18, 43:2, 46:16, 52:4, 54:16, 54:23, 58:17, 59:8, 65:5, 65:19, 68:2, 69:18, 77:19, 77:23, 79:14, 79:17, 81:6, 81:16, 82:6, 83:10, 84:8, 95:16, 99:21, 100:14, 101:17, 102:1, 102:24, 104:8, 107:11, 114:19, 119:8, 131:3, 133:20, 136:6, 136:7, 136:14, 137:11, 143:19, 146:8, 148:16, 153:6, 155:9, 170:16, 182:17, 184:24,

185:8, 185:12

**cases** [8] - 9:11, 9:13, 9:19, 10:15, 10:18, 133:18, 136:5, 152:1

**CASO** [2] - 5:10, 5:20

**Caso** [8] - 5:19, 19:2, 75:10, 91:9, 93:17, 126:12, 128:14, 128:23

**caused** [3] - 120:15, 131:11, 140:24

**caution** [7] - 159:13, 160:12, 160:21, 161:3, 161:7, 161:18, 161:19

**cautionary** [1] - 161:12

**CCTV** [55] - 19:9, 19:13, 19:20, 19:24, 20:5, 20:17, 21:6, 21:14, 21:20, 22:1, 47:6, 47:11, 47:17, 47:21, 47:23, 50:15, 55:2, 55:5, 55:20, 56:12, 62:18, 62:24, 63:6, 63:9, 91:16, 92:9, 92:13, 92:16, 93:4, 94:17, 105:25, 106:18, 107:2, 107:10, 107:13, 108:6, 109:12, 109:16, 109:19, 110:8, 112:1, 114:14, 115:1, 116:7, 117:13, 118:1, 120:12, 132:6, 156:10, 156:23, 156:24, 157:4, 176:21, 176:23, 187:2

**cerebellar** [1] - 130:11

**certain** [7] - 23:7, 23:16, 55:7, 56:3, 62:24, 78:8, 113:8

**certainty** [8] - 49:10, 56:1, 63:12, 92:2, 92:11, 92:22, 112:17, 155:24

**certification** [1] - 43:6

**certified** [1] - 43:4

**cetera** [3] - 99:13, 102:11

**chance** [3] - 82:11, 116:21, 188:16

**change** [4] - 46:14, 80:1, 92:6, 94:25

**changed** [5] - 44:6, 44:9, 44:17, 102:7, 121:9

**changes** [3] - 79:25,



91:24, 94:18
**Chapter** [2] - 103:16, 103:22
**chapter** [1] - 104:15
**characteristics** [2] - 77:24, 80:2
**characterization** [1] - 111:22
**charged** [1] - 185:11
**charging** [1] - 184:24
**Chau** [1] - 129:19
**cheap** [1] - 128:1
**check** [2] - 12:19, 188:12
**checking** [2] - 36:5, 188:1
**Chiou** [1] - 65:13
**chose** [1] - 72:4
**circular** [11] - 144:2, 144:6, 144:9, 145:2, 145:5, 145:10, 146:1, 146:14, 149:14, 150:11
**circulars** [1] - 144:11
**circumstance** [1] - 79:21
**circumstances** [1] - 79:18
**cite** [5] - 63:24, 65:9, 104:15, 130:1, 144:2
**cited** [5] - 64:21, 65:6, 129:14, 129:23, 131:2
**citing** [1] - 68:3
**civil** [1] - 32:25
**clarification** [1] - 83:5
**clarify** [1] - 177:22
**clarifying** [1] - 85:17
**classification** [11] - 72:7, 72:9, 72:10, 72:13, 72:22, 72:25, 73:3, 73:9, 73:10, 73:11, 73:13
**classified** [4] - 72:20, 80:8, 101:17, 144:25
**classifies** [1] - 88:20
**classify** [2] - 86:23, 87:17
**clean** [3] - 17:21, 17:25, 176:18
**cleaned** [2] - 99:3, 100:18
**cleaner** [2] - 16:5, 156:4
**cleaning** [7] - 16:13, 16:15, 16:18, 16:19, 98:13, 98:20, 100:13
**clear** [7] - 14:13, 31:13, 48:24, 78:17, 123:16, 161:16,

187:2
**clearly** [4] - 55:23, 108:12, 118:2, 160:7
**clogged** [3] - 178:8, 179:23, 180:7
**closely** [1] - 42:8
**Coefficient** [1] - 76:10
**coefficient** [28] - 65:16, 66:19, 68:6, 69:2, 70:20, 74:10, 74:11, 74:14, 74:15, 74:17, 78:4, 80:8, 80:18, 81:3, 81:7, 81:14, 82:1, 82:15, 82:16, 82:17, 82:20, 82:21, 83:2, 83:8, 83:10, 90:13, 90:20, 104:16
**COF** [2] - 74:17, 78:7
**coffee** [2] - 81:1, 81:2
**Cohen** [1] - 65:13
**collaborative** [1] - 83:20
**Collantes** [14] - 59:22, 61:4, 113:24, 156:11, 157:5, 159:21, 162:8, 162:20, 163:25, 164:22, 167:13, 170:25, 171:3, 171:17
**Collantes'** [4] - 158:23, 159:3, 170:10, 171:2
**collapses** [1] - 13:25
**collect** [1] - 36:7
**color** [2] - 92:7, 102:10
**combination** [1] - 48:13
**coming** [4] - 56:25, 86:21, 92:8, 125:14
**comment** [3] - 83:22, 96:16, 163:14
**comments** [1] - 83:24
**committee** [1] - 83:14
**committees** [1] - 83:16
**common** [1] - 127:8
**companies** [2] - 16:13, 16:15
**company** [4] - 16:18, 16:20, 16:22, 16:24
**compare** [6] - 54:15, 90:8, 119:9, 119:17, 121:10, 174:6
**compared** [2] - 119:20, 183:21
**comparing** [6] - 54:6, 94:16, 112:14,

120:13, 121:1, 172:5
**comparison** [4] - 50:23, 51:2, 86:18, 122:4
**complaint** [1] - 50:6
**complement** [1] - 46:6
**complete** [2] - 133:12, 185:7
**computer** [3] - 28:2, 186:12, 186:19
**computes** [1] - 78:6
**concentration** [1] - 127:5
**concerned** [1] - 70:2
**concerning** [3] - 141:19, 167:18, 169:15
**concluded** [1] - 188:24
**concrete** [1] - 17:8
**condition** [21] - 46:22, 80:1, 120:19, 121:4, 121:20, 121:24, 122:8, 122:12, 122:15, 122:22, 122:25, 123:2, 123:5, 123:9, 155:24, 165:1, 165:6, 175:9, 180:10, 183:8, 184:7
**conditioned** [1] - 45:12
**conditions** [19] - 54:6, 54:18, 54:21, 63:10, 65:20, 89:1, 90:1, 99:12, 130:22, 141:9, 142:2, 142:5, 142:23, 167:19, 169:16, 172:15, 172:18, 173:9, 173:10
**conduct** [2] - 51:13, 51:14
**conducted** [1] - 39:18
**conducting** [1] - 109:25
**confirm** [1] - 93:20
**connected** [1] - 187:6
**connection** [2] - 31:2, 72:12
**consciously** [1] - 143:8
**conservative** [1] - 182:14
**considered** [8] - 65:17, 87:4, 89:24, 89:25, 90:5, 149:16, 180:6
**consistent** [2] - 96:6, 119:15

**consult** [2] - 34:11, 87:6
**consultant** [1] - 7:24
**consulted** [1] - 11:21
**consumed** [2] - 129:4, 132:2
**consumption** [5] - 126:24, 127:18, 128:24, 129:7, 130:11
**contacted** [1] - 167:10
**contain** [1] - 93:21
**contained** [5] - 8:20, 9:1, 28:9, 93:18, 93:24
**contains** [1] - 89:13
**contaminant** [2] - 100:12, 162:3
**contaminants** [2] - 98:25, 99:13
**context** [12] - 121:17, 122:17, 127:3, 148:25, 149:11, 155:12, 161:2, 161:4, 161:5, 161:16, 166:15, 166:19
**continue** [1] - 75:4
**contrast** [12] - 55:24, 91:18, 91:23, 91:24, 94:17, 94:25, 112:16, 140:24, 143:7, 161:11, 171:9, 171:22
**contrasts** [1] - 63:7
**control** [10] - 52:9, 52:11, 52:17, 73:21, 79:23, 101:8, 103:3, 103:12, 176:1, 177:4
**controlled** [1] - 177:9
**Convention** [1] - 104:10
**conversations** [1] - 83:15
**cooler** [1] - 175:10
**copy** [9] - 18:22, 58:3, 76:14, 91:4, 91:10, 103:15, 103:24, 185:10, 187:13
**copyright** [3] - 71:4, 71:11, 71:15
**copyrighted** [1] - 88:23
**Coral** [1] - 6:10
**corner** [3] - 57:25, 178:18, 180:21
**Corporation** [3] - 10:22, 10:23, 12:14
**correct** [353] - 7:15, 7:16, 8:9, 10:4,

10:16, 12:22, 12:23, 12:25, 13:1, 13:3, 14:4, 14:10, 14:14, 14:17, 14:19, 14:21, 14:24, 14:25, 15:1, 15:2, 15:5, 15:8, 15:11, 15:14, 15:21, 15:22, 15:24, 15:25, 16:3, 16:6, 16:11, 17:13, 18:1, 18:5, 18:18, 18:19, 19:5, 19:8, 19:11, 20:6, 20:9, 20:21, 21:15, 22:8, 22:11, 23:8, 23:9, 23:12, 23:20, 24:5, 24:19, 24:20, 26:2, 26:22, 26:23, 26:24, 27:5, 27:9, 27:12, 29:22, 32:17, 33:3, 33:7, 35:5, 35:6, 37:13, 37:22, 38:7, 38:8, 38:11, 38:12, 38:15, 38:16, 39:9, 39:21, 40:1, 40:4, 40:17, 41:2, 41:3, 41:24, 42:1, 42:14, 42:23, 43:3, 43:12, 44:12, 44:16, 44:21, 46:14, 46:18, 46:19, 46:23, 46:24, 47:19, 47:22, 48:1, 48:11, 49:6, 49:7, 49:11, 49:12, 50:11, 53:22, 53:25, 54:10, 55:8, 55:9, 56:18, 56:19, 56:25, 57:1, 58:11, 58:15, 58:20, 59:11, 59:13, 59:19, 60:3, 60:7, 61:25, 62:7, 62:25, 63:1, 63:25, 64:22, 64:23, 64:25, 65:3, 65:7, 65:8, 65:13, 65:18, 65:24, 66:4, 66:8, 66:14, 66:16, 66:20, 67:11, 73:2, 73:5, 74:10, 74:16, 74:21, 74:22, 74:24, 74:25, 75:12, 75:16, 75:23, 75:24, 76:25, 77:6, 77:9, 77:10, 77:12, 77:13, 78:2, 78:10, 78:11, 78:19, 79:7, 79:8, 79:10, 79:11, 79:13, 80:6, 80:10, 80:12, 80:13, 80:15, 82:2, 82:16, 82:25, 83:1, 83:18, 84:13, 84:14, 85:6, 85:7, 86:17, 92:4, 95:19, 97:20, 97:25, 98:2,



101:22, 102:19, 103:1, 103:5, 103:10, 103:11, 105:16, 105:21, 105:22, 106:7, 106:12, 107:14, 107:15, 107:17, 109:17, 109:18, 110:23, 112:20, 113:1, 114:1, 114:3, 114:23, 115:7, 115:19, 115:22, 115:24, 117:10, 117:11, 117:14, 118:10, 118:12, 118:13, 118:16, 119:2, 119:4, 120:20, 121:5, 121:21, 122:9, 122:23, 123:6, 123:12, 123:13, 123:15, 124:11, 124:20, 126:15, 126:17, 126:24, 127:11, 127:19, 128:25, 129:24, 130:4, 130:17, 131:3, 131:12, 132:2, 132:21, 132:24, 136:1, 137:21, 138:8, 138:11, 138:13, 139:3, 139:4, 139:5, 139:6, 139:8, 139:9, 139:16, 140:5, 140:6, 140:18, 141:1, 141:2, 141:7, 141:8, 141:14, 141:15, 141:25, 142:11, 142:12, 142:21, 142:25, 143:1, 143:5, 144:1, 144:3, 144:9, 144:12, 144:13, 144:15, 144:17, 147:3, 147:5, 147:9, 149:7, 150:1, 151:17, 153:15, 153:17, 154:2, 154:7, 154:8, 154:24, 156:1, 156:2, 156:16, 156:18, 157:2, 157:9, 157:13, 157:17, 157:25, 159:3, 159:4, 159:7, 159:8, 159:22, 160:13, 160:17, 160:22, 162:4, 162:5, 162:9, 162:21, 164:8,

165:3, 166:1, 167:3, 167:7, 167:9, 167:15, 167:16, 168:2, 169:4, 170:12, 171:19, 172:3, 173:9, 173:15, 173:21, 174:2, 174:9, 174:15, 174:18, 176:10, 176:13, 177:7, 177:13, 178:1, 178:2, 178:17, 178:23, 179:2, 179:3, 180:11, 180:12, 182:8, 182:9, 183:10, 183:11, 185:2, 185:25
**corrected** [1] - 152:22
**correctly** [6] - 77:2, 86:5, 95:25, 136:2, 161:17, 174:20
**correspond** [1] - 171:21
**corresponding** [2] - 40:2, 67:23
**corresponds** [1] - 69:1
**corridor** [28] - 97:3, 104:9, 115:19, 115:23, 115:24, 117:6, 139:11, 141:10, 144:20, 144:22, 144:25, 145:4, 145:6, 145:10, 145:11, 145:13, 146:15, 147:12, 147:21, 148:1, 148:3, 148:21, 149:14, 149:16, 156:12, 160:15, 160:18
**corridors** [4] - 145:3, 145:25, 146:18, 147:1
**counsel** [4] - 25:18, 128:11, 133:2, 187:21
**counsel's** [2] - 111:22, 171:2
**Counsel's** [1] - 163:14
**country** [1] - 70:10
**couple** [7] - 9:15, 21:7, 117:18, 117:20, 117:22, 122:5, 133:21
**course** [3] - 34:14, 43:6, 97:18
**COURT** [3] - 5:2, 10:10, 188:22

**court** [6] - 8:11, 12:3, 14:14, 126:4, 126:6, 165:15
**covered** [3] - 90:4, 118:18
**coverings** [1] - 88:1
**cracked** [1] - 57:24
**created** [1] - 29:4
**creating** [1] - 29:12
**Crew** [1] - 156:11
**crew** [43] - 15:23, 37:17, 37:21, 46:3, 46:6, 53:8, 55:3, 55:17, 56:8, 57:5, 60:2, 60:6, 60:17, 60:19, 92:17, 105:20, 106:3, 106:18, 106:25, 107:12, 108:9, 108:18, 108:20, 108:25, 109:1, 109:9, 109:19, 109:23, 110:8, 111:16, 112:1, 113:7, 113:20, 114:6, 114:19, 116:10, 132:9, 158:12, 167:13, 171:18, 173:13, 176:4, 176:15
**cross** [3] - 28:18, 47:6, 188:18
**cross-referencing** [1] - 47:6
**cross-talk** [1] - 28:18
**cruise** [14] - 15:10, 15:13, 15:21, 15:24, 16:1, 18:6, 18:9, 69:14, 69:15, 69:22, 69:24, 157:17, 157:25, 176:9
**Cruises** [4] - 10:23, 11:1, 11:2, 11:14
**cup** [3] - 81:1, 81:4, 81:8
**curled** [1] - 58:1
**current** [1] - 185:14
**curving** [1] - 108:15
**cut** [1] - 39:1
**CV** [1] - 10:6
**cycle** [13] - 119:17, 119:19, 119:22, 120:2, 120:6, 120:7, 120:14, 121:1, 121:8, 121:13, 122:4

---

# D

**D-I-N** [1] - 69:4
**damage** [1] - 150:5

**dark** [1] - 140:25
**data** [2] - 36:7, 37:10
**date** [17] - 7:18, 25:14, 26:7, 43:10, 46:10, 128:1, 155:25, 162:8, 162:20, 163:25, 164:23, 165:1, 165:2, 165:4, 180:10, 184:8
**dated** [2] - 123:17, 126:16
**Daubert** [1] - 163:21
**DE** [2] - 5:10, 5:19
**De** [8] - 5:19, 19:2, 75:10, 91:9, 93:17, 126:12, 128:14, 128:23
**deals** [1] - 77:5
**deciding** [1] - 51:12
**deck** [3] - 38:17, 137:13, 138:3
**declared** [1] - 22:20
**deemed** [1] - 65:24
**defendant** [2] - 9:14, 10:2
**Defendant** [1] - 5:11
**Defendant's** [1] - 136:23
**defense** [1] - 10:1
**deficiency** [1] - 14:7
**deficient** [1] - 101:10
**define** [12] - 13:4, 64:16, 99:15, 119:3, 123:2, 134:3, 144:21, 145:4, 145:6, 145:12, 145:14, 179:19
**defined** [5] - 74:17, 89:6, 89:7, 145:1, 145:13
**defines** [1] - 145:10
**definition** [15] - 80:7, 80:19, 80:22, 81:19, 87:16, 88:5, 89:14, 104:18, 104:19, 104:23, 105:3, 105:4, 119:7, 121:7, 144:20
**definitions** [9] - 87:6, 87:13, 88:2, 88:15, 89:16, 90:6, 90:7, 104:21, 145:14
**deformations** [2] - 100:2, 100:3
**degree** [7] - 63:11, 63:12, 92:1, 92:22, 112:17, 131:15
**degrees** [4] - 15:4, 35:4, 37:7, 38:6
**deleted** [3] - 30:8,

30:11, 31:16
**denies** [1] - 125:18
**depicted** [4] - 21:25, 107:13, 108:7, 170:22
**depo** [4] - 47:16, 106:9, 157:15, 159:24
**depos** [1] - 116:15
**deposited** [24] - 57:4, 95:5, 95:9, 95:11, 95:17, 96:12, 105:20, 107:4, 132:8, 155:17, 158:12, 159:19, 167:22, 168:10, 169:20, 171:13, 172:6, 172:10, 172:21, 178:6, 179:9, 180:18, 180:19
**depositing** [3] - 106:4, 106:19, 155:13
**deposition** [38] - 6:19, 8:11, 21:3, 22:24, 22:25, 23:3, 23:8, 23:21, 24:17, 25:8, 47:25, 48:6, 55:3, 55:16, 59:4, 59:21, 60:17, 99:4, 106:2, 106:17, 110:19, 112:3, 116:12, 132:6, 132:20, 133:12, 134:21, 135:1, 157:1, 158:24, 159:3, 168:14, 170:11, 170:23, 171:2, 188:6, 188:7, 188:24
**depositions** [6] - 24:3, 24:7, 25:1, 47:8, 54:23, 176:17
**deposits** [1] - 98:24
**depth** [2] - 63:21, 70:19
**derived** [2] - 9:7, 88:7
**describe** [1] - 117:6
**described** [6] - 30:9, 41:11, 51:21, 119:2, 173:4, 176:17
**description** [1] - 87:15
**design** [5] - 31:9, 32:2, 32:9, 153:1, 182:24
**designed** [7] - 18:6, 18:8, 18:11, 18:14, 33:33, 33:25, 150:17
**designer** [1] - 102:12
**desktop** [4] - 186:14, 186:19, 187:6,

187:11
**detail** [2] - 23:5, 82:11
**detailed** [1] - 32:10
**details** [2] - 26:10, 140:14
**determination** [1] - 48:10
**determine** [15] - 40:12, 47:4, 47:20, 48:8, 50:25, 51:25, 52:7, 63:7, 67:5, 77:24, 120:14, 142:18, 169:1, 173:1, 179:9
**determined** [1] - 50:20
**determining** [1] - 51:22
**Deutsch** [2] - 69:6, 101:24
**device** [10] - 30:22, 35:20, 37:8, 37:10, 43:13, 45:3, 77:15, 78:6, 79:10, 79:18
**devices** [1] - 42:15
**Di** [3] - 70:18, 150:15, 161:9
**DI** [1] - 70:18
**Diane** [1] - 10:25
**difference** [4] - 74:20, 112:16, 152:8, 185:22
**different** [28] - 32:14, 41:14, 41:21, 47:1, 51:11, 63:7, 67:25, 70:19, 70:22, 73:20, 78:6, 85:12, 87:14, 88:2, 88:16, 90:5, 90:19, 90:20, 95:6, 96:10, 102:9, 130:3, 145:24, 148:10, 151:1, 173:5, 174:17, 185:21
**differentiate** [1] - 131:4
**differently** [1] - 78:7
**difficult** [3] - 113:13, 113:15, 170:8
**difficulties** [1] - 126:15
**difficulty** [5] - 124:10, 124:18, 125:13, 126:14, 141:11
**DIN** [26] - 67:24, 68:4, 68:13, 68:14, 68:24, 69:3, 69:8, 69:13, 69:21, 70:1, 70:2, 71:19, 71:23, 71:25, 84:19, 85:11, 85:23, 86:22, 87:6, 87:14, 87:23, 88:8, 89:3,

89:12, 90:16, 101:23
**dinner** [1] - 127:22
**DIRECT** [1] - 5:14
**direction** [3] - 97:5, 97:9, 160:16
**directions** [1] - 53:2
**directly** [5] - 86:1, 86:10, 154:17, 181:14, 182:12
**dirt** [1] - 98:25
**disability** [2] - 22:13, 22:17
**disabled** [1] - 22:20
**disagree** [1] - 25:16
**discern** [1] - 141:12
**discounting** [1] - 172:2
**discriminate** [1] - 82:12
**discuss** [1] - 157:3
**discussed** [5] - 64:3, 64:10, 65:5, 77:14, 115:14
**discusses** [4] - 66:18, 70:19, 76:23, 90:17
**discussing** [2] - 94:15, 175:18
**discussion** [1] - 31:5
**disinfected** [1] - 98:24
**disinfecting** [2] - 98:14, 98:20
**Disney** [1] - 148:6
**displacing** [1] - 81:5
**dispute** [1] - 12:18
**distance** [2] - 98:6, 98:7
**distinction** [1] - 81:25
**distort** [1] - 133:5
**distribute** [1] - 88:25
**disturb** [1] - 130:3
**docs** [1] - 38:19
**doctor** [8] - 14:21, 14:22, 119:2, 122:10, 123:11, 125:1, 125:15, 127:7
**document** [18] - 24:14, 26:10, 27:2, 27:10, 40:7, 48:7, 57:15, 61:4, 66:24, 86:1, 88:24, 104:3, 124:23, 125:3, 125:21, 126:16, 144:6, 185:10
**documentation** [8] - 45:4, 54:24, 84:8, 101:17, 133:20, 136:6, 136:8, 136:14
**documents** [11] - 7:23, 8:25, 9:1, 21:2, 32:5, 38:23, 69:18,

74:3, 104:1, 134:20, 145:6
**done** [10] - 72:11, 89:1, 100:23, 121:15, 150:22, 151:2, 153:5, 160:25, 173:1, 179:10
**Donna** [1] - 10:22
**door** [13] - 96:23, 97:1, 97:9, 97:14, 97:15, 97:22, 97:23, 98:2, 98:4, 98:6, 117:13, 146:10, 146:16
**dots** [1] - 100:8
**down** [12] - 92:8, 94:19, 94:20, 100:4, 117:5, 178:15, 179:5, 181:17, 184:20, 186:6
**download** [1] - 89:3
**Dr** [10] - 19:2, 27:14, 75:10, 91:9, 93:17, 123:17, 124:7, 126:12, 128:14, 128:23
**drain** [58] - 95:11, 96:22, 105:19, 154:16, 154:19, 154:20, 154:22, 155:2, 155:7, 155:11, 155:17, 158:21, 168:11, 177:21, 178:6, 178:24, 179:1, 179:5, 179:11, 179:16, 179:22, 179:24, 179:25, 180:9, 180:13, 180:15, 180:17, 180:18, 180:21, 181:1, 181:8, 181:9, 181:12, 181:15, 181:20, 181:21, 181:24, 182:3, 182:4, 182:7, 182:16, 182:20, 182:23, 183:1, 183:3, 183:7, 183:14, 183:17, 183:18, 183:20, 183:23, 183:24, 184:12, 184:19, 184:22
**drainage** [26] - 94:5, 94:6, 94:24, 95:2, 105:11, 105:15, 153:13, 153:24, 154:21, 155:22, 158:6, 169:1,

170:14, 177:21, 177:23, 177:25, 178:5, 178:8, 178:10, 179:20, 180:6, 181:24, 182:17, 182:21, 183:15, 183:19
**drained** [2] - 105:15, 167:22
**draining** [6] - 178:25, 179:13, 179:17, 179:18, 179:20, 180:7
**drains** [20] - 95:3, 95:14, 153:17, 154:2, 154:7, 154:10, 154:17, 155:14, 168:7, 169:21, 179:10, 179:11, 180:14, 180:16, 182:22, 182:23, 182:25, 183:24, 184:7
**drawing** [1] - 33:18
**drawings** [7] - 31:9, 32:2, 32:9, 33:3, 33:5, 33:7, 33:10
**dried** [1] - 62:3
**dries** [1] - 167:14
**drive** [4] - 180:5, 187:4, 187:7, 187:8
**dry** [22] - 17:21, 54:1, 54:9, 54:14, 60:7, 60:11, 61:5, 61:6, 61:7, 61:9, 61:11, 61:12, 61:20, 109:24, 141:12, 157:6, 160:1, 167:18, 169:16, 172:14, 173:14, 176:19
**drying** [2] - 60:12, 176:3
**due** [6] - 55:23, 63:9, 95:3, 131:16, 180:21, 183:24
**duly** [1] - 5:12
**dump** [2] - 169:3, 170:11
**dumped** [3] - 168:5, 168:6, 168:22, 170:4, 170:13
**dumping** [2] - 168:1, 169:10
**during** [27] - 27:16, 28:6, 29:2, 30:19, 30:22, 37:11, 41:10, 54:7, 77:18, 93:21, 95:17, 107:4, 107:5, 112:15, 142:23,

151:24, 162:10, 162:18, 163:5, 165:16, 167:21, 168:10, 169:20, 173:11, 174:13, 176:17
**During** [1] - 169:19
**duties** [3] - 112:2, 113:22, 181:23
**Dynamic** [1] - 76:9
**dynamic** [13] - 74:10, 74:14, 78:4, 80:6, 80:7, 80:9, 81:7, 81:20, 82:1, 82:7, 82:16, 82:20, 83:9

## E

**E-tran** [1] - 188:21
**easier** [1] - 182:16
**Edition** [1] - 66:11
**education** [1] - 14:23
**effectiveness** [1] - 161:10
**effects** [2] - 127:9, 128:9
**egress** [4] - 104:7, 144:23, 149:17
**eight** [1] - 123:20
**either** [6] - 7:7, 32:13, 87:11, 90:10, 143:11, 145:15
**elaborate** [1] - 16:10
**electronic** [4] - 7:23, 8:20, 28:10, 71:7
**electronically** [3] - 6:22, 20:22, 20:25
**element** [1] - 14:1
**elevated** [2] - 181:10, 181:21
**elicit** [1] - 134:24
**emergency** [1] - 104:8
**employed** [12] - 5:21, 5:23, 15:13, 15:21, 16:1, 16:17, 16:19, 16:21, 16:23, 133:23, 134:12, 157:24
**employment** [1] - 6:3
**empty** [1] - 127:22
**end** [8] - 36:13, 50:8, 95:4, 97:3, 139:10, 154:24, 156:12, 184:19
**engineer** [6] - 6:7, 12:24, 14:16, 14:19, 18:4, 32:25
**engineering** [3] - 13:8, 33:6, 33:10
**engines** [1] - 102:10



**English** [17] - 42:6, 42:17, 42:25, 43:5, 43:13, 43:21, 44:6, 66:3, 77:15, 77:18, 77:21, 78:2, 79:6, 79:13, 133:7, 139:5, 168:10
**enter** [1] - 97:12
**entered** [1] - 97:10
**entering** [1] - 141:10
**enters** [1] - 96:24
**entire** [8] - 20:20, 23:22, 35:15, 145:20, 146:9, 146:24, 147:4, 148:20
**entirety** [6] - 19:12, 19:24, 23:2, 23:15, 23:18, 24:2
**entitled** [2] - 65:10, 76:8
**entrance** [11] - 96:22, 104:7, 139:11, 143:25, 144:19, 144:22, 147:20, 148:21, 149:16, 152:20, 160:14
**entrances** [1] - 148:4
**entry** [1] - 97:1
**entryway** [1] - 98:4
**envisioned** [1] - 182:24
**equipment** [3] - 41:9, 78:15, 79:6
**equivalent** [3] - 135:20, 138:22, 139:23
**especially** [1] - 79:25
**essentially** [1] - 144:22
**established** [3] - 157:6, 157:14, 158:1
**et** [3] - 99:13, 102:10
**et.al** [1] - 119:12
**etiology** [1] - 130:10
**European** [3] - 67:24, 69:8, 70:6
**evaluate** [2] - 96:18, 126:7
**evaluated** [3] - 131:7, 183:4, 184:20
**evaluating** [1] - 105:13
**evaluation** [9] - 86:6, 98:22, 99:23, 100:15, 117:2, 117:4, 153:5, 172:21, 184:10
**evaluations** [1] - 181:13

**evaporate** [1] - 172:23
**evaporation** [3] - 39:8, 173:1, 173:5
**event** [5] - 77:4, 80:6, 80:9, 81:24, 89:4
**eventually** [1] - 179:22
**everyday** [1] - 17:17
**everywhere** [1] - 161:7
**evidence** [14] - 57:10, 102:1, 112:21, 116:7, 133:20, 135:22, 135:23, 143:16, 143:19, 155:9, 155:16, 170:16, 182:6, 183:23
**evident** [1] - 157:5
**exact** [17] - 7:18, 26:9, 46:22, 73:8, 138:24, 139:19, 139:21, 140:4, 158:19, 162:8, 162:19, 164:11, 164:19, 165:1, 166:17, 173:9, 178:7
**exactly** [8] - 49:4, 49:10, 66:24, 71:17, 89:15, 113:23, 115:13, 115:15
**EXAMINATION** [1] - 5:14
**examination** [3] - 62:20, 63:3, 63:14
**examined** [1] - 5:12
**example** [3] - 89:23, 90:2, 123:16
**examples** [1] - 88:9
**except** [3] - 118:17, 118:23, 133:11
**excluded** [5] - 12:3, 12:6, 12:11, 12:15
**excuse** [1] - 25:23
**executive** [1] - 16:2
**exemplar** [1] - 164:7
**exhibit** [17] - 25:8, 26:3, 47:13, 47:25, 49:15, 49:19, 106:8, 106:15, 116:12, 116:13, 116:14, 116:20, 132:20, 157:1, 170:24, 171:1, 187:14
**Exhibit** [57] - 6:12, 6:15, 6:18, 8:7, 8:8, 8:9, 8:12, 18:24, 19:2, 26:12, 26:16, 26:18, 27:6, 48:2, 48:6, 49:17, 49:20, 55:16, 56:23, 57:12,

57:17, 57:23, 75:14, 76:5, 78:3, 86:3, 91:4, 91:5, 91:6, 92:16, 93:14, 94:15, 112:13, 115:19, 116:22, 123:21, 124:5, 125:11, 158:23, 159:3, 160:19, 160:20, 160:23, 168:14, 168:18, 170:10, 170:22, 171:3, 171:6, 185:3, 185:6, 186:22, 187:17, 187:18, 188:3, 188:6, 188:7
**exhibits** [7] - 25:1, 25:5, 34:13, 47:7, 47:9, 54:22, 54:25
**exist** [2] - 29:17, 30:24
**existed** [4] - 167:19, 169:16, 172:15, 173:6
**existence** [1] - 20:5
**exists** [1] - 29:22
**exit** [1] - 104:8
**expedited** [1] - 188:23
**expeditious** [1] - 133:13
**experience** [2] - 16:8, 157:12
**expert** [18] - 6:5, 9:8, 13:11, 13:22, 15:7, 15:9, 15:16, 15:19, 19:4, 27:14, 64:19, 83:4, 87:5, 89:19, 131:3, 150:3, 151:11, 185:17
**expertise** [3] - 25:22, 125:25, 128:3
**explain** [1] - 83:3
**explicit** [5] - 72:14, 79:4, 90:3, 95:16, 123:3
**explicitly** [10] - 60:10, 63:8, 80:3, 83:8, 88:19, 96:17, 104:13, 130:24, 138:3, 150:18
**extending** [1] - 138:5
**extent** [2] - 143:16, 143:17
**Extrinsic** [1] - 129:18
**extrinsic** [1] - 131:5
**eyes** [7] - 57:7, 100:20, 110:8, 110:23, 111:25, 112:24, 113:1

# F

**F-116** [1] - 80:24
**F-1166** [4] - 67:2, 74:8, 74:23, 81:25
**F-1666** [1] - 83:12
**facilities** [2] - 108:11, 166:21
**facility** [2] - 170:15, 176:2
**fact** [16] - 12:10, 46:25, 91:23, 93:3, 94:22, 98:19, 99:2, 99:6, 99:8, 113:6, 129:13, 147:13, 160:16, 163:24, 179:14, 180:1
**factor** [1] - 130:2
**factors** [5] - 15:5, 15:7, 15:9, 38:4, 131:5
**Factors** [1] - 129:18
**Fahrenheit** [3] - 35:4, 174:19, 175:15
**failed** [4] - 14:3, 101:10, 157:5, 176:2
**failure** [2] - 13:24, 14:12
**Fall** [2] - 65:10, 138:21
**fall** [32] - 24:19, 38:7, 38:11, 38:14, 41:2, 41:23, 46:23, 49:14, 71:20, 105:18, 108:7, 108:8, 114:17, 115:11, 116:5, 118:8, 128:24, 129:8, 130:4, 131:6, 131:12, 133:17, 133:18, 134:17, 135:6, 135:19, 136:5, 136:10, 138:20, 143:21, 150:21
**falling** [2] - 122:23, 123:6
**falls** [1] - 150:13
**Falls** [1] - 129:17
**familiar** [15] - 33:8, 66:9, 75:15, 75:18, 75:21, 75:22, 75:25, 76:15, 76:17, 76:19, 76:21, 78:15, 129:20, 130:12, 130:16
**far** [2] - 23:21, 70:1
**fast** [2] - 167:18, 169:15
**features** [1] - 32:16
**fee** [1] - 186:3

**fell** [59] - 37:22, 39:21, 46:18, 46:21, 50:10, 55:22, 56:5, 57:3, 57:13, 58:11, 58:20, 59:5, 59:11, 59:17, 60:10, 60:24, 62:6, 62:11, 62:12, 62:22, 63:5, 91:15, 92:12, 93:5, 96:25, 97:15, 98:5, 106:23, 107:1, 107:8, 107:17, 108:19, 109:21, 110:3, 110:9, 111:17, 112:9, 114:1, 115:12, 115:14, 115:16, 115:22, 138:11, 138:25, 139:18, 139:20, 139:22, 139:23, 139:24, 140:1, 141:20, 146:10, 149:16, 160:22, 172:13, 179:2
**felt** [1] - 59:17
**few** [4] - 7:4, 117:25, 120:4, 120:12
**Figure** [14] - 96:15, 96:21, 100:8, 120:1, 120:11, 122:3, 155:4, 162:3, 168:9, 172:20, 178:12, 178:16, 183:16
**figure** [7] - 8:10, 13:19, 94:14, 97:5, 118:2, 181:4, 181:5
**file** [13] - 8:21, 9:2, 20:21, 20:24, 22:13, 28:10, 28:16, 29:9, 29:16, 29:20, 31:19, 34:11, 134:24
**files** [8] - 11:11, 21:3, 31:12, 31:14, 31:22, 148:16, 187:15, 187:16
**finalizing** [1] - 110:2
**findings** [1] - 99:20
**fine** [3] - 124:4, 128:12, 187:24
**finish** [4] - 97:16, 109:4, 119:25, 149:1
**finished** [3] - 158:12, 167:24, 169:22
**finishes** [1] - 102:10
**firm** [3] - 9:4, 12:20, 18:21
**first** [15] - 5:12, 48:15, 48:16, 48:19, 68:8, 106:6, 107:6, 125:3, 125:9, 135:16,



141:17, 159:5, 168:1, 179:1, 183:6
**five** [1] - 113:3
**fixture** [1] - 45:16
**flip** [2] - 140:7, 140:10
**flip-flops** [2] - 140:7, 140:10
**flooded** [2] - 180:2, 180:4
**floor** [91] - 17:8, 39:17, 42:4, 42:9, 42:20, 46:13, 46:15, 46:18, 46:21, 51:3, 53:5, 53:13, 54:5, 54:14, 54:18, 54:20, 56:4, 57:3, 57:7, 57:12, 58:11, 58:20, 59:5, 59:11, 61:5, 61:6, 61:7, 62:2, 62:3, 62:11, 62:22, 67:6, 71:24, 77:16, 77:25, 78:5, 80:2, 80:10, 80:11, 91:14, 93:4, 94:18, 94:22, 99:23, 101:11, 104:12, 105:11, 105:13, 106:3, 106:11, 106:19, 108:5, 108:9, 108:21, 112:4, 112:6, 112:7, 112:11, 135:20, 135:23, 137:20, 138:3, 138:22, 139:18, 141:13, 156:12, 157:6, 157:7, 159:25, 160:8, 160:21, 165:10, 167:14, 167:18, 168:2, 168:6, 168:20, 168:23, 169:4, 170:12, 170:17, 173:14, 174:13, 174:20, 174:23, 175:11, 175:14, 176:3, 181:6, 181:24
**Flooring** [1] - 76:10
**flooring** [1] - 76:24
**floors** [7] - 17:16, 17:20, 17:25, 113:23, 175:2, 176:19
**flops** [2] - 140:7, 140:10
**Florida** [1] - 6:11
**flow** [8] - 96:18, 169:15, 180:20, 181:8, 181:17, 182:10, 182:16, 184:21

**flowed** [1] - 184:22
**flowing** [1] - 96:21
**flows** [2] - 155:14, 182:12
**flush** [1] - 181:24
**follow** [3] - 12:20, 52:1, 105:8
**following** [1] - 146:1
**follows** [1] - 5:13
**food** [1] - 127:5
**foot** [18] - 44:5, 44:11, 44:14, 44:25, 45:2, 45:10, 45:11, 45:12, 45:19, 48:14, 48:16, 48:19, 48:25, 49:10, 104:12, 104:17, 104:20, 175:22
**footage** [23] - 19:10, 19:13, 19:24, 20:11, 20:14, 20:15, 20:17, 21:6, 21:24, 47:6, 47:12, 55:20, 62:19, 62:21, 62:25, 63:2, 92:9, 105:25, 112:1, 117:5, 117:9, 118:1, 120:5
**force** [7] - 80:20, 80:21, 81:4, 81:6, 81:11, 81:14, 128:6
**Force** [1] - 156:4
**forces** [5] - 80:25, 82:4, 82:12, 83:3
**forensic** [3] - 62:20, 63:3, 63:14
**forget** [3] - 91:3, 127:25, 148:6
**form** [52] - 25:15, 26:8, 32:18, 55:13, 56:6, 58:22, 59:6, 59:12, 60:8, 60:22, 61:13, 64:1, 64:8, 64:15, 71:21, 73:16, 74:1, 82:22, 87:12, 92:14, 93:6, 102:5, 107:18, 107:24, 110:25, 113:2, 114:2, 124:2, 124:12, 127:1, 128:12, 130:13, 130:18, 130:25, 131:13, 133:3, 134:7, 138:12, 140:12, 147:10, 152:16, 157:18, 161:8, 163:13, 164:9, 166:16, 168:3, 170:20, 173:18, 174:3, 176:11, 184:9
**Form** [1] - 14:5
**formal** [2] - 8:3, 14:23

**format** [3] - 29:18, 30:15, 30:16
**Forney** [1] - 27:14
**forwards** [2] - 108:10, 112:5
**four** [11] - 11:4, 19:18, 19:21, 50:8, 53:1, 110:12, 111:9, 111:23, 115:1, 115:10, 176:23
**FRANCISCO** [1] - 5:10
**Francisco** [1] - 5:19
**frank** [1] - 28:22
**Frank** [1] - 28:23
**free** [4] - 104:12, 104:17, 104:20, 105:2
**frequency** [1] - 35:21
**frequent** [1] - 130:10
**Friction** [1] - 76:10
**friction** [27] - 65:16, 66:19, 69:2, 70:21, 74:10, 74:12, 74:14, 74:15, 74:17, 78:4, 80:8, 80:19, 81:3, 81:7, 81:14, 82:1, 82:15, 82:16, 82:18, 82:20, 82:21, 83:2, 83:8, 83:11, 90:13, 90:20, 104:16
**front** [17] - 20:25, 21:22, 26:11, 27:7, 27:10, 28:2, 38:21, 49:25, 53:3, 87:24, 89:11, 91:1, 113:17, 114:22, 154:22, 158:25, 170:1
**front-back** [1] - 53:3
**Fu** [1] - 65:12
**Fu-Tien** [1] - 65:12
**full** [4] - 5:17, 140:13, 147:20, 187:7
**function** [1] - 179:21

**G**

**Gables** [1] - 6:10
**gait** [32] - 56:18, 116:25, 117:4, 117:9, 117:12, 117:25, 118:5, 118:9, 119:1, 119:3, 119:7, 119:8, 119:13, 119:16, 119:17, 119:19, 119:22, 120:7, 120:13, 121:1, 121:8, 121:24, 122:1, 122:4, 122:19, 124:10,

124:18, 125:16, 126:15, 128:21
**gallon** [2] - 179:6, 179:8, 182:5
**gallons** [5] - 154:12, 154:13, 155:6, 155:10, 179:25
**Gauchard** [1] - 129:19
**general** [5] - 51:14, 123:4, 127:17, 129:6, 130:20
**generally** [1] - 38:25
**generated** [5] - 18:17, 29:5, 29:12, 30:3, 30:7
**generic** [5] - 32:14, 79:3, 80:21, 127:2, 130:20
**geometric** [1] - 152:25
**geometry** [1] - 161:10
**German** [6] - 69:7, 69:9, 69:11, 70:4, 70:5, 70:9
**GERSON** [95] - 6:24, 7:2, 7:4, 10:12, 11:19, 14:5, 25:15, 25:19, 25:25, 26:8, 26:25, 28:17, 28:21, 28:23, 32:18, 34:11, 55:13, 56:6, 57:18, 58:22, 59:6, 59:12, 60:8, 60:22, 61:13, 62:13, 64:1, 64:8, 64:15, 71:21, 73:16, 74:1, 82:22, 87:12, 92:14, 93:6, 102:5, 103:7, 107:18, 107:24, 110:11, 110:25, 111:4, 111:9, 111:21, 113:2, 114:2, 118:18, 120:21, 124:2, 124:12, 125:7, 125:19, 125:24, 126:3, 126:6, 127:1, 128:2, 128:5, 128:17, 129:9, 130:13, 130:18, 131:13, 132:25, 133:10, 134:7, 138:12, 140:12, 147:10, 152:13, 152:16, 152:21, 157:18, 158:2, 161:8, 162:22, 163:13, 164:2, 164:9, 166:16, 168:3, 169:24, 170:5, 170:20,

173:18, 174:3, 176:11, 184:9, 187:20, 187:25, 188:9, 188:13, 188:18
**Gerson** [3] - 7:12, 9:3, 187:13
**Gerson's** [2] - 31:24, 93:19
**GETAWAY** [2] - 135:22, 137:8
**given** [14] - 10:19, 11:4, 13:10, 14:13, 27:4, 35:23, 52:1, 83:4, 96:11, 104:18, 130:25, 166:21, 187:4, 188:13
**glass** [2] - 127:25, 175:6
**God** [1] - 5:7
**Goldstein** [1] - 10:25
**Google** [1] - 104:3
**Gordon** [1] - 163:16
**GORDON** [126] - 5:15, 6:14, 6:16, 7:1, 7:3, 7:7, 7:8, 8:14, 10:14, 12:1, 14:8, 19:1, 25:18, 25:23, 26:1, 26:14, 27:3, 29:1, 31:4, 31:7, 32:20, 34:16, 47:18, 48:4, 55:19, 56:11, 57:21, 58:5, 58:8, 59:2, 59:9, 59:14, 60:13, 60:23, 61:17, 62:17, 64:5, 64:12, 64:18, 72:3, 73:18, 74:4, 75:2, 75:9, 76:7, 82:24, 87:20, 91:8, 92:23, 93:1, 93:9, 93:16, 102:17, 103:9, 107:21, 108:2, 110:4, 110:6, 110:15, 111:2, 111:7, 111:11, 111:12, 112:10, 113:14, 114:4, 118:21, 120:24, 123:24, 124:3, 124:15, 125:8, 125:22, 126:1, 126:5, 126:9, 126:11, 127:10, 128:11, 128:13, 128:20, 128:22, 129:12, 130:14, 131:1, 131:17, 133:2, 133:8, 133:14, 133:15, 134:9, 136:20,



138:15, 140:16,
147:16, 152:15,
153:2, 157:23,
158:4, 161:13,
161:20, 161:24,
162:24, 162:25,
163:19, 163:22,
164:6, 164:10,
166:23, 168:12,
170:7, 170:9,
170:21, 173:23,
174:7, 176:22,
177:19, 184:13,
185:5, 186:24,
187:23, 188:1,
188:5, 188:11,
188:15, 188:23
**grabbed** [1] - 149:23
**grabbing** [1] - 81:9
**gravity** [1] - 94:20
**gray** [1] - 168:21
**greater** [2] - 82:18,
83:11
**Grey** [7] - 137:25,
139:12, 139:20,
139:25, 140:4,
140:7, 140:10
**Grey's** [1] - 139:7
**Grill** [1] - 10:24
**Grimson** [1] - 119:12
**grinding** [1] - 180:22
**ground** [1] - 61:24
**grout** [5] - 91:24, 92:7,
92:8, 94:18, 94:25
**guess** [4] - 8:7,
135:18, 137:3,
180:22
**guests** [2] - 108:10,
114:18
**guidelines** [1] -
148:18

## H

**half** [5] - 43:16, 96:1,
96:3, 175:9
**hand** [5] - 5:3, 81:8,
81:9, 97:2, 108:16
**handbook** [4] - 70:18,
70:19, 70:24, 150:16
**handed** [1] - 165:17
**handrail** [32] - 143:25,
144:4, 144:19,
145:15, 145:17,
145:20, 146:3,
146:9, 146:17,
146:21, 146:23,
147:4, 147:20,
148:20, 148:22,
149:4, 149:6,

149:18, 149:20,
149:23, 150:13,
151:8, 151:10,
151:16, 151:18,
151:23, 151:25,
152:13, 152:19,
152:23, 152:25,
153:9
**handrails** [12] - 144:8,
145:25, 146:17,
147:12, 148:2,
148:3, 149:14,
150:4, 150:10,
150:16, 150:20,
150:23
**harassment** [1] -
128:18
**Hard** [1] - 76:10
**hard** [3] - 76:24, 77:6,
78:5
**Harvey** [1] - 65:13
**hazard** [1] - 158:7
**hazardous** [1] -
159:12
**head** [3] - 44:4, 76:2,
90:23
**health** [1] - 98:16
**hear** [3] - 52:22,
66:22, 83:14
**hearing** [1] - 22:17
**heat** [2] - 173:14,
175:4
**heated** [7] - 37:22,
37:25, 167:15,
174:16, 174:21,
174:23, 175:1
**heating** [1] - 175:2
**heavy** [1] - 29:20
**heel** [7] - 42:10, 42:11,
42:21, 77:21, 80:9,
80:11, 81:16
**height** [3] - 152:2,
153:6, 153:11
**held** [3] - 31:5, 149:6,
149:9
**Helen** [2] - 137:25,
139:12
**help** [3] - 5:6, 21:2,
150:21
**helps** [1] - 81:23
**herself** [1] - 126:12
**high** [4] - 63:11, 92:1,
140:24, 143:7
**higher** [4] - 68:6, 68:7,
69:1, 86:7
**hired** [1] - 12:20
**history** [2] - 118:15,
119:20
**hitting** [1] - 175:7
**hold** [6] - 13:13,

13:16, 15:4, 39:3,
41:8, 145:17
**Hold** [1] - 39:2
**holding** [1] - 108:16
**holds** [1] - 46:3
**home** [1] - 186:18
**homogeneous** [3] -
100:9, 100:12,
100:15
**homogeneousness**
[1] - 45:17
**hope** [2] - 81:23,
85:17
**horizontal** [2] - 80:20,
81:6
**hot** [4] - 152:11,
154:23, 154:25,
155:3
**hour** [3] - 175:9,
185:18, 185:24
**hourly** [1] - 185:16
**House** [1] - 10:24
**housekeeper** [2] -
16:3, 157:25
**housekeeping** [4] -
157:13, 157:16,
157:21, 176:9
**human** [4] - 15:4,
15:7, 15:9, 77:23
**hypothetically** [2] -
183:12, 184:3

## I

**I'** [1] - 61:15
**ideal** [1] - 181:23
**ideally** [1] - 166:19
**identification** [13] -
6:13, 8:13, 18:25,
26:13, 48:3, 76:6,
91:7, 93:15, 123:22,
185:4, 186:23,
187:19, 188:4
**identified** [2] - 28:19,
154:18
**ignore** [2] - 28:18,
161:6
**image** [2] - 107:2,
108:6
**images** [2] - 106:17,
107:10
**imaging** [1] - 99:18
**immediate** [1] - 116:6
**immediately** [2] -
62:6, 119:9
**IMO** [6] - 144:2,
144:12, 145:2,
145:3, 145:10, 146:1
**impact** [1] - 39:8
**impaired** [4] - 127:15,

127:16, 131:11,
131:15
**imperfections** [1] -
99:12
**implement** [1] - 157:5
**important** [3] - 81:13,
121:9, 150:2
**Improve** [1] - 66:11
**in-depth** [1] - 63:21
**inability** [1] - 131:22
**inadequate** [4] -
101:9, 119:13,
135:24, 153:21
**inadvertently** [2] -
30:12, 30:13
**inappropriate** [2] -
73:24, 126:9
**incident** [72] - 8:18,
21:8, 21:9, 22:21,
25:14, 26:7, 42:5,
46:10, 50:14, 54:4,
54:5, 54:7, 54:19,
54:21, 55:20, 56:18,
60:4, 69:19, 106:12,
109:14, 110:10,
112:23, 118:3,
118:8, 119:10,
119:21, 119:23,
120:6, 120:8,
120:13, 121:2,
122:5, 126:20,
128:10, 137:10,
137:23, 138:7,
138:20, 138:21,
139:7, 139:12,
140:8, 140:11,
140:18, 142:10,
142:16, 142:25,
143:4, 149:7,
155:11, 156:1,
162:9, 162:21,
164:1, 164:13,
164:14, 164:23,
165:3, 165:5,
165:13, 167:20,
170:19, 172:16,
172:18, 173:7,
174:2, 174:6,
174:14, 175:17,
180:11, 182:8, 183:8
**incidental** [1] - 18:3
**incidents** [7] - 13:24,
133:17, 134:17,
135:6, 135:20,
136:10, 137:2
**include** [2] - 29:21,
76:25
**included** [2] - 29:13,
103:14
**including** [2] - 138:4,

146:15
**income** [1] - 9:7
**incorrect** [5] - 67:13,
67:14, 68:3, 73:4,
102:3
**increased** [1] - 141:11
**independent** [1] - 6:5
**indicate** [1] - 20:11
**indicated** [4] - 39:22,
40:24, 104:13,
158:19
**indicating** [1] - 49:20
**individual** [6] - 29:16,
29:25, 91:20,
127:21, 157:16,
159:21
**Individuals** [1] -
129:17
**individuals** [1] -
115:16
**industry** [1] - 51:8
**infer** [6] - 49:13, 58:2,
92:21, 93:2, 98:23,
171:14
**inferred** [6] - 27:7,
27:8, 91:25, 109:3,
109:25, 110:20
**inferring** [4] - 110:22,
149:13, 161:17,
172:4
**informally** [1] - 163:11
**information** [8] - 34:2,
46:5, 55:11, 71:16,
130:21, 134:25,
136:21, 166:22
**initial** [1] - 184:21
**Initial** [1] - 136:24
**injuries** [1] - 150:8
**injury** [1] - 150:14
**inlets** [1] - 179:11
**inspect** [6] - 34:3,
34:8, 34:17, 73:1,
90:9, 166:5
**inspected** [11] - 72:17,
73:15, 92:5, 146:14,
153:17, 155:23,
162:1, 162:18,
163:24, 174:18,
174:21
**inspecting** [2] - 98:21,
154:2
**inspection** [40] - 8:17,
8:23, 27:17, 28:7,
29:2, 30:19, 30:22,
35:10, 35:13, 35:15,
36:12, 36:13, 37:11,
41:4, 42:2, 93:22,
94:17, 95:14, 98:15,
99:10, 107:4, 107:5,
112:15, 138:4,



141:23, 142:24,
155:25, 162:10,
162:19, 163:6,
165:2, 165:16,
165:22, 171:23,
172:4, 172:6,
173:11, 175:10,
183:9, 184:8
**inspections** [2] -
25:22, 73:21
**install** [1] - 146:3
**installed** [4] - 71:24,
101:21, 145:25,
149:18
**instance** [5] - 90:3,
127:24, 146:15,
148:2, 183:16
**instead** [3] - 41:17,
77:2, 85:21
**institute** [2] - 69:7,
101:24
**Institute** [3] - 69:6,
69:9, 75:20
**instrument** [13] -
36:21, 36:22, 40:8,
40:9, 40:10, 40:11,
42:3, 42:7, 42:8,
43:1, 43:23, 44:15,
100:20
**instruments** [4] -
41:21, 42:14, 42:18,
42:22
**insure** [3] - 45:17,
98:16, 176:3
**intent** [4] - 96:15,
96:16, 119:17,
155:12
**intentionally** [1] -
30:11
**interest** [1] - 18:21
**interested** [1] - 41:18
**interior** [2] - 102:10,
102:12
**international** [1] -
70:12
**International** [2] -
104:10, 146:13
**internet** [1] - 31:2
**interrogatories** [1] -
134:18
**Interrogatories** [1] -
136:25
**interrogatory** [1] -
139:13
**intoxicated** [2] -
131:11, 131:15
**Intrinsic** [1] - 129:18
**intrinsic** [1] - 131:5
**invented** [1] - 66:6
**investigated** [1] -

13:19
**invoice** [2] - 184:25,
185:10
**invoices** [1] - 185:7
**involve** [1] - 13:9
**involved** [2] - 14:2,
24:18
**involving** [4] - 13:24,
24:22, 164:1, 183:8
**iPad** [2] - 169:25,
170:2
**issue** [5] - 14:7, 71:4,
71:11, 143:20,
159:14
**issued** [1] - 86:4
**issues** [2] - 71:16,
119:1
**items** [2] - 6:21, 137:6
**itself** [9] - 47:17, 70:3,
73:14, 81:5, 88:18,
95:3, 133:1, 145:6,
170:6

## J

**janitor** [1] - 16:9
**janitorial** [2] - 16:21,
16:24
**janitors** [1] - 16:11
**January** [4] - 76:1,
123:18, 124:9,
126:17
**Jean** [1] - 65:12
**Jemalyn** [1] - 59:24
**job** [4] - 16:25, 17:24,
109:25, 159:24
**Jose** [1] - 5:19
**Judith** [1] - 10:24
**jump** [1] - 86:1
**jumping** [2] - 72:24,
86:10

## K

**Kessler** [75] - 7:14,
21:25, 22:3, 22:10,
22:19, 23:22, 24:22,
37:22, 39:21, 46:18,
46:21, 47:20, 48:5,
48:14, 49:14, 55:22,
56:5, 56:21, 57:3,
58:9, 59:3, 62:6,
62:11, 80:14, 91:15,
92:12, 93:5, 96:25,
97:15, 98:5, 105:19,
106:22, 107:1,
107:8, 107:17,
108:19, 109:21,
110:3, 110:9,
111:17, 112:8,

114:1, 114:16,
115:6, 115:12,
115:22, 116:5,
119:1, 124:9,
126:12, 131:10,
131:24, 137:20,
138:11, 138:25,
139:18, 139:24,
140:17, 140:19,
141:12, 141:20,
143:3, 143:20,
145:21, 146:10,
149:5, 149:12,
149:22, 160:13,
160:22, 164:1,
172:13, 175:21,
179:2, 183:9
**Kessler's** [43] - 22:12,
22:16, 23:3, 24:17,
25:8, 25:13, 38:7,
38:10, 38:14, 41:2,
41:23, 46:10, 47:25,
48:19, 48:25, 50:3,
56:18, 60:4, 62:19,
71:20, 106:12,
114:17, 116:25,
117:4, 117:9,
117:25, 118:12,
120:19, 142:9,
142:16, 142:25,
155:11, 156:1,
162:9, 162:20,
165:3, 167:20,
170:18, 173:7,
174:2, 174:14,
180:11, 182:8
**kind** [4] - 78:11, 100:7,
108:9, 108:14
**knowledge** [13] - 11:5,
11:24, 12:4, 12:8,
12:9, 12:12, 12:16,
29:6, 30:20, 127:8,
143:22, 163:2,
185:15
**known** [6] - 84:11,
86:13, 101:11,
155:13, 172:24,
176:3
**Ko** [1] - 10:23

## L

**lab** [3] - 17:4, 17:5,
17:17
**lack** [2] - 100:13,
180:22
**laser** [1] - 40:7
**last** [11] - 11:3, 43:7,
43:17, 43:23, 44:6,
99:3, 113:21, 115:5,

161:21, 173:19,
185:9
**Latin** [1] - 10:24
**law** [4] - 7:12, 9:4,
12:19, 14:14
**lay** [2] - 129:9, 157:20
**lead** [1] - 140:25
**leading** [3] - 146:16,
148:1, 155:3
**leads** [1] - 97:24
**least** [1] - 55:7
**Lee** [2] - 65:12, 119:12
**Lee-Jean** [1] -
68:21, 178:11
**left** [3] - 48:16, 48:19,
48:25
**length** [4] - 146:24,
147:4, 147:20,
148:20
**Lenoso** [2] - 59:24,
167:14
**Leonardo** [1] - 6:10
**less** [7] - 96:8, 100:11,
100:12, 115:3,
117:23, 182:11,
183:24
**letters** [1] - 69:4
**letting** [1] - 119:25
**level** [4] - 100:6,
150:17, 162:2,
171:12
**levels** [2] - 130:3,
135:23
**lie** [3] - 87:7, 90:10,
91:2
**Life** [1] - 104:11
**light** [2] - 32:15,
140:25
**lighting** [4] - 63:10,
141:19, 142:22,
143:20
**likely** [3] - 90:11,
98:13, 174:16
**limited** [2] - 12:15,
173:10
**Lin** [1] - 65:12
**line** [9] - 15:10, 15:14,
15:21, 16:2, 61:21,
91:24, 92:8, 94:19,
94:25
**lines** [2] - 58:13, 132:4
**link** [8] - 6:24, 18:20,
21:4, 28:5, 29:7,
93:19, 134:20, 186:7
**liquid/contaminants**
[1] - 132:8
**list** [3] - 10:6, 19:6,
90:2
**listed** [1] - 23:10
**listen** [2] - 22:15,
83:14

**literature** [10] - 51:8,
51:20, 51:23, 52:2,
52:13, 52:15, 54:9,
67:16, 70:16, 88:10
**litigation** [2] - 9:8,
9:12
**lobbies** [1] - 90:3
**local** [1] - 49:21
**located** [10] - 97:1,
124:14, 139:14,
152:3, 152:19,
153:7, 155:2,
168:21, 178:11,
180:21
**location** [54] - 39:23,
41:19, 47:5, 47:8,
48:18, 48:23, 49:1,
50:19, 51:1, 52:7,
52:8, 52:25, 53:1,
53:20, 56:10, 63:5,
69:19, 70:2, 92:20,
93:12, 95:5, 96:4,
96:25, 105:18,
105:19, 110:21,
112:8, 112:18,
114:16, 115:16,
138:10, 139:19,
139:21, 140:4,
142:12, 142:18,
145:20, 146:4,
152:10, 155:4,
155:19, 159:14,
175:8, 178:7, 178:9,
179:5, 180:15,
181:16, 181:17,
181:18, 181:20,
183:7
**locations** [8] - 39:25,
40:25, 50:21, 50:22,
51:5, 51:22, 52:21,
96:7
**locker** [1] - 97:12
**logs** [1] - 142:17
**look** [14] - 31:17,
61:11, 70:2, 70:17,
89:18, 90:7, 91:10,
99:11, 134:19,
134:23, 136:13,
148:16, 150:15,
161:5
**looked** [7] - 48:8,
48:9, 55:10, 71:13,
71:14, 100:16,
100:18
**looking** [14] - 31:18,
48:17, 57:11, 91:17,
97:2, 98:8, 100:4,
135:1, 136:22,
170:10, 171:22,
178:13, 180:18,



183:16
**looks** [4] - 53:21, 70:3, 93:24, 94:2
**low** [2] - 92:22, 112:17
**lower** [1] - 49:20
**lunch** [2] - 127:22, 129:4

## M

**machine** [7] - 36:5, 44:12, 45:5, 45:8, 45:10, 77:9, 77:11
**magnification** [1] - 100:22
**maintained** [1] - 100:16
**maintaining** [3] - 60:3, 106:11, 177:6
**maintenance** [5] - 98:15, 100:14, 176:2, 177:4, 177:12
**management** [4] - 133:24, 133:25, 134:3, 134:4
**manager** [3] - 134:2, 134:6, 134:13
**Mandara** [14] - 33:14, 33:25, 34:4, 34:8, 37:18, 73:25, 87:10, 103:1, 103:5, 141:19, 151:5, 153:19, 156:5, 166:1
**mandatory** [3] - 144:17, 147:5, 147:8
**manner** [1] - 51:21
**manuals** [1] - 177:8
**manufactured** [1] - 45:20
**manufacturer** [10] - 45:6, 45:13, 67:19, 67:22, 68:9, 68:10, 101:4, 102:22, 166:18, 167:11
**manufacturers** [2] - 70:11, 70:13
**marine** [1] - 65:20
**maritime** [2] - 18:12, 18:15
**Maritime** [1] - 146:13
**mark** [9] - 18:22, 25:20, 48:5, 75:13, 91:5, 155:5, 186:25, 187:16, 188:5
**marked** [10] - 6:12, 6:15, 6:17, 8:6, 8:12, 18:24, 19:2, 26:12, 26:15, 26:18, 27:2, 34:12, 39:23, 47:25, 48:2, 75:11, 76:5,

91:6, 93:14, 123:21, 158:7, 160:24, 168:14, 182:3, 185:3, 185:6, 186:22, 187:14, 187:18, 188:3
**markers** [1] - 181:6
**marking** [2] - 93:18, 159:12
**Marshall** [5] - 11:8, 11:9, 11:13, 11:16, 12:6
**match** [1] - 176:20
**material** [5] - 6:8, 13:24, 32:25, 69:18, 78:12
**Materials** [1] - 76:11
**materials** [9] - 14:2, 19:7, 71:2, 71:10, 72:22, 76:24, 78:5, 185:19, 186:7
**matter** [8] - 12:7, 64:3, 64:10, 69:25, 82:6, 89:14, 155:13, 162:3
**matters** [5] - 9:4, 9:9, 9:12, 121:17, 166:19
**maximum** [1] - 35:22
**mean** [10] - 19:17, 35:17, 49:9, 50:6, 89:9, 121:22, 132:16, 133:3, 147:23, 149:5
**meaning** [5] - 81:1, 85:10, 119:22, 125:16, 161:6
**means** [6] - 104:6, 144:22, 144:23, 149:16, 175:10, 186:17
**meant** [2] - 50:22, 52:11
**measure** [12] - 40:5, 42:14, 42:16, 42:23, 43:1, 66:18, 77:15, 79:7, 96:23, 98:3, 98:7, 151:19
**Measure** [1] - 66:10
**measured** [5] - 82:18, 151:18, 152:24, 153:11, 175:11
**measurement** [1] - 65:18
**measurements** [2] - 104:16, 141:18
**Measuring** [1] - 76:9
**measuring** [2] - 76:23, 153:3
**medical** [25] - 14:21, 14:22, 14:23, 22:9, 118:12, 118:15,

119:2, 119:20, 120:19, 121:3, 121:20, 121:23, 122:7, 122:10, 122:14, 122:22, 122:25, 123:2, 123:5, 123:9, 123:11, 123:14, 123:17, 125:1, 127:7
**meet** [5] - 28:24, 67:6, 69:1, 104:10, 183:2
**meets** [2] - 44:19, 152:25
**member** [25] - 15:23, 55:17, 56:8, 106:3, 106:18, 106:25, 107:13, 108:9, 108:18, 108:20, 108:25, 109:1, 109:9, 109:19, 109:23, 110:8, 110:17, 110:19, 111:16, 112:2, 113:7, 113:20, 114:6, 116:11, 176:15
**members** [13] - 37:18, 37:21, 46:3, 53:8, 55:3, 57:5, 60:2, 60:6, 60:17, 60:19, 167:13, 171:18, 173:13
**mention** [3] - 74:9, 84:17, 121:6
**mentioned** [17] - 22:25, 30:3, 42:19, 59:1, 77:20, 84:15, 84:18, 84:24, 88:8, 92:2, 112:14, 114:6, 116:19, 121:13, 122:5, 165:12, 186:5
**mentioning** [1] - 80:24
**MEP** [2] - 32:15, 32:16
**met** [3] - 22:6, 102:16, 151:25
**Method** [1] - 76:9
**method** [1] - 76:23
**methodologies** [1] - 70:20
**methodology** [1] - 77:23
**methods** [1] - 61:5
**Miami** [3] - 5:25, 142:3, 142:13
**Michael** [1] - 59:22
**microscope** [1] - 100:21
**microscopic** [4] - 98:22, 99:10, 99:17, 99:18

middle [1] - 52:10
**might** [25] - 14:7, 30:10, 30:25, 46:16, 46:25, 79:18, 80:1, 87:5, 88:10, 96:13, 102:13, 112:17, 112:20, 119:13, 120:15, 121:12, 127:6, 150:7, 150:9, 157:22, 159:14, 159:15, 163:11, 182:11, 186:13
**Mike** [2] - 163:16, 188:9
**mimics** [3] - 42:8, 42:19, 77:21
**minimum** [4] - 35:22, 67:18, 90:10, 104:25
**minute** [2] - 35:21, 75:3
**minutes** [14] - 7:5, 19:18, 19:21, 21:7, 108:8, 115:1, 115:6, 115:10, 167:24, 169:22, 176:23, 180:3, 188:12, 188:14
**mistaken** [1] - 126:20
**misunderstood** [1] - 23:25
**mitigate** [1] - 150:5
**mode** [2] - 13:19, 14:12
**moment** [3] - 11:25, 21:13, 60:25
**monitor** [3] - 79:24, 155:19, 176:8
**monitoring** [1] - 80:3
**moon** [1] - 70:1
**Moreover** [1] - 158:5
**Most** [1] - 98:13
**most** [4] - 90:10, 130:10, 180:1, 181:7
**mostly** [1] - 181:20
**motion** [2] - 42:10, 81:18
**move** [7] - 28:4, 57:20, 92:23, 110:4, 111:21, 128:7, 163:13
**movement** [1] - 81:11
**moving** [3] - 81:5, 81:10, 81:12
**MR** [227] - 5:15, 6:14, 6:16, 6:24, 7:1, 7:2, 7:3, 7:4, 7:6, 7:7, 7:8, 8:14, 10:12, 10:14, 11:19, 12:1, 14:5, 14:8, 19:1, 25:15, 25:18, 25:19,

25:23, 25:25, 26:1, 26:8, 26:14, 26:25, 27:3, 28:15, 28:17, 28:20, 28:21, 28:22, 28:23, 28:24, 29:1, 31:4, 31:7, 32:18, 32:20, 34:11, 34:16, 47:14, 47:18, 48:4, 55:13, 55:19, 56:6, 56:11, 57:18, 57:21, 58:5, 58:8, 58:22, 59:2, 59:6, 59:9, 59:12, 59:14, 60:8, 60:13, 60:22, 60:23, 61:13, 61:17, 62:13, 62:17, 64:1, 64:5, 64:8, 64:12, 64:15, 64:18, 71:21, 72:3, 73:16, 73:18, 74:1, 74:4, 75:2, 75:9, 76:7, 82:22, 82:24, 87:12, 87:20, 91:8, 92:14, 92:23, 93:1, 93:6, 93:9, 93:16, 102:5, 102:17, 103:7, 103:9, 107:18, 107:21, 107:24, 108:2, 110:4, 110:6, 110:11, 110:15, 110:25, 111:2, 111:4, 111:7, 111:9, 111:11, 111:12, 111:21, 112:10, 113:2, 113:14, 114:2, 114:4, 118:18, 118:21, 120:21, 120:24, 123:24, 124:2, 124:3, 124:12, 124:15, 125:7, 125:8, 125:19, 125:22, 125:24, 126:1, 126:3, 126:5, 126:6, 126:9, 126:11, 127:1, 127:10, 128:2, 128:5, 128:11, 128:13, 128:17, 128:20, 128:22, 129:9, 129:12, 130:13, 130:14, 130:18, 131:1, 131:13, 131:17, 132:25, 133:2, 133:5, 133:8, 133:10, 133:14, 133:15, 134:7, 134:9, 136:20, 138:12, 138:15, 140:12, 140:16,



147:10, 147:16,
152:13, 152:15,
152:16, 152:21,
153:2, 157:18,
157:23, 158:2,
158:4, 161:8,
161:13, 161:20,
161:24, 162:22,
162:24, 162:25,
163:13, 163:19,
163:22, 164:2,
164:6, 164:9,
164:10, 166:16,
166:23, 168:3,
168:12, 169:24,
170:5, 170:7, 170:9,
170:20, 170:21,
173:18, 173:23,
174:3, 174:7,
176:11, 176:22,
177:19, 184:9,
184:13, 185:5,
186:24, 187:20,
187:23, 187:25,
188:1, 188:5, 188:9,
188:11, 188:13,
188:15, 188:18,
188:23
**MS** [1] - 11:1
**MSC** [1] - 10:23
**Mur** [1] - 129:19
**must** [1] - 104:12

## N

**N-A-I-K** [1] - 47:14
**Naik** [2] - 47:12,
167:13
**Naik's** [4] - 168:14,
168:18, 170:22,
188:6
**name** [7] - 5:17, 28:21,
52:3, 52:18, 69:5,
106:1, 148:7
**National** [2] - 75:20,
76:9
**natural** [1] - 95:3
**naval** [2] - 12:21,
12:24
**NCL's** [1] - 27:13
**near** [1] - 139:7
**necessary** [1] - 98:16
**need** [14] - 10:12,
11:11, 12:19, 20:15,
31:2, 44:2, 51:25,
82:12, 108:1,
135:15, 147:11,
148:16, 182:25,
183:2
**needed** [4] - 17:14,

54:11, 83:7, 172:25
**needs** [1] - 183:1
**neighborhood** [1] -
51:7
**Neolite** [1] - 44:11
**Neurologic** [2] -
124:17, 125:12
**never** [20] - 14:13,
15:10, 15:13, 15:20,
15:23, 16:1, 17:24,
44:17, 79:12, 117:8,
125:21, 133:23,
134:12, 139:2,
140:3, 157:24,
165:7, 165:9,
165:25, 176:7
**next** [3] - 158:6,
168:20, 178:23
**nice** [1] - 28:24
**non** [1] - 65:20
**nonbinding** [1] -
144:12
**noncontact** [2] - 40:8,
40:10
**nonregular** [1] -
119:16
**northeast** [1] - 53:2
**Norwegian** [20] -
31:10, 32:3, 33:11,
33:23, 34:1, 34:9,
34:22, 37:17, 37:21,
46:3, 50:4, 73:25,
86:24, 89:23, 102:2,
102:21, 148:7,
151:2, 151:4, 151:6
**Norwegian** [1] - 34:4
**notes** [11] - 24:6, 24:9,
24:10, 35:18, 37:11,
37:12, 40:15, 40:16,
186:5, 188:2, 188:12
**nothing** [5] - 5:6,
69:12, 78:18,
128:18, 132:22
**nuisance** [3] - 80:16,
80:17, 81:19
**number** [32] - 27:21,
27:24, 39:3, 44:3,
48:22, 48:23, 49:1,
49:4, 49:11, 52:6,
76:2, 95:5, 104:25,
116:20, 123:23,
155:5, 178:23,
180:20, 181:1,
181:6, 181:7,
181:12, 181:14,
181:15, 181:16,
181:21, 182:3,
183:17, 183:18,
183:21
**numerous** [1] - 156:10

## O

**Oasis** [1] - 156:3
**Oberg** [1] - 119:12
**object** [53] - 25:15,
26:8, 32:18, 55:13,
56:6, 58:22, 59:6,
59:12, 60:8, 60:22,
61:13, 64:1, 64:8,
64:15, 71:21, 73:16,
74:1, 81:12, 82:22,
87:12, 92:14, 93:6,
102:5, 107:18,
107:24, 110:25,
111:21, 113:2,
114:2, 124:2,
124:12, 127:1,
128:12, 130:13,
130:18, 131:13,
133:2, 134:7,
138:12, 140:12,
147:10, 152:16,
157:18, 161:8,
163:13, 164:9,
166:16, 168:3,
170:20, 173:18,
174:3, 176:11, 184:9
**objecting** [1] - 128:17
**objection** [11] - 57:18,
62:13, 103:7,
110:11, 120:21,
125:23, 126:2,
126:10, 158:2,
162:22, 164:2
**observation** [1] -
108:4
**observe** [4] - 63:4,
100:19, 110:7,
143:13
**observed** [9] - 56:4,
92:12, 109:11,
156:10, 156:23,
162:3, 162:6,
176:20, 181:20
**observing** [2] -
116:10, 143:3
**obtain** [1] - 54:12
**obtained** [2] - 35:19,
167:8
**obviously** [5] - 8:24,
102:6, 165:5,
179:23, 182:22
**occasion** [1] - 17:12
**occasionally** [3] -
84:12, 86:14, 89:10
**occasions** [1] -
156:11
**occupation** [2] - 6:6,
32:23
**occurred** [10] - 50:14,

54:5, 135:20,
137:13, 137:19,
138:21, 138:24,
139:13, 141:23,
172:22
**office** [6] - 7:13,
31:24, 93:19,
186:18, 187:3,
187:10
**officer** [1] - 106:7
**officially** [1] - 63:6
**often** [1] - 36:5
**old** [1] - 45:18
**once** [3] - 57:23,
129:3, 186:25
**one** [50] - 9:5, 12:10,
15:15, 23:19, 25:10,
35:21, 38:22, 38:23,
39:2, 41:7, 41:17,
48:7, 52:3, 52:18,
58:6, 67:4, 67:10,
79:18, 85:24, 86:12,
104:7, 110:13,
119:16, 119:21,
122:18, 129:13,
131:6, 134:10,
135:3, 137:15,
137:18, 139:24,
143:7, 144:23,
145:17, 146:15,
148:10, 148:23,
149:5, 162:11,
163:17, 163:25,
164:5, 164:14,
164:16, 166:20,
170:25, 177:11,
178:9, 180:15
**one-shot** [1] - 41:7
**ones** [1] - 67:4
**ongoing** [2] - 155:19,
181:18
**online** [1] - 31:19
**onset** [1] - 120:15
**onwards** [1] - 96:19
**open** [8] - 20:15,
85:24, 97:23, 98:1,
106:16, 108:1,
116:14, 171:1
**operate** [2] - 174:23,
175:2
**operation** [1] - 38:3
**opinion** [22] - 48:24,
67:12, 79:20,
101:22, 101:23,
104:5, 107:7,
117:24, 120:3,
124:25, 135:18,
144:3, 145:16,
145:19, 146:5,
146:8, 146:11,

146:19, 157:4,
177:20, 178:4,
178:24
**opinions** [18] - 8:18,
12:2, 12:5, 12:14,
14:14, 56:17, 64:25,
83:22, 99:20,
122:19, 128:8,
128:21, 130:25,
137:10, 153:24,
163:20, 165:20,
177:25
**opposed** [2] - 9:14,
89:10
**opposite** [6] - 11:12,
122:16, 122:24,
149:8, 151:17,
160:14
**order** [20] - 29:4,
40:12, 42:11, 45:17,
51:2, 52:16, 61:6,
71:15, 80:1, 80:3,
104:8, 109:23,
120:14, 128:7,
130:21, 131:4,
169:1, 170:14,
179:9, 180:3
**ordered** [1] - 188:20
**ordering** [1] - 188:22
**organization** [2] -
75:18, 75:21
**Organization** [1] -
146:13
**orientation** [1] -
142:18
**original** [4] - 44:14,
45:2, 45:22, 172:12
**orthogonal** [1] - 53:2
**otherwise** [2] - 65:6,
102:7
**ounce** [1] - 95:24
**ounces** [2] - 96:2,
96:3
**outlet** [4] - 180:17,
181:1, 181:9, 184:22
**outlets** [1] - 179:11
**output** [1] - 76:13
**outside** [6] - 63:21,
100:24, 125:24,
128:3, 142:2, 166:7,
166:14, 168:25
**overall** [5] - 53:22,
72:20, 72:25, 73:22,
142:7
**overcast** [1] - 142:8
**own** [14] - 43:13, 57:7,
78:20, 78:24,
100:19, 110:8,
110:23, 111:25,
112:25, 130:1,



130:15, 166:14,
166:25
**owned** [1] - 43:15

## P

**p.m** [16] - 25:14, 26:7,
26:23, 49:21, 50:5,
50:11, 50:15, 75:6,
75:8, 114:10,
136:17, 136:19,
142:11, 177:16,
177:18, 188:24
**Padula** [2] - 10:22,
12:13
**page** [56] - 19:6,
23:10, 24:3, 24:24,
35:3, 36:16, 37:1,
38:22, 39:12, 40:25,
46:7, 50:13, 53:21,
61:11, 61:12, 61:16,
61:21, 61:23, 65:15,
66:24, 84:10, 84:22,
86:5, 88:6, 94:4,
94:7, 95:21, 98:8,
101:7, 105:7,
116:24, 124:17,
125:11, 130:6,
132:5, 132:11,
132:12, 133:16,
135:19, 140:21,
140:24, 143:24,
153:23, 156:7,
161:25, 175:25,
177:3, 178:11,
178:14, 181:2,
181:4, 181:5, 182:3,
186:9, 186:10,
186:11
**paper** [1] - 86:1
**paragraph** [1] - 96:17
**parallel** [2] - 81:12,
81:21
**pardon** [5] - 5:22,
13:15, 68:22, 140:9,
167:4
**Part** [2] - 103:16,
103:22
**part** [38] - 7:23, 18:8,
18:14, 21:1, 21:2,
21:6, 24:25, 32:4,
38:18, 49:20, 54:23,
57:25, 68:11, 69:17,
90:15, 91:16, 94:11,
95:13, 98:15,
101:16, 102:11,
104:22, 107:11,
132:10, 133:19,
134:1, 134:4,
134:18, 136:6,

147:12, 159:12,
167:23, 169:1,
169:21, 171:20,
172:21, 182:24,
184:21
**partake** [1] - 83:21
**partial** [1] - 39:1
**partially** [1] - 142:8
**particles** [1] - 51:12
**particular** [3] - 48:7,
69:15, 79:1
**parts** [2] - 13:9, 23:25
**passage** [1] - 146:24
**passengers** [2] - 46:2,
46:6
**past** [2] - 79:15, 101:2
**patient** [1] - 125:17
**Patricia** [1] - 138:2
**Pause** [1] - 188:8
**PDF** [3] - 29:9, 29:16
**Pedestrian** [1] - 66:10
**peer** [2] - 83:16, 83:19
**peer-reviewed** [2] -
83:16, 83:19
**pen** [3] - 187:4, 187:7,
187:8
**Pennsylvania** [1] -
22:17
**people** [9] - 38:2,
46:8, 73:1, 83:21,
114:16, 115:5,
115:21, 146:9, 161:5
**per** [4] - 35:21, 81:20,
185:18, 185:24
**percent** [7] - 9:7, 9:10,
9:13, 9:24, 9:25,
10:3, 93:11
**percentage** [1] - 9:22
**perfectly** [1] - 81:21
**perform** [2] - 8:17,
182:25
**performance** [8] -
68:17, 75:1, 165:23,
166:4, 180:6,
182:13, 183:2,
184:12
**performed** [4] - 96:9,
155:15, 166:21,
169:13
**performing** [5] -
112:2, 113:21,
166:14, 181:23,
185:17
**perhaps** [1] - 113:4
**period** [4] - 35:23,
41:10, 41:16, 172:22
**permanently** [1] -
22:20
**perpendicular** [2] -
81:15, 81:17

**Perrin** [1] - 129:19
**person** [13] - 16:6,
22:6, 42:9, 42:20,
69:5, 115:11,
119:14, 127:4,
128:24, 129:3,
129:9, 157:13,
157:21
**person's** [1] - 126:24
**personal** [2] - 16:8,
88:25
**personally** [6] - 63:18,
71:6, 110:7, 111:15,
111:25, 150:22
**personnel** [1] - 176:9
**perspiration** [1] -
175:22
**pertaining** [1] - 22:9
**PH.D** [1] - 5:10
**phone** [1] - 30:23
**photo** [1] - 47:24
**photocopy** [1] - 71:5
**photograph** [5] -
36:23, 58:4, 91:11,
97:7, 180:23
**photographs** [15] -
9:1, 27:16, 29:4,
29:8, 29:11, 29:15,
29:25, 30:1, 37:10,
40:18, 47:21, 47:22,
93:18, 93:21, 172:8
**photos** [1] - 48:13
**physically** [1] - 90:9
**picture** [11] - 95:9,
97:2, 97:4, 97:8,
97:9, 168:16,
168:17, 171:8,
171:14, 178:22,
179:14
**pictures** [4] - 28:14,
31:21, 93:23, 172:5
**Pilla** [3] - 70:18,
150:15, 161:9
**PILLA** [1] - 70:18
**place** [9] - 70:1, 86:16,
98:14, 98:20,
147:22, 147:23,
159:13, 159:18,
182:11
**placed** [8] - 69:24,
69:25, 86:23, 109:6,
147:13, 181:14,
181:15, 181:19
**placement** [2] -
161:10, 161:19
**places** [1] - 147:19,
147:25
**placing** [3] - 55:17,
81:10, 92:19
**plain** [1] - 133:6

**plaintiff** [7] - 9:14,
9:25, 10:3, 10:4,
19:25, 89:20, 128:10
**Plaintiff's** [1] - 136:24
**plaintiff's** [5] - 8:18,
18:21, 159:6,
185:12, 186:20
**plan** [2] - 38:18,
183:17
**plans** [5] - 32:4, 32:6,
32:7, 32:14, 32:16
**plenty** [1] - 52:15
**point** [28] - 8:7, 32:11,
36:3, 36:9, 36:21,
37:3, 37:5, 52:13,
60:15, 62:9, 69:13,
69:21, 70:9, 70:15,
82:7, 98:4, 98:7,
100:9, 100:13,
103:20, 107:6,
113:8, 122:2,
124:13, 138:23,
151:11, 180:24,
182:17
**points** [1] - 105:15
**policies** [4] - 176:16,
176:19, 177:5
**policy** [2] - 176:18,
177:12
**polls** [1] - 52:20
**pool** [8] - 38:3, 87:7,
89:24, 139:8, 139:9,
139:15, 151:17,
178:11
**porosity** [2] - 99:11,
100:7
**Port** [2] - 142:3,
142:13
**portion** [2] - 19:14,
168:23
**portions** [3] - 23:3,
23:16, 55:7
**position** [6] - 6:1,
96:19, 108:14,
133:24, 134:1, 176:8
**positions** [2] - 32:15,
176:16
**positively** [1] - 92:10
**possibilities** [1] -
150:9
**possibility** [1] - 150:2
**possible** [16] - 55:23,
57:15, 58:2, 63:11,
92:8, 92:20, 93:7,
96:20, 98:23,
109:14, 112:17,
115:13, 119:24,
119:25, 129:10,
129:11
**postural** [1] - 130:3

**poured** [1] - 154:15
**pouring** [2] - 154:6,
154:10
**practical** [1] - 70:17
**Practice** [1] - 65:11
**practice** [5] - 67:9,
99:22, 146:3,
147:14, 150:16
**practices** [3] - 51:15,
51:24, 146:19
**present** [1] - 141:10
**presented** [2] - 27:6,
116:14
**press** [1] - 36:1
**prevented** [1] - 166:12
**Prevention** [1] - 65:11
**previous** [3] - 31:11,
86:12, 169:11
**previously** [3] - 77:14,
77:20, 78:14
**principal** [3] - 6:2, 6:7,
32:24
**printed** [5] - 28:5,
37:10, 57:14, 91:4,
186:7
**printouts** [1] - 40:13
**priors** [2] - 133:19,
135:4
**problem** [2] - 182:21,
183:15
**problems** [2] - 143:3,
183:18
**procedures** [2] -
157:6, 176:4
**Proceedings** [3] -
75:7, 136:18, 177:17
**process** [5] - 13:9,
78:16, 83:20, 83:21,
177:10
**processes** [1] - 177:4
**procure** [1] - 102:8
**produced** [1] - 25:3
**prohibited** [2] -
165:11, 166:2
**proper** [3] - 51:21,
101:20
**properly** [2] - 176:2,
180:15
**properties** [3] - 42:11,
77:16, 80:4
**protective** [1] - 128:7
**protocol** [1] - 74:24
**provide** [20] - 8:17,
36:8, 36:9, 51:2,
51:3, 52:11, 52:17,
65:4, 67:20, 68:4,
71:5, 71:12, 74:23,
83:5, 83:22, 83:24,
86:11, 130:21,
131:21, 144:8



**provided** [57] - 10:5, 19:21, 20:12, 23:7, 23:13, 23:15, 24:25, 25:2, 25:5, 26:3, 29:9, 29:10, 29:15, 32:4, 38:19, 47:7, 50:3, 53:16, 54:4, 54:23, 55:21, 57:11, 57:24, 62:19, 63:10, 64:21, 67:8, 68:11, 71:9, 84:7, 84:25, 88:11, 93:19, 103:25, 106:1, 106:9, 106:16, 109:22, 113:1, 114:14, 115:8, 116:8, 120:12, 122:3, 124:24, 125:1, 125:17, 129:14, 130:19, 134:20, 136:7, 137:6, 144:6, 150:4, 164:7, 164:12, 178:12

**provides** [7] - 35:22, 67:25, 75:18, 77:22, 87:14, 88:18, 101:24

**providing** [5] - 46:4, 71:14, 122:18

**public** [5] - 46:4, 83:22, 83:24, 98:16, 104:3

**publication** [2] - 66:1, 66:9

**published** [2] - 66:13, 83:25

**pull** [4] - 60:25, 84:22, 85:24, 170:24

**pulling** [1] - 186:3

**pulls** [1] - 94:20

**purchasing** [1] - 166:13

**purportedly** [2] - 67:6, 102:3

**purpose** [4] - 17:9, 99:9, 121:14, 182:9

**purposes** [15] - 6:13, 8:13, 18:25, 26:13, 48:3, 50:23, 76:6, 79:23, 91:7, 93:15, 123:22, 185:4, 186:23, 187:19, 188:4

**push** [3] - 109:20, 110:9, 183:13

**pushed** [3] - 107:7, 108:4, 182:20

**pushing** [2] - 108:18, 159:21

**put** [16] - 29:4, 53:4,

72:4, 73:2, 73:24, 95:23, 96:3, 144:11, 147:4, 147:15, 155:7, 155:10, 179:4, 181:11, 182:2, 182:7

## Q

**quality** [5] - 57:14, 58:1, 63:9, 73:21, 79:23

**quantity** [3] - 127:20, 155:13, 182:10

**quarter** [4] - 154:11, 179:7, 179:8, 182:5

**questioner** [1] - 27:1

**questions** [9] - 28:18, 122:19, 128:6, 133:4, 133:12, 133:21, 135:7, 156:20, 187:25

**quick** [1] - 124:7

**quickly** [3] - 167:14, 172:14, 173:14

**quite** [1] - 100:14

**quote** [5] - 88:14, 104:22, 125:12, 138:20

**quoted** [1] - 131:21

**quoting** [2] - 130:9, 132:7

## R

**R-A-M-P** [1] - 70:7

**R11** [21] - 67:21, 68:12, 68:21, 84:2, 84:6, 84:9, 84:10, 84:19, 84:24, 85:4, 85:13, 85:21, 86:13, 87:17, 88:10, 90:14, 90:18, 101:6, 101:18, 101:19

**R12** [20] - 68:21, 69:1, 84:15, 84:18, 85:1, 85:9, 85:20, 85:24, 86:19, 87:1, 87:3, 87:7, 87:11, 87:19, 89:7, 89:24, 90:5, 90:10, 90:18, 101:19

**R13** [18] - 69:1, 84:18, 85:1, 85:9, 85:20, 86:19, 87:1, 87:3, 87:7, 87:11, 87:19, 89:7, 89:25, 90:1, 90:5, 90:11, 90:18

**rag** [1] - 157:7

**Raise** [1] - 5:2

**ramp** [4] - 70:7,

154:24, 155:3, 178:12

**range** [4] - 67:20, 68:9, 68:15, 117:14

**ranges** [3] - 67:25, 90:19, 91:2

**rated** [2] - 87:11, 102:4

**rates** [4] - 173:1, 173:5, 184:23, 185:16

**rather** [1] - 125:15

**rating** [7] - 84:3, 85:13, 87:18, 89:7, 90:12, 101:20

**ratings** [6] - 85:12, 85:14, 87:8, 87:15, 87:16, 88:3

**ratio** [4] - 80:20, 80:24, 82:4, 83:2

**ray** [1] - 113:10

**reach** [1] - 96:10

**read** [17] - 10:15, 22:24, 27:5, 36:16, 82:10, 82:11, 86:18, 88:8, 90:25, 125:9, 132:1, 136:2, 161:20, 161:22, 167:12, 176:5, 188:19

**reading** [14] - 27:1, 35:11, 36:20, 37:8, 41:6, 41:7, 84:10, 86:8, 103:18, 125:20, 130:6, 156:13, 170:1, 188:25

**readings** [2] - 40:14, 40:19

**ready** [2] - 125:10, 135:13

**real** [2] - 49:22, 124:7

**really** [4] - 67:10, 81:17, 81:19, 115:4

**Realtime** [1] - 169:25

**reason** [7] - 12:18, 14:3, 29:14, 54:3, 64:24, 78:22, 78:24

**reasonably** [1] - 65:17

**received** [1] - 62:24

**recent** [1] - 148:10

**recess** [3] - 75:5, 136:16, 177:15

**recite** [1] - 76:20

**recognized** [1] - 70:12

**recollection** [7] - 19:22, 21:12, 58:12, 58:25, 59:7, 62:15, 105:1

**recommendation** [10]

- 68:21, 144:7, 144:13, 144:16, 147:3, 147:6, 147:18, 148:18, 148:24, 149:17

**recommendations** [7] - 67:8, 144:5, 146:1, 146:12, 146:20, 147:1, 152:1

**recommended** [1] - 150:10

**recommends** [1] - 149:14

**recondition** [1] - 44:19

**reconditioned** [1] - 44:18

**reconstruct** [1] - 14:11

**reconstructing** [1] - 14:10

**reconstruction** [2] - 13:7, 13:11

**reconstructionist** [5] - 13:3, 13:5, 13:14, 13:17, 13:22

**record** [14] - 26:25, 28:19, 31:4, 31:6, 31:14, 36:2, 39:3, 39:4, 123:17, 124:6, 125:19, 159:2, 169:24, 170:6

**recorded** [1] - 161:23

**recording** [1] - 41:16

**recordings** [1] - 30:19

**records** [5] - 22:9, 35:20, 118:12, 123:14, 126:13

**recreate** [1] - 151:9

**reduce** [2] - 141:1, 150:5

**refer** [7] - 73:10, 95:1, 103:2, 115:18, 116:3, 139:10, 155:4

**reference** [41] - 39:11, 52:9, 52:11, 65:9, 67:1, 67:5, 67:17, 68:2, 68:23, 68:24, 70:25, 71:15, 78:5, 89:2, 94:5, 101:7, 103:19, 103:21, 104:24, 105:10, 105:17, 106:14, 106:15, 116:24, 119:11, 130:16, 130:21, 132:6, 133:16, 135:5, 136:7, 140:23, 140:24, 143:6, 143:12, 143:23,

144:18, 153:12, 156:9, 161:25, 175:25

**referenced** [9] - 19:9, 24:3, 24:24, 31:14, 84:16, 118:6, 130:24, 168:9, 177:8

**references** [9] - 65:16, 67:3, 69:17, 71:14, 88:19, 89:13, 104:15, 130:2, 133:1

**referencing** [6] - 47:6, 47:10, 67:17, 84:2, 137:2, 158:11

**referred** [2] - 70:6, 103:12

**referring** [25] - 38:25, 39:16, 47:20, 50:15, 51:17, 54:25, 60:16, 62:5, 66:25, 73:4, 73:13, 73:14, 87:21, 94:11, 94:13, 95:13, 97:19, 105:23, 105:25, 106:8, 134:16, 136:10, 138:19, 147:25, 153:22

**refers** [4] - 74:16, 95:2, 104:17, 145:3

**regard** [3] - 63:15, 104:5, 153:9

**regarding** [26] - 39:12, 45:5, 72:11, 114:6, 116:10, 116:25, 117:25, 127:8, 132:7, 132:19, 135:19, 143:24, 151:22, 152:4, 152:7, 153:12, 153:24, 156:9, 156:16, 157:1, 157:4, 160:25, 176:1, 177:12, 177:21, 177:25

**regardless** [3] - 140:3, 160:10, 183:19

**regular** [1] - 53:7

**regulation** [1] - 130:3

**Regulation** [1] - 103:16

**Regulations** [1] - 65:12

**reiterate** [1] - 120:11

**relate** [2] - 51:24, 99:20

**related** [3] - 8:18, 9:9, 9:12

**relative** [3] - 43:18, 44:6, 100:1

**relatively** [5] - 100:3,



100:5, 100:9,
140:25, 142:8
**released** [1] - 76:1
**relevance** [1] - 64:10
**relevant** [3] - 54:14,
64:3, 133:11
**relying** [4] - 67:11,
137:9, 137:23, 144:9
**remained** [4] - 105:14,
107:5, 167:23,
169:21
**remains** [1] - 30:13
**remember** [11] -
43:10, 44:4, 58:12,
58:16, 58:17, 59:16,
86:5, 95:25, 135:2,
165:12, 174:20
**remove** [1] - 17:10
**repeat** [7] - 7:10,
13:15, 34:6, 52:22,
62:23, 135:10, 169:9
**rephrase** [4] - 17:22,
17:23, 56:7, 169:8
**replaced** [2] - 45:23,
45:24
**replacing** [2] - 177:6,
177:13
**replied** [1] - 41:25
**report** [87] - 10:9,
18:17, 19:4, 19:6,
21:2, 23:11, 24:4,
24:11, 25:11, 27:13,
34:12, 35:3, 36:15,
37:1, 39:12, 39:23,
40:25, 45:14, 46:7,
47:3, 48:17, 49:5,
50:7, 50:13, 53:17,
53:23, 56:17, 63:25,
64:22, 65:9, 84:9,
84:21, 85:24, 86:3,
86:19, 88:6, 94:4,
94:12, 94:14, 95:2,
98:8, 100:8, 102:3,
103:14, 103:18,
104:6, 116:3,
116:25, 118:6,
119:4, 119:8,
121:10, 122:3,
124:14, 129:15,
130:1, 130:23,
131:3, 131:7,
131:21, 132:10,
135:25, 136:11,
138:21, 140:21,
141:16, 142:7,
144:14, 144:17,
144:21, 147:7,
150:20, 154:18,
156:7, 157:10,
161:15, 161:18,

162:1, 165:21,
165:24, 166:6,
169:2, 171:9,
173:10, 180:24,
181:2
**reported** [7] - 50:9,
53:23, 124:10,
133:19, 136:6,
159:23, 169:2
**REPORTER** [3] - 5:2,
10:10, 188:22
**reporter** [4] - 8:11,
161:23, 187:22,
187:24
**reports** [2] - 25:3,
101:24
**represent** [1] - 7:14
**representative** [1] -
50:23
**reproduce** [2] - 89:12,
172:19
**reproduces** [1] - 42:10
**request** [2] - 38:18,
133:20
**requested** [1] - 6:21
**require** [2] - 78:1, 81:4
**required** [3] - 13:5,
13:9, 17:1
**requirement** [1] -
90:13
**requirements** [4] -
44:20, 152:1, 152:2,
152:25
**requires** [3] - 77:8,
78:8, 83:20
**rereviewing** [1] - 61:3
**Research** [1] - 65:11
**research** [4] - 51:14,
51:24, 72:11, 160:25
**resistance** [18] - 42:4,
42:14, 42:16, 42:23,
43:1, 65:18, 67:7,
67:18, 76:24, 77:5,
79:7, 90:18, 95:7,
95:15, 95:18, 95:22,
104:25, 150:23
**Resistance** [1] - 66:10
**respect** [6] - 33:13,
46:17, 52:4, 102:25,
150:23, 156:4
**respectively** [1] -
86:20
**respond** [2] - 28:17,
135:8
**responsibilities** [3] -
18:4, 134:1, 134:4
**responsibility** [2] -
17:25, 176:15
**responsible** [2] - 60:2,
106:11

**rest** [1] - 176:5
**restroom** [1] - 53:11
**result** [4] - 25:13,
26:18, 53:15, 68:5
**resulted** [2] - 141:11,
150:8
**results** [2] - 24:22,
121:24
**resumed** [3] - 75:7,
136:18, 177:17
**retained** [7] - 7:9,
7:11, 7:17, 7:21, 9:3,
9:12, 9:19
**retainer** [2] - 8:3,
75:10
**Review** [1] - 65:11
**review** [25] - 7:20,
19:12, 20:14, 21:17,
22:12, 23:2, 23:22,
24:2, 24:21, 32:2,
33:17, 44:3, 50:2,
55:21, 71:1, 91:16,
112:13, 123:14,
124:21, 124:24,
125:3, 125:4,
130:23, 156:22,
185:19
**reviewed** [46] - 8:20,
19:7, 19:9, 20:12,
21:6, 21:21, 21:24,
22:9, 23:4, 23:25,
24:1, 24:7, 24:16,
25:6, 25:7, 26:2,
26:4, 26:5, 26:17,
27:13, 31:9, 33:9,
55:5, 55:12, 56:13,
56:15, 56:24, 59:21,
63:18, 65:20, 83:16,
83:19, 107:10,
107:12, 109:16,
112:22, 114:15,
117:8, 118:11,
118:24, 131:23,
142:17, 173:12,
176:24, 176:25,
187:3
**reviewing** [7] - 37:17,
37:20, 61:3, 63:6,
63:17, 124:23,
134:22
**RFP** [3] - 38:19, 135:2
**rhythm** [3] - 119:14,
119:15, 119:22
**right-hand** [1] - 97:2
**risk** [7] - 133:24,
133:25, 134:2,
134:3, 134:6, 134:13
**Role** [1] - 129:18
**roles** [3] - 134:5,
134:10, 176:14

**room** [5] - 97:12,
138:5, 138:8, 139:3,
168:25
**rotational** [1] - 81:18
**routine** [1] - 98:15
**routinely** [1] - 99:5
**Royal** [3] - 11:1,
11:13, 12:7
**rule** [2] - 175:20,
175:23

## S

**safe** [2] - 65:17,
101:11
**Safety** [1] - 104:11
**safety** [3] - 67:23,
147:14, 153:1
**sail** [2] - 73:15
**sample** [1] - 130:20
**samples** [1] - 51:25
**sampling** [5] - 51:3,
51:12, 51:24
**sand** [4] - 45:8, 45:19
**sandpaper** [5] - 45:15,
45:16, 45:18, 45:21,
45:22
**Sara** [1] - 11:1
**saving** [1] - 18:22
**saw** [8] - 57:4, 93:3,
111:25, 113:5,
115:21, 142:23,
172:5, 184:8
**scenario** [1] - 182:17
**scene** [1] - 139:18
**schematic** [2] - 32:8,
32:13
**Schwartz** [3] - 9:4,
123:17, 124:7
**science** [1] - 6:8
**scientist** [4] - 6:2, 6:7,
32:24, 33:1
**scroll** [2] - 178:15,
180:25
**scrolling** [1] - 61:15
**SD** [2] - 30:14, 30:16
**se** [1] - 81:20
**Sea** [1] - 104:11
**sealed** [4] - 33:2, 33:4,
33:6, 33:9
**Second** [2] - 66:11,
136:24
**second** [6] - 27:4,
39:2, 85:24, 136:13,
145:18, 178:9
**seconds** [12] - 7:25,
21:8, 26:21, 27:5,
41:8, 117:17,
117:18, 117:20,
117:21, 118:1,

120:4, 120:12
**section** [7] - 86:2,
94:13, 104:13,
104:21, 130:25,
153:22, 178:10
**Section** [5] - 86:6,
86:10, 95:1, 96:16,
138:20
**sections** [1] - 86:11
**Security** [3] - 22:13,
22:16, 22:21
**security** [1] - 106:7
**see** [74] - 26:20, 36:6,
38:25, 55:21, 56:21,
57:2, 57:6, 57:12,
57:16, 58:10, 58:18,
58:19, 59:4, 59:10,
62:21, 63:3, 91:14,
91:17, 91:22, 91:23,
94:24, 97:6, 98:17,
98:25, 100:7,
101:13, 101:14,
104:2, 106:3, 108:8,
108:12, 108:17,
108:20, 108:24,
109:8, 109:14,
109:19, 110:17,
110:23, 111:15,
112:11, 112:23,
112:25, 113:11,
113:16, 113:19,
113:20, 114:15,
115:10, 116:4,
124:7, 125:2, 125:3,
132:10, 155:14,
156:13, 157:8,
158:8, 159:6,
160:20, 165:18,
167:23, 169:21,
171:9, 171:14,
172:14, 172:22,
177:7, 182:10,
182:12, 182:13,
183:20, 186:6
**seeing** [5] - 92:6, 92:7,
114:18, 168:11,
179:12
**seizures** [1] - 125:18
**selected** [6] - 47:8,
101:10, 102:18,
102:21, 102:25,
103:5
**send** [11] - 7:1, 31:23,
63:20, 186:20,
186:21, 187:13,
187:16, 187:20,
187:21, 187:23
**sense** [2] - 151:12,
182:14
**sent** [1] - 6:24



**September** [2] - 168:15
**services** [1] - 184:24
**serving** [1] - 9:8
**sets** [1] - 73:15
**seven** [1] - 95:24
**seven-ounce** [1] - 95:24
**several** [7] - 21:8, 27:20, 108:8, 112:6, 170:13, 173:8, 187:15
**shadow** [1] - 171:18
**shall** [4] - 82:18, 83:11, 89:17, 104:20
**shape** [1] - 150:17
**share** [1] - 137:12
**shared** [3] - 31:21, 31:22, 138:6
**shares** [2] - 138:14, 139:17
**sharing** [1] - 138:25
**sheet** [1] - 186:4
**ship** [34] - 8:23, 15:24, 18:6, 18:9, 27:17, 30:19, 49:23, 49:25, 69:14, 69:15, 69:22, 69:24, 71:19, 72:12, 72:16, 72:20, 72:24, 72:25, 73:1, 73:14, 73:22, 102:25, 141:23, 142:15, 142:17, 142:19, 142:23, 148:19, 157:17, 157:25, 166:8, 166:15, 176:9
**ships** [2] - 148:8, 151:1
**shoot** [1] - 40:11
**short** [1] - 77:1
**shot** [3] - 41:7, 116:16, 116:18
**show** [12] - 26:15, 36:21, 37:9, 49:15, 69:21, 71:17, 76:14, 87:21, 100:13, 106:18, 123:17, 168:13
**showers** [1] - 89:25
**showing** [9] - 6:17, 32:14, 39:4, 91:9, 113:8, 124:5, 159:2, 159:11, 171:5
**shown** [1] - 95:10
**shows** [11] - 55:16, 111:1, 111:2, 111:4, 111:5, 121:25, 171:8, 179:14, 183:17, 183:23
**sic** [1] - 81:2

**side** [8] - 10:13, 53:3, 97:3, 151:17, 152:20, 160:14, 160:18
**side-side** [1] - 53:3
**sign** [5] - 159:13, 159:18, 160:12, 160:21, 161:19
**signed** [1] - 8:4
**significant** [4] - 132:7, 150:14, 162:2, 171:15
**significantly** [1] - 183:21
**signing** [1] - 188:25
**signs** [5] - 161:1, 161:3, 161:7, 161:12, 161:18
**similar** [6] - 41:11, 75:23, 147:1, 151:10, 162:13, 166:13
**simple** [1] - 111:14
**simply** [1] - 125:20
**sink** [1] - 180:5
**sit** [9] - 19:23, 21:5, 21:19, 38:5, 40:23, 46:20, 88:13, 89:4, 90:24
**site** [1] - 64:13
**sitting** [2] - 81:2, 188:10
**size** [4] - 73:5, 73:12, 161:11, 184:4
**skills** [2] - 13:5, 13:8
**slightly** [2] - 181:9, 181:21
**Slip** [2] - 65:10, 66:10
**slip** [40] - 42:4, 42:14, 42:16, 42:23, 43:1, 65:18, 67:6, 67:18, 76:23, 77:5, 77:23, 79:7, 90:17, 95:7, 95:15, 95:18, 95:22, 104:12, 104:17, 104:20, 104:25, 105:2, 105:18, 115:11, 116:5, 120:15, 131:6, 131:22, 133:17, 133:18, 134:17, 135:6, 135:19, 136:5, 150:7, 150:6, 150:7, 150:21, 150:23, 151:24
**slip-and-fall** [9] - 105:18, 131:6, 133:17, 133:18, 134:17, 135:6,

135:19, 136:5, 136:10
**slip-free** [4] - 104:12, 104:17, 104:20, 105:2
**slipness** [1] - 159:14
**slipped** [17] - 47:20, 48:8, 48:14, 48:16, 48:19, 48:25, 49:10, 50:4, 50:24, 51:7, 92:20, 106:22, 139:25, 140:2, 140:4, 149:25, 175:21
**slipping** [2] - 91:19, 152:9
**slope** [6] - 94:5, 94:6, 94:22, 95:2, 95:3, 169:1
**slopes** [1] - 94:19
**sloping** [1] - 94:23
**slowly** [1] - 179:18
**SLS** [1] - 77:2
**small** [1] - 100:6
**smaller** [1] - 91:12
**smells** [1] - 127:25
**Smith** [1] - 10:21
**smooth** [2] - 100:3, 100:5
**smoothness** [1] - 100:1
**snapshots** [1] - 47:11
**soapy** [1] - 78:12
**Social** [3] - 22:13, 22:16, 22:21
**societies** [2] - 72:10, 72:14
**society** [2] - 72:8, 72:9
**SOLAS** [6] - 103:15, 103:19, 103:21, 104:11, 104:14, 105:5
**solid** [1] - 41:17
**solids** [1] - 41:19
**Sololow** [1] - 10:24
**solution** [1] - 78:9
**someone** [11] - 16:2, 62:10, 108:4, 121:20, 122:7, 122:21, 123:6, 129:8, 150:13, 151:24, 152:9
**somewhere** [1] - 36:14
**Soo** [1] - 10:23
**soon** [1] - 76:4
**sorry** [20] - 8:9, 9:16, 10:10, 30:16, 31:11, 34:6, 55:1, 66:22, 84:20, 86:8, 94:1,

114:11, 128:4, 141:6, 145:17, 155:1, 168:15, 177:5, 178:13, 180:23
**sort** [18] - 20:10, 29:18, 30:21, 31:17, 62:20, 63:3, 63:14, 63:21, 100:20, 119:14, 133:23, 141:18, 153:4, 167:17, 169:14, 172:7, 176:8, 183:14
**sounds** [1] - 11:5
**source** [1] - 159:15
**southwest** [1] - 53:2
**spa** [57] - 32:7, 33:18, 37:18, 37:25, 52:10, 56:25, 71:24, 72:5, 84:6, 85:5, 86:23, 87:7, 87:16, 89:23, 90:8, 96:22, 96:24, 97:10, 97:24, 98:21, 101:8, 101:19, 103:3, 103:13, 104:7, 104:9, 106:11, 135:20, 135:23, 137:13, 138:22, 139:11, 139:15, 141:10, 143:4, 143:14, 143:21, 143:25, 144:19, 144:22, 145:22, 146:16, 147:21, 148:1, 156:12, 164:16, 167:3, 167:6, 170:14, 170:18, 171:16, 173:15, 174:16, 175:5, 176:2, 177:4, 182:24
**Spa** [14] - 33:14, 33:25, 34:4, 34:9, 37:18, 73:25, 87:10, 103:1, 103:5, 141:19, 151:5, 153:19, 156:5, 166:1
**space** [3] - 5:20, 70:18
**spaces** [2] - 32:15, 140:25
**spas** [2] - 148:2, 148:5
**speaking** [2] - 125:22, 126:1
**speaks** [2] - 132:25, 170:6
**spec** [3] - 68:17, 75:1, 85:10
**specialized** [1] - 13:6
**specific** [35] - 37:9, 38:4, 39:7, 41:19,

44:8, 45:16, 51:4, 52:8, 52:12, 60:15, 65:19, 68:18, 68:19, 78:3, 83:7, 84:6, 85:5, 88:15, 90:13, 91:2, 101:1, 102:25, 104:15, 104:24, 105:3, 134:24, 136:9, 137:1, 137:9, 149:15, 156:4, 158:5, 158:18, 179:5, 181:5
**specifically** [27] - 7:20, 8:15, 33:13, 43:8, 47:9, 48:22, 48:25, 49:4, 51:16, 52:3, 52:18, 55:12, 57:11, 74:13, 76:22, 82:19, 87:9, 89:5, 96:13, 103:4, 105:23, 130:1, 145:1, 145:9, 151:5, 157:16, 158:10
**specification** [9] - 68:11, 69:17, 70:13, 84:25, 85:1, 85:2, 85:5, 85:8, 85:21
**specifications** [5] - 38:1, 67:22, 68:12, 72:1, 84:18
**specifics** [1] - 21:10
**specified** [3] - 67:20, 86:7, 102:13
**specify** [2] - 102:9, 102:23
**speck** [3] - 183:13, 184:17, 184:18
**specs** [2] - 102:15, 102:16
**speculate** [1] - 128:2
**spell** [1] - 69:3
**Spencer** [1] - 11:15
**spilled** [1] - 180:2
**spoken** [1] - 22:3
**spot** [1] - 138:24
**squeegee** [41] - 17:1, 17:5, 18:1, 18:3, 61:24, 107:13, 108:15, 108:18, 109:10, 111:16, 112:4, 132:9, 157:7, 159:19, 162:1, 162:6, 162:8, 162:16, 162:18, 162:19, 163:3, 163:8, 163:24, 164:8, 164:11, 164:12, 164:20, 165:9, 165:13, 165:25, 166:4,



166:7, 166:13, 173:16, 173:21, 173:25, 177:6, 177:9, 177:10, 184:3
**squeegeed** [5] - 55:17, 106:4, 106:25, 107:3, 109:9
**squeegeeing** [27] - 17:16, 17:20, 56:9, 61:7, 61:19, 92:17, 92:18, 106:3, 106:18, 106:20, 108:9, 108:20, 108:25, 109:4, 109:11, 110:1, 110:18, 110:21, 112:6, 113:18, 113:25, 114:7, 116:11, 156:11, 158:13, 159:24, 160:4
**squeegees** [7] - 109:2, 109:23, 110:19, 112:7, 113:22, 160:8, 177:13
**squeeze** [2] - 107:16, 165:10
**stable** [3] - 120:2, 121:14, 121:24
**stack** [1] - 186:6
**stagnant** [3] - 105:14, 107:5, 179:15
**stamp** [1] - 39:5
**stand** [1] - 152:22
**standard** [35] - 50:1, 67:9, 67:24, 68:14, 68:25, 69:13, 69:22, 70:5, 70:9, 70:12, 70:14, 74:16, 74:18, 75:25, 76:16, 76:17, 76:22, 77:5, 77:8, 78:1, 78:3, 83:12, 83:17, 83:19, 84:19, 85:1, 85:11, 86:22, 87:23, 88:15, 88:18, 89:1, 89:12, 89:17, 90:17
**Standard** [1] - 76:9
**standards** [5] - 69:7, 75:16, 75:19, 83:5, 91:1
**Standards** [2] - 69:9, 75:20
**start** [5] - 81:4, 86:12, 105:10, 138:17, 180:5
**starting** [1] - 80:19
**starts** [1] - 81:10
**state** [17] - 5:17, 12:9,

35:3, 66:21, 74:13, 82:14, 83:9, 84:9, 88:5, 88:19, 92:10, 105:13, 112:18, 118:7, 138:3, 141:7, 142:6
**statement** [21] - 50:3, 56:5, 56:8, 67:11, 99:4, 101:15, 121:23, 122:13, 123:4, 127:3, 127:17, 129:6, 132:18, 135:25, 136:4, 136:11, 137:10, 143:9, 156:16, 174:25, 176:21
**statements** [1] - 177:8
**states** [9] - 51:9, 51:20, 54:9, 66:23, 104:11, 113:22, 125:12, 130:10, 150:16
**static** [11] - 65:16, 66:19, 74:9, 74:14, 80:25, 81:3, 82:1, 82:7, 82:15, 82:20, 83:9
**stating** [7] - 58:13, 61:4, 73:8, 73:24, 138:23, 159:17, 161:15
**steady** [3] - 121:14, 121:24, 121:25
**steam** [4] - 138:5, 138:8, 139:3, 168:25
**step** [1] - 168:4
**stepping** [1] - 91:18
**still** [17] - 29:19, 29:23, 30:24, 31:12, 47:22, 47:24, 48:5, 50:15, 56:21, 106:17, 116:16, 116:18, 121:25, 149:25, 167:23, 172:23, 173:25
**stills** [2] - 47:17, 55:2
**stipulate** [1] - 126:5
**stitched** [2] - 29:11, 30:2
**stitches** [1] - 29:3
**stop** [2] - 110:14, 166:10
**stopping** [4] - 108:15, 108:21, 110:3, 112:8
**strange** [1] - 119:13
**Street** [1] - 6:10
**strike** [28] - 17:19, 23:14, 35:17, 36:3, 37:4, 37:19, 39:19,

56:2, 78:23, 80:9, 80:11, 81:17, 92:23, 96:11, 101:6, 110:4, 111:21, 117:2, 120:17, 130:15, 141:22, 152:6, 157:11, 160:11, 163:14, 164:18, 165:8, 180:13
**strike-off** [1] - 96:11
**striking** [8] - 42:9, 42:12, 42:20, 44:23, 77:22, 81:12, 81:21, 82:8
**strip** [1] - 50:24
**structural** [3] - 6:8, 13:23, 32:25
**structure** [1] - 14:1
**sub** [2] - 91:20
**subcontract** [1] - 91:21
**subject** [2] - 22:21, 163:20
**submitted** [1] - 10:7
**subpoena** [3] - 6:14, 6:18, 6:21
**subscribed** [1] - 83:13
**subsequent** [2] - 34:25, 84:19
**substance** [6] - 17:10, 53:4, 53:12, 59:4, 59:10, 77:2
**suffer** [1] - 150:13
**sufficient** [2] - 65:24, 66:19
**suitable** [5] - 84:11, 86:13, 86:19, 87:1, 87:18
**suite** [1] - 139:14
**summarize** [1] - 121:18
**summarized** [1] - 24:11
**summary** [1] - 28:13
**summer** [2] - 43:9, 43:11
**sun** [2] - 175:5, 175:7
**Sunday** [1] - 34:15
**sunny** [2] - 142:6, 142:8
**supervise** [1] - 176:8
**Supplemental** [1] - 136:24
**supplementary** [1] - 140:15
**support** [7] - 64:25, 71:18, 87:10, 136:11, 137:10, 144:3, 144:5
**supporting** [2] - 55:3,

70:16
**supports** [3] - 37:4, 37:6, 107:7
**supposedly** [1] - 67:22
**surface** [82] - 17:6, 39:13, 39:15, 39:17, 40:2, 40:5, 40:11, 40:24, 41:6, 41:17, 41:22, 42:12, 44:19, 44:22, 46:9, 46:13, 46:15, 46:18, 46:21, 54:6, 56:10, 58:18, 60:12, 68:18, 70:3, 71:24, 76:24, 77:16, 77:22, 79:24, 79:25, 81:13, 81:21, 86:6, 89:22, 92:17, 94:16, 94:18, 94:22, 95:2, 95:3, 95:23, 99:1, 99:3, 99:11, 99:24, 100:2, 100:3, 100:6, 100:9, 101:11, 105:11, 105:14, 106:19, 108:25, 109:24, 110:1, 110:18, 110:20, 135:21, 135:23, 137:14, 137:20, 138:6, 138:22, 139:1, 139:18, 141:13, 156:12, 160:8, 166:1, 166:4, 166:8, 169:13, 171:10, 172:21, 172:25, 174:13, 174:20, 181:22, 181:25
**Surface** [1] - 76:10
**surfaces** [7] - 68:25, 82:8, 85:3, 85:25, 86:6, 104:12, 174:23
**surveillance** [1] - 171:9
**Susan** [1] - 10:25
**susceptible** [3] - 122:23, 123:1, 123:6
**swear** [1] - 5:4
**swimming** [3] - 139:8, 139:15
**sworn** [1] - 5:12
**symptoms** [1] - 124:24
**synced** [1] - 186:13
**syndromes** [1] - 130:11
**system** [3] - 153:13, 154:21, 155:22

**T**

**Table** [1] - 53:16
**table** [5] - 81:2, 81:10, 90:22, 91:2, 135:4
**talks** [5] - 74:11, 78:4, 80:24, 120:12, 131:7
**tap** [4] - 53:7, 53:13, 78:17, 96:3
**tear** [3] - 99:12, 99:14, 99:15
**technical** [3] - 80:17, 80:18, 83:15
**Tellez** [5] - 47:16, 55:15, 106:2, 106:6, 106:10
**Tellez's** [2] - 116:11, 157:1
**temperature** [40] - 35:4, 35:12, 35:19, 36:6, 36:10, 36:12, 37:6, 37:24, 38:3, 38:4, 38:6, 38:10, 38:14, 39:8, 39:13, 39:15, 39:17, 40:3, 40:6, 40:12, 41:6, 41:7, 41:9, 41:12, 41:15, 41:18, 41:19, 41:20, 41:23, 172:24, 173:6, 174:1, 174:5, 174:10, 174:17, 174:24, 175:3, 175:8, 175:14, 175:17
**temperatures** [3] - 40:24, 41:4, 42:2
**temporarily** [1] - 141:1
**ten** [3] - 115:6, 117:21, 117:23
**tends** [1] - 117:22
**term** [1] - 103:12
**terms** [11] - 21:10, 21:20, 33:17, 51:18, 66:20, 67:23, 68:23, 79:6, 80:7, 120:19, 180:5
**terrible** [1] - 127:24
**Test** [1] - 76:9
**test** [57] - 24:22, 25:13, 26:17, 27:4, 42:4, 44:5, 44:11, 44:14, 44:19, 44:21, 44:25, 45:2, 45:10, 45:11, 45:12, 45:19, 46:9, 47:5, 48:18, 48:23, 50:18, 50:21, 50:22, 50:25, 51:13, 51:22, 52:1, 52:6, 52:7, 52:17, 52:24,



53:1, 53:18, 54:1, 54:9, 70:7, 70:20, 76:23, 88:15, 88:18, 95:11, 95:17, 96:6, 96:13, 96:14, 139:19, 152:14, 155:12, 166:3, 166:4, 166:7, 170:14, 173:17, 173:22, 173:25

**tested** [21] - 39:20, 39:22, 49:11, 51:10, 52:14, 53:1, 55:18, 94:24, 95:14, 95:15, 99:3, 101:1, 101:4, 139:2, 140:3, 141:22, 165:7, 165:25, 180:9, 183:25

**testified** [24] - 5:13, 24:18, 33:17, 58:10, 58:14, 58:17, 59:3, 60:7, 60:19, 62:10, 79:5, 107:16, 107:20, 107:23, 109:1, 109:16, 110:2, 113:24, 115:2, 118:17, 118:23, 132:1, 160:1, 173:13

**testifies** [2] - 112:3, 160:3

**testify** [1] - 163:17

**testifying** [3] - 60:18, 61:8, 163:19

**testimony** [38] - 5:4, 10:6, 10:19, 11:4, 11:7, 11:20, 11:22, 13:10, 22:16, 23:17, 37:17, 37:21, 59:22, 62:10, 85:19, 106:24, 108:17, 109:22, 116:9, 116:10, 131:23, 132:6, 143:2, 143:13, 146:7, 160:5, 160:8, 160:11, 167:12, 170:2, 171:24, 172:2, 173:12, 185:20, 185:21, 185:23, 186:1

**testing** [37] - 17:14, 42:18, 46:11, 46:23, 52:4, 53:5, 66:20, 67:25, 74:24, 77:5, 77:18, 78:9, 78:13, 78:14, 82:15, 88:1, 95:7, 95:18, 95:23, 100:23, 150:22,

151:22, 152:4, 152:7, 152:24, 153:4, 156:3, 166:14, 166:24, 167:17, 167:21, 167:25, 169:15, 169:19, 169:23, 172:14, 179:15

**tests** [9] - 39:18, 51:13, 54:14, 54:15, 96:9, 96:10, 168:8, 168:10, 169:12

**THE** [56] - 5:2, 5:8, 10:10, 11:23, 14:6, 26:9, 32:19, 34:14, 47:15, 55:15, 56:7, 58:7, 58:24, 59:7, 59:13, 60:9, 61:15, 62:15, 64:2, 64:9, 64:16, 71:22, 74:2, 75:4, 87:13, 92:15, 93:7, 102:6, 107:19, 107:25, 111:24, 113:5, 114:3, 123:23, 124:13, 127:2, 128:4, 129:11, 130:19, 131:14, 138:13, 140:13, 147:11, 152:18, 152:23, 157:20, 161:9, 164:4, 166:17, 168:4, 170:3, 173:20, 174:4, 176:13, 184:10, 188:22

**therefore** [16] - 41:18, 42:10, 65:2, 71:25, 77:22, 78:6, 81:18, 83:10, 109:6, 118:14, 131:22, 143:16, 147:18, 149:17, 166:3, 176:21

**Thereupon** [5] - 31:5, 75:5, 136:16, 161:22, 177:15

**THEREUPON** [2] - 5:1, 5:9

**thermal** [5] - 37:18, 96:24, 97:24, 139:14, 145:21

**thermometer** [2] - 35:8, 35:9

**third** [1] - 103:12

**three** [8] - 82:23, 96:1, 96:3, 103:8, 110:12, 114:23, 183:24, 184:19

**throughout** [7] - 21:3,

35:14, 36:11, 41:16, 147:4, 171:15, 175:9

**thumb** [1] - 184:18

**thumbnail** [1] - 184:4

**Tien** [1] - 65:12

**tile** [66] - 44:21, 67:19, 67:24, 68:8, 68:10, 68:25, 69:16, 69:24, 69:25, 70:3, 70:11, 70:13, 72:2, 72:4, 72:23, 73:24, 76:25, 77:6, 80:4, 84:3, 84:6, 84:16, 84:17, 84:25, 85:4, 85:5, 85:13, 85:21, 86:16, 86:23, 87:10, 87:17, 90:12, 90:14, 90:18, 98:23, 99:3, 99:10, 100:1, 100:4, 100:17, 100:24, 101:2, 101:6, 101:10, 101:17, 101:18, 101:20, 101:21, 102:3, 102:4, 102:18, 102:21, 103:1, 103:5, 112:16, 137:20, 138:6, 139:1, 139:23, 156:4, 167:2, 167:5, 167:14

**tiles** [6] - 85:2, 90:20, 91:2, 91:24, 101:3, 167:8

**timer** [1] - 35:24

**timestamp** [2] - 20:10, 114:5

**timestamps** [2] - 21:15, 21:20

**title** [2] - 134:11, 134:13

**today** [14] - 7:2, 8:21, 19:23, 20:18, 20:19, 21:5, 21:19, 40:23, 46:20, 60:18, 71:3, 89:4, 173:8, 185:14

**today's** [1] - 6:18

**together** [2] - 10:8, 172:24

**Tong's** [1] - 132:19

**tonnage** [2] - 73:5, 73:12

**took** [9] - 29:2, 40:19, 43:6, 53:10, 93:21, 98:14, 98:20, 172:6, 180:3

**tool** [1] - 80:3

**top** [6] - 44:3, 57:25, 76:2, 90:23, 178:11, 178:18

**total** [2] - 23:13, 46:5

**totality** [4] - 19:20, 20:5, 73:22, 117:24

**totally** [3] - 22:20, 126:8, 128:6

**toward** [1] - 160:13

**towards** [3] - 97:2, 112:7, 139:14

**towel** [2] - 108:16, 177:10

**toxicologist** [4] - 15:1, 15:3, 25:17, 27:14

**toxicology** [1] - 128:9

**tracking** [3] - 108:11, 113:9, 113:16

**traction** [1] - 135:24

**trade** [1] - 6:8

**train** [2] - 176:3, 176:8

**training** [1] - 13:6

**tran** [1] - 188:21

**transcript** [8] - 23:16, 23:18, 23:22, 24:17, 106:2, 110:19, 169:25

**transcripts** [4] - 23:8, 106:17, 112:22, 135:2

**transfer** [1] - 144:24

**transferred** [1] - 24:10

**transferring** [1] - 30:15

**transiting** [1] - 144:24

**transitional** [3] - 84:11, 86:14, 88:21

**translated** [1] - 69:10

**transmit** [1] - 31:24

**transmitted** [1] - 29:7

**trench** [8] - 154:20, 155:2, 158:6, 180:18, 181:17, 181:18, 182:5, 184:22

**trial** [1] - 186:1

**tribometer** [3] - 42:5, 66:6, 76:13

**tried** [1] - 47:19

**tries** [1] - 96:18

**trip** [1] - 150:21

**true** [9] - 46:17, 56:5, 59:5, 59:20, 122:16, 122:24, 149:8, 163:10, 173:7

**truth** [3] - 5:5, 5:6

**try** [2] - 33:19, 48:9

**trying** [27] - 49:13, 51:19, 63:7, 72:23, 73:9, 83:3, 85:15, 85:23, 88:4, 89:15, 99:16, 119:9, 121:6, 121:18, 122:16,

125:2, 134:19, 135:4, 135:6, 135:8, 136:3, 136:4, 153:23, 170:8, 171:1, 183:3, 184:20

**tub** [4] - 152:11, 154:23, 154:25, 155:3

**tummy** [1] - 127:23

**Tung** [3] - 106:6, 106:10, 116:11

**turn** [1] - 38:24

**turning** [2] - 113:12, 113:17

**two** [20] - 9:17, 9:18, 19:10, 41:21, 51:4, 60:2, 74:21, 75:3, 82:8, 86:11, 112:24, 112:25, 117:23, 126:19, 180:3, 181:13, 183:24, 184:19, 188:11, 188:14

**two-minute** [1] - 75:3

**type** [25] - 13:18, 18:11, 42:3, 52:1, 53:4, 70:22, 72:10, 73:6, 79:9, 82:8, 83:1, 83:7, 83:10, 100:23, 101:2, 101:10, 127:4, 135:21, 137:13, 138:14, 138:22, 139:17, 166:8, 167:2, 167:5

**types** [5] - 13:21, 73:20, 73:21, 85:12, 181:13

**typical** [1] - 98:24

**typically** [3] - 70:6, 146:3, 159:13

## U

**ultimately** [2] - 102:14, 102:21

**unable** [1] - 31:3

**unaware** [3] - 33:24, 34:2, 139:21

**under** [11] - 65:19, 87:17, 103:19, 104:12, 104:17, 104:20, 108:13, 117:21, 124:17, 125:11, 175:22

**understood** [1] - 164:13

**undertaken** [1] - 112:15

**unfortunately** [1] -



112:22
**University** [1] - 5:25
**unknown** [5] - 137:17, 137:18, 137:19, 177:3, 177:14
**unless** [1] - 113:10
**up** [15] - 10:11, 10:13, 12:20, 23:6, 43:24, 44:24, 71:13, 71:14, 97:24, 98:4, 154:25, 172:14, 182:1, 184:19, 188:2
**upper** [1] - 178:22
**Urbina** [1] - 138:2
**Urbina's** [1] - 138:7
**USB** [1] - 100:21
**uses** [1] - 41:15
**UTC** [1] - 50:15
**utility** [1] - 16:6

## V

**VALOR** [2] - 148:10, 148:12
**valuable** [2] - 65:4, 166:22
**value** [4] - 84:10, 86:7, 86:13
**values** [5] - 68:1, 68:4, 69:2, 86:19, 88:16
**variable** [1] - 42:5
**variance** [1] - 68:6
**varies** [2] - 67:20, 68:12
**various** [3] - 47:21, 63:24, 64:22
**vary** [2] - 41:20, 96:13
**vendor** [1] - 63:21
**verbatim** [2] - 58:16, 104:23
**version** [1] - 71:7
**versus** [11] - 10:21, 10:22, 10:23, 10:24, 10:25, 11:1, 11:13, 12:6, 12:13, 42:17
**vertical** [1] - 80:21
**vessel** [11] - 18:12, 18:15, 34:18, 53:6, 101:8, 102:23, 103:3, 103:13, 135:21, 145:25, 147:13
**vessels** [6] - 145:23, 146:14, 147:2, 147:15, 148:3
**video** [36] - 21:24, 28:6, 28:13, 29:2, 29:5, 29:7, 29:10, 29:13, 29:17, 29:18, 30:2, 30:6, 31:12,

31:14, 40:21, 56:24, 57:10, 108:4, 108:14, 109:10, 109:20, 111:15, 111:16, 112:12, 113:1, 114:6, 114:22, 114:24, 116:16, 116:17, 116:18, 117:5, 120:4, 120:9
**videos** [3] - 28:16, 30:15, 55:1
**view** [7] - 20:15, 32:11, 100:10, 100:13, 151:12, 182:18, 183:17
**viewed** [1] - 110:8
**vision** [1] - 113:10
**visited** [1] - 148:3
**visual** [3] - 99:23, 141:1, 165:22
**visually** [2] - 63:17, 166:5
**volume** [3] - 171:12, 172:9, 184:11

## W

**waived** [1] - 188:25
**walk** [10] - 80:12, 81:20, 104:9, 120:20, 121:4, 121:21, 122:8, 122:15, 131:22, 146:9
**walked** [6] - 46:8, 115:5, 115:15, 115:17, 117:13, 145:21
**walking** [10] - 50:24, 80:5, 80:8, 114:16, 115:21, 117:5, 119:23, 139:14, 160:13, 160:17
**walks** [1] - 119:14
**wall** [1] - 183:20
**warning** [2] - 160:11, 161:1
**water** [151] - 39:8, 53:6, 53:7, 53:13, 55:17, 55:21, 56:4, 56:9, 57:2, 57:4, 57:6, 57:12, 57:16, 58:2, 58:10, 58:18, 58:19, 62:21, 63:4, 63:8, 77:3, 78:11, 78:18, 91:14, 92:4, 92:8, 92:11, 92:19, 92:21, 93:3, 93:11, 94:15, 94:19, 94:23,

95:5, 95:8, 95:10, 95:16, 95:17, 95:23, 96:4, 96:12, 96:13, 96:18, 105:14, 105:18, 106:4, 106:20, 106:25, 107:3, 107:4, 107:7, 107:17, 108:4, 108:11, 108:18, 109:2, 109:3, 109:6, 109:9, 109:11, 109:20, 109:23, 110:2, 110:9, 110:21, 111:3, 111:16, 112:11, 112:18, 112:20, 113:9, 113:16, 113:19, 113:25, 114:7, 116:11, 154:6, 154:9, 155:6, 155:10, 155:13, 155:17, 158:7, 159:15, 159:19, 159:22, 165:10, 167:22, 167:23, 168:2, 168:5, 168:9, 168:11, 168:19, 168:22, 168:23, 169:3, 169:9, 169:10, 169:18, 169:20, 169:21, 170:4, 170:11, 170:13, 170:17, 171:10, 171:12, 171:15, 171:18, 172:3, 172:6, 172:10, 172:20, 172:23, 178:6, 179:4, 179:15, 179:25, 180:1, 180:2, 180:17, 180:19, 180:20, 181:7, 181:11, 181:14, 181:15, 181:19, 181:22, 182:2, 182:7, 182:10, 182:11, 182:12, 182:15, 182:16, 182:19, 182:23, 183:3, 183:13, 183:19, 183:24, 184:3, 184:11, 184:17, 184:18, 184:21
**wear** [4] - 99:12, 99:14, 99:15, 162:2
**wearing** [2] - 140:7, 140:10
**weather** [2] - 142:1, 142:4
**website** [2] - 31:17,

89:3
**welcome** [1] - 70:25
**well-maintained** [1] - 100:16
**wet** [66] - 53:5, 53:19, 54:5, 54:15, 54:18, 54:21, 59:17, 60:19, 60:21, 62:2, 62:3, 62:11, 66:20, 68:5, 68:18, 68:19, 68:20, 68:25, 82:18, 84:12, 85:2, 85:25, 86:15, 86:19, 86:20, 87:1, 87:3, 87:4, 88:5, 88:7, 88:20, 89:5, 89:9, 89:10, 89:22, 91:25, 92:6, 92:7, 92:9, 101:12, 108:12, 109:24, 110:20, 112:4, 113:23, 141:12, 158:20, 159:12, 159:25, 160:4, 160:9
**whatnot** [1] - 129:5
**white** [1] - 186:11
**whole** [2] - 5:5, 82:7
**wife** [1] - 127:24
**William** [1] - 66:3
**Williford** [1] - 10:25
**wine** [1] - 127:25
**wipe** [1] - 157:7
**wise** [1] - 9:22
**WITNESS** [53] - 5:8, 11:23, 14:6, 26:9, 32:19, 34:14, 47:15, 55:15, 56:7, 58:7, 58:24, 59:7, 59:13, 60:9, 61:15, 62:15, 64:2, 64:9, 64:16, 71:22, 74:2, 75:4, 87:13, 92:15, 93:7, 102:6, 107:19, 107:25, 111:24, 113:5, 114:3, 123:23, 124:13, 127:2, 128:4, 129:11, 130:19, 131:14, 138:13, 140:13, 147:11, 152:18, 152:23, 157:20, 161:9, 164:4, 166:17, 168:4, 170:3, 173:20, 174:4, 176:13, 184:10
**witness** [12] - 5:11, 9:8, 15:19, 27:1, 39:3, 39:4, 125:20, 128:8, 128:19, 163:15, 170:1,

188:18
**word** [2] - 105:2, 145:11
**words** [5] - 61:10, 83:2, 148:25, 180:19, 181:8
**wrapping** [1] - 188:2
**write** [2] - 83:12, 83:17
**writing** [2] - 71:17, 83:23
**written** [6] - 50:3, 65:12, 83:6, 129:18, 159:6, 161:17
**wrote** [1] - 186:6

## X

**X-ray** [1] - 113:10
**XL** [17] - 42:6, 42:17, 42:25, 43:5, 43:13, 43:21, 44:6, 44:25, 66:6, 77:15, 77:18, 77:21, 78:2, 79:6, 79:13, 139:5, 168:10

## Y

**year** [2] - 43:7, 43:16
**years** [2] - 11:4, 126:19
**yell** [1] - 109:5
**yellow** [2] - 160:21, 181:6
**yourself** [4] - 13:13, 13:16, 165:18, 167:9

