# FRANCISCO DE CASO Ph.D., LEED A.P.

# *EXPERT REPORT*

# CHRISTINE KESSLER
# v.
# NORWEGIAN CRUISE LINE

# CASE NO.: 19-CV-20583

Report Number: R190811
Date Issue: October 1, 2019

**REPORT PREPARED FOR:**

Gerson and Schwartz, PA
Attn: Nicholas I. Gerson
1980 Coral Way, Miami, FL 33145
Email: ngerson@gslawusa.com; Phone (305) 371-6000; Fax (305) 371-5749

**SCOPE OF WORK:**

Inspection onboard the Norwegian Breakaway

**Francisco De Caso, Ph.D., LEED A.P.**
5804 Leonardo St., Coral Gables FL, 33146 • 305-450-9291
fjdecaso@gmail.com

| Controls: | |
|---|---|
| Superseded Report | New report |
| Reason for Revision | n/a |
| Effective Date | October 1, 2019 |

| Report Approval: |
|---|
| *I indicate that I have authored and reviewed this report and agree with the contents it presents, and I approve for its release.* |

Name:             Francisco J. De Caso Basalo, Ph.D., LEED A.P., CXLT

Signature:

Date:             October 1, 2019

This document and its contents are the work of Francisco De Caso. The document should only be duplicated and/or distributed in its entirety. The document may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this document are based upon the data and information available to at the time of its issue, and may be subject to revision as additional information or data becomes available.

**TABLE OF CONTENTS**

| SECTION | TITLE | PAGE |
|---------|-------|------|
| **1.** | **INTRODUCTION** | **4** |
| *1.1.* | *PURPOSE OF REPORT* | *4* |
| *1.2.* | *REPORT PREPERATION* | *4* |
| *1.3.* | *QUALIFICATIONS* | *4* |
| *1.4.* | *DOCUMENTATION* | *5* |
| *1.5.* | *REPORT REQUETSED BY* | *5* |
| **2.** | **INSPECTION** | **6** |
| *2.1.* | *COMPLAINT* | *6* |
| *2.2.* | *VESSEL BACKGROUND* | *6* |
| *2.3.* | *SCOPE OF EVALUATION* | *6* |
| **3.** | **EVALUATION** | **7** |
| *3.1.* | *SPA FACILITIES* | *7* |
| *3.2.* | *SPA SURFACE* | *12* |
| **4.** | **OPINIONS** | **16** |
| *4.1.* | *SITE EVALUATION* | *16* |
| *4.2.* | *SURAFACE EVALUATION* | *18* |
| **5.** | **CONCLUSIONS** | **21** |
| **6.** | **REFERENCES** | **22** |

# 1.    INTRODUCTION

## 1.1.   PURPOSE OF REPORT

This report provides findings, opinions and conclusions relevant to the evaluation subsequent to the document review and inspection on board the Norwegian Breakaway on the matter arising from the litigation relating the complaint by Ms. Christine Kessler v. Norwegian Cruise Line in the United States District Court Southern District of Florida, as referenced within Case No.: 19-CV-20583.

## 1.2.   REPORT PREPERATION

This report and its contents have been prepared by myself, Francisco De Caso, Ph.D., LEED A.P., CXLT.  The opinions contained herein are based on my professional knowledge, education, and training; and are based within a reasonable degree of scientific probability.  I disclose no known conflict of interest with known parties. Preparation of this report included the review of various documents related to the litigation as well as studies, standards, codes, provisions and guidelines.

This report is based on the information currently available to me, and if additional information is subsequently provided, I reserve the right to amend or supplement my opinions. Documents aided the preparation of this report are referenced within the report.

## 1.3.   QUALIFICATIONS

I received my Masters of Engineering (Meng) in Civil and Architectural Engineering from the University of Bath, England (UK), and my Ph.D. in Civil Engineering with emphasis in structural engineering and material science from the University of Miami, where I am currently a Principal Scientist. My knowledge area and research is in civil and structural engineering, including testing, evaluation and analysis of materials, systems and technologies. These activities encompass a broad spectrum of expertise related to understanding and behavior of materials and elements applied to the built environment, characterization of different physical and mechanical material parameters, effect of aging and durability in materials, performance requirements and design related issues of the built environment. I am also the Associate Director of the Center for Integration of Composites into Infrastructure (CICI), a National Science Foundation Industry/University cooperative research center involved in technology transfer, as well as fundamental and applied research with private and public organizations. I am actively engaged in sponsored research from federal, state agencies, and private industry. I am an active member of numerous professional organizations dedicated to the development as well as review of test methods, standards, guidelines and codes amongst some are the ASTM international, International Code Council Evaluation Service (ICC-ES), American Concrete Institute (ACI), and American Society of Civil Engineers (ASCE), as well as a Certified XL Tribometist. Furthermore, I am the manager of the Structures and Materials Laboratory, an ISO 17025-2017 accredited laboratory that performs testing, evaluation, analysis and design on a variety of different materials, systems, technologies and structures. My CV and fee sheet are attached, containing my education and licenses, participation in professional organizations, as well as published conference and peer reviewed papers, participation as a reviewer in high impact journal publications, relevant awards, research projects and other relevant information to demonstrate my qualifications to render opinions to the aforementioned matter.

## 1.4.   DOCUMENTATION

The following relevant case documents regarding the litigation have been reviewed in preparation for this report, stated in no particular order:

1.4.1.   Complaint and demand for trial by Jury.
1.4.2.   CCTV footage from two angles.
1.4.3.   Notice of service of answers to interrogatories.
1.4.4.   Defendant's initial notice of serving supplemental answers to Plaintiff's initial interrogatories.
1.4.5.   Defendant's first notice of serving supplemental answers to Plaintiff's initial interrogatories.
1.4.6.   Defendant's second notice of serving supplemental answers to Plaintiff's initial interrogatories.
1.4.7.   Plaintiff's better answers to numbers 13,18and 21 of Defendants initial interrogatories.
1.4.8.   Documents produced in response to Plaintiff's initial request for production.
1.4.9.   IssuTrax log, issue details, issue # 355814.
1.4.10.   Defendant's second supplemental responses to plaintiff's amended initial request for production.
1.4.11.   Transcript of deposition of Brett Berman, and corresponding exhibits.
1.4.12.   Transcript of deposition of Christine Kessler, and corresponding exhibits.
1.4.13.   Transcript of deposition of Michael Cabigon Collantes, and corresponding exhibits.
1.4.14.   Transcript of deposition of Jemalyn Lenoso, and corresponding exhibits.
1.4.15.   Transcript of deposition of Tung Tellez, and corresponding exhibits.
1.4.16.   Transcript of deposition of Sibbhantz Naik, and corresponding exhibits.
1.4.17.   Product specification document, Oasis Enforce self-foaming chlorinated alkaline cleaner.

## 1.5.   REPORT REQUETSED BY

This expert witness report was prepared for:

Gerson and Schwartz, PA
Attn: Nicholas I. Gerson
1980 Coral Way
Miami, FL 33145
Email: ngerson@gslawusa.com;
Phone (305) 371-6000; Fax (305) 371-5749

## 2.    INSPECTION

### 2.1.    COMPLAINT

The complaint is related to the incident, which occurred the afternoon of January 8, 2019 just before 4.00 pm (UTC) on board the vessel Norwegian Breakaway, on deck 15 forward to starboard, in the Spa & Salon facilities. Based on the review of the aforementioned documents, including CCTV footage, it can be inferred that Ms. Christine Kessler, while walking into the main Spa via the entrance corridor she slipped and fell, suffering serious injuries. Figure 1 shows the indecent location per the vessel deck plan (refer to red arrow). To this end, the Spa area and entrance hallway on deck 15 where the incident occurred was inspected to form an opinion and determine the likelihood of the potential causes of the subject incident.

### 2.2.    VESSEL BACKGROUND

Operated by Norwegian Cruise Lines (NCL), the Norwegian Breakaway is 1,068.3 foot long cruise ship with 145,655 gross tonnage and a maximum capacity for 3,963 passengers, with a crew complement of 1,657. The Norwegian Breakaway entered service in April 2013, and was refurbished in 2018.

### 2.3.    SCOPE OF EVALUATION

On Sunday August 25, 2019, at Port of Miami, Florida, starting at approximately 9.00 am I initiated the inspection on board Norwegian Breakaway, deck 15 in and around the Spa forward/starboard indicated by the red arrow in Figure 1. The inspection lasted about 90 minutes. The overall purpose of the inspection consisted in surveying, photographing and evaluating the area of the subject incident including the slip resistance properties of the spa floor surface on board the Norwegian Breakaway; evaluating the drainage at the spa facility, including surface flow of water; and other related environment factors that may have contributed to the aforementioned slip and fall complaint by Ms. Christine Kessler v. Norwegian Cruise Line. In additional, the scope of the evaluation included the review of CCTV footage to determine potential factors contributing to the incident as well as evaluating the gait of Ms. Christine Kessler prior and during the incident.



Figure 1 – Norwegian Breakaway deck 15 plan and elevation, showing inspection location (red arrow)

## 3.   EVALUATION

The activities conducted during the evaluation of the Spa area are summarized as followed between the Spa facilities and the Spa surface. Opinions related to the evaluation activities are presented in Section 4 of this report. All measuring equipment during the inspection was conditioned prior recording measurements, providing sufficient time to ensure dimensional compensation changes due to temperature effects. Length measurements were recorded with a Leica DISTO D2 (a hand held laser distance-meter) with an accuracy of 1/16 (0.06) of an inch, a tape measure with an accuracy of 1/8 (0.125) of an inch, or a caliper with a precision of 1/1000 (0.001) of an inch, as necessary. Angle measurements were recorded with precision digital angle-measuring levels with an accuracy of 0.1-degrees.

### 3.1.   SPA FACILITIES

The location of the incident under evaluation was indoors, located at the entrance hallway/corridor entering the mainly Spa area deck 15 forward, starboard, as indicated in Figure 1. The following relevant Spa facilities observations were made.

3.1.1.   The average air temperature was 77°F.

3.1.2.   At the time of the inspection the Spa was closed to guests, and appeared to have been previously cleaned, in preparation for boarding guests. The entrance corridor to the Spa area, facing forward and starboard-aft, can be seen in Figure 2.

3.1.3.   Artificial light sources were visible and operational overhead the entrance corridor.

3.1.4.   The Spa area houses different amenities including salt bath, rain showers, a steam room, a hot tub and pool. The spa area faces forward and has windows thought the exterior perimeter, as seen in Figure 3.

3.1.5.   Adjacent to the Spa entrance corridor, on the port side, a pool access ramp was located with a hand rail to one side, as seen in Figure 4. The average height of the hand rail was 36.0 inches.

3.1.6.   A perimeter drainage trench 7.0 inches wide, was located around the pool area. The segment located by the end of the Spa corridor entrance, immediately next to the location of the slip and fall incident, was inspected as seen in Figure 5.

3.1.7.   The drainage trench had two drainage outlets at corners identified as #2 and #3, refer to Figure 5. The outlets had an average dimeter of 1.88 inches.

3.1.8.   Surface grinding at around the perimeter of each drainage outlet was visible. Drainage #3 had significant more inner wall buildup compared to #2, as seen in Figure 6.

3.1.9.   The average slope of the drainage trench from point #1 to #3 was 0.14° based on seven measurements.

3.1.10.   Drainage capacity was evaluated in two ways; firstly, by pouring water directly on each outlet; and secondly by pouring a known quantity of water at the start of the trench (ID #1) next to the slip and fall incident. Based on this evaluation, it was possible to see that i) water drained directly via the outlet, where in outlet #2 no backup was observed, whereas in comparison outlet #3 did experience a backup of water. ii) Water did flow from point #1 to #3, mostly circumventing point #2, at a relatively slow rate.

3.1.11.   An additional drainage point, part of the Spa drainage system of was inspected at the top of the pool access ramp area, identified as #4, and presented in Figure 7.

3.1.12.   This last drain point (#4) was clogged and had stagnated water and did not drain water.

3.1.13.   The surface squeegee used to maintain the Spa floor surface dry was only visually inspected, since it was not possible to utilize, and it is represented in Figure 8.





Figure 2 – Entrance corrido to Spa area, immediately prior to incident location facing forward (top) and facing starboard-aft (bottom)



Figure 3 –  Spa amenities



Figure 4 –  Hand rail to access pool area



Figure 5 –  Perimeter drainage trench and drain outlets immediately after incident location



Figure 6 –  Close up of drainage outlets showing difference in build up


Figure 7 – Drainage trench and outlet by pool access


Figure 8 – Spa squeegee

## 3.2.   SPA SURFACE

An evaluation to determine quantitatively and qualitatively the condition of the Spa corridor entrance floor surface was undertaken. Slip resistant index measurements, slope, as well as microscopic visual surface evaluation methods were used. The evaluation of the floor surface at four different areas was performed using an ASTM F2508 English XL Variable Incidence Tribometer (VIT), to measure slip resistant index in the wet condition. The test locations were deliberately selected to ensure that comparison and representative segments of the floor surface area were sampled and tested. Test location #10 was selected as the slip and fall incident location, correlated based on the CCTV footage. Test locations #11 and #12 were situated at either side of the slip and fall location; and #14 was situated in the middle of the Spa entrance corridor. Figure 9 provides test location and direction references.

The English XL VIT instrument mimics significant biomechanical parameters of the human walking gait.  The instrument is used stationary at the test location, where the angle and velocity of the leg operating mechanism, and the size and shape of the test foot replicate the heel strike of a human walking; the instrument also has a functional ankle. Thus the leg of the English XL VIT is free to accelerate once a slip occurs, with a real-world human slip event, resulting in the slip resistant index. To this end, slip resistant index tests were conducted in the wet condition in four orthogonal directions (namely, North, N; East, E; South, S; and West, W) where the relative North direction was looking aft (as seen in Figure 9). A total of 16 wet surface tests were performed using regular tap water as a medium (four locations, four directions at each location), results are summarized in Table 1. Prior to conducting slip tests, a valid verification test was conducted on a calibrated tile. The standard Neolite test foot was re-conditioned and prepared as necessary per manufacturer's instructions. In addition to the aforementioned standard test practices, protocols recommended by the equipment manufacturer were implemented to ensure accurate testing. Figure 10 shows the test equipment during testing. The following relevant Spa surface floor observations were made.

3.2.1.   The floor surface was composed of square tiles, as seen in Figure 9, with an apparent irregular surface pattern.

3.2.2.   The average wet slip resistant index of the Spa entrance corridor floor surface was found to equal 0.57, including all tested locations.

3.2.3.   The overall maximum and minimum wet slip resistant index values in any given direction were found to be 0.65 and .49, corresponding to the west (W) direction at ID #14, and south (S) direction at ID#10, respectively.

3.2.4.   A microscopic visual evaluation of the condition of the surface floor at each test location is represented in Figure 11. The scale provided in 1/100 inches.

3.2.5.   The surface drainage slope relative to the slip and fall location was also evaluated, to assess flow and direction. To this end, water was deposited at location #10 and #11. The water remain mostly stagnant, within a 4 square-feet area for over five minutes. After this time, the water sloped out of this area, draining from the source across the Spa entrance corridor, away from the end of the drainage trench previously described (ID #1), refer to Figure 12.

Table 1 – Surface evaluation test results

| Location ID | Surface Temperature (F) | Slope | | Relative Slip Resistant Index Test Direction | | | | Average |
|---|---|---|---|---|---|---|---|---|
| | | N-S | E-W | N | E | S | W | |
| **#10** | 81.1 | 0.2 | 0.0 | 0.59 | 0.58 | 0.49 | 0.57 | 0.56 |
| **#11** | 81.0 | 0.2 | 0.0 | 0.55 | 0.57 | 0.54 | 0.55 | 0.55 |
| **#12** | 81.5 | 0.1 | 0.0 | 0.58 | 0.56 | 0.55 | 0.61 | 0.58 |
| **#14** | 81.6 | 0.2 | 0.0 | 0.54 | 0.55 | 0.60 | 0.65 | 0.59 |

| | | |
|---|---|---|
| **MAX** | | **0.65** |
| **MIN** | | **0.49** |
| **AVERAGE** | | **0.57** |



Figure 9 – Surface evaluation test location identification and direction


Figure 10 – English XL VIT instrument set up for the surface evaluation


Figure 11 – Representative surface conditions with microscopy (Scale 1/100 inch)





Figure 12 – Surface water stagnant and drainage flow from incident location

## 4.    OPINIONS

The results and evidence obtained from the inspection conducted on Sunday August 25, 2019, at Port of Miami, Florida, on board the vessel Norwegian Breakaway, deck 15 in and around the Spa main corridor entrance, in relation to the slip and fall incident by Ms. Christine Kessler, which occurred on January 8, 2018; are discussed and interpreted in this section. The opinions provided herein consider the plausible cause(s) contributing to the subject incident based on evidence, standards, applicable requirements, established body of knowledge and guidelines relevant to this matter.

### 4.1.   SITE EVALUATION

From the Spa facilities evaluation and supporting documentation the following can be inferred:

4.1.1.    The entrance corridor to the Spa, where the slip and fall incident occurred, is identified as a mean of egress, identified by the emergency exit signs both at the start and end of the corridor.

4.1.2.    The conditions of the Spa and inspected area at the time of the incident are more likely than not, not equivalent to those at the time of Ms. Kessler's incident, given the that Spa area at the time of the inspection had been prepared prior to guest arrival. Most likely cleaning and disinfecting activities took place prior the inspection as part of routine maintenance, necessary to ensure public health. This is supported by use of *Oasis Enforce*, a chlorinated alkaline cleaner used on the Spa floor.

4.1.3.    On the other hand, it is well established that high contrast caused between relatively dark and light spaces can lead to temporarily reduced visual capacity(IES 2010, Di Pilla 2016). This conditions were present when entering the Spa corridor, and may have resulted in increased difficulty by Ms. Kessler to discern wet areas from dry areas on the floor surface.

4.1.4.    The Spa has numerous sources of water that can be tracked in any direction by guests resulting on a wet surface. This was known by those in control of the maintenance and operation of the Spa, thus the need to maintain dry floor surfaces all times/immediately; also reported by Mr. Collantes, Mr. Naik and Ms. Lenoso.

4.1.5.    No hand rail in the entrance of the Spa corridor was present. Handrail are mandated by the Insertional Maritime Organization (IMO 1996) as per the recommendations provided by the Maritime Safety Committee circular 735.

4.1.6.    The inspected drainage system, was found to be inadequate due to the lack of slope to provide adequate self-draining capabilities. Although water did drain at each outlet located when placed directly above each outlet within the drainage trench, it was evident during the inspection that water remained stagnant for a prolonged period of time on the floor surface around the drained trench area.

4.1.7.    For one of the drains (#4), water was clearly observed not to drain when water was placed directly into the drain, resulting in overflowing the drainage trench, and water spilling over and flowing down the ramp towards the other drainage trench located next to the slip and fall incident. This is evidence of inadequate and defective drainage, and can result in an unreasonable dangerous condition. Those in control of the maintenance of the Spa facility, should have been aware of the defective drainage condition.

4.1.8.  It is understood from the various case documents including the deposition transcripts by Mr. Collantes, Ms. Lenoso and Mr. Naik that it is the crew's principal responsibility and priority as part of training to make the floor dry at all times on a frequent basis, regardless of the level of traffic provided by passengers utilizing the Spa facilities.

4.1.9.  It was observed from the CCTV that in numerous occasion crew Collantes is seen squeegeeing the floor surface around the end of the Spa corridor and placing the squeegeed surface liquid/contaminants around the drain trench system, at the location where Ms. Kessler slipped and fell.

4.1.10.  Based on CCTV and as inferred from the deposition transcripts provided by Mr. Collantes and Ms. Lenoso, it is evident that significant amounts of liquid/contaminants were squeegeed at the location where Ms. Kessler slipped and fell, prior to the incident.

4.1.11.  Based on the CCTV it is evident that Mr. Collantes failed to implement established procedures to dry the floor using a rag to wipe the floor after the squeegee was used, as stated in the deposition transcript Ms. Lenoso and Mr. Naik. Moreover, the specific area next to the drainage trench was not adequately mark as a hazard area, where water accumulated.

4.1.12.  The inspected squeegee had a significant level of wear and accumulation of contaminant matter as observed in Figure 8. Since it was not possible to test it on the surface it was not possible to determine if the floor surface would result in a dry condition free of contaminates, or simply spread throughout the surface.

4.1.13.  From the various reports as stated within deposition transcripts by the crew, the squeegee is used as the main method to immediately dry the floor surface in the Spa, and the water must be squeegeed directly to drainage locations; where, when used correctly in the Spa, the floor becomes immediately dry. It is evident from the CCTV footage that the method of squeegee was not used adequately, where the squeegee is partly dragged at the location where Ms. Kessler slipped and fell. Moreover, water was placed next to the drain by crew Collantes when using the squeegee. It is reasonable to assume that if the squeegee was working according to the requirements set by those in control of the vessel, significant amounts of water and potentially other surface contaminates were accumulated on the Spa floor surface, resulting in a dangerous condition, at the location where Ms. Kessler slipped and fell.

4.1.14.  Those in control of the maintenance of the Spa facility failed to properly train and ensure adequate known floor drying procedures by crew to ensure that all water pushed/squeegeed towards the drainage be placed directly on the drainage trench - where water was mostly found to drain. In fact, based on the deposition transcript by Mr. Collantes, he acknowledged not having read the position role and responsibilities, safety manual and other training documents that ensure a reasonably safe floor surface condition.

4.1.15.  It is also unknown if those in control of the maintenance of the Spa have processes and/or policies on maintaining and replacing the squeegee to ensure its effectiveness when used to dry the floor and achieve a contaminant-free surface that results in a reasonably safe condition.

## 4.2.   SURFACE EVALUATION

The risk of slipping and falling accidents is significantly increased due to surfaces not having the necessary degree of traction, slip resistance as provided by the coefficient of friction. Lee-Jean Lin et. al. 1995; Peake et. al. 1999; Lois 2004; Jensen 2005; Dahl 2010, Di Pilla 2016). Based on the Spa surface evaluation and supporting documentation the following can be inferred

4.2.1.   Conditions of the slip resistance testing was conducted on a clean floor, which is more likely than not, not equivalent to the time of Ms. Kessler's incident, as the floor surface appeared treated and clean/disinfected prior to the opening of the Spa for guest arrival. This was observed from the visual microscopic evaluation showing a significant portion of the tile micro-pores free of contaminants.

4.2.2.   The slip resistance rating of the tile at the Spa floor provided by the manufacturer is R11. This is based on the German Ramp Test, where R-numbers are provided by the standard DIN 51130 (DIN, 2014). A R11 value is known to be suitable for transitional areas that can occasionally become wet. In comparison, R values R12 and R13 that are suitable for wet and very wet areas, respectively. Based on the application where the tile was installed, it is possible to observe via the available CCTV and as reported in the deposition transcript by Mr. Berman, that the floor surface in the Spa is found to be wet or very wet.

4.2.3.   Surfaces specified with a R value of R11, such as the tile located in the spa at the time of the incident by Ms. Kessler, are known to have a coefficient of friction (COF) varying from 0.4 to 0.7 when wet. Whereas Surfaces specified with a higher R value will provide a higher degree of traction or COF when wet.

4.2.4.   The slip resistance rating is therefore considered inadequate for the application as a Spa. Those in control of the vessel and Spa should have been aware of the inadequate and deficient selected type of tile, and thus failed to use a safe floor surface for an area that is known to be wet or very wet.

4.2.5.   The low level of desired slip resistance as provided by the tile manufacturer rating was corroborated by the surface evaluation tests, where in the direction and location that Ms. Keesler slipped and fell, the slip resistance of the floor surface was found to be below the necessary surface traction needed to ensure a safe walking surface.

4.2.6.   Furthermore, for floor surfaces in marine environments where surfaces are more likely than not to be wet or very wet, the American Society for Testing and Materials International (ASTM) F1166-07, "Standard Practice for Human Engineering Design for Marine Systems, Equipment and Facilities", states that the minimum COF to ensure reasonably safe floor surface is 0.60, the Spa floor failed to meet the minimum 0.60 standard.

4.2.7.   Additionally, as a mean of egress or means of escape, the evaluated Spa corridor does not meet the International Convention for the Safety of Life At Sea (SOLAS) requirements that states floor surfaces must be slip-free underfoot as indicated in Chapter II-2, Part D, Regulation 13, Section 3.2.4.1, for which vessels such as the Norwegian Breakaway must comply to.

4.2.8.    With regards to floor surface drainage, typically Spa and pool facilities will incorporate self-drainage surfaces to avoid water being stagnant resulting in the formation of puddles. When evaluating the floor surface, water remain stagnant and when it drained it did so away from the drainage points; additional evidence on the defective floor surface; and how the accumulation of water at the slip and fall location of Ms. Kessler did not drain from this location when deposited by crew.

4.2.9.    Based on the lack of self-draining surfaces, a higher level of surface traction is would be further needed as it relates to defective drainage conditions, which were evidenced during the inspection showing that water and other liquids or surface contaminates remain stagnated and/or drain away from the drainage systems further increasing the likelihood of having wet floors, and thus increasing the risk of a slip and fall. Those in control of the maintenance of the Spa facility should have been aware of dangerous conditions provided by the inadequate drainage and relative low surface traction for wet and very wet surfaces.

4.2.10.   The gait of a person, generally described as the manner in which that person walks, can be evaluated and analyzed based on mechanics and vectors (Öberg et. al. 1993, Lee and Grimson 2002). Vectors, which can be represented by arrows, are in essence a quantity having direction as well as magnitude, with a position of one point in space relative to another, and are a fundamental part of engineering analysis. To this end, Ms. Kessler's gait was evaluated based on the CCTV footage, and it is possible to confirm that Ms. Kessler's gait cycle is stable and balance, providing firm initial contact with the heel, stable loading response, a steady mid- to terminal- stance, with an adequate balance during the initial- mid- and terminal- swing, as represented in Figure 13.

4.2.11.   When comparing Ms. Kessler gait at the onset of the slip and fall incident, I found that the fall was not related to her gait or balance, and in fact the inadequate floor surface condition and low traction, results in her slip and fall incident. It is clear that Ms. Kessler upon initial contact with the surface, she immediately slipped and her heel came forward not being able to have a loading response, nor continuing any further with the stance phase, as represented in Figure 14. Moreover, she is seen trying to hold on to something with her left arm as her heel continues to slip forward.

4.2.12.   Moreover, as supported by CCTV and deposition testimony, the significant accumulation of liquid/contaminates deposited by the crew with the squeegee (next to the drain) on the surface contribute directly to the slip and fall incident experienced by Ms. Kessler, as it can be derived from the inspection evidence which corroborates the CCTV and deposition transcripts statements by Mr. Collantes, Ms. Lenoso and Mr. Naik.

4.2.13.   Lastly, prior slip and fall incidents that occurred on equivalent Spa floor surface type both at the Breakaway vessel and the Getaway (sister vessel/class ship) as the one where Ms. Kessler slipped and fell (as reported by the Defendant's answers to initial interrogatories), are further evidence that the levels of the Spa floor surface traction may have been inadequate, therefore resulting in an unreasonable hazardous condition for a Spa area, that would not meeting the SOLAS nor ASTM aforementioned standards.



Figure 13 – Ms. Kessler gait cycle prior incident



Figure 14 – Ms. Kessler gait cycle during the incident

## 5.    CONCLUSIONS

The slipping and falling incident involving Ms. Christine Kessler was evaluated by conducting a vessel inspection, reviewing relevant documents, peer reviewed studies and applicable references. For the type of occupancy and exposure in which the Spa floor surface is intended to be utilized, the hazardous conditions relating to the i) deficient drainage of the floor, ii) substandard surface traction, and iii) floor maintenance during the use of the Spa facilities, should have been known and appreciated by those in control of the Spa facility and of the maintenance and training that is required and necessary for reasonably safe pedestrian access.

Based on my education, professional experience, training and understating of applicable requirements and standards, it is my opinion within a reasonable degree of scientific probability, the increased risk of slipping and falling by Ms. Christine Kessler was due to the combination of a defective and inadequate drainage of the surface floor area; lack of maintenance to ensure a dry floor surface was provided by those in control of the Spa facility; lack of adequate training of crew resulting in depositing excessive amounts of water away from drainage points; and the low level of surface traction for marine applications that are commonly wet or very wet such as the Spa/Pool area where the incident occurred.

# 6.    REFERENCES

ASTM F1166-07, Standard Practice to Human Engineering Design for Marine Systems, Equipment and Facilities, ASTM International 2007

Dahl, Eilif. "Passenger accidents and injuries reported during 3 years on a cruise ship." Int Marit Health 61.1 (2010): 1-48

Di Pilla S. Slip, trip, and fall prevention: A practical handbook.(2016) CRC Press.

DIN 51130, "Testing of floor coverings - Determination of the anti-slip property - Workrooms and fields of activities with slip danger - Walking method - Ramp test" DIN Standards Committee Material Testing, 2014-02.

Dusek, Glenn. "Smart Safety Design to Prevent Slips, Trips and Falls." ASSE Professional Development Conference and Exposition. American Society of Safety Engineers, 2011

Gauchard, G., Chau, N., Mur, J.M. and Perrin, P., 2001. Falls and working individuals: role of extrinsic and intrinsic factors. Ergonomics, 44(14), pp.1330-1339

IES, The Lighting Handbook Tenth Edition. Illuminating Engineering Society of North America (IES) 2010

International Maritime Organization (IMO) Maritime Safety Committee Circular 735 (MSC/Cir 735), "Recommendation On The Design And Operation Of Passenger Ships To Respond To Elderly And Disabled Persons' Needs." June 24, 1996

Jensen, Olaf C., et al. "Non-fatal occupational injuries related to slips, trips and falls in seafaring." American journal of industrial medicine 47.2 (2005): 161-171

Leclercq, S., 1999. The prevention of slipping accidents: a review and discussion of work related to the methodology of measuring slip resistance. Safety science, 31(2), pp.95-125

Lee-Jean Lin, Fu-Tien Chiou, H. Harvey Cohen. "Slip and fall accident prevention: A review of research, practice, and regulations, Journal of Safety Research, Vol. 26, Issue 4, pp. 203-212, 1995

Lee, L. and Grimson, W.E.L., Gait analysis for recognition and classification. In Proceedings of Fifth IEEE International Conference on Automatic Face Gesture Recognition (2002) IEEE.

Lois, P., et al. "Formal safety assessment of cruise ships." Tourism Management 25.1 (2004): 93-109

Miller, B.C., 1994. In plane view: blind spots and visual limits. Occupational health and safety, 63(5), pp.98-102

Öberg, A Karsznia, K Öberg. "Basic gait parameters: reference data for normal subjects, 10-79 years of age.' Journal of rehabilitation research and Development Vol. 30, No. 2, (1993) pp. 210-223.

Peake, Dwight Edward, et al. "Descriptive epidemiology of injury and illness among cruise ship passengers." Annals of emergency medicine 33.1 (1999): 67-72.

SOLAS, International Convention for the Safety Of Life At Sea, 2004.

## ♦ END OF REPORT ♦