1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 19-cv-20583-Gayles

AT LAW AND IN ADMIRALTY

CHRISTINE KESSLER, a resident
of the State of Pennsylvania,

          Plaintiff,

vs.

NCL (BAHAMAS) LTD, a Bermuda
company, d/b/a, NORWEGIAN
CRUISE LINE,

          Defendant.
_____/

                         Foreman Friedman, P.A.
                         One Biscayne Tower
                         Suite 2300
                         2 South Biscayne Boulevard
                         Miami, Florida  33131
                         Friday November 1, 2019
                         12:13 p.m. - 4:38 p.m.


          DEPOSITION OF FRANCISCO DE CASO, PH.D


          Stenographically taken before

RHONDA BONNER, RPR, FPR, Notary Public in and

for the State of Florida at Large, pursuant to

Re-Notice of Taking Deposition Duces Tecum.

---

## Page 2

APPEARANCES:


     PHILIP M. GERSON, ESQUIRE
     GERSON & SCHWARTZ, P.A.
     1980 CORAL WAY
     MIAMI, FLORIDA 33145
     ngerson@gslawusa.com
     ON BEHALF OF THE PLAINTIFF.



     MICHAEL C. GORDON, ESQUIRE
     FRANK CARRASCO, ESQUIRE
     FOREMAN FRIEDMAN, P.A.
     2 SOUTH BISCAYNE BOULEVARD
     MIAMI, FLORIDA
     mgordon@fflegal.com
     ON BEHALF OF THE DEFENDANT.

---

## Page 3

### I N D E X

| EXAMINATIONS | PAGE |
|---|---|
| FRANCISCO DE CASO, PH.D. | |
| DIRECT EXAMINATION | 5 |

---

## Page 4

### E X H I B I T S

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena | 6 |
| Exhibit 2 | Retainer Agreement | 8 |
| Exhibit 3 | Expert Report | 18 |
| Exhibit 4 | Breathalyzer Test Result | 26 |
| Exhibit 5 | Still photograph of Ms. Kessler | 48 |
| Exhibit 6 | "American National Standard Test Method for Measuring Dynamic Coefficient of Friction Hard Surface Flooring Materials." | 76 |
| Exhibit 5A | Duplicate of Exhibit 5 | 91 |
| Exhibit 7 | Photographs contained in link provided by Mr. Gerson's office | 93 |
| Exhibit 8 | Dr. Schwartz Medical Record, January 12, 2017 | 123 |
| Exhibit 9 | De Caso's Invoices | 185 |
| Exhibit 10 | De Caso's Notes | 186 |
| Exhibit 11 | CCTV on Thumb Drive | 187 |
| Exhibit 12 | Exhibit 1 to Mr. Naik's deposition | 188 |

*Exhibits 10 & 11 to be provided by the witness to Mr. Gerson

5

1  THEREUPON:
2           THE COURT REPORTER:  Raise your right
3       hand, please.
4           Do you swear the testimony you're
5       about to give is the truth, the whole
6       truth, and nothing but the truth, so help
7       you God?
8           THE WITNESS:  I do.
9  THEREUPON:
10          FRANCISCO DE CASO, PH.D.
11  was called as a witness by the Defendant and, after
12  having been first duly sworn, was examined and
13  testified as follows:
14           DIRECT EXAMINATION
15  BY MR. GORDON:
16      Q.  Good afternoon.
17          Can you please state your full name
18  for us.
19      A.  Francisco Jose De Caso Basalo, D-E,
20  space, C-A-S-O, space, B-A-S-A-L-O.
21      Q.  How are you employed, sir?
22      A.  Pardon me?
23      Q.  How are you employed?  Where do you
24  work?
25      A.  At the University of Miami.

6

1      Q.  What's your position?
2      A.  Principal scientist.
3      Q.  Do you have any other employment other
4  than that?
5      A.  As an independent expert.  That's all.
6      Q.  What's your occupation?
7      A.  I'm a principal scientist, engineer by
8  trade -- structural material science.
9      Q.  What's your business address?
10      A.  5804 Leonardo Street, Coral Gables,
11  Florida 33146.
12          (Exhibit 1 was marked for
13          identification purposes.)
14          MR. GORDON:  I'm having the subpoena
15       marked as Exhibit 1.
16  BY MR. GORDON:
17      Q.  Sir, I'm showing you what we've marked
18  as Exhibit 1.  It's a subpoena for today's
19  deposition.
20          Have you brought with you all of the
21  items that was requested in the subpoena?
22      A.  I have them electronically.
23      Q.  You don't have anything on your --
24          MR. GERSON:  We sent you a link with
25       the -- with access to everything so that --

7

1          MR. GORDON:  When did you send it?
2          MR. GERSON:  Today.
3          MR. GORDON:  When?
4          MR. GERSON:  Probably just a few
5       minutes ago.
6          MR. CARRASCO:  I haven't got anything.
7          MR. GORDON:  I haven't got it either.
8  BY MR. GORDON:
9      Q.  Who retained you in this case, sir?
10      A.  Can you repeat?
11      Q.  Who retained you in this case?
12      A.  In this case, it was Gerson law
13  office.
14      Q.  And they represent Ms. Kessler in this
15  case; is that correct?
16      A.  That's correct.
17      Q.  When were you retained in this case?
18      A.  I can't recall the exact date.
19      Q.  Okay.  Is there something you can
20  review to tell us when you were specifically
21  retained in this case?
22      A.  Yes.  I can tell you right now.  It
23  was -- it's part of the electronic case documents.
24  The agreement, consultant agreement.  And if you
25  give me 30 seconds.

8

1      Q.  Sure.
2      A.  That would have been August 1st, 2019.
3      Q.  Is there a formal retainer agreement
4  signed?
5      A.  Yes.
6      Q.  Can we please marked that as
7  Exhibit 1, and then I guess at some point we'll --
8      A.  Exhibit 2, I assume.
9      Q.  Sorry.  Exhibit 2.  You're correct.
10          And we'll figure out how to get these
11  to the court reporter after the deposition.
12          (Exhibit 2 was marked for
13          identification purposes.)
14  BY MR. GORDON:
15      Q.  What were you specifically asked to do
16  in this case, sir?
17      A.  To perform an inspection and provide
18  opinions related to the plaintiff's incident.
19      Q.  Is there anything that you have
20  reviewed that is not contained in your electronic
21  file which you brought with you today?
22      A.  Yeah.
23      Q.  Other than the ship inspection,
24  obviously.
25      A.  All the case documents and additional

9

1  documents, photographs, is all contained within the
2  case file.
3      Q.   Have you been retained by the Gerson
4  Schwartz law firm in any other matters other than
5  this one?
6      A.   I have not.
7      Q.   What percent of your income is derived
8  as serving as an expert witness in litigation
9  related matters?
10     A.   I'd say maybe about 20 percent.
11     Q.   And of the cases in which you're
12 retained for litigation related matters, what
13 percent of those cases are on behalf of the
14 plaintiff as opposed to the defendant?
15     A.   Probably a couple out of 30.
16     Q.   I'm sorry?
17     A.   Two out of the 30, I said.
18     Q.   Two out of 30 being what?
19     A.   Cases where I've been retained.
20     Q.   Okay.  I'm not sure I understand.
21          You do --
22     A.   Percentage wise --
23     Q.   Yes.
24     A.   -- 5 percent.
25     Q.   5 percent being the plaintiff or

10

1  defense?
2      A.   For the defendant.
3      Q.   Okay.  95 percent for the plaintiff?
4      A.   For the plaintiff, correct.
5      Q.   Okay.  Have you provided a prior
6  testimony list, I believe, with your CV, which was
7  submitted to us in this case?
8      A.   That's my understanding, together with
9  the report.
10          THE COURT REPORTER:  I'm sorry.  Speak
11     up.
12          MR. GERSON:  Yeah.  We need to speak
13     up on the question side, too.
14 BY MR. GORDON:
15     Q.   I'll just read you the cases and you
16 can tell me if these are correct or if there's
17 anything that has to be added.  Okay?
18     A.   Cases of what?
19     Q.   Where you've given testimony.
20     A.   Okay.
21     Q.   Aurelia Smith versus Carnival
22 Corporation.  Donna Padula versus Carnival
23 Corporation.  Soo Ko versus MSC Cruises.
24 Judith Sololow versus Latin House Grill.
25 Diane Williford versus Carnival.  Susan Goldstein

11

1  versus MS Cruises.  Sara Bostic versus Royal
2  Caribbean Cruises.
3          Is there any other case in the last
4  four years in which you've given testimony?
5      A.   To my knowledge, that sounds about
6  right.
7      Q.   Did you ever give testimony in a case
8  called Marshall?
9      A.   Marshall?
10     Q.   Yes.
11     A.   I would need to recall my files.
12          Do you know who was the opposite --
13     Q.   Marshall versus Royal Caribbean
14 Cruises.
15          Spencer Aronfeld was the attorney for
16 Marshall.
17     A.   Was this maybe 2006?
18     Q.   I think it's around 2016-17.
19          MR. GERSON:  The question is whether
20     you gave testimony, not whether you
21     consulted or you know about the case.
22          Did you give testimony?
23          THE WITNESS:  I can't recall right
24     now.  I can't recall to my best knowledge
25     at this moment.

12

1  BY MR. GORDON:
2      Q.   Have any of your opinions in any case
3  ever been excluded by a court?
4      A.   They have not, to my best knowledge.
5      Q.   Are you aware of any of your opinions
6  being excluded in the Marshall versus
7  Royal Caribbean matter?
8      A.   Not to my knowledge.
9      Q.   Well, you state not to your knowledge.
10 Do you know for a fact one way or the other if they
11 have been excluded or were excluded?
12     A.   As I said, not to my knowledge.
13     Q.   Okay.  How about Padula versus
14 Carnival Corporation, were any of your opinions
15 excluded or limited in that case?
16     A.   Not to my knowledge.
17     Q.   Okay.  If they were, would you have
18 any reason to dispute that?
19     A.   I would need to check with the law
20 firm that hired me and follow up.
21     Q.   You're not a naval architect; is that
22 correct?
23     A.   That's correct.
24     Q.   You're not a naval engineer; is that
25 correct?

**13**

1    A.   That's correct.
2    Q.   You're not an accident
3  reconstructionist; is that correct?
4    A.   Define what an "accident
5  reconstructionist" skills are required.
6    Q.   Do you have any specialized training
7  in accident reconstruction?
8    A.   Within the engineering skills that are
9  required that involve that process, in parts, yes.
10    Q.   Okay.  Have you ever given testimony
11  as an expert in accident reconstruction?
12    A.   I have not.
13    Q.   Do you hold yourself out as an
14  accident reconstructionist?
15    A.   I beg your pardon?  Can you repeat?
16    Q.   Do you hold yourself out as an
17  accident reconstructionist?
18    A.   Depending on the type of accident and
19  the figure mode to be investigated, that would be
20  the case, yes.
21    Q.   What types of accidents do you think
22  you're an expert accident reconstructionist in?
23    A.   Structural based accidents or
24  incidents involving material failure.
25    Q.   Such as building collapses?

**14**

1    A.   Or element or any structure that has
2  materials involved in it.
3    Q.   Right.  That for some reason failed;
4  correct?
5        MR. GERSON:  Form.
6        THE WITNESS:  Or whatever the
7        deficiency or issue might be.
8  BY MR. GORDON:
9    Q.   But that's not the same as
10  reconstructing an accident; correct?
11    A.   Well, you can reconstruct it based on
12  the failure mode, yes.
13    Q.   And to be clear, you've never given
14  opinions in a court of law about that; correct?
15    A.   As you asked before, I did not, yes.
16    Q.   You're not a biomechanical engineer;
17  correct?
18    A.   I am not.
19    Q.   Not a biomedical engineer; correct?
20    A.   I'm not.
21    Q.   You're not a medical doctor; correct?
22    A.   I'm not a medical doctor.
23    Q.   You have no formal medical education.
24  Would that be correct?
25    A.   That's correct.

**15**

1    Q.   You're not a toxicologist; correct?
2    A.   That's correct, I'm not a
3  toxicologist.
4    Q.   You don't hold any degrees in human
5  factors; correct?
6    A.   No.
7    Q.   You're not a human factors expert;
8  correct?
9    A.   I'm not a human factors expert, no.
10    Q.   You've never worked for a cruise line;
11  is that correct?
12    A.   I have not.
13    Q.   You've never been employed by a cruise
14  line; correct?
15    A.   Only for one case, yes.
16    Q.   As an expert?
17    A.   Yes.
18    Q.   In what capacity?
19    A.   As an expert witness.
20    Q.   But you've never actually been
21  employed by a cruise line other than that; correct?
22    A.   That's correct.
23    Q.   You've never been a crew member on a
24  cruise ship; correct?
25    A.   That's correct.

**16**

1    Q.   You've never been employed by a cruise
2  line in the capacity as someone like an executive
3  housekeeper; correct?
4    A.   I have not.
5    Q.   Or any in any capacity as a cleaner or
6  utility person; correct?
7    A.   I have not.
8    Q.   Do you have any personal experience as
9  a janitor?
10    A.   Can you elaborate?
11    Q.   You know what janitors are; correct?
12    A.   I understand, yes.
13    Q.   Do you know what cleaning companies
14  are?
15    A.   I understand what cleaning companies
16  are, yes.
17    Q.   Have you ever been employed by a
18  cleaning company?
19    A.   I have not been employed by a cleaning
20  company, no.
21    Q.   Have you been employed by a janitorial
22  company?
23    A.   I have not been employed by a
24  janitorial company, no.
25    Q.   Have you ever worked in a job that

17

1  required the use of a squeegee?
2      A.  I would say, yes.
3      Q.  What?
4      A.  Just in the lab where I work.
5      Q.  What did you squeegee in your lab?
6      A.  The surface.
7      Q.  Of what?
8      A.  Of the concrete floor.
9      Q.  For what purpose?
10     A.  To remove whatever substance was on
11  it.
12     Q.  And that would be on occasion;
13  correct?
14     A.  Depending when the testing is needed,
15  yes.
16     Q.  You weren't squeegeeing the floors on
17  the lab everyday, were you?
18     A.  I was not, no.
19     Q.  You weren't doing that -- strike that.
20         You weren't squeegeeing floors to
21  clean or dry them in your capacity?
22     A.  Can you rephrase?
23     Q.  I'll rephrase the question.
24         You've never had a job where your only
25  responsibility was to clean floors using a

18

1  squeegee; would that be correct?
2      A.  That would be accurate.
3      Q.  You used a squeegee incidental to your
4  responsibilities as an engineer?
5      A.  That would be correct.
6      Q.  Have you ever designed a cruise ship?
7      A.  I have not.
8      Q.  Have you ever designed any part of a
9  cruise ship?
10     A.  I have not.
11     Q.  Have you ever designed any type of
12  maritime vessel?
13     A.  I have not.
14     Q.  Have you ever designed any part of a
15  maritime vessel?
16     A.  I have not.
17     Q.  You generated a report in this case;
18  is that correct?
19     A.  That would be correct.
20     Q.  We just got the link from the
21  plaintiff's attorney's firm.  But in the interest
22  of saving time, I've got a copy, we can mark that
23  as 3.
24         (Exhibit 3 was marked for
25         identification purposes.)

19

1  BY MR. GORDON:
2      Q.  Dr. De Caso, I marked as Exhibit 3 --
3      A.  Thank you.
4      Q.  -- your expert report; is that it?
5      A.  That's correct.
6      Q.  Does page 5 of your report list the
7  materials you have reviewed in this case?
8      A.  That would be correct.
9      Q.  You referenced that you reviewed CCTV
10  footage from two angles; is that accurate?
11     A.  That's correct.
12     Q.  Did you review the entirety of the
13  CCTV footage in this case?
14     A.  The portion that was available -- that
15  was made available to me, yes.
16     Q.  When you say "that was made
17  available," what does that mean?
18     A.  It was, like, four minutes, or
19  something like that.
20     Q.  Okay.  So the totality of the CCTV was
21  four minutes that you were provided?
22     A.  To my best recollection, yes.
23     Q.  As you sit here today, you don't know
24  if that is the entirety of the CCTV footage that
25  was made available to the plaintiff in this case,

20

1  do you?
2      A.  To my understanding, that was what was
3  available -- made available to me.
4      Q.  The question is, you don't know if
5  that's the totality of the CCTV in existence;
6  correct?
7      A.  I wouldn't know, yes.
8      Q.  You would not know?
9      A.  That's correct.
10     Q.  Do you have any sort of timestamp that
11  would indicate the time of the footage that you
12  were provided which you reviewed in this case?
13     A.  I wouldn't have it available now, no.
14  But if I were to review the footage, I would -- I
15  would need to open the footage and view it.
16     Q.  Let me ask it this way.
17         Do you have the CCTV footage with you
18  today?
19     A.  I don't have it with me today.
20     Q.  You were asked to bring your entire
21  file; correct?
22     A.  Which was made electronically
23  available, yes.
24     Q.  Okay.  You said you have your file
25  electronically in front of you.

21

1    A.   Not all of it.  I've got part of it.
2  The report and part of the case documents to help
3  me throughout the deposition.  All the files were
4  made through a link.
5    Q.   As you sit here today, can you tell me
6  what part of the CCTV footage you reviewed?
7    A.   As I said, it was a couple minutes
8  before the incident and several seconds after the
9  incident.
10    Q.   Can you give me specifics in terms of
11  time?
12    A.   I can't.  To my best recollection, I
13  can't recall at this moment.
14    Q.   You would agree that the CCTV has
15  timestamps on it; correct?
16    A.   I would agree.  As I said, if those
17  are made available, I would review them and I would
18  be able to recall.
19    Q.   As you sit here today, can you tell me
20  what the timestamps are in terms of the CCTV you
21  reviewed in this case?
22    A.   Since I don't have it in front of me,
23  I cannot.
24    Q.   Have you reviewed any video footage of
25  Ms. Kessler, other than what's depicted in the

22

1  CCTV?
2    A.   I have not.
3    Q.   Have you ever spoken to Ms. Kessler
4  ever?
5    A.   I have not.
6    Q.   Have you ever met with her in person?
7    A.   I have not.
8    Q.   Am I correct that you have not
9  reviewed any medical records pertaining to
10  Ms. Kessler?
11    A.   That's correct.
12    Q.   Did you ever review Ms. Kessler's
13  Social Security Administration disability file?
14    A.   No.
15    Q.   Did you ever listen to the audio
16  testimony from Ms. Kessler's Social Security
17  disability hearing in Pennsylvania?
18    A.   I did not.
19    Q.   Are you aware that Ms. Kessler was
20  declared to be totally and permanently disabled by
21  Social Security prior to the subject incident on
22  the BREAKAWAY?
23    A.   I was not.
24    Q.   Did you read her deposition?
25    A.   She mentioned it in the deposition,

23

1  yes.
2    Q.   Did you review the entirety of
3  Ms. Kessler's deposition or just portions of it?
4    A.   I went through it.  I reviewed all of
5  it, but not in detail.
6    Q.   Let me back up.
7         You were provided with certain
8  deposition transcripts; am I correct?
9    A.   That's correct.
10    Q.   And they're listed on page 5 of your
11  report; yes?
12    A.   That is correct.
13    Q.   Were you provided with the total or --
14  strike that.
15         Were you provided with the entirety of
16  each transcript or just certain portions of the
17  testimony?
18    A.   The entirety of the transcript.
19    Q.   Okay.  For each one?
20    A.   That's correct.
21    Q.   So as far as the deposition of
22  Ms. Kessler, did you review the entire transcript?
23    A.   Yes.
24    Q.   Okay.  I thought you just said you
25  reviewed parts of it.  Maybe I misunderstood.

24

1    A.   I reviewed all of it, yes.
2    Q.   Okay.  And did you review the entirety
3  of the other depositions referenced on page 5 of
4  your report?
5    A.   That's correct.
6    Q.   Okay.  Did you take notes when you
7  reviewed the depositions?
8    A.   Yes.
9    Q.   Do you have the notes with you?
10    A.   The notes were transferred onto the
11  report, summarized as within the report.
12    Q.   Right.
13         But did you actually --
14    A.   Annotate the document?
15         No, I did not.
16    Q.   Okay.  So if you reviewed
17  Ms. Kessler's deposition transcript, you're aware
18  that she testified that she had been involved in
19  prior fall accidents; correct?
20    A.   That's correct.
21    Q.   All right.  Did you review the alcohol
22  breathalyzer test results involving Ms. Kessler?
23    A.   Yes, I did.
24    Q.   Where is that referenced on page 5?
25    A.   I think it was provided as part of

25

1  exhibits on the depositions.
2      Q.  Okay.  Were you ever provided with the
3  additional breathalyzer reports that were produced
4  in this case?
5      A.  If they were provided as exhibits,
6  that's what I reviewed.
7      Q.  So you reviewed whatever was attached
8  to Ms. Kessler's deposition as an exhibit?
9      A.  Right.
10         And one of them was a breathalyzer
11  report, yes.
12     Q.  Okay.  So you would agree that
13  Ms. Kessler's breathalyzer test result was .056 at
14  10:14 p.m. on the date of the incident?
15         MR. GERSON:  I object to the form of
16     the question.  He can't agree or disagree.
17     He's not a toxicologist.
18         MR. GORDON:  Counsel --
19         MR. GERSON:  You're just way off the
20     mark.
21         Why are you doing this?  Ask him about
22     his expertise and his inspections.
23         MR. GORDON:  Excuse me.  Please don't
24     do that again.
25         MR. GERSON:  Don't tell me what to do.

26

1  BY MR. GORDON:
2      Q.  You reviewed it; correct?
3      A.  If it was an exhibit provided, I
4  reviewed it.
5      Q.  So you've reviewed it, and you're
6  aware, are you not, that she blew a .056 at
7  10:14 p.m. on the date of the incident?
8         MR. GERSON:  Object to the form.
9         THE WITNESS:  I can't recall the exact
10     details since I don't have that document in
11     front of me.
12         (Exhibit 4 was marked for
13     identification purposes.)
14  BY MR. GORDON:
15     Q.  Let me show you what is marked as
16  Exhibit 4.
17         And you reviewed the breathalyzer test
18  result marked as Exhibit 4?
19     A.  Yes.
20     Q.  And you can see it's .056 at 22:14 and
21  32 seconds?
22     A.  That's correct.
23     Q.  That's 10:14 p.m.; correct?
24     A.  That's correct.
25         MR. GERSON:  For the record, the

27

1      witness and the questioner are reading from
2      the document that has been marked.
3  BY MR. GORDON:
4      Q.  She was given a second test at 22:31
5  and 9 seconds, and it was read at .051; correct?
6      A.  Based on the Exhibit 4 presented in
7  front of me, yes, that's what can be inferred.
8      Q.  Well, it's not inferred.  It's what it
9  says.  Correct?
10     A.  Based on the document that's in front
11  me, yes.
12     Q.  Correct.
13         Have you reviewed the report of NCL's
14  expert toxicologist, Dr. Forney?
15     A.  I did not.
16     Q.  Did you take any photographs during
17  your ship inspection?
18     A.  I did.
19     Q.  How many did you take?
20     A.  Several.
21     Q.  Well, was there a number?
22     A.  Yes --
23     Q.  How many?
24     A.  -- there was a number.
25     Q.  How many?

28

1      A.  I can't recall right now.
2      Q.  Is it on your computer in front you?
3      A.  Yeah.
4      Q.  I'll move on.  We're going to get the
5  link printed.
6         So did you take any video during your
7  inspection?
8      A.  I did.
9      Q.  Okay.  And is that contained in your
10  electronic file?
11     A.  Yes.
12     Q.  And did you --
13     A.  The video is a summary of the
14  pictures, basically.
15         MR. CARRASCO:  I don't think there's
16     videos in the file.
17         MR. GERSON:  You only respond to his
18     questions and ignore the cross-talk.
19         Are you identified on the record?
20         MR. CARRASCO:  Yes.
21         MR. GERSON:  Tell me your name.
22         MR. CARRASCO:  Frank Carrasco.
23         MR. GERSON:  Frank?
24         MR. CARRASCO:  Yeah.  Nice to meet
25     you.

29

1   BY MR. GORDON:
2        Q.   You took video during the inspection?
3        A.   So the camera automatically stitches
4   photographs created in order to put them as a
5   video.  So that was the video that was generated.
6        Q.   Okay.  To your knowledge, was that
7   video transmitted to us on this link?
8        A.   Probably not, since the photographs
9   are provided as a PDF file.
10       Q.   So the video was not provided to us?
11       A.   The stitched photographs is
12  automatically generated by the camera, creating a
13  video.  It was probably not included.
14       Q.   Is there a reason why not?
15       A.   Because the photographs were provided
16  as individual PDF -- in a PDF file.
17       Q.   Okay.  Does the video exist in some
18  sort of video format?
19       A.   If it's still in the camera, yes.
20  It's a very heavy file, so that's why I don't
21  include it.
22       Q.   But it exists; correct?
23       A.   If it's still in the camera, yes.
24       Q.   Why wouldn't it be in the camera?
25       A.   So the photographs, the individual

30

1   photographs that are taken, are automatically
2   stitched in a video.  That video was not taken by
3   me, as I mentioned.  It was automatically generated
4   by the camera.
5            So in answering your question, did I
6   take any video, the answer would be no.  It was
7   automatically generated by the camera.
8        Q.   Okay.  And has that been deleted, what
9   you just described?
10       A.   It might have, yes.
11       Q.   Okay.  Was that deleted intentionally
12  or inadvertently, or did it do it automatically?
13       A.   It's inadvertently because it remains
14  in the SD card of the camera.  So it -- it will
15  probably format the videos after transferring all
16  the -- sorry.  I format the SD card after using the
17  card.
18       Q.   Okay.  Do you have any audio
19  recordings that you did during the ship inspection?
20       A.   Not to my knowledge.
21       Q.   Did you not speak into some sort of
22  device during your inspection?
23       A.   In the phone, then, maybe.  Yes.
24       Q.   Does that still exist?
25       A.   So -- I think that might have been the

31

1   camera.  So that would have been the -- I would
2   need to -- do you have an internet connection?
3   Because I'm unable to access because of that.
4            MR. GORDON:  Off the record.
5            (Thereupon, a discussion was held
6            off the record.)
7   BY MR. GORDON:
8        Q.   Back on.
9            Have you reviewed any design drawings
10  for the Norwegian BREAKAWAY?
11       A.   Sorry.  Answering your previous
12  question, I do still have those video files.
13       Q.   Okay.  Just so we're clear on the
14  record, the video files you referenced, you do have
15  them?
16       A.   Yes, I do.  They were not deleted.
17       Q.   Did you look at some sort of website?
18  What are you looking at to give me that answer?
19       A.   It's the online file that I have.
20       Q.   Okay.
21       A.   With the shared pictures -- with the
22  shared files.
23       Q.   We would ask that you send those to
24  Mr. Gerson's office and he can transmit those to
25  us.

32

1        A.   Yes.
2        Q.   Did you review any design drawings for
3   the Norwegian BREAKAWAY?
4        A.   There was some plans provided as part
5   of the case documents, yes.
6        Q.   What plans?
7        A.   Plans of the area of the spa.
8        Q.   Is that a schematic or architectural
9   or design drawings?
10       A.   Well, they're not detailed from an
11  architectural point of view.
12       Q.   Right.
13       A.   They're not a schematic either.  So
14  generic plans of the area showing the different
15  spaces, some of the light positions, and other MEP
16  features.  I would assume these are MEP plans.
17       Q.   You're an architect; correct?
18            MR. GERSON:  Object to the form.
19            THE WITNESS:  I am not an architect.
20  BY MR. GORDON:
21       Q.   You're not an architect?
22       A.   I'm not an architect, no.
23       Q.   What's your occupation?
24       A.   I'm a principal scientist.  I'm a
25  civil and structural engineer.  I'm a material

33

1    scientist.
2         Q.   You know what sealed architectural
3    drawings are; correct?
4         A.   Yes.  These were not sealed
5    architectural drawings.
6         Q.   You know what sealed engineering
7    drawings are; correct?
8         A.   I'm familiar with those, yes.
9         Q.   Have you reviewed any sealed
10   architectural or engineering drawings for the
11   Norwegian BREAKAWAY?
12        A.   I have not.
13        Q.   And specifically with respect to the
14   Mandara Spa.
15        A.   I have not.
16        Q.   Do you have whatever it is you
17   testified to that you did review in terms of a
18   drawing of the spa?
19        A.   I could try to find it.
20        Q.   Okay.
21        A.   Would you like me to?
22        Q.   Yes, sir.
23             Who designed the Norwegian BREAKAWAY?
24        A.   I'm unaware of that.
25        Q.   Who designed the Mandara Spa in the

34

1    Norwegian BREAKAWAY?
2         A.   I'm unaware of that information.
3         Q.   Okay.  What day did you inspect the
4    Mandara Spa on the Norweigian BREAKAWAY in this
5    case?
6         A.   Sorry.  Can you repeat that?
7         Q.   Yeah.
8              What day did you inspect the Mandara
9    Spa on the Norwegian BREAKAWAY in this case?
10        A.   That was --
11             MR. GERSON:  You can consult your file
12        or your report or any of the marked
13        exhibits.
14             THE WITNESS:  Of course.  It was on
15        Sunday, August 25th, 2019.
16   BY MR. GORDON:
17        Q.   All right.  What time did you inspect
18   the vessel?
19        A.   Approximately, 9:00 a.m.
20        Q.   Until when?
21        A.   10:30.
22        Q.   Had you ever been on the Norwegian
23   BREAKAWAY prior to August 25, 2019?
24        A.   I have not.
25        Q.   Have you been on it subsequent to

35

1    August 25, 2019?
2         A.   I have not.
3         Q.   You state on page 7 of your report the
4    average air temperature was 77 degrees Fahrenheit;
5    isn't that correct?
6         A.   That's correct.
7         Q.   How did you come to the calculation?
8         A.   From a thermometer.
9         Q.   You had a thermometer on you?
10        A.   At the time of the inspection, yes.
11        Q.   How many times did you take a reading
12   of the air temperature when you were at the
13   inspection?
14        A.   It's the average of -- throughout the
15   entire inspection.
16        Q.   Right.
17             But I mean, did you -- strike that.
18             Did you take notes of the air
19   temperature calculations you obtained that day?
20        A.   No.  The device automatically records
21   them at a frequency of, I think, one per minute and
22   then provides the average maximum and minimum for
23   the given period of time.
24        Q.   So is it on a timer?  How does that
25   work?

36

1         A.   You press the button, and then you let
2    it record.
3         Q.   Okay.  So at some point -- strike
4    that.
5              How often are you checking the machine
6    to see the temperature?
7         A.   It will collect the data and then
8    provide the average automatically.
9         Q.   At what point did it provide you with
10   the average temperature?
11        A.   Throughout -- it's the average
12   temperature from the beginning of inspection until
13   the end of inspection.
14        Q.   Is that captured somewhere?
15        A.   In the report.
16        Q.   Well, what I just read on page 7?
17        A.   Uh-huh.
18        Q.   Yes?
19        A.   Yes.
20        Q.   But is there an actual reading of
21   instrument you can point to and show me?
22        A.   The instrument that I had at the time.
23        Q.   Okay.  Do you have a photograph of it?
24        A.   I do not, no.
25        Q.   Okay.  So other than what's stated on

37

1    page 7 of your report --
2         A.   Yes.
3         Q.   -- can you point to me anything that
4    supports -- strike that.
5              Can you point to me anything that
6    supports that the average air temperature is
7    77 degrees?
8         A.   The reading from the device.
9         Q.   Okay.  Can you show me any specific
10   photographs or printed data from that device?
11        A.   The notes during the inspection.
12        Q.   Your notes?
13        A.   Correct.
14        Q.   Okay.  Other than that?
15        A.   No.
16        Q.   You are aware, are you not, from
17   reviewing the testimony of the Norwegian crew
18   members that the thermal spa in the Mandara Spa --
19   strike that.
20             You're aware from reviewing the
21   testimony of the Norwegian crew members that the
22   area where Ms. Kessler fell was heated; correct?
23        A.   That's my understanding.
24        Q.   Okay.  What is the temperature of the
25   area in the spa when it is heated?

38

1         A.   I'm not aware what the specifications
2    are.  It will depend on people that are around, the
3    temperature of the pool, the operation, many other
4    factors of the specific temperature.  I don't know.
5         Q.   So, as you sit here, you don't know if
6    the average air temperature was 77 degrees at the
7    time of Ms. Kessler's fall; correct?
8         A.   That's correct.
9         Q.   And you don't know what the average
10   air temperature was at the time of Ms. Kessler's
11   fall; correct?
12        A.   That's correct.
13        Q.   You don't know what the air
14   temperature was at the time of Ms. Kessler's fall;
15   correct?
16        A.   That's correct.
17             If you want to go back to the deck
18   plan -- I found it.  It's part of the request, the
19   RFP docs that were provided.
20        Q.   Sure.
21             Do you have it in front you?
22        A.   It would be this one.  It's page 37 of
23   44 on one of the case documents.
24        Q.   You can just turn it around.  I just
25   want to see generally what you're referring to.

39

1         A.   It's a partial.  It's cut off.
2         Q.   Hold on one second.  There's a Bates
3    number.  For the record, the witness -- hold on.
4              For the record, the witness is showing
5    Bates stamp 123.
6              Thanks.  I appreciate it.
7              You would agree that the specific air
8    temperature may impact evaporation of water;
9    correct?
10        A.   I would agree.
11        Q.   You also made reference in your
12   report -- I believe it's on page 13 -- regarding
13   the surface temperature.
14        A.   Yes.
15        Q.   So when you say "surface temperature,"
16   what are you referring to?
17        A.   The surface temperature of the floor
18   where the tests were conducted.
19        Q.   Okay.  And that's -- strike that.
20             You tested where you believe
21   Ms. Kessler fell; correct?
22        A.   I tested where I indicated the
23   location as marked in the report, yes.
24        Q.   Right.
25             It is locations 10 through 14; right?

40

1         A.   That would be correct.
2         Q.   And it gives a corresponding surface
3    temperature?
4         A.   That's correct.
5         Q.   How did you measure the surface
6    temperature?
7         A.   Through a laser based document, a
8    noncontact instrument.
9         Q.   An instrument?
10        A.   Yes, an instrument, a noncontact
11   instrument.  You basically shoot at the surface in
12   order to determine its temperature.
13        Q.   Okay.  And do you have any printouts
14   from those readings?
15        A.   Again, they would be on the notes.
16        Q.   Your notes?
17        A.   That's correct, as I said before.
18        Q.   Okay.  Do you have any photographs of
19   what the readings were as you took them that day?
20        A.   No.
21        Q.   Okay.  Any video?
22        A.   No.
23        Q.   As you sit here today, you don't know
24   if the surface temperatures, as indicated on
25   page 13 of your report, from locations 10 through

41

1  14, were the same as they were at the time of
2  Ms. Kessler's fall; correct?
3        A.   That's correct.  Those are the
4  temperatures at the time of the inspection.
5        Q.   All right.  Did you take an average
6  reading of the surface temperature or just a
7  one-shot temperature reading?
8        A.   You hold it for about 30 seconds and
9  the equipment gives you that average temperature
10  during that period of time.
11        Q.   Is it similar to what you described
12  earlier about the air temperature?
13        A.   No.
14        Q.   How is it different?
15        A.   Air temperature uses an average
16  throughout the period of time that was recording.
17  This one was a solid surface instead of air
18  temperature, and therefore you're interested on the
19  specific temperature of that location.  Solids
20  don't vary in temperature as much as the air does.
21  It's two different instruments.
22        Q.   You don't know what the surface
23  temperature was at the time of Ms. Kessler's fall;
24  correct?
25        A.   You asked before, and I replied

42

1  before, that's correct.  I only know the
2  temperatures at the time of the inspection.
3        Q.   What type of instrument did you use to
4  test the slip resistance of the floor?
5        A.   It was a variable incident tribometer
6  English XL.
7        Q.   Why did you use that instrument?
8        A.   That instrument mimics closely the
9  biomechanics of a person striking the floor with
10  the heel and therefore reproduces that motion in
11  order to understand the properties between the heel
12  striking the surface and the surface.
13        Q.   You're aware there are other
14  instruments that measure slip resistance; correct?
15        A.   There are other devices that do
16  measure slip resistance.  Yes, I'm aware.
17        Q.   Why did you use the English XL versus
18  other instruments to do your testing in this case?
19        A.   I just mentioned, it mimics the
20  biomechanics of a person striking the floor with
21  the heel.
22        Q.   But there are other instruments that
23  can be used to measure slip resistance; correct?
24        A.   As I answered before, yes.
25        Q.   Okay.  Is the English XL only

43

1  instrument you used to measure slip resistance in
2  this case?
3        A.   That's correct.
4        Q.   When did you become certified to use
5  the English XL?
6        A.   I took a certification course in 2018,
7  last year.
8        Q.   Do you know when specifically?
9        A.   I think it was the summer.  I don't
10  remember the date.
11        Q.   Summer of 2018?
12        A.   That's correct.
13        Q.   Do you own your own English XL device?
14        A.   I do.
15        Q.   How long have you owned it for?
16        A.   For a year and a half.
17        Q.   When was the last time it had been
18  calibrated relative to August 25, 2019?
19        A.   I think it's April 2019.
20        Q.   Who calibrated it?
21        A.   English XL.
22        Q.   How many times did you use the
23  instrument between April 2019, when it was last
24  calibrated, up to August 25, 2019?
25        A.   I would not know at this time.

44

1        Q.   Why not?
2        A.   Because I would need to go back and
3  review the number of times.  From the top of my
4  head, I can't remember.
5        Q.   When was the test foot on your
6  English XL last changed relative to August 25,
7  2019?
8        A.   Can you be more specific when you say
9  "changed"?
10        Q.   Yeah.
11        You know there's a Neolite test foot
12  on the machine; correct?
13        A.   I'm aware of that, yes.
14        Q.   Is that the original test foot that
15  came with the instrument when you bought it?
16        A.   That's correct.
17        Q.   You've never changed it?
18        A.   It gets reconditioned; right?  Before
19  each test you recondition the surface so it meets
20  the requirements.
21        Q.   You test it with a test tile; correct?
22        A.   Yes.  Or whatever other surface you're
23  striking against.
24        Q.   Let me just back up.
25        The test foot on your XL --

45

1    A.   Yes.
2    Q.   -- is it the original test foot?
3    A.   That came with the device, yes.
4    Q.   Do you have any documentation
5  regarding when the machine was calibrated by the
6  manufacturer?
7    A.   Yes.
8    Q.   Okay.  Did you sand the machine before
9  using it on August 25th?
10    A.   The machine or the test foot?
11    Q.   The test foot.
12    A.   The test foot was conditioned
13  according to the manufacturer, as stated in the
14  report.
15    Q.   How did you -- did you use sandpaper?
16    A.   A specific sandpaper and a fixture in
17  order to insure homogeneousness.
18    Q.   How old was the sandpaper that you
19  used to sand the test foot?
20    A.   I don't know when it was manufactured,
21  the sandpaper.
22    Q.   Well, was it the original sandpaper
23  you had, or was it replaced?
24    A.   No.  It was replaced.
25    Q.   Do you know when?

46

1    A.   I don't recall.
2    Q.   Do you know how many passengers and
3  crew members the Norwegian BREAKAWAY holds?
4    A.   Based on the public available
5  information, I think it's a total of 3,963
6  passengers and a complement of crew 1,657, as
7  stated on page 6 of the report.
8    Q.   Do you know how many people walked
9  over the same surface area where you did your test
10  in between Ms. Kessler's incident and the date of
11  your testing?
12    A.   I do not know.
13    Q.   You would agree that a floor surface
14  can change over time; correct?
15    A.   Depending on the floor surface, yes.
16  That might be the case.
17    Q.   That would be true with respect to the
18  floor surface where Ms. Kessler fell; correct?
19    A.   That would be correct, yes.
20    Q.   As you sit here today, you don't know
21  if the floor surface where Ms. Kessler fell was in
22  the same exact condition at the time of your
23  testing as it was at the time of the fall; correct?
24    A.   That's correct.  I wouldn't know if
25  it's the same.  In fact, it might have been

47

1  different.
2    Q.   All right.
3    A.   As stated in the report.
4    Q.   How did you determine where to do your
5  test location, sir?
6    A.   By cross-referencing the CCTV footage
7  with -- and the exhibits provided in the
8  depositions with the location that I selected.
9    Q.   Which exhibits specifically are you
10  referencing?
11    A.   There's snapshots of those CCTV
12  footage in the -- what do you call that? -- Naik
13  exhibit.
14        MR. CARRASCO:  N-A-I-K.
15        THE WITNESS:  Yeah.  Thank you.
16        The Tellez depo.  There were some
17        stills there as well.  And the CCTV itself.
18  BY MR. GORDON:
19    Q.   So am I correct that you tried to
20  determine where Ms. Kessler slipped by referring to
21  the CCTV and various photographs of the area?
22    A.   Correct.  Still photographs of the
23  area and from that CCTV.
24    Q.   What about this still photo that was
25  marked as an exhibit to Ms. Kessler's deposition?

48

1    A.   That's correct.
2        (Exhibit 5 was marked for
3        identification purposes.)
4  BY MR. GORDON:
5    Q.   I will mark the still of Ms. Kessler
6  as Exhibit 5 to your deposition.
7        Is there one document in particular
8  you looked at to determine where she slipped, or
9  you just looked at all of them to try to make that
10  determination?
11    A.   That's correct.
12    Q.   Which?  Everything?
13    A.   The combination of photos.
14    Q.   Which foot of Ms. Kessler slipped
15  first?
16    A.   The left foot slipped first.
17    Q.   And looking at your report, you
18  believe that test location 10 is the area where
19  Ms. Kessler's left foot first slipped?
20    A.   Between 11 and 12, yes.
21    Q.   Well, is it between 11 and 12, or is
22  it number 10, specifically?
23    A.   Number 10 would be the test location.
24    Q.   Just so I'm clear, is it your opinion
25  that Ms. Kessler's left foot specifically slipped

49

1 at location number 10?
2 A. In that area, yes.
3 Q. Okay. So you don't know if it's
4 specifically exactly where you have the number 10
5 in your report?
6 A. Correct.
7 Q. That's correct?
8 A. Yes.
9 Q. Okay. I mean, you can't tell with
10 certainty that her foot slipped exactly where you
11 tested at number 10; correct?
12 A. That's correct. That's what I'm
13 trying to infer.
14 Q. Okay. What time did Ms. Kessler fall?
15 A. Can you show me that exhibit again,
16 please.
17 Q. Exhibit 5?
18 A. Yes, please.
19 Based on the exhibit, it would be --
20 the time indicating on the lower part of Exhibit 5
21 is 3:53 p.m. local time, I'm assuming.
22 Q. Do you know if that's real time or
23 ship time?
24 A. As I said, it's what's available in
25 front of me. I wouldn't know if it's ship time or

50

1 any other standard time.
2 Q. Okay. Well, did you review
3 Ms. Kessler's written statement provided to
4 Norwegian where she said she slipped at about
5 4:30 p.m.?
6 A. The complaint, yes -- I mean, the
7 report, yes.
8 At the end. I think it was four --
9 4:45, she reported, something like that.
10 Q. But she also said that she fell at
11 around 4:30 p.m.; correct?
12 A. Yes.
13 Q. So on page 6 of your report, where you
14 say that this incident occurred just before
15 4:00 p.m. UTC, you're referring to the CCTV still.
16 Would that be accurate?
17 A. That would be accurate.
18 Q. All right. So you talked about test
19 location 10.
20 Can you tell me how you determined
21 your other test locations.
22 A. The other test locations are meant to
23 be representative for comparison purposes adjacent
24 to that strip where she was walking and slipped.
25 Q. So why did you determine to test at

51

1 location 11 and 12?
2 A. In order to provide a comparison of
3 and provide an average and a sampling of the floor.
4 Q. Okay. But why those two specific
5 locations?
6 A. Because those are adjacent to the
7 neighborhood where she slipped.
8 Q. Is there any industry literature that
9 states that's the area where you should have
10 tested?
11 A. There are many different, what we
12 call, sampling particles when we're deciding to
13 test and how many tests to conduct and how to
14 conduct them. So it's general research best
15 practices.
16 Q. Okay. What specifically are you
17 referring to?
18 A. In terms of?
19 Q. Yeah. I'm just trying to find out if
20 there's any authoritative literature that states
21 that what you just described is the proper manner
22 of determining test locations.
23 A. So there's literature out there based
24 on research best practices that relate to sampling.
25 And when you need to determine how many samples to

52

1 get on given type of test, then you can follow
2 those. There's a lot of literature out there.
3 Q. Can you name me one specifically with
4 respect to the testing that you did in this case?
5 A. Not now, no.
6 Q. Okay. How about number 14, test
7 location 14, how did you determine to test that
8 specific location?
9 A. That's a control reference. That is
10 in the middle of the access way to the spa. And
11 it's meant to provide a control reference.
12 Q. Again, is there any specific
13 authoritative literature that you can point to to
14 tell me that's where you should have tested it?
15 A. Again, there's plenty of literature
16 available in order to make sure that you also
17 provide a control test.
18 Q. Can you name me one specifically?
19 A. I can't at this time.
20 Q. And how many polls did you do for each
21 of the locations?
22 A. Can you repeat that? I didn't hear
23 you.
24 Q. How many times did you test each test
25 location?

53

1    A.   Each test location was tested in four
2  orthogonal directions; northeast, southwest,
3  front-back, side-side.
4    Q.   What type of substance did you put on
5  the floor when you did your wet testing?
6    A.   Water available from the vessel,
7  regular tap water.
8    Q.   Okay.  The crew members made that
9  available to you?
10   A.   Yes.  Actually, I took it from the
11 restroom.
12   Q.   Did you apply any other substance on
13 the floor other than the tap water?
14   A.   I did not.
15   Q.   And the average result was what?
16   A.   That would be provided in Table 1 of
17 the report.
18   Q.   Okay.  What was the average test when
19 it was wet?
20   A.   For which location?
21   Q.   Well, I'm on page 13.  It looks like
22 you did an overall average; correct?
23   A.   That was reported in the report, yes.
24   Q.   That was .57?
25   A.   That's correct.

54

1    Q.   Did you test the area dry?
2    A.   I did not.
3    Q.   Is there a reason why not?
4    A.   Since the incident was provided in
5  the -- the incident occurred with a wet floor
6  surface, this was comparing it to the conditions
7  during the incident.
8    Q.   Okay.  You'll agree that the
9  literature states you should also test it dry;
10 correct?
11   A.   If needed, yes, based on what you want
12 to obtain.
13   Q.   Okay.  Well, you would agree it would
14 be relevant to know how the floor tests dry to
15 compare it to how it tests wet; would it not?
16   A.   Not for the case.
17   Q.   Why not?
18   A.   Because the floor conditions were wet
19 at the time of the incident.
20   Q.   And why do you say the floor
21 conditions were wet at the time of the incident?
22   A.   Based on the exhibits, as well as the
23 depositions provided as part of the case
24 documentation.
25   Q.   What exhibits are you referring to?

55

1    A.   The videos and the -- sorry.  The
2  stills that came from the CCTV, as well as the
3  supporting deposition of the crew members at the
4  time.
5    Q.   Okay.  You reviewed the CCTV; right?
6    A.   Yes.
7    Q.   Or at least certain portions of it;
8  correct?
9    A.   That's correct.
10   Q.   Is there anything that you've looked
11 at to give us more information as to what
12 specifically you reviewed?
13       MR. GERSON:  Object to the form.
14   Asked and answered.
15       THE WITNESS:  Yes.  So in the Tellez
16   deposition, Exhibit 1, also shows how a
17   crew member is placing squeegeed water in
18   the area that was tested.
19 BY MR. GORDON:
20   Q.   The CCTV footage of the incident that
21 you were provided to review, did you see any water
22 in the area where Ms. Kessler fell before she fell?
23   A.   It's not possible to tell clearly due
24 to the contrast --
25   Q.   Okay.

56

1    A.   -- with certainty.
2    Q.   Okay.  So you don't -- strike that.
3        You can't tell us for certain that you
4  actually observed water on the floor at the time
5  Ms. Kessler fell.  Would that be a true statement?
6        MR. GERSON:  Object to the form.
7        THE WITNESS:  If I can rephrase the
8    statement, it would be that a crew member
9    can be seen squeegeeing water on the
10   surface to that location.
11 BY MR. GORDON:
12   Q.   My question is, the CCTV that you
13 reviewed --
14   A.   Yes.
15   Q.   You reviewed it, right?
16   A.   As I said before, yes.
17   Q.   You gave opinions in your report about
18 Ms. Kessler's gait before the incident; correct?
19   A.   That's correct.
20   Q.   Which we'll get to.
21       You see a still of Ms. Kessler; right?
22   A.   Yes.
23   Q.   Exhibit 5.
24       And you reviewed the video of her
25 coming into the spa area; correct?

57

1      A.   That's correct.
2      Q.   Okay.  Did you see any water on the
3   floor in the area right before Ms. Kessler fell?
4      A.   I saw water being deposited in that
5   area before by crew members.
6      Q.   Did you actually see the water on the
7   floor with your own eyes?
8      A.   Since I wasn't there, I'm not able to
9   say that I did.
10     Q.   Okay.  But of the video evidence that
11  you've been provided, specifically looking at
12  Exhibit 5, do you see any water on the floor where
13  she fell?
14     A.   Again, on the quality of the printed
15  document, it's not possible to tell.
16     Q.   Well, do you see any water on
17  Exhibit 5?
18          MR. GERSON:  Objection.  Asked and
19          answered.
20          Please move on.
21  BY MR. GORDON:
22     Q.   Go ahead.
23     A.   Once again, on the Exhibit 5 that is
24  provided, it's seems a little cracked and bent on
25  the bottom part, and the top right corner is

58

1   curled.  And based on the quality, it's not
2   possible to infer if there's water.
3      Q.   We'll get a better copy of the
4   photograph.
5          MR. GORDON:  Can you please get me
6          one:
7          THE WITNESS:  Thank you.
8   BY MR. GORDON:
9      Q.   You'll agree that Ms. Kessler
10  testified that she did not see any water on the
11  floor before she fell; correct?
12     A.   To my best recollection, I remember
13  she stating something along those lines, yes.
14     Q.   Well, that's what she testified to;
15  correct?
16     A.   I don't remember verbatim that's the
17  case, but yes.  I remember she testified that she
18  did not see any water on the surface.
19     Q.   And she didn't see any water on the
20  floor after she fell; correct?
21     A.   Again --
22          MR. GERSON:  Object to the form.
23          You may answer.
24          THE WITNESS:  Thank you.
25          From my best recollection, that's what

59

1   she mentioned, yes.
2   BY MR. GORDON:
3      Q.   And Ms. Kessler testified at her
4   deposition that she didn't see any substance on the
5   floor before she fell; true?
6          MR. GERSON:  Object to the form.
7          THE WITNESS:  To my best recollection,
8          that's the case, yes.
9   BY MR. GORDON:
10     Q.   And she didn't see any substance on
11  the floor after she fell; correct?
12          MR. GERSON:  Object to the form.
13          THE WITNESS:  That's correct.
14  BY MR. GORDON:
15     Q.   Okay.
16     A.   I do remember that she said that she
17  felt it was wet after she fell.
18     Q.   And she didn't know where it came
19  from; correct?
20     A.   That's true, yes.
21     Q.   And you reviewed the deposition
22  testimony of Michael Collantes?
23     A.   Yes.
24     Q.   Jemalyn Lenoso?
25     A.   Yes.

60

1      Q.   Okay.  And your understanding is,
2   those were the two crew members responsible for
3   maintaining the area; correct?
4      A.   At the time of Ms. Kessler's incident,
5   yes.
6      Q.   And both of those crew members
7   testified the area was dry; correct?
8          MR. GERSON:  Object to the form.
9          THE WITNESS:  I'm not sure if they
10         said explicitly the area where she fell was
11         dry, but the area where they were working,
12         they were drying the surface.
13  BY MR. GORDON:
14     Q.   Okay.
15     A.   Can you point me to the specific area
16  in the -- that you're referring to in the
17  deposition of those crew members, please?
18     Q.   Well, you're testifying today that the
19  crew members testified the area was wet.
20          So can you tell me where they said it
21  was wet --
22          MR. GERSON:  Object to the form.
23  BY MR. GORDON:
24     Q.   -- in the area where she fell?
25     A.   Yeah.  Give me a moment.  I can pull

61

1    out the --
2        Q.   Sure.
3        A.   I'm reviewing -- rereviewing the
4    document for Collantes.  I don't recall him stating
5    that the floor was dry.  Just on the methods used
6    in order to dry the floor and how he was
7    squeegeeing the area to dry the floor.
8        Q.   Okay.  You don't recall him testifying
9    it was dry?
10       A.   With those words, no.
11       Q.   Look at page 90, he said it's dry.
12   Page 92, he said it's dry.
13           MR. GERSON:  Object to the form.
14           You may answer.
15           THE WITNESS:  I' scrolling to the
16       page.
17   BY MR. GORDON:
18       Q.   Okay.
19       A.   "It's already -- no, I'm squeegeeing,
20   but it's already dry."
21           That would be page 90, line 3.
22       Q.   Right.
23           And page 89, "Question:  Okay.  So you
24   now have the squeegee on the ground at 3:47;
25   correct"?

62

1        A.   Right.
2        Q.   "Yeah.  But the floor is not wet.
3    It's not wet.  It's dried, the floor, already."
4        A.   I understand that.
5            We're referring to the area
6    immediately where Ms. Kessler fell; right?
7        Q.   Correct.
8        A.   That was the question.
9        Q.   My question to you is, can you point
10   to me to any testimony where someone testified that
11   the floor where Ms. Kessler fell was wet right
12   before she fell?
13           MR. GERSON:  Objection.  Asked and
14       answered.
15           THE WITNESS:  To my best recollection
16       right now, I can't.
17   BY MR. GORDON:
18       Q.   Okay.  Did you ever take the CCTV
19   footage you were provided by Ms. Kessler's
20   attorneys and do any sort of forensic examination
21   of the footage to see if you can see any water on
22   the floor where she fell?
23       A.   Can you repeat, please?
24       Q.   Okay.  You received certain CCTV
25   footage; correct?

63

1        A.   That's correct, yes.
2        Q.   Did you ever take the footage and do
3    any sort of forensic examination to see if you
4    could observe any water in the area right before
5    she fell in the location where she fell?
6        A.   By officially reviewing the CCTV and
7    the different contrasts, I was trying to determine
8    if there was water explicitly there.
9            But due to the quality of the CCTV
10   that I was provided and the lighting conditions,
11   it's not possible with a degree -- with a high
12   degree of certainty.
13       Q.   Okay.  But did you attempt to do any
14   sort of forensic examination to assist you in that
15   regard?
16       A.   I think I just answered that by
17   reviewing it visually.
18       Q.   You personally reviewed it?
19       A.   Right.
20       Q.   Did you send it it somebody else, like
21   an outside vendor, to do any sort of in-depth
22   analysis?
23       A.   I did not.
24       Q.   You cite various articles in your
25   report that you believe are authoritative; correct?

64

1            MR. GERSON:  Object to the form.
2            THE WITNESS:  That I believe are
3        relevant to the matter being discussed,
4        yes.
5    BY MR. GORDON:
6        Q.   Well, you believe they're
7    authoritative; right?
8            MR. GERSON:  Object to the form again.
9            THE WITNESS:  I think they bring
10       relevance to the matter being discussed,
11       yes.
12   BY MR. GORDON:
13       Q.   Well, would you site articles that
14   aren't authoritative?
15           MR. GERSON:  Object to form, again.
16           THE WITNESS:  Can you define
17       authoritative?
18   BY MR. GORDON:
19       Q.   Well, you're the expert; right?
20       A.   I think so, yes.
21       Q.   And you provided and cited in your
22   report various articles; correct?
23       A.   That is correct.
24       Q.   And the reason you did that is because
25   you believe they support your opinions; correct?

65

1        A.   As I said, yes.
2        Q.   Therefore, you believe they would be
3    authoritative articles; correct?
4        A.   I think they would provide valuable
5    background to the case being discussed, yes.
6        Q.   Otherwise you wouldn't have cited
7    them; correct?
8        A.   Correct.
9        Q.   You reference and cite in your report
10   an article entitled, "Slip and Fall Accident
11   Prevention, A Review of Research, Practice and
12   Regulations," written by Lee-Jean Lin, Fu-Tien
13   Chiou, and H. Harvey Cohen; correct?
14       A.   Yes.
15       Q.   And you'll agree that on page 210 it
16   references that a static coefficient of friction of
17   .5 would be considered a reasonably safe
18   measurement for slip resistance; correct?
19       A.   For that specific case under the
20   conditions that was reviewed that are non marine
21   based applications, yes.
22       Q.   We'll get there.
23            But .5, according to that article, was
24   deemed to be sufficient; correct?
25       A.   Again, it's an average, as it was

66

1    stated on the publication.
2        Q.   Right.
3            You're aware of who William English
4    is; correct?
5        A.   Yes.
6        Q.   He invented the XL tribometer that you
7    used?
8        A.   That's correct.
9        Q.   Are you familiar with his publication,
10   "Pedestrian Slip Resistance, How to Measure It and
11   How to Improve It, Second Edition"?
12       A.   Yes.
13       Q.   Published in 2003?
14       A.   That's correct.
15       Q.   You would agree that's authoritative;
16   correct?
17       A.   I would agree with that, yes.
18       Q.   And he discusses that a measure of .5
19   static coefficient of friction would be sufficient
20   in terms of wet testing; correct?
21       A.   He does state that, yes.
22       Q.   Sorry.  I couldn't hear you.
23       A.   I recall that that's what he states.
24   I don't know exactly what page of the document --
25   of the book you're referring to, but yes.

67

1        Q.   All right.  And you make reference to
2    ASTM F-1166; is that accurate?
3        A.   As well as other references, yes.
4        Q.   Okay.  Well, that's one of the ones --
5    that is the reference you make to determine that
6    the floor purportedly did meet appropriate slip
7    resistance; is it not?
8        A.   To the recommendations provided by
9    that standard practice, yes.
10       Q.   That's really the only one that you're
11   relying on for that statement; correct -- or that
12   opinion; right?
13       A.   That would be incorrect.
14       Q.   That's incorrect?
15       A.   Yes.
16       Q.   Is there any other literature that
17   you're referencing or reference that says the
18   minimum slip resistance should be .6?
19       A.   So the manufacturer for the tile does
20   provide a range, as it was specified.  It varies
21   from .04 to .7 for R11 -- right? -- which is
22   supposedly -- so the manufacturer specifications in
23   terms of safety, as well.  And the corresponding
24   DIN, which is the European standard for tile
25   testing, also provides different ranges or

68

1    R values.
2            And the reference in this case that
3    you are incorrect that I'm not citing is the
4    DIN 55130 does provide that R values 13 and 12 for
5    wet or very wet areas should be used, which result
6    in a higher coefficient variance that would be
7    higher than .7.
8        Q.   Okay.  First of all, the tile
9    manufacturer you said had a range?
10       A.   So the tile manufacturer, the
11   specification that was provided as part of the
12   specifications, it was R11.  And R11 varies, from
13   my understanding, from .4 to .7, based on DIN,
14   D-I-N, the standard.
15       Q.   Well, you say a range.  So anything
16   between .4 and a .7?
17       A.   That would be a performance spec.
18       Q.   Is that specific to a wet surface?
19       A.   That's specific not for wet or very
20   wet areas.  For wet or very wet areas, the
21   recommendation is that you use R12 or R11 -- 13,
22   pardon me.
23            So in terms of the reference that I'm
24   providing, I'm providing the reference of the DIN
25   standard for wet or very wet surfaces.  Tile should

69

1  meet an R12 or R13, which corresponds to higher
2  coefficient of friction values.
3        Q.  How do you spell "DIN"?
4        A.  D-I-N.  Capital letters.
5        Q.  Is that the name of a person or?
6        A.  It's the Deutsch Institute of -- it's
7  the German institute of standards, just like ASTM
8  for American, the DIN is for European.
9        Q.  German Institute of Standards?
10       A.  It's translated to it.  I don't know
11 the -- my German is not that good, I should say.
12       Q.  Okay.  And there's nothing you can
13 point to that says that that DIN standard is
14 applicable to a cruise ship, can you?  Or this
15 particular cruise ship, the BREAKAWAY?
16       A.  Well, that's -- the tile that they
17 used references that specification as part of the
18 case documents.  So that was the material being
19 used in the incident location.
20       Q.  Okay.  My question is, is there
21 anything you can point to to show me that this DIN
22 standard is allegedly applicable to a cruise ship?
23       A.  It's applicable as it's stated to the
24 tile that was placed on that cruise ship.  It
25 doesn't matter where the tile is placed.  You can

70

1  place it in the moon, as far as the DIN is
2  concerned.  The DIN doesn't look at the location of
3  the tile.  It just looks at the surface itself.
4        Q.  That's a German?
5        A.  That is a German based standard, yes.
6  Typically referred to as European.  It's called the
7  ramp test, R-A-M-P.
8        Q.  Is there anything authoritative you
9  can point to that says that that German standard
10 would be applicable in this country?
11       A.  So a lot of the tile manufacturers use
12 it.  It is an international recognized standard.
13 Many tile manufacturers use it as a specification
14 standard.
15       Q.  Can you point me to any authoritative
16 literature supporting what you just said?
17       A.  Yes.  If you look at the practical
18 handbook of Di Pilla, D-I, space, P-I-L-L-A, the
19 handbook discusses in depth all of the different
20 methodologies that there are to test coefficient of
21 friction, as well as the applicability to the
22 different type of things.
23       Q.  Do you have that with you?
24       A.  I don't have the handbook with me, no.
25 But you have the reference, and you're welcome to

71

1  buy it and review it.
2        Q.  Do you have it amongst the materials
3  you have here today?
4        A.  Well, there's a copyright issue, so I
5  cannot just photocopy the book and provide it.
6        Q.  Well, do you personally have it?
7        A.  I have an electronic version of it,
8  yes.
9        Q.  Have you provided it with your
10 materials?
11       A.  No.  It's a copyright issue.  I cannot
12 provide it.
13          Just like you looked up the other
14 references that you looked up.  By providing a
15 reference and in order to not breach any copyright
16 issues, you have access to that information.
17       Q.  Can you show me exactly in writing
18 anything to support what you just said about the
19 DIN being applicable on this ship at the time of
20 Ms. Kessler's fall?
21          MR. GERSON:  Object to the form.
22          THE WITNESS:  So to answer your
23          question, the DIN is applicable to the
24          floor surface that was installed in the spa
25          area on that boat; and, therefore, the DIN

72

1          specifications are applicable because the
2          tile is in the boat.
3  BY MR. GORDON:
4        Q.  Okay.  Who chose the tile that was put
5  into the spa?
6        A.  I'm afraid I don't know that.
7        Q.  Do you know what the classification
8  society is?
9        A.  The classification society?  There's
10 many type of classification societies.
11       Q.  Have you done any research regarding
12 that in connection with this ship, BREAKAWAY?
13       A.  When you talk about classification
14 societies, can you be more explicit?
15       Q.  Yeah.
16          After a ship is built, it gets
17 inspected, does it not, by the appropriate
18 authorities?
19       A.  Okay.  You're talking about the
20 overall ship, how the ship is classified.
21       Q.  Yes.
22       A.  There's materials classification.
23 That's why I'm trying -- we're talking about tile
24 and your ship.  You're now jumping to the
25 classification of the overall ship; yes?

73

1    Q.   People inspect the ship before it gets
2    put into use; correct?
3    A.   Yeah.  The classification that you're
4    referring to, if I'm incorrect, it's about the
5    tonnage and the size; is that correct?  Is that the
6    type?
7    Q.   I'm asking you.
8    A.   Since you are not stating the exact
9    classification, I'm trying to understand what you
10   refer by "classification."
11        So is it the classification of the
12   size of the boat based on tonnage, or is there
13   another classification that you're referring to?
14   Q.   I'm referring to the ship itself.  It
15   gets inspected, does it not, before it sets sail?
16        MR. GERSON:  Object to the form.
17        Argumentative.
18   BY MR. GORDON:
19   Q.   By applicable authorities?
20   A.   There's many different types of --
21   types of quality control and inspections of the
22   overall ship in totality, yes.
23   Q.   Are you aware of anything anywhere
24   stating that it was inappropriate tile be put into
25   the Norwegian BREAKAWAY in the Mandara Spa?

74

1        MR. GERSON:  Object to the form.
2        THE WITNESS:  I don't have access to
3        those documents.
4    BY MR. GORDON:
5    Q.   So is the answer no?
6    A.   I don't know.  The answer is I don't
7    know.
8    Q.   All right.  You will agree ASTM F-1166
9    does not mention whether the .6 is static or
10   dynamic coefficient of friction; correct?
11   A.   It talks about coefficient of
12   friction, yes.
13   Q.   It doesn't specifically state whether
14   it's static coefficient of friction or dynamic
15   coefficient of friction; right?
16   A.   Correct.  The standard just refers to
17   COF, coefficient of friction, as defined in the
18   standard.
19   Q.   Right.
20        And there's a difference between the
21   two; correct?
22   A.   That is correct, yes.
23   Q.   And F-1166 does not provide for a
24   testing protocol; correct?
25   A.   That's correct.  It only is a

75

1    performance based spec.
2        MR. GORDON:  Okay.
3        Want to take a two-minute break?
4        THE WITNESS:  We can continue.
5        (Thereupon, a brief recess was
6        taken @ 1:35 p.m.)
7        (Proceedings were resumed @
8        1:43 p.m.)
9    BY MR. GORDON:
10   Q.   Dr. De Caso, is this the retainer
11   agreement, just so we can get that marked?
12   A.   That's correct.
13   Q.   All right.  We can mark this as
14   Exhibit 2.
15        You are familiar with what ANSI
16   standards are; correct?
17   A.   Not all of them, but I understand.
18   I'm familiar with the organization that provides
19   those standards, yes.
20   Q.   American National Standards Institute.
21   Are you familiar with that organization?
22   A.   I'm familiar with them, yes.
23   Q.   It's similar to ASTM; correct?
24   A.   That's correct.
25   Q.   Are you familiar with ANSI standard

76

1    A326.3-2017, which was released January 2018?
2    A.   That number, from the top of my head,
3    I'm afraid I wouldn't be able to recall.  But I
4    think I will soon find out.
5        (Exhibit 6 was marked for
6        identification purposes.)
7    BY MR. GORDON:
8    Q.   Well, it's entitled, "American
9    National Standard Test Method for Measuring Dynamic
10   Coefficient of Friction Hard Surface Flooring
11   Materials."
12   A.   Probably use the BOT, the binary
13   output tribometer, I'm assuming.
14   Q.   I'll show you a copy of it.
15        Are you familiar with this ANSI
16   standard?
17   A.   I'm familiar with this standard, yes.
18   Q.   You are?
19   A.   I'm familiar.  I'm not going to be
20   able to recite it, if that's what you're going to
21   ask.  But I am familiar with it, yes.
22   Q.   That ANSI standard specifically
23   discusses the test method for measuring the slip
24   resistance of hard surface flooring materials,
25   which include tile; correct?

77

1      A.   Like using a BOT for short and using,
2  if I recall correctly, SLS substance instead of
3  water.
4      Q.   Okay.  In any event, this ANSI
5  standard deals with testing slip resistance for
6  hard tile; correct?
7      A.   Yes.
8      Q.   And this standard requires the use of
9  the BOT-3000 machine; correct?
10     A.   Correct.  The BOT.
11     Q.   You did not use the BOT machine;
12 correct?
13     A.   That's correct.
14          As we discussed previously, the
15 English XL was the only device used to measure the
16 properties of the floor surface.
17     Q.   Why did you not use the BOT-3000 in
18 addition to the English XL during your testing in
19 this case?
20     A.   As I mentioned previously, the
21 English XL best mimics the biomechanics of the heel
22 striking the surface and therefore provides for
23 this case, a human slip case, a methodology in
24 which to determine the characteristics of the
25 floor.

79

1      A.   Not any particular that I can think of
2  but...
3          It's a very generic question.  If you
4  could maybe be more explicit, I'd appreciate it.
5      Q.   Well, you've already testified there's
6  more than just the English XL in terms of equipment
7  that can measure slip resistance; is that correct?
8      A.   That's correct.
9      Q.   And the BOT-3000 is another type of
10 device; correct?
11     A.   That's correct.
12     Q.   So you never used anything but the
13 English XL; correct?
14     A.   For the case.  I have used a BOT in
15 the past, yes.
16     Q.   Okay.
17     A.   Depending on the case and depending on
18 the circumstances, one device might be better than
19 the other.
20     Q.   So what, in your opinion, would be a
21 circumstance where the BOT-3000 would be better to
22 be used?
23     A.   For quality control purposes, if you
24 want to assess and monitor a surface and how that
25 surface changes with time or -- especially after

78

1      Q.   But does the ANSI standard require the
2  use of the BOT and not the English XL; correct?
3      A.   This specific standard, Exhibit 6,
4  talks about the dynamic coefficient of friction for
5  hard floor materials and it does reference the BOT,
6  which is a different device and therefore computes
7  differently the COF.
8      Q.   It also requires the use of a certain
9  solution when you do the testing with the BOT-3000;
10 correct?
11     A.   That is not water; correct.  It's kind
12 of like a soapy material.
13     Q.   Which you didn't do in your testing.
14     A.   Not in my testing.  But I previously
15 used this equipment, so I'm very familiar with the
16 process.
17     Q.   Just to be clear, you just used tap
18 water with nothing in it?
19     A.   That's correct.
20     Q.   Do you own a BOT-3000?
21     A.   I do not.
22     Q.   Is there a reason why you did not --
23 strike that.
24          Is there any reason why you don't own
25 a BOT-3000?

80

1  applying a condition in order to it might change
2  the characteristics of that floor, it's a good
3  monitoring tool in order to explicitly address the
4  properties of that tile before and after.
5      Q.   You would agree that walking is a
6  dynamic event; correct?
7      A.   In terms of the definition for dynamic
8  coefficient of friction, walking can be classified
9  as a dynamic event when you strike a heel with a
10 floor.  That would be correct.
11     Q.   You strike a heel on the floor when
12 you walk; correct?
13     A.   That's correct.
14     Q.   That's what Ms. Kessler was doing;
15 correct?
16     A.   That would -- so there are nuisance.
17 We can get technical.  There is a nuisance.  So
18 let's get technical.  So that coefficient of
19 friction -- just starting with a basic definition
20 of that -- is the ratio between horizontal force
21 and a vertical force.  And that's the generic
22 definition.
23          So the ASTM that you've been
24 mentioning before, F-116, talks about the ratio of
25 those forces.  And those forces are static,

81

1 meaning, let's assume you've got this cup of coffee
2 on the table and it's sitting on the coffee {sic},
3 the static coefficient of friction will be the
4 force that would require the cup to start
5 displacing and moving itself after applying, in
6 this case, a horizontal force.
7          Dynamic coefficient of friction, on
8 the other hand, is, that as I -- this cup is
9 approaching from my hand that I'm grabbing and I'm
10 placing it as it moving on the table, it starts
11 already with a movement, and it would be the force
12 of that moving object striking parallel to the
13 other surface.  And that's very important because
14 coefficient of friction basically is a force
15 perpendicular to the other.
16          And the BOT in this case, a heel
17 doesn't really strike perpendicular to it, you have
18 a rotational motion, and therefore there's a
19 nuisance of definition.  So it's not really when
20 you walk a dynamic per se, because you're not
21 striking perfectly parallel to the surface.
22      Q.   Well --
23      A.   I hope that helps.
24      Q.   -- in any event, you've already agreed
25 that the ASTM F-1166 does not make a distinction

82

1 between static or dynamic coefficient of friction.
2      A.   That's correct.
3      Q.   Okay.
4      A.   It's the ratio of those forces.
5      Q.   Okay.
6      A.   In any case, it wouldn't matter if
7 it's static or dynamic.  The whole point is that
8 any type of striking between two surfaces should be
9 .6.
10          When you read the ASTM -- I don't know
11 if you had a chance to read it in detail -- that's
12 why you don't need to discriminate between forces
13 because you to make sure that it's always above .6.
14      Q.   But it doesn't state whether it should
15 be testing static coefficient of friction or
16 dynamic coefficient of friction; correct?
17      A.   Again, it says that the coefficient of
18 friction shall be .6 or greater when measured wet.
19      Q.   It doesn't say specifically if it's
20 static coefficient of friction or dynamic
21 coefficient of friction.
22          MR. GERSON:  Object to the form.
23          Asked and answered three times now.
24 BY MR. GORDON:
25      Q.   Correct?

83

1      A.   Correct.  It says that any type of
2 coefficient of friction.  In other words, the ratio
3 between those forces I was trying to explain
4 before.  And given that I'm the expert, maybe I can
5 provide clarification on that on how standards are
6 written.
7          If you needed a specific type of
8 coefficient of friction, then it would explicitly
9 state if it's static or dynamic.  That's not the
10 case.  So therefore any type of coefficient of
11 friction shall be greater than .6.
12      Q.   Did you write the standard F-1666?
13      A.   No.  But I'm subscribed to the
14 committee, and I do listen and hear a lot of the
15 technical conversations that go on this
16 peer-reviewed committees.
17      Q.   You did not write the standard;
18 correct?
19      A.   No.  The standard is a peer-reviewed
20 process that requires a collaborative approach.
21 Many people partake in the process.  Also there's
22 public comment where you can provide opinions about
23 the writing for that.
24      Q.   Did you provide public comments?
25      A.   No, since it was published some time

84

1 ago.
2      Q.   You were referencing earlier about R11
3 tile, the rating of the tile.
4      A.   I did, yes.
5      Q.   I believe you were saying that this
6 specific tile in the spa is R11?
7      A.   That's what was provided based on the
8 case documentation, yes.
9      Q.   And you state in your report, "An R11
10 value" -- I'm reading on page 18 -- "An R11 value
11 is known to be suitable for transitional areas that
12 can occasionally become wet."
13          Correct?
14      A.   That's correct.
15      Q.   You mentioned there's an R12?  What
16 was the other tile you referenced?
17      A.   I didn't mention any other tile.  I
18 mentioned the specifications R12 and R13, which are
19 those subsequent to R11 based on the DIN standard.
20      Q.   I'm sorry.  Say that again.
21      A.   It's in the report.  I'll go ahead and
22 pull it out so we're all on the same page.
23      Q.   Sure.
24      A.   I mentioned that R11 is the
25 specification provided by the tile.  And that same

85

1  specification standard, R12 and R13, is the
2  specification for tiles for wet or very wet
3  surfaces.
4        Q.   Just so I understand, R11 is the tile
5  specification for this specific tile in the spa;
6  correct?
7        A.   Correct.
8        Q.   And is there another specification
9  called R12 and R13?
10       A.   That's within the same spec, meaning
11  the DIN standard.
12            You have different types of ratings.
13  R for rating.  The rating for this tile is R11.
14  There are other ratings, 12 and 13.
15       Q.   Okay.  I'm just trying to understand
16  what you're saying.  That's all.
17       A.   I hope I'm clarifying that.
18       Q.   I think so.
19            So is it your testimony that you
20  believe that there should have been an R12 or R13
21  specification tile instead of R11?
22       A.   Right.
23            Based on the DIN -- and I'm trying to
24  pull the report open.  One second.  The -- R12 is
25  for wet or very wet surfaces.  Since you have the

86

1  paper document, let me jump directly to that
2  section.
3            This is Exhibit 3.  It's the report
4  that I issued.
5            If I remember correctly, on page 18,
6  in the Section 4.2, surface evaluation.  "Surfaces
7  specified with a higher R value will" --
8        Q.   Sorry.  Where you reading from?
9        A.   Yes.
10            Section 4.2.  And jumping directly to
11  4.2.3.  And I'm going to provide you two sections.
12  So maybe I'll start with the previous one, 4.2.2.
13            "R11 value is known to be suitable for
14  transitional areas that can occasionally become
15  wet," as you just stated.
16       Q.   And that's the tile that was in place.
17       A.   That's correct.
18            In comparison, as I read from the
19  report, "R values R12 and R13 are suitable for wet
20  and very wet areas, respectively."
21       Q.   That's coming from where?
22       A.   From the DIN standard, which was used
23  to classify the tile that was placed in the spa at
24  the Norwegian BREAKAWAY.
25       Q.   So if I understand what you're saying,

87

1  R12 and R13 are suitable for wet and very wet
2  areas.
3        A.   R12 for wet and R13 for very wet.
4        Q.   And what's considered wet or very wet?
5        A.   Right.  That's where an expert might
6  come in.  And if you consult the DIN definitions,
7  spa areas and pool areas lie within the R12 and R13
8  ratings.
9        Q.   Where specifically are you getting any
10  support that the tile in the Mandara Spa should
11  have been either rated R12 or R13?
12            MR. GERSON:  Object to the form.
13            THE WITNESS:  Based on the definitions
14       that DIN provides for the different
15       ratings, and the description and the
16       definition for those ratings, a spa area
17       would not classify under an R11 tile
18       rating.  It would be more suitable for an
19       R12 or R13.
20  BY MR. GORDON:
21       Q.   Can you show me what you're referring
22  to?
23       A.   The DIN, the 511 standard.
24       Q.   Do you have it in front of you?
25       A.   I don't.  I don't have it.  It's the

88

1  51130 is the testing of coverings and within that
2  gives you the definitions for the different
3  ratings.
4        Q.   What I'm trying to find out is what's
5  the definition for wet or very wet, as you state in
6  page 18 of your report.
7        A.   For wet and very wet, it is derived
8  from the DIN, as I just mentioned.  And if you read
9  those, it gives you examples.  It's a lot of
10  literature that might give you what an R11 is and
11  can be provided if it makes any use.
12       Q.   I'm asking if you know right now, as
13  we sit here.
14       A.   Again, I can't quote a -- I can quote
15  a specific test standard has definitions for those
16  different R values.
17       Q.   Okay.
18       A.   And the test standard itself provides
19  additional references that will explicitly state
20  what classifies as a wet or very wet or
21  transitional areas.
22       Q.   And you're saying that these are
23  copyrighted or something?
24       A.   So the document that I have is for my
25  personal use and I cannot distribute it.  Those are

89

1    the conditions for which that standard is done.
2          Since you have the reference, you can
3    go to the DIN website and download it.
4          Q.   In any event, as you sit here today,
5    can you tell me how wet or very wet is specifically
6    defined?
7          A.   It's defined as an R12 and R13 rating.
8          Q.   I got that.
9          But what do they mean by wet or very
10   wet, as opposed to occasionally can become wet?
11         A.   So I don't have it in front me, as I
12   said.  But if I were to reproduce the DIN standard
13   and the references that it contains and -- it's a
14   matter of definition.
15         Q.   Exactly.  I'm trying to find out what
16   those definitions are.
17         A.   You shall find them in the standard,
18   if you look at them.
19         Q.   I'm asking you now as the expert for
20   the plaintiff.
21         A.   Right.
22         So if I'm answering you, wet surface
23   can be a spa area, as example, in the Norwegian
24   BREAKAWAY can be considered as an R12.  Pool areas
25   are considered R13.  Showers are considered R13.

90

1    Bathtubs are conditions R13.
2          So you have an example list of
3    explicit areas.  Lobbies, for instance, depending
4    if they're covered or not covered, can also be
5    considered R12 or R13.  So there's different
6    definitions.
7          When you look at those definitions and
8    you compare them with the spa area that you have,
9    and I was able to physically inspect and be there,
10   that would lie either as a R12 at minimum or most
11   likely an R13.
12         Q.   Are you saying that this tile rating
13   has a specific coefficient of friction requirement?
14         A.   I'm saying that this is an R11 tile.
15         Q.   I got that part.
16         But is there anything from the DIN
17   standard that discusses what the acceptable slip
18   resistance should be for the R11, R12, or R13 tile?
19         A.   There's different ranges of
20   coefficient of friction for the different tiles.
21         Q.   What are they?
22         A.   Again, I can't recall the table from
23   the top of my head.
24         Q.   So you don't know, as you sit here?
25         A.   I can't recall the -- I can't read the

91

1    standards since I don't have it in front of me, the
2    table of specific ranges that those tiles lie on.
3          Q.   Okay.  Here, before I forget, I have
4    printed a better copy of Exhibit 5.  I would like
5    to mark it as Exhibit 5A.
6          (Exhibit 5A was marked for
7          identification purposes.)
8    BY MR. GORDON:
9          Q.   I'm showing you, Dr. De Caso, 5A.
10   Does that look like a better copy of the
11   photograph?
12         A.   It seems a little smaller, but that's
13   okay.  Yes.
14         Q.   Do you see any water on the floor in
15   5A in the area where Ms. Kessler fell?
16         A.   As part of the review of the CCTV,
17   when looking at it, you can see that there's a
18   contrast in the area where she's stepping and
19   slipping.  We're talking about this before.  I
20   didn't sub to any individual -- sub the work,
21   subcontract the work.
22         But you can see, there's an area of
23   contrast.  And, in fact, you can even see how the
24   grout line between the tiles changes contrast, and
25   it could be inferred that that's a wet area.

92

1    Again, with a degree of -- not with a high degree
2    of certainty, as I mentioned before.
3          Q.   You're just assuming it could be
4    water; correct?
5          A.   Well, after having inspected and
6    making wet the area, and also seeing the change of
7    color grout when it becomes wet and seeing the
8    water coming down the grout line, it is possible
9    that it could be wet from the CCTV footage.
10         Q.   Can you positively state with
11   certainty that there was any water that you
12   observed in the area where Ms. Kessler fell on the
13   CCTV?
14         MR. GERSON:  Object to the form.
15         THE WITNESS:  Based on -- based on the
16   CCTV, prior Exhibit 5A, and having seen
17   crew squeegeeing the surface, I'm assuming
18   they were squeegeeing it because it had
19   water on that area.  And placing it at the
20   location where she slipped, it is possible
21   to infer that there could have been water,
22   with a low degree of certainty.
23         MR. GORDON:  Move to strike the
24   answer.
25                    ///

93

1    BY MR. GORDON:
2        Q.   I'm not asking you to infer.  I'm
3    asking you, do know for a fact that you saw water
4    on the floor in the CCTV in the area where
5    Ms. Kessler fell?
6            MR. GERSON:  Object to the form.
7            THE WITNESS:  It's not possible to
8        tell that --
9    BY MR. GORDON:
10       Q.   Okay.
11       A.   -- if it's 100 percent water in that
12   location.
13       Q.   Let's do this.  What are we on now?
14           (Exhibit 7 was marked for
15           identification purposes.)
16   BY MR. GORDON:
17       Q.   Dr. De Caso, what I'm doing now is I'm
18   marking the photographs that were contained in the
19   link that was provided by Mr. Gerson's office.
20           Can you just confirm for me that these
21   contain all the photographs you took during your
22   inspection, please.
23       A.   I would assume that all the pictures
24   are contained within here.  Yes.  It looks about
25   right.

94

1        Q.   I'm sorry?
2        A.   It looks about right.
3        Q.   Okay.  Thank you.
4            On page 12 of your report, you make
5    reference to drainage slope?
6        A.   Drainage slope.
7        Q.   Page 12, 3.25.
8        A.   Yeah.
9        Q.   Are you with me?
10       A.   I'm with you.
11       Q.   What were you referring to as part of
12   your report?
13       A.   I'm referring to that same section in
14   figure 12 of the report.  And just as we were
15   discussing before, Exhibit 5A, about is there water
16   or not on that surface and how I was comparing the
17   CCTV with the actual inspection and the contrast
18   changes of the floor surface, as well as the grout
19   line, and how the water slopes down.  Down, because
20   it has to go down because gravity pulls it down.
21           So even though it may not feel like
22   there's a slope on that floor surface, in fact,
23   there was, as the water was sloping away from the
24   drainage and the tested area.  And you can see also
25   the contrast change of the grout line.

95

1        So when I refer in Section 3.25 of the
2    report, surface drainage slope refers to how the
3    surface drains itself due to the natural slope.
4        Q.   Okay.  And it says, "To this end,
5    water was deposited at location number 10 and 11."
6            Is this something different than when
7    you did your slip resistance testing?
8        A.   That would be the water that was
9    deposited there for what is being for the picture
10   shown.  And then there was other additional water
11   deposited to test the drain.
12       Q.   Right.
13           So is this referring to the part of
14   the inspection where you tested the drains or when
15   you tested -- in the slip resistance tested?
16       A.   In this explicit case, the water
17   deposited was the water deposited during the test.
18       Q.   The slip resistance testing?
19       A.   That's correct.
20       Q.   Okay.
21       A.   Yeah.  We're on the same page.
22       Q.   When you did the slip resistance
23   testing, how much water did you put on the surface?
24       A.   I think it's about a seven-ounce
25   bottle, if I remember correctly.  So that would

96

1    probably be half of that.  So three and a half
2    ounces.
3        Q.   You put three and a half ounces of tap
4    water in the location?
5        A.   Give or take.
6        Q.   Is that consistent with all the test
7    locations?
8        A.   More or less, yes.  There was only --
9    since the same tests were performed.  However, as
10   you do different tests, if you don't reach, you
11   know, the strike-off at the given time, maybe it
12   would have been more water deposited so.  So the
13   amount of water might vary specifically from test
14   to test.
15           Again, the intent of Figure 12 and the
16   comment -- the intent of Section 3.25, and to
17   answer your question, that paragraph explicitly
18   tries to evaluate where the water would flow from
19   that position onwards.
20           And it was possible to tell, as it can
21   been seen in Figure 12, that it was flowing away
22   from the drain and away across the spa entrance.
23       Q.   Did you measure the area from the door
24   that enters into the thermal spa area until the
25   location where Ms. Kessler fell?

97

1    A.   The door entry that's located -- if
2  you're looking at picture 12 towards the right-hand
3  side at the end of the corridor?
4    Q.   Picture 12?
5    A.   Figure 12.  In that direction.
6    Q.   Well, I don't see it in the
7  photograph.
8    A.   No.  It's not in the picture.  But the
9  direction of the picture is the door that we
10  entered into the spa.
11    Q.   You know what I'm talking about.  You
12  enter from the locker room area --
13    A.   Yes.
14    Q.   -- there's a door.  Then you go from
15  the door to get to the area where Ms Kessler fell.
16       All right.  Just let me just finish
17  the question, and then you can answer.
18    A.   Of course.
19    Q.   You know what I'm referring to;
20  correct?
21    A.   I'm just making sure we're talking
22  about the same door, yes.
23    Q.   Yeah.  There's a door where you open
24  up and leads into the thermal area of the spa;
25  correct?

98

1    A.   If you don't open it, you would bang
2  onto the door.  That's correct.
3    Q.   Okay.  Did you measure from the
4  entryway of that door up until the point where
5  Ms. Kessler fell?
6    A.   The distance between the door and that
7  point?  I did not measure that distance.
8    Q.   Looking on page 16 of your report, on
9  your 4.1.2.  And when you're there, let me know.
10    A.   4.1.2.
11    Q.   Yes.
12    A.   Right there.
13    Q.   Okay.  You say, "Most likely, cleaning
14  and disinfecting activity took place prior to the
15  inspection, as part of routine maintenance
16  necessary to insure public health."
17       Do you see that?
18    A.   Yes.
19    Q.   Do you know for a fact whether any
20  cleaning or disinfecting activities took place
21  right prior to you inspecting the spa?
22    A.   So based on the microscopic evaluation
23  of the tile, it's possible to infer that it was
24  disinfected since there's no typical deposits of
25  dirt and contaminants that you would see when

99

1  you -- when the surface is being used.
2    Q.   Okay.  Do you know for a fact when the
3  tile surface you tested was last cleaned?
4    A.   Based on deposition statement, they do
5  it routinely.  So I would assume -- I don't know
6  for a fact.
7    Q.   That's what I'm asking.
8    A.   I don't know for a fact.
9    Q.   What was the purpose of you doing a
10  microscopic inspection of the tile?
11    A.   To look at the surface porosity, the
12  conditions, imperfections, wear, tear,
13  contaminants, et cetera, et cetera.
14    Q.   Was there wear and tear?
15    A.   Not to -- define wear and tear.
16    Q.   I'm trying to find out why you did the
17  microscopic -- what did you call it?
18    A.   Microscopic imaging.
19    Q.   Why did you do it and what were your
20  findings?  How they relate to your opinions in this
21  case?
22    A.   Why do I do it?  It's a good practice
23  and it's a good visual evaluation of any floor
24  surface.
25       What I was able to find from this is

100

1  that there's a relative smoothness to the tile.  So
2  the surface deformations that there are are
3  relatively smooth.  The surface deformations that
4  can be seen, as you're looking down on to the tile,
5  are relatively smooth.
6       There was a small level of surface
7  porosity, which you can see in the kind of little
8  dots of the Figure 11 in the report.  And it was
9  relatively homogeneous, again, from a surface point
10  of view.
11       If you had areas with more or less --
12  so if it was less homogeneous from a contaminant
13  point of view, it would show lack of cleaning or
14  maintenance.  That was not the case.  It was quite
15  homogeneous, from the evaluation.
16    Q.   It looked like it was well-maintained
17  tile?
18    A.   It looked like it was cleaned, yes.
19    Q.   And did you observe this with your own
20  eyes or with some sort of instrument?
21    A.   This was using a USB microscope and
22  with a magnification of 50, whatever it was.
23    Q.   Have you done any testing of this type
24  of tile outside of the BREAKAWAY?
25    A.   I have not, no.

101

1    Q.   Have you ever tested this specific
2  type of tile in the past, other than this tile?
3    A.   I'm not aware of other tiles that I
4  have tested that are from the same manufacturer.
5  I'm not sure.
6    Q.   R11 tile has -- strike that.
7         You make reference on page 18 of
8  4.2.4.  "Those in control of the vessel and spa
9  should have been aware of the inadequate and
10 deficient selected type of tile, and thus failed to
11 use a safe floor surface for an area that is known
12 to be wet or very wet."
13        Do you see that?
14   A.   I see that.
15   Q.   What's the basis for that statement?
16   A.   Well, the basis is that it's part of
17 the case documentation.  The tile is classified as
18 an R11 tile.  And for the application that it was
19 applied to, the spa, an R12 or R11 would have been
20 the proper tile to be -- the proper rating for the
21 tile to be installed.
22   Q.   That's your opinion; correct?
23   A.   It is the opinion of the DIN, the
24 Deutsch institute that provides those reports as
25 well, yes.

102

1    Q.   And is there any evidence in this case
2  that anyone from Norwegian was aware that this
3  report -- this tile was purportedly the incorrect
4  rated tile?
5         MR. GERSON:  Object to the form.
6         THE WITNESS:  Obviously, they didn't
7    know, otherwise they would have changed it.
8    But so when you procure a boat, you
9    know, you specify all the different things,
10   engines, interior color, finishes, et
11   cetera.  And, you know, part of that, I'm
12   sure, maybe the interior designer or the
13   architect might have specified that.
14   Ultimately, you know, you buy something
15   with your specs, and you would want to make
16   sure your specs are met.
17 BY MR. GORDON:
18   Q.   You don't know who selected the tile;
19 correct?
20   A.   As we said before, I don't know who
21 selected the tile.  But ultimately Norwegian buys
22 the boat, not from the manufacturer, from the
23 vessel, and they specify what they want.
24   Q.   But you don't know in this case with
25 respect to this ship who selected that specific

103

1  tile for the Mandara Spa; correct?
2    A.   That's why I refer as to those in
3  control of the vessel and the spa.
4    Q.   You don't know who specifically
5  selected the tile in the Mandara Spa; correct?
6    A.   I don't.
7         MR. GERSON:  Objection.  Asked and
8    answered three times.
9  BY MR. GORDON:
10   Q.   Correct?
11   A.   Correct.  I don't.  And that's why I
12 referred to a third term based, those in control of
13 the vessel and the spa.  If I knew who it was,
14 maybe I would have included it in the report.
15   Q.   Do you have a copy of the SOLAS
16 Chapter 2-2, Part D, Regulation 13?
17   A.   Can you say that again?
18   Q.   I was just reading off your report.
19 Under 4.2.7, you made reference to SOLAS.
20   A.   4.2 point?
21   Q.   You make reference to SOLAS
22 Chapter 2-2, Part D?
23   A.   Yes.
24   Q.   Do you have a copy of that with you?
25   A.   It's probably provided in the

104

1  documents or --
2    Q.   I didn't see it but --
3    A.   It's a public document.  If you Google
4  it, you will be able to.
5    Q.   What's your opinion in this regard?
6    A.   As stated in the report, the means of
7  egress, which the entrance to the spa area was one,
8  since in order to exit in case of an emergency you
9  have to walk through there, that spa corridor does
10 not meet the International Convention for the
11 Safety of Life at Sea, SOLAS, in which it states
12 that floor surfaces must be slip-free under foot.
13 And it's indicated explicitly on that section.
14   Q.   Is there anything in that SOLAS
15 chapter you cite which references specific
16 coefficient of friction measurements?
17   A.   It refers to a slip-free under foot.
18 And there's a definition given by it.
19   Q.   What's the definition?
20   A.   That it shall be slip-free under foot.
21 There's a section for definitions in the earlier
22 part that I don't have with me.  So I cannot quote
23 verbatim what that definition is.
24   Q.   But does it make specific reference to
25 a slip resistance number, a minimum?

105

1    A.   Not to my recollection.
2    Q.   Okay.  And the word "slip-free," is
3  there any specific definition for that at all?
4    A.   There's a definition within the --
5  within the SOLAS.  Again, I don't have that with
6  me.
7    Q.   All right.  We're on page 19, if you
8  want to follow with me.
9    A.   Yeah.
10   Q.   4.2.8.  You start making reference to
11  floor surface drainage.
12   A.   Yes.
13   Q.   You state, "When evaluating the floor
14  surface, water remained stagnant and when it
15  drained it did so away from the drainage points."
16   A.   That's correct.
17   Q.   Then you make reference to, "An
18  accumulation of water at the slip-and-fall location
19  of Ms. Kessler did not drain from this location
20  when deposited by crew."
21       Correct?
22   A.   That's correct.
23   Q.   What are you referring to specifically
24  there?
25   A.   I'm referring to the CCTV footage that

106

1  was provided by the -- I'll get the name right --
2  the Tellez transcript, deposition transcript, that
3  you can see a crew member squeegeeing the floor and
4  depositing the water that was squeegeed in that
5  area.
6    Q.   Okay.  First of all, Tung Tellez is a
7  security officer; correct?
8    A.   He is.  I'm referring to the exhibit
9  that was provided in that depo.
10   Q.   Okay.  You'll agree Tung Tellez wasn't
11  responsible for maintaining the floor in the spa on
12  the day of Ms. Kessler's incident; correct?
13   A.   I would agree with that.  I think I'm
14  not making any reference to that.  I'm only making
15  reference to the exhibit that I happened to have
16  open, which has also been provided in other
17  deposition transcripts, on the still images from
18  the CCTV that show the crew member squeegeeing the
19  floor and depositing it, whatever surface floor
20  water he was squeegeeing in that area.
21   Q.   In what area?
22   A.   In the area where Ms. Kessler slipped
23  and fell.
24   Q.   Okay.  So your testimony is that a
25  crew member squeegeed water in the area when

107

1  Ms. Kessler fell?
2    A.   So based on the CCTV image, as a
3  squeegeed area, and that was the area where water
4  was deposited during the inspection, that water
5  during the inspection remained stagnant.
6    Q.   I want to first get to the point that
7  supports your opinion that somebody pushed water in
8  the area where Ms. Kessler fell before she fell.
9  What's that based on?
10   A.   Based on the CCTV images reviewed as
11  part of the case.
12   Q.   And you reviewed the actual crew
13  member depicted in the CCTV with the squeegee;
14  correct?
15   A.   That's correct, yes.
16   Q.   And he testified he did not squeeze
17  water in the area where Ms. Kessler fell; correct?
18       MR. GERSON:  Object to the form.
19       THE WITNESS:  That's what he
20       testified, I assume, yes.
21  BY MR. GORDON:
22   Q.   Well, it's not what you assume.
23  That's what he testified to.  Right?
24       MR. GERSON:  Object to the form.
25       THE WITNESS:  Again, I don't have --

108

1  we need to open it, but yes.
2  BY MR. GORDON:
3    Q.   So you're just assuming based on your
4  observation of a video that someone pushed water on
5  the floor?
6    A.   So there was a CCTV image that
7  depicted the fall.  And prior to the fall and even
8  several minutes before the fall, you can see the
9  same crew member kind of squeegeeing the floor
10  backwards and forwards as other guests are using
11  the facilities, tracking water around.  You can
12  clearly see that they are wet.
13       And then he appears to come under
14  where the video position camera is and kind of
15  curving around with the squeegee and stopping,
16  holding the towel in his hand.
17   Q.   Is it your testimony that you can see
18  a crew member pushing water with a squeegee in the
19  area where Ms. Kessler fell?
20   A.   I can see the crew member squeegeeing
21  the floor and stopping at the area -- I'm answering
22  your question so --
23   Q.   Okay.
24   A.   -- what I'm alluding to is, I can see
25  the crew member squeegeeing the surface.  And since

109

1  the same crew member testified that he only
2  squeegees areas where there's water, it can be
3  inferred that there was water while he was
4  squeegeeing that area -- let me finish.  Thank you.
5      Q.  Go ahead.  I'm not going to yell.
6      A.  And therefore he placed that water
7  over there.  Thank you.
8      Q.  My question is, did you see actual
9  water being squeegeed by the crew member on the
10  video?  Not whether he's using a squeegee, whether
11  he's actually squeegeeing water that you observed
12  on the CCTV.
13      A.  I was not there at the time of
14  incident; so it's not possible to see.
15      Q.  Right.
16          You testified you reviewed CCTV;
17  correct?
18      A.  That's correct.
19      Q.  Did you see on the CCTV a crew member
20  actually push water on the video in the area where
21  Ms. Kessler fell?
22      A.  Based on the testimony provided by the
23  crew member saying that he squeegees water in order
24  to dry the surface when it's wet, then it can be
25  inferred that, as he was conducting his job, he was

110

1  squeegeeing the surface -- which should have had
2  water, that's what he testified -- finalizing and
3  stopping in the area where Ms. Kessler fell.
4          MR. GORDON:  Move to strike the
5      answer.  I'll ask it again.
6  BY MR. GORDON:
7      Q.  Did you personally observe with your
8  own eyes on the CCTV that you viewed a crew member
9  push water in the area where Ms. Kessler fell
10  before the incident?
11          MR. GERSON:  Objection.  Asked and
12      answered three or four times.
13          I'm going to let him answer one more
14      time.  Then we're going to stop this.
15  BY MR. GORDON:
16      Q.  Go ahead.
17      A.  Again, I see a member that is
18  squeegeeing the surface.  And based on the
19  deposition transcript, that member only squeegees
20  the surface when it's wet.  So it can be inferred
21  that he's squeegeeing water to that location.
22      Q.  You're inferring it, but you didn't
23  actual see with your own eyes; correct?
24      A.  As I said --
25          MR. GERSON:  Object to the form.  It

111

1  shows what it shows.
2          MR. GORDON:  It does.  It shows no
3  water.
4          MR. GERSON:  Whatever it shows, it
5  shows.
6          What are you arguing with him for?
7          MR. GORDON:  I'm not arguing.  I want
8  him to answer the question because --
9          MR. GERSON:  He just answered it four
10  times.
11          MR. GORDON:  He hasn't answered it.
12  BY MR. GORDON:
13      Q.  Ask it again.  Okay?  It's very
14  simple.
15          Did you personally see on the video a
16  crew member squeegee water on the video before
17  Ms. Kessler fell in that same area?
18      A.  Can I answer?
19      Q.  You haven't answer it yet, but go
20  ahead.
21          MR. GERSON:  Object.  Move to strike
22      counsel's characterization.  He's answered
23      it four times already.
24          THE WITNESS:  What can be seen, that I
25      personally saw with my own eyes, both of

112

1  them, the CCTV footage, that the crew
2  member is performing his duties, which as
3  he testifies in the deposition is to
4  squeegee the floor when wet.  And he can
5  been seen going backwards, forwards,
6  squeegeeing the floor several times, and
7  then squeegees the floor towards that area,
8  stopping at the location where Ms. Kessler
9  fell.
10  BY MR. GORDON:
11      Q.  Okay.  Did you see water on the floor
12  in the video?
13      A.  Based on the review of Exhibit 5A and
14  5, as mentioned before, and comparing to what was
15  undertaken during the inspection, and understanding
16  the difference in contrast with the tile, with a
17  low degree of certainty, it might be possible to
18  state that there's water at that location.
19      Q.  And you're just assuming that there
20  might be water there; correct?
21      A.  Again, based on the evidence and the
22  transcripts that I reviewed, yes.  Unfortunately, I
23  wasn't there at the time of the incident to see it
24  with my two eyes.
25      Q.  You didn't see it with your own two

113

1  eyes on the video you were provided; correct?
2          MR. GERSON:  Object to the form.
3          Asked and answered five times now or
4          perhaps more.
5          THE WITNESS:  As I said, I saw -- in
6          fact, you could even tell that the angle of
7          the crew member with -- you know, at a
8          certain point is showing your back.  So
9          tracking the water along.
10         So unless I have X-ray vision to be
11         able to see through him, it would be -- I'm
12         saying, as he's turning around.  Right?
13         So -- so it would be difficult.
14 BY MR. GORDON:
15     Q.  Difficult for what?
16     A.  To see him tracking that water as he's
17 turning around in front of the camera,
18 squeegeeing --
19     Q.  So you didn't actually see the water.
20     A.  As I said, I see the crew member
21 performing -- maybe this is the last time I will
22 answer -- his duties that he states he squeegees
23 wet floors.  And that's exactly what he's doing.
24     Q.  He also testified, Mr. Collantes said
25 he was not squeegeeing water in the area where

114

1  Ms. Kessler fell; correct?
2          MR. GERSON:  Object to the form.
3          THE WITNESS:  That's correct.
4  BY MR. GORDON:
5      Q.  Do you have the timestamp of this
6  video that you mentioned regarding this crew member
7  who you think was squeegeeing water?
8      A.  Yes, I do.
9      Q.  What is it?
10     A.  3:47:06.257 p.m.
11     Q.  You said 3:47?  I'm sorry.
12     A.  3:47:06.
13     Q.  Okay.  Thanks.
14         And in the CCTV that you were provided
15 and which you reviewed, did you also see other
16 people walking in the same location as Ms. Kessler
17 prior to Ms. Kessler's fall?
18     A.  I recall seeing other guests in this
19 case, yes.  And crew.
20     Q.  How many?
21     A.  I can't recall.  I don't have the
22 video in front of me.
23     Q.  It was more than three, correct?
24     A.  As I said, I don't have the video, so
25 I can't recall.

115

1      Q.  You only had four minutes of CCTV,
2  which you testified earlier; right?
3      A.  More or less, yes.
4      Q.  Okay.  So you really don't know how
5  many people walked through there within the last, I
6  don't know, ten minutes before Ms. Kessler;
7  correct?
8      A.  I can only attest to what was provided
9  to me.
10     Q.  In that four minutes, did you see any
11 other person slip and fall in the same area where
12 Ms. Kessler fell?
13     A.  Not possible to tell exactly the same
14 area where she fell, as we discussed before.  I
15 wouldn't know if they walked exactly in the same
16 location where she fell, those individuals that
17 walked through the area.
18     Q.  Sir, you refer to this area
19 corridor -- correct? -- in Exhibit 5 or 5A?
20     A.  Yes.
21     Q.  You saw other people walking in that
22 area before Ms. Kessler fell; correct?
23     A.  In the corridor, yes.
24     Q.  You call it a corridor; correct?
25     A.  Yeah.

116

1      Q.  Right?
2      A.  That's what we are calling it, yes.
3  That's what I refer to it in the report.
4      Q.  Did you see anybody else other than
5  Ms. Kessler slip and fall prior to her in the
6  immediate area?
7      A.  Based on the CCTV evidence that was
8  provided to me, I did not.
9      Q.  And your testimony about -- the
10 testimony that you had regarding observing a crew
11 member squeegeeing water from Tung Tellez's
12 deposition, I believe you said it was an exhibit?
13     A.  Right.  It was the exhibit that I had
14 open.  That same exhibit has been presented in
15 other depos, yeah.
16     Q.  Is that a video or still shot of the
17 video?
18     A.  It's a still shot of the video, as I
19 mentioned before.
20     Q.  Do you know what the exhibit number
21 is, by any chance?
22     A.  I think it's Exhibit 1.
23     Q.  All right.  Thanks.
24         You have a reference on page 19 of
25 your report regarding Ms. Kessler's gait.

117

1     A.   Yes.
2     Q.   Okay.  And your evaluation -- strike
3  that.
4          Your evaluation of Ms. Kessler's gait
5  was based on the video footage of her walking down
6  what you describe as the corridor?
7     A.   Yes.
8     Q.   Okay.  And you've never reviewed any
9  footage of Ms. Kessler's gait prior to that ever;
10 correct?
11    A.   That's correct.
12    Q.   You don't know what her gait was like
13 before she walked through that door into that CCTV
14 range; correct?
15    A.   Only what was available made to me,
16 yes.
17    Q.   And that was how many seconds?
18    A.   A couple of seconds.
19    Q.   How many?
20    A.   A couple of seconds.
21    Q.   It was under ten seconds?
22    A.   Probably, yes.  A couple tends to be
23 two.  So that would be less than ten.
24    Q.   Okay.  So the totality of your opinion
25 regarding Ms. Kessler's gait was based on those few

118

1  seconds of CCTV footage?
2     A.   So they can be clearly seen in figure
3  13 prior to her incident.
4     Q.   Okay.
5     A.   That's what I'm basing the gait in as
6  is referenced in the report.
7     Q.   You also state that you don't think
8  that the incident was based on her -- or her fall
9  was not based on her gait or her balance?
10    A.   Her balance; correct.
11    Q.   And you have not reviewed any of
12 Ms. Kessler's medical records; correct?
13    A.   That's correct.
14    Q.   Okay.  And therefore you would agree
15 that you don't know what her medical history was;
16 correct?
17    A.   Except for what she testified.
18         MR. GERSON:  This has all been covered
19    already.
20         Why are you doing this?
21 BY MR. GORDON:
22    Q.   Go ahead.
23    A.   Except for what she's testified, as we
24 reviewed before.
25    Q.   Okay.  And -- you don't know whether

119

1  Ms. Kessler had any issues with her gait as
2  described by a medical doctor; correct?
3     A.   Can you define "gait," please.
4     Q.   Well, it's in your report; correct?
5     A.   I know, but I want to make sure we
6  talk about the same thing.
7     Q.   What's your definition of "gait"?
8     A.   So in the case of the report, the gait
9  that I'm trying to compare is immediately before
10 and after the incident.
11         Maybe bring some background reference,
12 as it's stated, Oberg, et.al, and Lee Grimson, you
13 might have an inadequate or a strange gait.  Gait
14 being the sort of rhythm that a person walks.  And
15 as long as that rhythm is consistent, even for the
16 awkwardness that one may have of a nonregular gait
17 cycle, the intent here is to compare the gait
18 before and after.
19         So the gait cycle that was being
20 compared, it's not about any medical history, since
21 I don't have that one, or after the incident, it's
22 about the gait cycle, meaning that rhythm that she
23 has as she's walking prior to the incident.
24         And it is possible -- thank you for
25 letting me finish, appreciate it.  It was possible,

120

1  based on Figure 13, as we stated before, that that
2  cycle was stable and balanced.  And that's the
3  opinion that I'm making.
4     Q.   Based on the few seconds of video
5  footage?
6     A.   The cycle prior to the incident, yes.
7  Her gait cycle prior to her gait cycle after the
8  incident.
9     Q.   Which is based on the video.
10    A.   This is what we've been saying from
11 the beginning.  So we reiterate that Figure 13
12 talks about the CCTV provided, the few seconds
13 prior to her incident, and we're comparing the gait
14 cycle prior and after in order to determine the
15 onset of the slip and what might have caused it.
16    Q.   You would agree that you are not -- or
17 strike that.
18         You would agree that you do not know
19 what Ms. Kessler's medical condition was in terms
20 of her ability to walk; correct?
21         MR. GERSON:  Objection.  Asked and
22    answered over and over again.
23         Why are you doing this?
24 BY MR. GORDON:
25    Q.   Go ahead.

121

1    A.   Again, I'm comparing the gait cycle
2  before or after the incident.
3    Q.   You would agree that a medical
4  condition could affect someone's ability to walk;
5  correct?
6    A.   So even -- as I was trying to mention
7  when I asked about the definition -- even if your
8  gait cycle is altered in any way, it's altered or
9  changed in any way, the important thing -- again,
10  what I'm doing in the report is to compare before
11  and after.
12         So even though you might have an
13  awkward cycle, as I mentioned before, if that cycle
14  is steady, stable, and balanced, that's the purpose
15  of what was being done here.
16    Q.   Okay.
17    A.   Context matters.  That's what I'm
18  maybe trying to summarize.
19    Q.   It does.  And you would agree that
20  someone with a medical condition, that may affect
21  their ability to walk; correct?
22    A.   Depends on -- I mean, it's a very
23  broad statement.  But as long as that medical
24  condition results in a steady and stable gait,
25  that's still okay.  It shows a balance and steady

122

1  gait.
2         The point being that the analysis that
3  is provided in the report, Figure 13, Figure 14, is
4  the comparison of the gait cycle before and after
5  the incident.  I think I mentioned it a couple of
6  times before.
7    Q.   My question is, someone with a medical
8  condition, that could affect their ability to walk;
9  correct?
10    A.   I'm not a medical doctor, so I don't
11  know how to answer that question.  It depends on
12  the condition.  It depends on many things.  It's a
13  very broad statement.
14         Even somebody without a medical
15  condition can affect their ability to walk.  Okay?
16  The opposite is true.  I'm just trying to give you
17  some context.
18    Q.   You're the one who's providing
19  opinions on gait.  So I'm just asking questions.
20    A.   Right.  I understand.
21    Q.   So you would agree that someone with a
22  medical condition, that may make them more
23  susceptible to falling; correct?
24    A.   And the opposite would be true.  They
25  could have a medical condition and not be

123

1  susceptible.
2         Please define the medical condition
3  and be more explicit when asking the question.
4    Q.   As a general statement, you would
5  agree, sir, that a medical condition may make
6  someone more susceptible to falling; correct?
7    A.   Its depends.  That would be my answer.
8    Q.   Depends on what?
9    A.   On the medical condition.
10    Q.   Right.
11         And you're not a medical doctor;
12  correct?
13    A.   That's correct.
14    Q.   You didn't review the medical records?
15    A.   That's correct, as we stated before.
16    Q.   And to be clear, for an example, I
17  will show a medical record from Dr. Schwartz dated
18  January 12, 2017.
19         What are we on?
20    A.   Eight.
21         (Exhibit 8 was marked for
22         identification purposes.)
23         THE WITNESS:  This is number 8?
24  BY MR. GORDON:
25    Q.   Yes, sir.

124

1    A.   Thank you.
2         MR. GERSON:  I object to the form.
3  BY MR. GORDON:
4    Q.   Okay.  That's fine.
5         Sir, showing you Exhibit 8, you would
6  agree that according to this record from
7  Dr. Schwartz -- can I see it real quick?
8    A.   Sure.
9    Q.   It's January 12, 2017.  Ms. Kessler
10  reported gait abnormality and balance difficulty;
11  correct?
12         MR. GERSON:  Object to the form.
13         THE WITNESS:  Could you point out in
14         the report where it's located at?
15  BY MR. GORDON:
16    Q.   Sure.
17         Page 2 under "Neurologic:  Balance
18  difficulty, admits.  Gait abnormality, admits."
19    A.   Thank you.
20    Q.   Correct?
21    A.   Can I review it?
22    Q.   All right.
23    A.   We're reviewing a document.  So this
24  is review of the symptoms.  This is provided by her
25  opinion.

125

1      Q.  It's provided by her medical doctor?

2      A.  Right.  I'm just trying to see, okay,

3 review.  This is first time I see this document.

4 So if you can give me some time to review it, I

5 appreciate it.

6      Q.  Sure.

7          MR. GERSON:  What's the question?

8 BY MR. GORDON:

9      Q.  You want to read it first and let me

10 know when you're ready.

11      A.  Yes.  Page 2 of Exhibit 8 under

12 "Neurologic" states, and I quote, "Balance

13 difficulty, admits."

14          I'm assuming that that's coming from

15 her rather than an assessment by the doctor.

16          "Gait abnormality, admits," meaning

17 that's provided by the patient.

18          "Seizures, denies."

19          MR. GERSON:  Okay.  For the record,

20      the witness is simply reading what's on a

21      document he's never seen before.

22          MR. GORDON:  It's a speaking

23      objection.

24          MR. GERSON:  And it's outside his

25      expertise.

126

1          MR. GORDON:  It's a speaking

2      objection.

3          MR. GERSON:  You bring this to the

4      attention of the court --

5          MR. GORDON:  You want to stipulate --

6          MR. GERSON:  -- and let the court

7      evaluate what you're doing now, which is

8      totally wrong.

9          MR. GORDON:  That's an inappropriate

10      objection.

11 BY MR. GORDON:

12      Q.  Dr. De Caso, Ms. Kessler herself

13 admitted, according to those records, that she had

14 a balance difficulty -- she had balance

15 difficulties and a gait abnormality; correct?

16      A.  Based on this document dated

17 January 12, 2017, that's -- appears to be correct.

18      Q.  Okay.

19      A.  Which is two years prior to the

20 incident, I think, if I'm not mistaken.

21      Q.  Right.

22      A.  Thank you.

23      Q.  You would agree that alcohol

24 consumption can affect a person's balance; correct?

25      A.  Again --

127

1          MR. GERSON:  Object to the form.

2          THE WITNESS:  Again, in a generic

3      statement -- again, in context, it depends

4      on the amount, the person, the type of

5      alcohol, concentration, the food that you

6      might have had.

7          I'm not a medical doctor, but I think

8      these are common knowledge regarding

9      alcohol, the effects of alcohol.

10 BY MR. GORDON:

11      Q.  So the answer is yes; correct?

12      A.  It depends.  The answer is, it

13 depends.

14          You could have alcohol and not be

15 impaired; right?  And you could have alcohol and be

16 impaired.  It depends.

17      Q.  As a general statement, you would

18 agree that alcohol consumption can affect someone's

19 balance; correct?

20      A.  It depends on the quantity of the

21 alcohol, on the individual, how big you are, if you

22 had lunch or dinner before, if you have an empty

23 tummy.

24          My wife, for instance, she's terrible.

25 She smells a glass of wine, and forget about it.

128

1 She's a cheap date, I should say.

2          MR. GERSON:  Let's not speculate about

3      things outside your expertise.

4          THE WITNESS:  Sorry.

5          MR. GERSON:  And let's not ask

6      questions that are totally wrong and force

7      us to move for protective order, because

8      this witness has no opinions to give on

9      toxicology or the effects of alcohol on the

10      plaintiff at the time of the incident.

11          MR. GORDON:  Counsel, if you want to

12      object to form, that's fine.

13 BY MR. GORDON:

14      Q.  Dr. De Caso --

15      A.  Yes.

16      Q.  -- you would agree that --

17          MR. GERSON:  I'm objecting because

18 this is harassment.  This has nothing to do

19 with this witness.

20          MR. GORDON:  Sure it does.  He has

21      opinions on balance and gait.

22 BY MR. GORDON:

23      Q.  Dr. De Caso, you would agree that

24 alcohol consumption can cause a person to fall;

25 correct?

129

1     A.   It depends.

2     Q.   Depends on what?

3     A.   Once again, it depends on the person,

4   the amount of alcohol consumed, and they had lunch

5   before and whatnot.

6     Q.   Okay.  As a general statement, you

7   would agree that alcohol consumption may cause

8   someone to fall?

9          MR. GERSON:  As a lay person, is it

10         possible?

11         THE WITNESS:  It could be possible.

12   BY MR. GORDON:

13     Q.   In fact, the article -- one of the

14   articles you provided, which is cited in your

15   report --

16     A.   Yes.

17     Q.   -- "Falls and Working Individuals,

18   Role of Extrinsic and Intrinsic Factors," written

19   by Gauchard, Chau, Mur, and Perrin.

20          You're familiar with that article;

21   right?

22     A.   Yes.

23     Q.   You cited it; right?

24     A.   That's correct.  It's 2010 -- yes.

25     Q.   You would agree that in that article

130

1   that you cite in your own report it specifically

2   references alcohol as being a factor that can

3   disturb the different levels of postural regulation

4   and cause a fall; correct?

5     A.   It can, yes.

6     Q.   I'm reading right out of page 1332 of

7   that article.

8     A.   Okay.

9     Q.   And I'm just quoting from that same

10   article which states "The most frequent etiology of

11   these cerebellar syndromes is alcohol consumption."

12          You're familiar with that --

13          MR. GERSON:  Object to the form.

14   BY MR. GORDON:

15     Q.   -- in your own article -- strike that.

16          You're familiar with that reference in

17   this article; correct?

18          MR. GERSON:  Object to the form.

19          THE WITNESS:  I am.  That's provided

20          as a generic sample -- as a general

21          reference in order to provide information

22          about conditions.

23          If you probably review the report,

24          it's not explicitly referenced within a

25          given section to form opinions.

131

1   BY MR. GORDON:

2     Q.   It's an article you cited in your

3   expert report in this case; correct?

4     A.   Yes.  In order to differentiate

5   between extrinsic and intrinsic factors that affect

6   a slip-and-fall accident.  One of the many things

7   that are evaluated in that report, it talks about

8   alcohol.

9     Q.   Right.

10          And assuming that Ms. Kessler was

11   intoxicated and impaired, that could have caused

12   her to fall; correct?

13          MR. GERSON:  Object to the form.

14          THE WITNESS:  Assuming that she was

15          intoxicated and impaired to a degree, I'm

16          assuming due to the alcohol?

17   BY MR. GORDON:

18     Q.   Yes.

19     A.   Right.  You didn't ask that.

20          Then, yes, that would cause her, as

21   you quoted of the -- on the report, it can provide

22   her inability to walk and therefore cause a slip.

23     Q.   Okay.  And you reviewed the testimony

24   of Ms. Kessler; right?

25     A.   Yes.

132

1     Q.   And you read where she testified she

2   consumed alcohol earlier that day; correct?

3     A.   She did say something along those

4   lines, yes.

5     Q.   And at 4.2.12 on page 19, you make

6   reference again to CCTV, deposition testimony,

7   regarding, I'm quoting, "The significant

8   accumulation of liquid/contaminants deposited by

9   the crew with the squeegee."

10          Do you see that part of the report?

11     A.   On page?

12     Q.   Page 19, 4.2.12.

13     A.   Uh-huh.

14     Q.   Yes?

15     A.   Yeah.

16     Q.   I mean, I don't want to go into this

17   again, if you already talked about it.  Is this

18   the -- is the basis for that statement what you

19   talked about earlier regarding Mr. Tong's

20   deposition exhibit?

21     A.   That's correct.

22     Q.   Okay.  So there's nothing else other

23   than that?

24     A.   That's correct.

25          MR. GERSON:  Well, it speaks for

133

1    itself in references.
2            MR. GORDON:  Well, counsel, object to
3    form.  I mean, if you want to ask him
4    questions --
5            MR. GERSON:  Why would you distort
6    something that's right there in plain
7    English?
8            MR. GORDON:  You want me to go over it
9    again?
10           MR. GERSON:  No.  I'm not asking you
11   to do anything except ask relevant
12   questions and complete the deposition in an
13   expeditious way.
14           MR. GORDON:  Okay.
15   BY MR. GORDON:
16       Q.  You make reference on page 19 at
17   4.2.13 to other or prior slip-and-fall incidents.
18       A.  4.2.13 to other slip-and-fall cases?
19   Yes, as part of priors that were reported in the
20   case documentation, the request for evidence.
21       Q.  Let me just ask you a couple questions
22   before that.
23           You've never been employed in any sort
24   of risk management position, have you?
25       A.  Depends.  I have risk management

134

1    responsibilities as part of my position.
2        Q.  Have you worked as a risk manager?
3        A.  Define "risk management."  Risk
4    management is part of my -- my responsibilities
5    and roles.
6        Q.  Have you worked as a risk manager?
7            MR. GERSON:  Object to the form.
8    Asked and answered.
9    BY MR. GORDON:
10       Q.  Not whether it's one of your roles;
11   whether it is your title.
12       A.  I've never been employed with the
13   title "risk manager," if that's the question that
14   you're asking.  No, I have not.
15       Q.  Yes.
16           What are you referring to for these
17   prior slip-and-fall incidents?
18       A.  This is part of the interrogatories.
19       Q.  I'm trying to look for them in the
20   documents that were provided on the link.
21       A.  It was in a deposition.  So in
22   reviewing the Berman.
23       Q.  As you look, is there anything
24   specific in your file that will elicit the
25   information?

135

1        A.  I'm looking at the deposition
2    transcripts.  I remember there's an RFP -- the RFP
3    box, I think maybe it was in that one.  It was a
4    table with priors.  I'm trying to recall.
5        Q.  Well, you make reference about prior
6    slip-and-fall incidents.  I'm just trying to ask
7    you questions about it so --
8        A.  I know.  And I'm trying to respond to
9    the question.
10           Can you repeat the question, please.
11       Q.  Yeah.
12           My question is -- before I get to my
13   question, I want to make sure you're ready to
14   answer them.  So is there something --
15       A.  I don't know.  You need to ask it
16   first.
17       Q.  Well, my question is, what is the
18   basis for your -- I guess it's an opinion on
19   page 19 at 4.2.13 regarding, "Prior slip-and-fall
20   incidents that occurred on equivalent spa floor
21   surface type, both at the BREAKAWAY vessel and the
22   GETAWAY, are further evidence about -- are further
23   evidence that the levels of the spa floor surface
24   traction may have been inadequate."
25           That's your statement in your report;

136

1    correct?
2        A.  You've read it correctly, yes.
3        Q.  I'm just trying to find the basis for
4    that statement.  That's all I'm trying to find out.
5        A.  So there was prior slip-and-fall cases
6    reported as part of the case documentation and
7    making reference to what was provided in the case
8    documentation.
9        Q.  Okay.  So what specific prior
10   slip-and-fall incidents are you referring to to
11   support that statement in your report?
12       A.  Right.
13           If you give me a second, I will look
14   through the case documentation.
15       Q.  That's what I was -- okay.
16           (Thereupon, a brief recess was
17   taken @ 2:59 p.m.)
18           (Proceedings were resumed @
19   3:08 p.m.)
20   BY MR. GORDON:
21       Q.  Sir, did you find the information you
22   were looking for?
23       A.  Yes.  This would be the Defendant's
24   Second Supplemental Answers to Plaintiff's Initial
25   Interrogatories.

137

1    Q.   Okay.  Is there any specific prior
2   incidents you're referencing?
3        A.   So the answer to, I guess,
4   Question 12.
5        Q.   Okay.
6        A.   It's provided items on the BREAKAWAY.
7        Q.   Right.
8        A.   And the GETAWAY.
9        Q.   Are you relying on any specific prior
10  incident to support your statement or opinions in
11  this case?
12       A.   Those that share the same -- those
13  that occurred in the spa deck on the same type of
14  surface.
15       Q.   Which one?
16       A.   So it would be Carolyn Anne.  It said
17  it was unknown.  Carolyn Anne Bellai, B-E-L-L-A-I,
18  said it was unknown.  Could be one or the other.
19       Q.   So it's unknown whether that occurred
20  on the same tile floor surface as Ms. Kessler;
21  correct?
22       A.   Yes.
23       Q.   What other incident are you relying
24  on?
25       A.   Helen Grey.

138

1        Q.   Okay.
2        A.   Patricia Urbina.  It doesn't
3   explicitly state it was the same floor, but deck
4   15, all of it, as seen in the inspection, including
5   the area extending to the steam room also had
6   shared the same tile surface.
7        Q.   Ms. Urbina's incident happened by the
8   steam room; correct?
9        A.   Right.
10       Q.   That's not the same location where
11  Ms. Kessler fell; correct?
12            MR. GERSON:  Object to the form.
13            THE WITNESS:  That's correct.  But it
14       shares the same type -- if I can answer --
15  BY MR. GORDON:
16       Q.   Go ahead.
17       A.   -- before you start nodding and
18  answering to my question.
19            I'm talking about the -- referring
20  back to Section 4.2.13 fall incident.  And I quote
21  from the report, "Fall incident that occurred on
22  equivalent spa floor surface type."
23            So I'm not at any point stating that
24  it occurred at the same exact spot where
25  Ms. Kessler fell.  I'm talking about sharing the

139

1   same tile surface.
2        Q.   Okay.  You never tested the area by
3   the steam room; correct?
4        A.   Correct.
5        Q.   With your English XL; correct?
6        A.   That's correct.
7        Q.   And Ms. Grey's incident happened near
8   the swimming pool; correct?  Or beside the swimming
9   pool; correct?
10       A.   Again, I refer to it as the end of the
11  corridor, the spa entrance.
12       Q.   Well, Helen Grey, her incident,
13  according to the interrogatory answers, "occurred
14  while walking towards the thermal suite located in
15  the spa area beside the swimming pool."
16            Correct?
17       A.   Right.  Which shares the same type of
18  surface floor as that scene where Ms. Kessler fell.
19       Q.   Did you ever test the exact location
20  where Ms. Grey fell?
21       A.   I'm unaware on the exact location
22  where she fell.  My understanding, again, is that
23  she fell on the same or the equivalent tile as the
24  one where Ms. Kessler fell.
25       Q.   I should say where Ms. Grey slipped.

140

1   I don't know if she fell or not.
2        A.   Thank you for that.  Slipped.
3        Q.   But regardless, you never tested the
4   exact same location where Ms. Grey slipped;
5   correct?
6        A.   That's correct.
7        Q.   And Ms. Grey was wearing flip-flops at
8   the time of the incident?
9        A.   Pardon me?
10       Q.   Ms. Grey was wearing flip-flops at the
11  time of the incident?
12            MR. GERSON:  Object to the form.
13            THE WITNESS:  I don't have the full
14       details, but that's what's stated on the
15       supplementary answers.
16  BY MR. GORDON:
17       Q.   Ms. Kessler was barefoot --
18  correct? -- at the time of the incident?
19       A.   Ms. Kessler was barefoot, yes.
20       Q.   If we can actually go back -- I want
21  to go back to page 16 of your report.
22       A.   Yes.
23       Q.   Okay.  You make reference to -- you
24  make reference on page 16 to high contrast caused
25  between relatively dark and light spaces can lead

141

1 to temporarily reduce visual capacity; correct?
2    A. Correct.
3    Q. And then you say --
4    A. This is 4.1.13, yes.
5    Q. I think it's 4.1.3.
6    A. 3. Sorry.
7    Q. That's what you state; correct?
8    A. That's correct.
9    Q. And then you say, "These conditions
10 were present when entering the spa corridor may
11 have resulted in increased difficulty by
12 Ms. Kessler to discern wet areas and dry areas on
13 the floor surface."
14    Correct?
15    A. That's correct. That's what's stated
16 on the report.
17    Q. All right. First of all, let me ask
18 you whether you did any sort of measurements
19 concerning the lighting in the Mandara Spa in the
20 area where Ms. Kessler fell.
21    A. I did not.
22    Q. Okay. And you tested -- strike that.
23    Your ship inspection occurred at
24 9:00 a.m. to 10:30 a.m.; right?
25    A. That's correct.

142

1    Q. Okay. And what were the weather
2 conditions outside?
3    A. At the Port of Miami.
4    Q. Do you recall what the weather
5 conditions were like?
6    A. I think I state that it was sunny and
7 overall -- let me get back to the report.
8    Relatively sunny, partially overcast.
9    Q. All right. And Ms. Kessler's
10 incident, according to her, happened at
11 approximately 4:30 p.m.; correct?
12    A. Correct. In another location that was
13 not Port of Miami.
14    Q. Right.
15    Where was the ship at the time of
16 Ms. Kessler's incident?
17    A. I haven't reviewed the ship logs to
18 determine the location and orientation location of
19 the ship.
20    Q. So you don't know.
21    A. That's correct.
22    Q. So you don't know if the lighting
23 conditions, as you saw them during your ship
24 inspection, were the same as those at the time of
25 Ms. Kessler's incident; correct?

143

1    A. Correct.
2    Q. And there's no testimony from
3 Ms. Kessler that she had any problems observing
4 anything in the spa at the time of the incident;
5 correct?
6    A. The reference I'm alluding to, these
7 are high contrast, as you go into one area to
8 another, so you wouldn't consciously think about --
9 like becoming blind so -- but in her statement
10 there's no -- I don't think she was asked about
11 that either.
12    Q. Is there any reference in her
13 testimony that she couldn't observe anything in the
14 spa?
15    A. She was not asked anything to that
16 extent; so therefore there's no evidence to that
17 extent.
18    Q. Okay. Let me ask it this way.
19    Is there any evidence in this case
20 that Ms. Kessler had an issue with the lighting in
21 the spa at the time right before her fall?
22    A. Not to my knowledge.
23    Q. All right. You make reference on
24 page 16 at 4.15 regarding there not being a
25 handrail in the entrance of the spa?

144

1    A. That's correct.
2    Q. Okay. And you cite an IMO circular --
3 correct? -- to support your opinion that you
4 believe there should have been a handrail?
5    A. To support that the recommendations
6 provided by that circular document, circular 735,
7 that there should have -- the recommendation is to
8 provide handrails.
9    Q. You're relying on a circular; correct?
10    A. As stated on 4.15, yes.
11    Q. You'll agree that the circulars put
12 out by the IMO are nonbinding; correct?
13    A. Correct. It's a recommendation, as
14 also stated on the report.
15    Q. Okay. It's not binding; correct?
16    A. It's a recommendation. It's not a
17 mandatory -- correct? -- as stated in the report.
18    Q. And you make reference about there not
19 being a handrail in the entrance of the spa
20 corridor. What's the definition of "corridor"?
21    A. As I define it in the report, it's --
22 the spa entrance is essentially a corridor, a means
23 of egress to -- a means of egress from one area to
24 another that you transfer -- that you're transiting
25 would be classified as a "corridor."

145

1    Q.   Is that defined specifically by the
2   IMO in this circular?
3    A.   The IMO only refers to corridors.
4    Q.   Does it define what a corridor is?
5    A.   Not on that circular, but other
6   documents define what a corridor itself --
7    Q.   My question --
8    A.   -- would be.
9    Q.   My question is specifically is whether
10  the IMO in the circular defines what a corridor is.
11   A.   It just says to the word "corridor."
12   Q.   Does it define it?
13   A.   It's defined as corridor.  There's no
14  definitions for anything else.  It doesn't define a
15  handrail either.
16   Q.   Okay.  Is it your opinion that there
17  should have been a handrail -- sorry, hold on one
18  second.
19        Is it your opinion that there should
20  have been a handrail in the entire location where
21  Ms. Kessler walked into the thermal area of the
22  spa?
23   A.   As seen in many other vessels that
24  I've been on and different areas of that same
25  vessel, corridors are installed with handrails

146

1   following the recommendations by the IMO circular.
2        So answering your question, yes.  It's
3   typically a best practice to install a handrail in
4   that location.
5        That would be my opinion.  I'm answer
6   your question.
7    Q.   But is it your testimony or your
8   opinion in this case that there should be a
9   handrail in the entire area where people walk in
10  that door through the area where Ms. Kessler fell?
11   A.   Again, you're asking my opinion.  I'm
12  answering that based on the recommendations by the
13  International Maritime Organization, and in that
14  circular, and having inspected other vessels,
15  including this one, for instance, the corridor
16  leading out of the spa, that door that we talked
17  about before, has a handrail, and there's handrails
18  in other corridors.
19        So my opinion, based on best practices
20  and recommendations, is that there should have been
21  a handrail.
22   Q.   Okay.  My question is whether you
23  think there should have been a handrail that went
24  the entire length of that passage way where --
25   A.   I just said, based on the

147

1   recommendations and having seen similar corridors
2   in that same vessels and other vessels, that would
3   be correct.  It would be a good recommendation to
4   put a handrail there throughout the entire length.
5    Q.   But it's not mandatory; correct?
6    A.   It's a recommendation, as it's stated
7   in report, yes.
8    Q.   But not the mandatory?
9    A.   Correct.
10       MR. GERSON:  Object to the form.
11       THE WITNESS:  You do not need
12       handrails in any part of any corridor of
13       the vessel.  But, in fact, they're placed
14       because it's a best practice for safety to
15       put them on vessels.
16  BY MR. GORDON:
17   Q.   Okay.  So --
18   A.   And therefore my recommendation would
19  have been that, as I've seen in other places, is to
20  have handrail the full length of that entrance
21  corridor to the spa.
22   Q.   What other place?
23   A.   What do you mean "what other place"?
24   Q.   You said "I've seen them in other
25  places."  What other places are you referring to?

148

1    A.   The corridor leading prior to the spa
2   has, for instance, handrails.  Other spas that I've
3   visited in vessels also have handrails in corridor
4   entrances.
5    Q.   Which other spas?
6    A.   I've been on Disney -- I forget the
7   name.  I've been on other; Norwegian, Carnival.
8    Q.   What ships?
9    A.   I can't recall at this time the
10  different -- VALOR is, I think, a recent one that
11  I --
12   Q.   Carnival VALOR?
13   A.   Yeah.
14   Q.   Okay.  Any others?
15   A.   I can't recall right now.  I would
16  need to look at my case files.
17       But answering your question, yes, it
18  is my recommendation that based on the guidelines
19  and other areas in that ship, there should have
20  been a handrail for the entire length of that
21  entrance corridor.
22   Q.   Even assuming there was a handrail
23  where you believe there should have been one --
24   A.   It's a recommendation.  You're taking
25  my words out of context.

149

1    Q.   You didn't let me finish the question.
2    A.   I apologize.
3    Q.   Even assuming that there was a
4 handrail where you believe there should have been
5 one, that doesn't mean that Ms. Kessler would have
6 held on to the handrail at the time of this
7 incident; correct?
8    A.   And the opposite could be true, that
9 it could have been that she could have held on.
10   Q.   Right.
11   A.   I'm talking about the context.  Again,
12 4.15.  I'm not talking about Ms. Kessler.  I'm not
13 inferring anything else.  I'm just saying that that
14 circular recommends having handrails in corridor
15 and access areas.  And this specific area where she
16 fell is considered corridor and entrance, means of
17 egress, and therefore the recommendation is that a
18 handrail should be installed.
19   Q.   Okay.  And even assuming there was a
20 handrail there --
21   A.   Yes.
22   Q.   -- and even assuming Ms. Kessler
23 grabbed on to the handrail --
24   A.   Yeah.
25   Q.   -- she still could have slipped;

150

1 correct?
2    A.   That is a possibility.  The important
3 things -- again, talking about expert and why
4 handrails are provided -- is that they can
5 mitigate, even reduce the, you know, damage that
6 you can cause to somebody when they slip.
7         So even if she did slip, it might have
8 not resulted in, you know, whatever injuries she
9 might have had.  So there's many possibilities, but
10 handrails are good things to have, as recommended
11 by the circular.
12   Q.   What's the basis for you to say that
13 someone who falls using a handrail would not suffer
14 a more significant injury?
15   A.   Well, Di Pilla, if you look at the
16 practice handbook, states why handrails are
17 designed at the level and the way and the shape
18 that they are explicitly for that.
19         So there's a lot of -- again, it's
20 stated in the report -- on why we use handrails and
21 how they help in slip, trip, and fall.
22   Q.   Have you personally done any testing
23 with respect to handrails and slip resistance?
24   A.   Yes, I have.
25   Q.   Where?

151

1    A.   At different ships.
2    Q.   Have you done it on the Norwegian
3 BREAKAWAY?
4    A.   No, not on the Norwegian BREAKAWAY.
5    Q.   Specifically in the Mandara Spa of the
6 Norwegian BREAKAWAY?
7    A.   I have not, no.  There was no
8 handrail.
9    Q.   Well, did you even attempt to recreate
10 something similar to the handrail?
11   A.   I would not.  From an expert point of
12 view, that wouldn't make sense.
13   Q.   You didn't do anything like that, did
14 you?
15   A.   I did not, no.
16   Q.   Well, there's a handrail on the
17 opposite side by the pool; correct?
18   A.   Yeah.  That handrail was measured.
19   Q.   Did you do anything other than measure
20 it?
21   A.   No.
22   Q.   Did you do any testing regarding
23 whether or not that handrail would have benefitted
24 someone during a slip?
25   A.   Well, that handrail met the

152

1 requirements or recommendations -- in some cases
2 requirements -- for the average height that it was
3 located at.
4    Q.   Did you do any testing regarding
5 whether it would have affected someone's ability
6 or -- strike that.
7         Did you do any testing regarding
8 whether it would have made any difference if
9 someone was slipping?
10   A.   In what location?
11   Q.   By the hot tub.
12   A.   I'm -- okay.
13        MR. GERSON:  There's no handrail there
14 to test.
15        MR. GORDON:  Sure there is.
16        MR. GERSON:  Object to the form of the
17 question.
18        THE WITNESS:  He's talking -- we're
19 talking about the other handrail located on
20 the other side of the entrance.
21        MR. GERSON:  Oh, okay.  All right.  I
22 stand corrected.
23        THE WITNESS:  So that handrail was
24 measured.  So the testing is that if that
25 handrail meets the geometric requirements

153

1    for safety design.
2    BY MR. GORDON:
3       Q.   Other than measuring it, did you do
4    any other sort of testing?
5       A.   That was the evaluation that was done.
6    In this case, it was just the height at which it
7    was located.
8       Q.   Other than that, did you do anything
9    else with regard to the handrail?
10      A.   No.  That was the only thing.  It was
11   measured, the height.
12      Q.   You make reference of 4.16 regarding
13   the drainage system --
14      A.   Okay.
15      Q.   -- correct?
16      A.   Yes.
17      Q.   You inspected the drains; correct?
18      A.   Uh-huh.
19      Q.   In the Mandara Spa; yes?
20      A.   Yes, I did.
21      Q.   And you found it to be inadequate?
22      A.   What section are you referring to?
23      Q.   Page 16.  I'm just trying to get into
24   your opinions regarding the drainage.  Okay?
25      A.   Understand.

154

1       Q.   You were out there, you were
2    inspecting the drains; correct?
3       A.   Uh-huh.
4       Q.   Yes?
5       A.   Yes.
6       Q.   Okay.  And you were pouring water into
7    the drains; correct?
8       A.   That's correct.
9       Q.   All right.  How much water were you
10   pouring into the drains?
11      A.   It was about a quarter of a bucket
12   that was 1.2 gallons.
13      Q.   1.2 gallons?
14      A.   Yes.
15      Q.   And you poured that where?  Which
16   drain?
17      A.   Directly over each of the drains
18   identified in the report.
19      Q.   That would be the drain --
20      A.   And the drain trench at the beginning
21   of the drainage system.
22      Q.   That would be the drain in front of
23   the hot tub?
24      A.   Correct.  At the end of the ramp that
25   goes up to the hot tub.

155

1       Q.   I'm sorry.  You said --
2       A.   The drain trench that is located at
3    the bottom of the ramp leading to the hot tub.  If
4    you refer to Figure 12, it would be at location
5    mark number 1.
6       Q.   You said it was 1.2 gallons of water
7    you put in the drain.
8       A.   About there.
9       Q.   Is there any evidence in this case
10   that there was 1.2 gallons of water that was put
11   into the drain right before Ms. Kessler's incident?
12      A.   No.  The intent of the test context is
13   a matter of depositing a known quantity of water
14   and see how it flows and drains.  And that was
15   performed.
16      Q.   Okay.  Is there any evidence that that
17   amount of water is ever deposited in that drain?
18      A.   I wouldn't know.  I'm not at the
19   location on an ongoing basis to monitor that.
20      Q.   So you don't know?
21      A.   I don't know.
22      Q.   And the drainage system that you
23   inspected, you would agree that you cannot say with
24   certainty that it was in the same condition on the
25   date of your inspection as it was on the date of

156

1    Ms. Kessler's incident; correct?
2       A.   That would be correct.
3       Q.   Did you do any testing using the Oasis
4    On Force cleaner with respect to this specific tile
5    in the Mandara Spa?
6       A.   I did not.
7       Q.   On page 17 of your report at 4.19 --
8       A.   Yes.
9       Q.   -- did you make reference regarding,
10   "It was observed on the CCTV that numerous
11   occasions Crew Collantes is seen squeegeeing the
12   floor surface around the end of the spa corridor."
13           Do you see where I'm reading from?
14      A.   Yes.
15      Q.   We've already talked about that --
16   correct? -- regarding what that statement is based
17   upon?
18      A.   Correct.
19      Q.   If I'm wrong, let me know.  I don't
20   want to ask the same questions over again.
21      A.   Please.
22      Q.   That's based upon your review of --
23      A.   The CCTV -- it was observed from the
24   CCTV, as stated in 4.19.
25      Q.   Okay.  That's what you talked about

157

1  earlier regarding Mr. Tellez's deposition exhibit?
2      A.  That's correct.
3      Q.  Okay.  At 4.1.11, you discuss an
4  opinion regarding, "Based on the CCTV, it is
5  evident that Mr. Collantes failed to implement
6  established procedures to dry the floor, using a
7  rag to wipe the floor after the squeegee was used."
8          Do you see that?
9      A.  Yes.  That's correct.  Stated as in
10  the report.
11      Q.  Okay.  Again, that's -- strike that.
12          You have no experience as a
13  housekeeping person; correct?
14      A.  As we established at the beginning of
15  the depo, yes.  Thank you.
16      Q.  Specifically a housekeeping individual
17  on a cruise ship; correct?
18          MR. GERSON:  Object to the form.
19          Asked and answered.
20          THE WITNESS:  Other than just a lay
21          person in housekeeping activities that I
22          might do.
23  BY MR. GORDON:
24      Q.  But you've never been employed as a
25  housekeeper on a cruise ship; correct?

158

1      A.  We established that before.
2          MR. GERSON:  Objection.  Asked and
3          answered.
4  BY MR. GORDON:
5      Q.  You say, "Moreover, the specific area
6  next to the drainage trench was not adequately
7  marked as a hazard area where water accumulated."
8          Do you see that?
9      A.  Yes.
10      Q.  Where specifically are you
11  referencing?
12      A.  Where the crew deposited or finished
13  squeegeeing.
14      Q.  Yes?
15      A.  Right.
16      Q.  You're saying there should have been a
17  what?
18      A.  With that specific area, it would be
19  good to have indicated as -- as the exact area that
20  was wet.
21      Q.  Where the drain is?
22      A.  On that area, yes.  If we have --
23  maybe we can bring out Exhibit 5 from Collantes'
24  deposition.
25      Q.  Do you have it in front you?

159

1      A.  Yes.
2      Q.  You're showing me, for the record,
3  Exhibit 5 for Mr. Collantes' deposition; correct?
4      A.  That's correct.
5      Q.  And, first of all, that black arrow
6  you see there, that was written by plaintiff's
7  attorney; correct?
8      A.  I think so.  That's correct.
9      Q.  Okay.
10      A.  Yeah.
11      Q.  So what are you showing me?
12      A.  So as part of marking hazardous wet
13  areas, typically you place the caution sign that
14  might alert the issue of slipness at the location
15  or the source of -- that you might have water
16  accumulated.  So.
17          What I'm stating there is that it
18  would be more appropriate to place that sign where
19  the water is being deposited by the squeegee.
20      Q.  We've already talked about this.  You
21  think that individual, Mr. Collantes, is pushing
22  water; correct?
23      A.  I'm assuming that, as he reported in
24  his depo, he's doing his job and squeegeeing the
25  wet floor.

160

1      Q.  Well, he testified it was dry.  We've
2  already talked about it --
3      A.  Right.  He also testifies that he was
4  squeegeeing when it's wet.
5      Q.  His testimony is his testimony;
6  agreed?
7      A.  I agree.  He says it clearly on the
8  testimony that he squeegees when the floor surface
9  is wet.
10      Q.  Regardless of what you believe his
11  testimony is or not, there is a warning -- strike
12  that -- there is a caution sign in the area where
13  Ms. Kessler was walking to or toward; correct?
14      A.  On the opposite side of the entrance
15  corridor, yes.
16      Q.  In fact, it's in the direction where
17  she was walking; correct?
18      A.  On the other side of the corridor,
19  yes, as seen in Exhibit 5.
20      Q.  Yes.  Exhibit 5 and 5A, you can see
21  the same yellow floor caution sign in the area
22  where Ms. Kessler fell; correct?
23      A.  In Exhibit 5A that we currently have
24  marked; yes.
25      Q.  Have you done any research regarding

161

1  whether there may be too many warning signs --
2      A.  In what context?
3      Q.  -- or caution signs?
4      A.  In what context?
5      Q.  In the context of people will not look
6  at them or give them any meaning or just ignore
7  them if there's 35 or 50 caution signs everywhere.
8          MR. GERSON:  Object to the form.
9          THE WITNESS:  Di Pilla does talk about
10         the effectiveness of placement and geometry
11         and size and contrast of the use of
12         cautionary signs.
13  BY MR. GORDON:
14     Q.  Okay.
15     A.  What I'm stating in the report, again,
16  just to be clear in context and making sure that
17  you are inferring correctly what is written in the
18  report, is not adding additional caution signs but
19  the placement of the caution sign.
20         MR. GORDON:  Can you read back the
21         last answer?
22         (Thereupon, the answer was read
23         back by the reporter as above recorded.)
24  BY MR. GORDON:
25     Q.  You also make reference on page 17 of

162

1  your report at 4.1.12 that the inspected squeegee
2  had a significant level of wear and accumulation of
3  contaminant matter, as observed in Figure 8;
4  correct?
5      A.  Correct.
6      Q.  The squeegee that you observed on
7  August 25, 2019, you don't know if that's the same
8  exact squeegee Mr. Collantes was using on the date
9  of Ms. Kessler's incident; correct?
10     A.  During the inspection, it was my
11  understanding that that's the one that was used.
12     Q.  Based on what?
13     A.  Or similar.
14         Based on what I asked at the time.  I
15  think you were there.  I said, "Is this the same
16  squeegee?"
17     Q.  My question is, you don't know whether
18  or not that the squeegee you inspected during your
19  inspection was the same exact squeegee that
20  Mr. Collantes used on the date of Ms. Kessler's
21  incident; correct?
22         MR. GERSON:  Objection.  Asked and
23         answered.
24         MR. GORDON:  No, it's not.
25  BY MR. GORDON:

163

1      Q.  Go ahead.
2      A.  To my knowledge, that was the same
3  squeegee being used.
4      Q.  Based on what?
5      A.  Based on what I was told during the
6  inspection.
7      Q.  Told by whom?
8      A.  I asked, "Is this is the same squeegee
9  used?"
10     Q.  That's not true, sir.
11     A.  It might have been informally asked.
12  So other than that --
13         MR. GERSON:  Object to the form.  Move
14         to strike Counsel's comment.
15         The witness has answered the question
16         that you, Mike Gordon, told him it was the
17         same one.  You can testify at some other
18         time.
19         MR. GORDON:  I'm not testifying.  His
20         opinions are going to be subject
21         to Daubert.
22  BY MR. GORDON:
23     Q.  I want to know if you can tell me for
24  a fact whether the squeegee you inspected was the
25  same as the one used by Mr. Collantes on the date

164

1  of incident involving Ms. Kessler.
2          MR. GERSON:  Objection.  Asked and
3          answered.
4          THE WITNESS:  That's what I was told,
5          that it was the same one.
6  BY MR. GORDON:
7      Q.  You were provided with an exemplar
8  squeegee, sir; correct?
9          MR. GERSON:  Object to the form.
10  BY MR. GORDON:
11     Q.  Not the same exact squeegee.
12     A.  I was provided with a squeegee at the
13  time of the incident, yes, that I understood was
14  the same one at the time of the incident.
15     Q.  Okay.
16     A.  The one used in the spa area.
17     Q.  All right.  You would agree that --
18  strike that.
19         Even assuming if it was the same exact
20  squeegee --
21     A.  Yes.
22     Q.  -- that Mr. Collantes was using on the
23  date of the incident --
24     A.  Yes.
25     Q.  -- you would agree that you don't know

165

1  if it was in the same exact condition on the date
2  of your inspection as it was on the date of
3  Ms. Kessler's incident; correct?
4      A.   Assuming it's been used since the date
5  of the incident, then obviously it would not be in
6  the same condition.
7      Q.   Okay.  And you never tested -- or
8  strike that.
9           You never used or applied the squeegee
10 to squeeze water on the floor; is that accurate?
11     A.   I was prohibited from doing that.
12 Remember, you mentioned, you cannot use the
13 squeegee at the time of the incident.
14     Q.   All right.  Did you ever ask or go to
15 court to do that?
16     A.   It was during the inspection.  I was
17 handed this and I was told I could not use it by
18 yourself, that I could only see it.  So I did not
19 use it.
20     Q.   Okay.  You have opinions in your
21 report about it, do you not?
22     A.   Based on the visual inspection, but
23 not based on its performance, as it's stated in the
24 report.
25     Q.   Okay.  So you never tested a squeegee

166

1  on the same surface as the Mandara Spa; correct?
2      A.   I was prohibited from doing that; so
3  therefore I was not able to test -- to apply the
4  squeegee on the surface to test its performance.  I
5  was only able to visually inspect it, as is stated
6  on the report.
7      Q.   Did you ever test a squeegee outside
8  the ship on any type of surface?
9      A.   I have not.
10     Q.   Anything stop you from doing that?
11     A.   I have not.
12     Q.   Has anything prevented you from
13 purchasing a similar squeegee or the same squeegee
14 and performing testing on your own outside the
15 context of the ship?
16          MR. GERSON:  Object to the form.
17          THE WITNESS:  Even if I knew the exact
18     manufacturer that did it, you know, the
19     context matters, and ideally you would want
20     to use it on the one that is used in the
21     facilities.  So it was not performed, given
22     that it would not be valuable information.
23 BY MR. GORDON:
24     Q.   Okay.  So you didn't do any testing on
25 your own?

167

1      A.   I have not, no.
2      Q.   And you knew the type of tile that
3  there was on the spa; correct?
4      A.   I beg your pardon?
5      Q.   You knew the type of tile that was in
6  the spa?
7      A.   That's correct, yes.
8      Q.   You could have obtained the tiles
9  yourself; correct?
10     A.   I could have contacted the
11 manufacturer, yes.
12     Q.   Okay.  You've read the testimony from
13 the crew members, Mr. Naik, Mr. Collantes and
14 Ms. Lenoso, that the tile floor dries quickly
15 because it's a heated area; correct?
16     A.   That's correct.
17     Q.   Did you do any sort of testing at all
18 concerning how fast the floor would dry in those
19 same conditions as existed at the time of
20 Ms. Kessler's incident?
21     A.   During the testing and during the time
22 that the water was deposited and drained out, you
23 could see that still part of the water remained
24 even after 20 minutes before we finished the
25 testing.

168

1      Q.   First of all, you were dumping buckets
2  of water on the floor; correct?
3          MR. GERSON:  Object to the form.
4          THE WITNESS:  So we'll step back.  The
5     buckets of water were not being dumped on
6     the floor.  They were being dumped on the
7     drains.
8          The tests that I'm alluding for are
9     referenced in Figure 12 for the water that
10    was deposited during the English XL tests
11    and seeing that water drain back.
12 BY MR. GORDON:
13     Q.   Sir, I'm going to show you what was
14 marked as Exhibit 1 to Mr. Naik's deposition on
15 September 5, 2019 -- sorry, on September 15, 2019.
16 That's you in the picture; right?
17     A.   That is me in the picture.  This is
18 Exhibit 1 on Naik's.
19     Q.   There is a bucket of water on the
20 floor next to you; right?
21     A.   There is a gray bucket located, yes.
22     Q.   You dumped a bucket of water or
23 portion of the bucket of water on the floor, did
24 you not?
25     A.   This was outside the steam room in

169

1  order to determine slope and drainage as part of
2  the -- what was reported in the report.
3      Q.  So you did dump buckets of water on
4  the floor when you were out there; correct?
5      A.  Yes.  I stated that from the
6  beginning.
7      Q.  Okay.  You just stated you didn't.
8      A.  No.  Okay.  Can you rephrase this --
9  can you repeat this question again?  On the water,
10  please?  On the dumping buckets of water and my
11  answer.  And the previous before that.  Because we
12  were talking about if I did any tests on the -- how
13  that surface performed.
14      "Question:  Did you do any sort of
15  testing at all concerning how fast the flow would
16  have dry away those same conditions how existed."
17      Right?  You're not asking about
18  buckets of water.
19      My answer is "During the testing and
20  during the time that the water was deposited,
21  drains out, you can see part of the water remained
22  even after 20 minutes before we finished the
23  testing."
24      MR. GERSON:  For the record, there's
25  Realtime transcript here on an iPad in

170

1      front me, and the witness was reading from
2      the iPad testimony.
3      THE WITNESS:  You're not asking me if
4      I dumped buckets of water.
5      MR. GERSON:  Let him ask another
6      question.  The record speaks for itself.
7      MR. GORDON:  I'll ask it again.  I'm
8      not trying to make it difficult.
9  BY MR. GORDON:
10      Q.  Looking at Exhibit 1 to Mr. Collantes'
11  deposition, you did dump a bucket of water on the
12  floor; correct?
13      A.  I dumped several buckets of water in
14  order to test the drainage capabilities of the spa
15  facility.
16      Q.  Is there any evidence in this case
17  that there was that amount of water on the floor
18  anywhere in the spa at the time of Ms. Kessler's
19  incident?
20      MR. GERSON:  Object to the form.
21  BY MR. GORDON:
22      Q.  As depicted to Exhibit 1 to Mr. Naik's
23  deposition?
24      A.  Maybe I'd like to pull out exhibit --
25  Mr. Collantes -- this one.

171

1      I'm trying to open an exhibit from
2  Collantes' deposition to answer the counsel's
3  question.  This would be Exhibit 3 of Collantes.
4  C-O-L-L-A-N-T-E-S.
5      Q.  Okay.  What are you showing me?
6      A.  So this is Exhibit 3.
7      Q.  Yes, sir.
8      A.  Which shows a picture of the
9  surveillance report.  You can also see the contrast
10  surface with water around.
11      Now, if you were to ask me, is the
12  same level of the amount of water volume of water
13  deposited there, I cannot answer that, but I can
14  see and infer from the picture that there was
15  significant amounts of water in the area throughout
16  the spa when it was being used.
17      Q.  Mr. Collantes, along with the other
18  crew members, stated that was a shadow, not water;
19  correct?
20      A.  That's part of what they were saying.
21  But that would not correspond to other -- having
22  been there and looking at that contrast of the
23  inspection.
24      Q.  That's what their testimony was;
25  right?

172

1      A.  I understand.
2      Q.  You're discounting their testimony and
3  just assuming there's water there; correct?
4      A.  I'm just inferring from the inspection
5  and what I saw and comparing it to the pictures I
6  took from the inspection having deposited water.
7      Q.  So you're now doing some sort of
8  analysis of photographs?
9      A.  So the question is "Was that volume of
10  water deposited there?"  I'm not able to answer
11  that question.  I don't know.
12      Q.  Okay.  And getting back to my original
13  question, the area where Ms. Kessler fell, did you
14  do any testing to see how quickly it would dry up
15  in the same conditions as it existed at the time of
16  her incident?
17      A.  Since we don't know the same
18  conditions at the time of the incident, I was not
19  able to reproduce that.  But what I did do, that is
20  stated also on Figure 12, is that the water that
21  was deposited as part of the surface evaluation,
22  the period of time that occurred, you can see how
23  the water is still there, and it did not evaporate.
24  That, together with the known temperature of the
25  surface, if needed, additional analysis could be

173

1 done to determine evaporation rates.
2     Q.   You didn't do that.
3     A.   I didn't do it, no.
4     Q.   What you just described about
5 evaporation rates, you were doing it at a different
6 temperature than how it existed at the time of
7 Ms. Kessler's incident; true?
8     A.   As we said several times today, that's
9 correct.  We don't know the exact conditions.  And
10 the conditions within the report are limited to
11 those during the inspection.
12     Q.   You've reviewed the testimony of the
13 crew members, and they each testified that the
14 floor would dry quickly because of the heat of the
15 spa; correct?
16     A.   After it's been squeegee yes.
17     Q.   You didn't do that or test that --
18         MR. GERSON:  Object to the form of the
19     last question.
20         THE WITNESS:  I was not able to use
21     the squeegee, correct, so I wasn't able to
22     test that.
23 BY MR. GORDON:
24     Q.   Okay.  But even if you did use a
25 squeegee, you still couldn't test anything because

174

1 it wasn't the same temperature as it was at the
2 time of Ms. Kessler's incident; correct?
3         MR. GERSON:  Object to the form.
4         THE WITNESS:  Again, we don't know
5     what the temperature was at the time of her
6     incident, but we can compare.
7 BY MR. GORDON:
8     Q.   Well, it wasn't the same as when you
9 were out there; correct?
10     A.   We don't know what the temperature
11 was, right.
12     Q.   Of when?
13     A.   Of the floor surface during
14 Ms. Kessler's incident.
15     Q.   Correct.
16         If it was a heated spa, more likely
17 than not it would have been a different temperature
18 than when you inspected it; correct?
19     A.   Actually, at 81 Fahrenheit, that's of
20 the floor surface, if I remember correctly on
21 average, inspected, it's already heated.
22     Q.   How do you know?
23     A.   Because heated floor surfaces operate
24 around that temperature.
25     Q.   What's the basis for that statement?

175

1     A.   You asked me how do I know that heated
2 floors, because heating floors operate around that
3 temperature.
4     Q.   Do you know if the heat was on in the
5 spa, or do you know if it was the sun blaring
6 through the glass?
7     A.   Right.  The sun was not hitting that
8 location.  It was further in.  The air temperature
9 condition throughout an hour and a half of the
10 inspection was 77.  That means it's cooler than
11 what was measured on the floor.
12         So do I know if it was on?  No, I
13 don't know if it was on.  But what I know is that
14 the temperature of the floor was an average of
15 81 Fahrenheit.
16     Q.   You don't know if it was the same
17 temperature at the time of the incident we were
18 discussing?
19     A.   Right.
20     Q.   You can't rule out that what
21 Ms. Kessler allegedly slipped on was just
22 perspiration under her foot, can you?
23     A.   I would not be able to rule that out,
24 no.
25     Q.   You make reference on page 17 at

176

1 4.1.14 regarding, "Those in control of the
2 maintenance of the spa facility failed to properly
3 train and insure adequate known floor drying
4 procedures by crew."
5         I won't read the rest --
6     A.   Yes.
7     Q.   -- but again, you've never been in a
8 position to train or monitor or supervise any sort
9 of housekeeping personnel on the cruise ship;
10 correct?
11         MR. GERSON:  Object to the form.
12     Asked and answered.
13         THE WITNESS:  Correct.  I'm making
14     those assumptions based on the roles and
15     responsibility of those crew member
16     positions, as well as the policies
17     described during the depositions on how
18     they should -- what is the policy to clean
19     and dry the floors, and the policies did
20     not match with what was observed in the
21     CCTV; therefore, the statement made.
22 BY MR. GORDON:
23     Q.   The what?  Four minutes of CCTV that
24 you reviewed?
25     A.   Whatever amount that was reviewed,

177

1   yes.
2       Q.   You talk about on the bottom of
3   page 17 at 4.1.15, "It is also unknown if those in
4   control of the maintenance of the spa had processes
5   and or policies," I'm sorry," and/or policies on
6   maintaining and replacing the squeegee."
7       A.   Correct.  I did not see on those
8   manuals that were referenced or statements if they
9   controlled the squeegee.  Only the use of the
10  squeegee and the process of using it with a towel.
11      Q.   So you don't know one way or the other
12  what the policy is regarding maintenance and/or
13  replacing the squeegees that they use; correct?
14      A.   It is unknown, yes.
15           (Thereupon, a brief recess was
16      taken @ 4:00 p.m.)
17           (Proceedings were resumed @
18      4:06 p.m.)
19  BY MR. GORDON:
20      Q.   Just so I understand what your opinion
21  is regarding the drain -- the drainage, can you
22  just clarify for me.
23      A.   The drainage?
24      Q.   Yeah.
25           You have opinions regarding drainage;

178

1   correct?
2       A.   Correct.
3       Q.   I want to make sure I understand what
4   your opinion is.
5       A.   So the drainage was found to be able
6   to drain the water when it was deposited with the
7   bucket, as stated, in exact 4, location 4, where
8   the drainage was clogged and did not work.
9       Q.   One second.  Where is location 4?
10      A.   Drainage 4 is section 3.1.11, the
11  bottom of page 7, located at the top of the pool
12  access ramp area.  Provided in Figure 7.
13      Q.   All right.  I'm sorry.  Looking at
14  page 11.  It's where?
15      A.   Yeah.  Let me scroll down.  It would
16  be Figure 7.
17      Q.   Correct.
18      A.   Top right the corner.  It says 444 on
19  there.
20      Q.   All right.
21      A.   Yes.  Right there.
22      Q.   Upper right picture?
23      A.   Right next to the number 4; correct.
24      Q.   And your opinion is that drain what?
25      A.   Was not draining.

179

1       Q.   First of all, that drain is not in the
2   area that Ms. Kessler fell; correct?
3       A.   That would be correct.
4       Q.   Okay.  So how much water did you put
5   down that specific drain at location 4?
6       A.   Again, about a gallon, gallon and a
7   quarter.
8       Q.   A gallon and a quarter?
9       A.   Deposited in order to determine how
10  much -- if it drains or not.  This was done in all
11  the drains at the drain inlets or outlets,
12  depending which way you're seeing it.  And that was
13  not draining.
14           In fact, the picture shows how before
15  testing it there was already stagnant water in the
16  drain.
17      Q.   Was it not draining at all or just
18  draining slowly?
19      A.   It was not -- okay.  When we define
20  drainage, then it's not draining.  It's not doing
21  its function.
22           Did it eventually drain?  Yes.  It
23  obviously is not -- it's clogged.
24      Q.   How long did it take for that drain to
25  drain that 1.2 gallons of water?

180

1       A.   In fact, the water -- most of the
2   water flooded and spilled around the area and then
3   probably took over two minutes in order for the --
4   or more -- again, I can't -- for the flooded area
5   to start to sink in and drive away.  But in terms
6   of performance of the drainage, it's considered
7   clogged.  It's not draining.
8       Q.   All right.  You don't know if that
9   drain, as you tested it on that day, was in the
10  same condition as it was on the date of
11  Ms. Kessler's incident; correct?
12      A.   Correct.  I don't know.
13      Q.   Other than that drain -- strike that.
14           Were there any other drains other than
15  that one at location 4 that did not properly drain?
16      A.   So the drains did -- the other drains
17  did drain at each outlet where the water was
18  deposited.  But when looking at the trench drain,
19  in other words, when the water was deposited by
20  number 1, the flow of water was seen to go and
21  bypass the drain located at the corner due to the,
22  I guess, lack of grinding around the area.
23      Q.   I'm sorry.  Which photograph?  Can you
24  point to me in your report?
25      A.   Yeah.  Let me scroll to the -- so this

181

1  would be drain number 2, drain outlet number 2.
2       Q.   Is there a page on your report that
3  you can --
4       A.   Yeah.  Figure 5 on page 10.
5       Q.   Figure 5 on page 10.  Which specific
6  number on the yellow markers on the floor?
7       A.   Number 2.  Most of the water was seen
8  to bypass, in other words, flow around the drain,
9  since the outlet of the drain was slightly
10 elevated.
11      Q.   So how much water did you put at that
12 drain at number 2?
13      A.   So it was two types of evaluations
14 made.  Number 1 was when water was placed directly
15 on the drain; and number 2, when water was placed
16 at location number 1, which is the beginning of the
17 trench location, that should flow down to location
18 2 and location 3 and ongoing on that trench.
19           So when water was placed on
20 location 1, it was observed to mostly bypass drain
21 number 2 because that drain was slightly elevated
22 at the surface of the water.  So that would not be
23 ideal, since it's not performing its duties as a
24 drain.  It's not flush with the drainage floor
25 surface.

182

1       Q.   Let me just back up.
2            How much water did you put into the
3  drain, which is marked number 1 on page 10?
4       A.   Right.  The beginning of the drain
5  trench, about a gallon, gallon and a quarter.
6       Q.   Okay.  There's no evidence that that
7  much water was put into that drain right before
8  Ms. Kessler's incident; correct?
9       A.   Correct.  The purpose of applying a
10 quantity of water is to see the flow of water.  If
11 you were to place less water, you might not be able
12 to see how the water flows directly.  So you want
13 to see the performance.
14           This, in a sense, is a conservative
15 approach, because if you have more water, you have
16 more water flow, and it's easier for it to drain.
17 So it's a best-case scenario from a drainage point
18 of view.
19      Q.   Well, if there's not much water being
20 pushed into the drain, there's not going to a
21 drainage problem, is there?
22      A.   There's obviously drains there.  And
23 the drains are used to drain water.  So I'm sure
24 that part of the design of the spa is envisioned
25 that those drains need to perform.

183

1       If you have a drain, the drain needs
2  to meet performance and they need to be able to
3  drain water.  That's what was trying to be
4  evaluated.
5       Q.   Right.
6            But, first of all, you don't know if
7  the drain at location 1, 2, and 3 were in the same
8  condition on the day of the incident involving
9  Ms. Kessler as on the day of your inspection;
10 correct?
11      A.   That's correct.
12      Q.   Okay.  Hypothetically, if you're going
13 to push a little bit or a speck a water into that
14 drain, that's not going to cause some sort of
15 drainage problem, is it?
16      A.   When looking, for instance, at Figure
17 6, which shows the plan view of drain number 2 and
18 drain number 3, when you talk about problems of
19 drainage, regardless of the amount of water, you
20 can see the accumulation on the drain wall of
21 number 3 compared to number 2 that is significantly
22 more.
23           That is evidence that shows that drain
24 two drains less water than drain three due to the
25 accumulation.  And that's what was being tested.

184

1       Q.   Right.
2            But if you're only going to, let's
3  say, hypothetically squeegee in the amount of water
4  the size of your thumbnail --
5       A.   Yes.
6       Q.   -- is that going to have any affect,
7  even assuming the drains were in the condition as
8  you saw them on date of your inspection?
9            MR. GERSON:  Object to the form.
10           THE WITNESS:  Again, the evaluation is
11 not about the volume of water; it's about
12 the performance of the drain.
13 BY MR. GORDON:
14      Q.   I understand.
15      A.   Okay.
16      Q.   But --
17      A.   So if you have a speck of water with a
18 thumb, that speck of water probably would go around
19 drain two and end up in drain three or further
20 down.  That's what was trying to be evaluated.  It
21 is the flow of water from the initial part of the
22 trench drain to its outlet and how that flowed.
23      Q.   What are your rates which you were
24 charging for your services in this case?
25      A.   Let me get the invoice.

185

1    Q.   Is this it?
2    A.   Yes.  That is correct.
3         (Exhibit 9 was marked for
4         identification purposes.)
5    BY MR. GORDON:
6    Q.   We will have that marked Exhibit 9.
7         Are those your complete invoices in
8    this case?
9    A.   They're the same.  This is the last
10   invoice.  This is the copy of the same document.
11   Q.   How much have you charged the
12   plaintiff's attorneys in the case?
13   A.   $3,190.10.
14   Q.   Is this current to today?
15   A.   To the best of my knowledge, yes.
16   Q.   What are your hourly rates for
17   performing expert work?
18   A.   165 per hour.
19   Q.   And is that for review of materials
20   and testimony?
21   A.   No.  It's different to testimony.
22   Q.   What's the difference?
23   A.   I think it's 250 for testimony.
24   Q.   Per hour?
25   A.   Yes.  Correct.

186

1    Q.   What about trial testimony?
2    A.   Same.
3         Yeah.  250.  Just pulling my fee
4    sheet.
5    Q.   You mentioned you had notes that you
6    wrote down.  I don't see them in the stack of
7    materials that we printed off the link.
8    A.   No?  It would have been like a blank
9    page.
10   Q.   A blank page?
11   A.   Like a white page.
12   Q.   Do you have it in your computer?
13   A.   It might not have synced from my
14   desktop.
15   Q.   Can you access it or not?
16   A.   No.  It's not there.
17   Q.   It means you have it accessible at
18   home or at your office?
19   A.   In the, yeah, the desktop computer.
20   Q.   Can you send it to the plaintiff's
21   attorney so they can send it to us?
22        (Exhibit 10 was marked for
23        identification purposes.)
24   BY MR. GORDON:
25   Q.   We'll mark that as 10 once we get it.

187

1    A.   Okay.
2    Q.   Just to be clear, the CCTV that you
3    reviewed, do you have that at your office?
4    A.   It was given to me in a pen drive.
5    Q.   Do you have it?
6    A.   I think it's connected on the desktop,
7    the full pen drive.
8         Yeah.  I don't have that pen drive
9    with me.
10   Q.   Do you have it at your office?
11   A.   Yeah.  On my desktop.
12   Q.   Can you make arrangements to make a
13   copy of that and send it to Mr. Gerson and we'll
14   have it marked as an exhibit?
15   A.   Sure.  It has several files.  I'll
16   send that as -- I'll send the files.  We can mark
17   this as Exhibit 11.
18        (Exhibit 11 was marked for
19        identification purposes.)
20        MR. GERSON:  You send everything to
21   me, then I send it to counsel or the
22   reporter.
23        MR. GORDON:  You can send to the
24   reporter.  That's fine.
25        MR. GERSON:  Any more questions?

188

1         MR. GORDON:  Yeah.  Just checking my
2    notes, wrapping it up.
3         (Exhibit 12 was marked for
4         identification purposes.)
5         MR. GORDON:  So we will mark that
6    Exhibit 1 to Mr. Naik's deposition as
7    Exhibit 12 to this deposition.
8         (Pause.)
9         MR. GERSON:  Come on, Mike.  We been
10   sitting here.
11        MR. GORDON:  You can't give me two
12   minutes to check my notes?
13        MR. GERSON:  I've given you more than
14   two minutes.
15        MR. GORDON:  Come on.  This is my
16   chance.
17        That's all I have.
18        MR. GERSON:  No cross.  The witness
19   will read.
20        If it's ordered, I would like an
21   E-tran only.  Thank you.
22        THE COURT REPORTER:  Are you ordering?
23        MR. GORDON:  I'd like it expedited.
24        (Deposition concluded @ 4:35 p.m.
25   reading and signing were not waived.)

**189**

(blank page, lines 1-25)

---

**190**

CERTIFICATE OF OATH

STATE OF FLORIDA        )
COUNTY OF MIAMI-DADE   )

I, Rhonda Bonner, Registered Professional
Reporter, Florida Professional Reporter, Notary
Public, State of Florida, certify that
FRANCISCO DE CASO, PH.D. personally appeared before
me on November 1, 2019, and was duly sworn.

WITNESS my hand and official seal this
5th day of November, 2019.


_____
RHONDA BONNER
REGISTERED PROFESSIONAL REPORTER
NOTARY PUBLIC - STATE OF FLORIDA
MY COMMISSION #DD806306
MY COMMISSION EXPIRES 10-15-20

---

**191**

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA        )
COUNTY OF MIAMI-DADE)

I, RHONDA BONNER, Registered Professional
Reporter, Florida Professional Reporter, certify
that I was authorized to and did stenographically
report the deposition of FRANCISCO DE CASO, PH.D.;
that a review of the transcript was requested; and
that the foregoing transcript, pages 1 through 190,
is a true and complete record of my stenographic
notes.

I further certify that I am not a
relative, employee, attorney, or counsel of any of
the parties, nor am I a relative or employee of any
of the parties' attorney or counsel connected with
the action, nor am I financially interested in the
action.

Dated this 5th day of November, 2019.


_____
RHONDA BONNER
REGISTERED PROFESSIONAL REPORTER
FLORIDA PROFESSIONAL REPORTER

---

**192**

JEANNIE REPORTING
28 West Flagler Street
Suite 610
Miami, Florida 33130

November 1, 2019

FRANCISCO DE CASO, PH.D.
c/o
NICHOLAS I. GERSON
GERSON & SCHWARTZ, P. A.
1980 CORAL WAY
MIAMI, FLORIDA 33145

IN RE: CHRISTINE KESSLER, a resident of the State
of Pennsylvania v. NCL (BAHAMAS) LTD, a Bermuda
company d/b/a NORWEGIAN CRUISE LINE

With reference to the examination of
YOURSELF, deponent in the above-styled cause, taken
on November 1, 2019, under oath, please be advised
that the transcript of the Deposition has been
transcribed and is awaiting your signature.

Please arrange to conclude this matter at
your earliest convenience. We would suggest that
you telephone this office and arrange an
appointment suitable for all concerned.

However, if this has not been taken care of
by the date of the governing rules related to this
matter, we shall conclude the reading and signing
of said deposition has been waived and shall then
proceed to file the original of the said transcript
with the party who took the deposition without
further notice to any parties.

Sincerely,


_____
Rhonda Bonner

via email:
ngerson@gslawusa.com
mgordon@fflegal.com

```
1              ERRATA SHEET

2    F.R.C.P. RULE 1.310 PROVIDES IN PART:
        (e)"...Any changes in form or substance that the
3    witness wants to make shall be entered upon a
     separate correction page by the officer with a
4    statement of the reasons given by the witness for
     making them..."

5

6    PAGE/LINE      CHANGE/CORRECTION      REASON

7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18
19   I, _____, do hereby certify that I
20   have read the foregoing transcript of my
21   deposition, given on November 1, 2019, and that
22   together with any additions or corrections made
23   herein, it is true and correct.
24               _____
25              FRANCISCO DE CASO, PH.D.
```

1

**$**

**$3,190.10** [1] - 185:13

**0**

**04** [1] - 67:21
**051** [1] - 27:5
**056** [3] - 25:13, 26:6, 26:20

**1**

**1** [19] - 6:12, 6:15, 6:18, 8:7, 53:16, 55:16, 116:22, 155:5, 168:14, 168:18, 170:10, 170:22, 180:20, 181:14, 181:16, 181:20, 182:3, 183:7, 188:6
**1,657** [1] - 46:6
**1.2** [5] - 154:12, 154:13, 155:6, 155:10, 179:25
**10** [15] - 39:25, 40:25, 48:18, 48:22, 48:23, 49:1, 49:4, 49:11, 50:19, 95:5, 181:4, 181:5, 182:3, 186:22, 186:25
**100** [1] - 93:11
**10:14** [3] - 25:14, 26:7, 26:23
**10:30** [2] - 34:21, 141:24
**11** [8] - 48:20, 48:21, 51:1, 95:5, 100:8, 178:14, 187:17, 187:18
**12** [22] - 48:20, 48:21, 51:1, 68:4, 85:14, 94:4, 94:7, 94:14, 96:15, 96:21, 97:2, 97:4, 97:5, 123:18, 124:9, 126:17, 137:4, 155:4, 168:9, 172:20, 188:3, 188:7
**123** [1] - 39:5
**13** [11] - 39:12, 40:25, 53:21, 68:4, 68:21, 85:14, 103:16, 118:3, 120:1, 120:11, 122:3
**1332** [1] - 130:6
**14** [5] - 39:25, 41:1, 52:6, 52:7, 122:3
**15** [2] - 138:4, 168:15
**16** [5] - 98:8, 140:21,

140:24, 143:24, 153:23
**165** [1] - 185:18
**17** [4] - 156:7, 161:25, 175:25, 177:3
**18** [4] - 84:10, 86:5, 88:6, 101:7
**19** [6] - 105:7, 116:24, 132:5, 132:12, 133:16, 135:19
**1:35** [1] - 75:6
**1:43** [1] - 75:8
**1st** [1] - 8:2

**2**

**2** [16] - 8:8, 8:9, 8:12, 75:14, 124:17, 125:11, 181:1, 181:7, 181:12, 181:15, 181:18, 181:21, 183:7, 183:17, 183:21
**2-2** [2] - 103:16, 103:22
**20** [3] - 9:10, 167:24, 169:22
**2003** [1] - 66:13
**2006** [1] - 11:17
**2010** [1] - 129:24
**2016-17** [1] - 11:18
**2017** [3] - 123:18, 124:9, 126:17
**2018** [3] - 43:6, 43:11, 76:1
**2019** [12] - 8:2, 34:15, 34:23, 35:1, 43:18, 43:19, 43:23, 43:24, 44:7, 162:7, 168:15
**210** [1] - 65:15
**22:14** [1] - 26:20
**22:31** [1] - 27:4
**25** [6] - 34:23, 35:1, 43:18, 43:24, 44:6, 162:7
**250** [2] - 185:23, 186:3
**25th** [2] - 34:15, 45:9
**2:59** [1] - 136:17

**3**

**3** [12] - 18:23, 18:24, 19:2, 61:21, 86:3, 141:6, 171:3, 171:6, 181:18, 183:7, 183:18, 183:21
**3,963** [1] - 46:5
**3.1.11** [1] - 178:10
**3.25** [3] - 94:7, 95:1, 96:16

**30** [5] - 7:25, 9:15, 9:17, 9:18, 41:8
**32** [1] - 26:21
**33146** [1] - 6:11
**35** [1] - 161:7
**37** [1] - 38:22
**3:08** [1] - 136:19
**3:47** [2] - 61:24, 114:11
**3:47:06** [1] - 114:12
**3:47:06.257** [1] - 114:10
**3:53** [1] - 49:21

**4**

**4** [13] - 26:12, 26:16, 26:18, 27:6, 68:13, 68:16, 178:7, 178:9, 178:10, 178:23, 179:5, 180:15
**4.1.11** [1] - 157:3
**4.1.12** [1] - 162:1
**4.1.13** [1] - 141:4
**4.1.14** [1] - 176:1
**4.1.15** [1] - 177:3
**4.1.2** [2] - 98:9, 98:10
**4.1.3** [1] - 141:5
**4.15** [3] - 143:24, 144:10, 149:12
**4.16** [1] - 153:12
**4.19** [2] - 156:7, 156:24
**4.2** [3] - 86:6, 86:10, 103:20
**4.2.12** [1] - 132:5, 132:12
**4.2.13** [4] - 133:17, 133:18, 135:19, 138:20
**4.2.2** [1] - 86:12
**4.2.3** [1] - 86:11
**4.2.4** [1] - 101:8
**4.2.7** [1] - 103:19
**4.2.8** [1] - 105:10
**44** [1] - 38:23
**444** [1] - 178:18
**4:00** [2] - 50:15, 177:16
**4:06** [1] - 177:18
**4:30** [3] - 50:5, 50:11, 142:11
**4:35** [1] - 188:24
**4:45** [1] - 50:9

**5**

**5** [27] - 9:24, 9:25, 19:6, 23:10, 24:3, 24:24, 48:2, 48:6,

49:17, 49:20, 56:23, 57:12, 57:17, 57:23, 65:17, 65:23, 66:18, 91:4, 112:14, 115:19, 158:23, 159:3, 160:19, 160:20, 168:15, 181:4, 181:5
**50** [2] - 100:22, 161:7
**511** [1] - 87:23
**51130** [1] - 88:1
**55130** [1] - 68:4
**57** [1] - 53:24
**5804** [1] - 6:10
**5A** [10] - 91:5, 91:6, 91:9, 91:15, 92:16, 94:15, 112:13, 115:19, 160:20, 160:23

**6**

**6** [11] - 46:7, 50:13, 67:18, 74:9, 76:5, 78:3, 82:9, 82:13, 82:18, 83:11, 183:17

**7**

**7** [11] - 35:3, 36:16, 37:1, 67:21, 68:7, 68:13, 68:16, 93:14, 178:11, 178:12, 178:16
**735** [1] - 144:6
**77** [4] - 35:4, 37:7, 38:6, 175:10

**8**

**8** [5] - 123:21, 123:23, 124:5, 125:11, 162:3
**81** [2] - 174:19, 175:15
**89** [1] - 61:23

**9**

**9** [3] - 27:5, 185:3, 185:6
**90** [2] - 61:11, 61:21
**92** [1] - 61:12
**95** [1] - 10:3
**9:00** [2] - 34:19, 141:24

**A**

**a.m** [3] - 34:19, 141:24
**A326.3-2017** [1] - 76:1
**ability** [6] - 120:20,

121:4, 121:21, 122:8, 122:15, 152:5
**able** [18] - 21:18, 57:8, 76:3, 76:20, 90:9, 99:25, 104:4, 113:11, 166:3, 166:5, 172:10, 172:19, 173:20, 173:21, 175:23, 178:5, 182:11, 183:2
**abnormality** [4] - 124:10, 124:18, 125:16, 126:15
**acceptable** [1] - 90:17
**access** [8] - 6:25, 31:3, 52:10, 71:16, 74:2, 149:15, 178:12, 186:15
**accessible** [1] - 186:17
**accident** [10] - 13:2, 13:4, 13:7, 13:11, 13:14, 13:17, 13:18, 13:22, 14:10, 131:6
**Accident** [1] - 65:10
**accidents** [3] - 13:21, 13:23, 24:19
**according** [6] - 45:13, 65:23, 124:6, 126:13, 139:13, 142:10
**accumulated** [2] - 158:7, 159:16
**accumulation** [5] - 105:18, 132:8, 162:2, 183:20, 183:25
**accurate** [6] - 18:2, 19:10, 50:16, 50:17, 67:2, 165:10
**activities** [2] - 98:20, 157:21
**activity** [1] - 98:14
**actual** [5] - 36:20, 94:17, 107:12, 109:8, 110:23
**added** [1] - 10:17
**adding** [1] - 161:18
**addition** [1] - 77:18
**additional** [6] - 8:25, 25:3, 88:19, 95:10, 161:18, 172:25
**address** [2] - 6:9, 80:3
**adequate** [1] - 176:3
**adequately** [1] - 158:6
**adjacent** [2] - 50:23, 51:6
**Administration** [1] - 22:13
**admits** [4] - 124:18,

125:13, 125:16
**admitted** [1] - 126:13
**affect** [8] - 121:4, 121:20, 122:8, 122:15, 126:24, 127:18, 131:5, 184:6
**affected** [1] - 152:5
**afraid** [2] - 72:6, 76:3
**afternoon** [1] - 5:16
**ago** [2] - 7:5, 84:1
**agree** [36] - 21:14, 21:16, 25:12, 25:16, 39:7, 39:10, 46:13, 54:8, 54:13, 58:9, 65:15, 66:15, 66:17, 74:8, 80:5, 106:10, 106:13, 118:14, 120:16, 120:18, 121:3, 121:19, 122:21, 123:5, 124:6, 126:23, 127:18, 128:16, 128:23, 129:7, 129:25, 144:11, 155:23, 160:7, 164:17, 164:25
**agreed** [2] - 81:24, 160:6
**agreement** [4] - 7:24, 8:3, 75:11
**ahead** [9] - 57:22, 84:21, 109:5, 110:16, 111:20, 118:22, 120:25, 138:16, 163:1
**air** [13] - 35:4, 35:12, 35:18, 37:6, 38:6, 38:10, 38:13, 39:7, 41:12, 41:15, 41:17, 41:20, 175:8
**alcohol** [18] - 24:21, 126:23, 127:5, 127:9, 127:14, 127:15, 127:18, 127:21, 128:9, 128:24, 129:4, 129:7, 130:2, 130:11, 131:8, 131:16, 132:2
**alert** [1] - 159:14
**allegedly** [2] - 69:22, 175:21
**alluding** [3] - 108:24, 143:6, 168:8
**altered** [2] - 121:8
**American** [3] - 69:8, 75:20, 76:8
**amount** [9] - 96:13, 127:4, 129:4, 155:17, 170:17,

171:12, 176:25, 183:19, 184:3
**amounts** [1] - 171:15
**analysis** [4] - 63:22, 122:2, 172:8, 172:25
**angle** [1] - 113:6
**angles** [1] - 19:10
**Anne** [2] - 137:16, 137:17
**annotate** [1] - 24:14
**ANSI** [6] - 75:15, 75:25, 76:15, 76:22, 77:4, 78:1
**answer** [31] - 30:6, 31:18, 58:23, 61:14, 71:22, 74:5, 74:6, 92:24, 96:17, 97:17, 110:5, 110:13, 111:8, 111:18, 111:19, 113:22, 122:11, 123:7, 127:11, 127:12, 135:14, 137:3, 138:14, 146:5, 161:21, 161:22, 169:11, 169:19, 171:2, 171:13, 172:10
**answered** [20] - 42:24, 55:14, 57:19, 62:14, 63:16, 82:23, 103:8, 110:12, 111:9, 111:11, 111:22, 113:3, 120:22, 134:8, 157:19, 158:3, 162:23, 163:15, 164:3, 176:12
**answering** [8] - 30:5, 31:11, 89:22, 108:21, 138:18, 146:2, 146:12, 148:17
**Answers** [1] - 136:24
**answers** [2] - 139:13, 140:15
**apologize** [1] - 149:2
**applicability** [1] - 70:21
**applicable** [8] - 69:14, 69:22, 69:23, 70:10, 71:19, 71:23, 72:1, 73:19
**application** [1] - 101:18
**applications** [1] - 65:21
**applied** [2] - 101:19, 165:9
**apply** [2] - 53:12,

166:3
**applying** [3] - 80:1, 81:5, 182:9
**appreciate** [4] - 39:6, 79:4, 119:25, 125:5
**approach** [2] - 83:20, 182:15
**approaching** [1] - 81:9
**appropriate** [3] - 67:6, 72:17, 159:18
**April** [2] - 43:19, 43:23
**architect** [6] - 12:21, 32:17, 32:19, 32:21, 32:22, 102:13
**architectural** [5] - 32:8, 32:11, 33:2, 33:5, 33:10
**area** [96] - 32:7, 32:14, 37:22, 37:25, 46:9, 47:21, 47:23, 48:18, 49:2, 51:9, 54:1, 55:18, 55:22, 56:25, 57:3, 57:5, 60:3, 60:7, 60:10, 60:11, 60:15, 60:19, 60:24, 61:7, 62:5, 63:4, 71:25, 87:16, 89:23, 90:8, 91:15, 91:18, 91:22, 91:25, 92:6, 92:12, 92:19, 93:4, 94:24, 96:23, 96:24, 97:12, 97:15, 97:24, 101:11, 104:7, 106:5, 106:20, 106:21, 106:22, 106:25, 107:3, 107:8, 107:17, 108:19, 108:21, 109:4, 109:20, 110:3, 110:9, 111:17, 112:7, 113:25, 115:11, 115:14, 115:17, 115:18, 115:22, 116:6, 138:5, 139:2, 139:15, 141:20, 143:7, 144:23, 145:21, 146:9, 146:10, 149:15, 158:5, 158:7, 158:18, 158:19, 158:22, 160:12, 160:21, 164:16, 167:15, 171:15, 172:13, 178:12, 179:2, 180:2, 180:4, 180:22
**areas** [20] - 68:5, 68:20, 84:11, 86:14,

86:20, 87:2, 87:7, 88:21, 89:24, 90:3, 100:11, 109:2, 141:12, 145:24, 148:19, 149:15, 159:13
**arguing** [2] - 111:6, 111:7
**argumentative** [1] - 73:17
**Aronfeld** [1] - 11:15
**arrangements** [1] - 187:12
**arrow** [1] - 159:5
**article** [10] - 65:10, 65:23, 129:13, 129:20, 129:25, 130:7, 130:10, 130:15, 130:17, 131:2
**articles** [5] - 63:24, 64:13, 64:22, 65:3, 129:14
**assess** [1] - 79:24
**assessment** [1] - 125:15
**assist** [1] - 63:14
**assume** [7] - 8:8, 32:16, 81:1, 93:23, 99:5, 107:20, 107:22
**assuming** [19] - 49:21, 76:13, 92:3, 92:17, 108:3, 112:19, 125:14, 131:10, 131:14, 131:16, 148:22, 149:3, 149:19, 149:22, 159:23, 164:19, 165:4, 172:3, 184:7
**assumptions** [1] - 176:14
**ASTM** [7] - 67:2, 69:7, 74:8, 75:23, 80:23, 81:25, 82:10
**attached** [1] - 25:7
**attempt** [2] - 63:13, 151:9
**attention** [1] - 126:4
**attest** [1] - 115:8
**attorney** [3] - 11:15, 159:7, 186:21
**attorney's** [1] - 18:21
**attorneys** [2] - 62:20, 185:12
**audio** [2] - 22:15, 30:18
**August** [9] - 8:2, 34:15, 34:23, 35:1, 43:18, 43:24, 44:6, 45:9, 162:7

**Aurelia** [1] - 10:21
**authoritative** [10] - 51:20, 52:13, 63:25, 64:7, 64:14, 64:17, 65:3, 66:15, 70:8, 70:15
**authorities** [2] - 72:18, 73:19
**automatically** [8] - 29:3, 29:12, 30:1, 30:3, 30:7, 30:12, 35:20, 36:8
**available** [15] - 19:14, 19:15, 19:17, 19:25, 20:3, 20:13, 20:23, 21:17, 46:4, 49:24, 52:16, 53:6, 53:9, 117:15
**average** [20] - 35:4, 35:14, 35:22, 36:8, 36:10, 36:11, 37:6, 38:6, 38:9, 41:5, 41:9, 41:15, 51:3, 53:15, 53:18, 53:22, 65:25, 152:2, 174:21, 175:14
**aware** [15] - 12:5, 22:19, 24:17, 26:6, 37:16, 37:20, 38:1, 42:13, 42:16, 44:13, 66:3, 73:23, 101:3, 101:9, 102:2
**awkward** [1] - 121:13
**awkwardness** [1] - 119:16

---

# B

**B-A-S-A-L-O** [1] - 5:20
**background** [2] - 65:5, 119:11
**backwards** [2] - 108:10, 112:5
**balance** [10] - 118:9, 118:10, 121:25, 124:10, 124:17, 126:14, 126:24, 127:19, 128:21
**Balance** [1] - 125:12
**balanced** [2] - 120:2, 121:14
**bang** [1] - 98:1
**barefoot** [2] - 140:17, 140:19
**Basalo** [1] - 5:19
**Based** [1] - 157:4
**based** [55] - 13:23, 14:11, 27:6, 27:10, 40:7, 46:4, 49:19, 51:23, 54:11, 54:22,

58:1, 65:21, 68:13, 70:5, 73:12, 75:1, 84:7, 84:19, 85:23, 87:13, 92:15, 98:22, 99:4, 103:12, 107:2, 107:9, 107:10, 108:3, 109:22, 110:18, 112:13, 112:21, 116:7, 117:5, 117:25, 118:8, 118:9, 120:1, 120:4, 120:9, 126:16, 146:12, 146:19, 146:25, 148:18, 156:16, 156:22, 162:12, 162:14, 163:4, 163:5, 165:22, 165:23, 176:14

**basic** [1] - 80:19

**basing** [1] - 118:5

**basis** [8] - 101:15, 101:16, 132:18, 135:18, 136:3, 150:12, 155:19, 174:25

**Bates** [2] - 39:2, 39:5

**bathtubs** [1] - 90:1

**become** [4] - 43:4, 84:12, 86:14, 89:10

**becomes** [1] - 92:7

**becoming** [1] - 143:9

**beg** [2] - 13:15, 167:4

**beginning** [9] - 36:12, 120:11, 154:20, 157:14, 169:6, 181:16, 182:4

**behalf** [1] - 9:13

**Bellai** [1] - 137:17

**BELLAI** [1] - 137:17

**benefitted** [1] - 151:23

**bent** [1] - 57:24

**Berman** [1] - 134:22

**beside** [2] - 139:8, 139:15

**best** [16] - 11:24, 12:4, 19:22, 21:12, 51:14, 51:24, 58:12, 58:25, 59:7, 62:15, 77:21, 146:3, 146:19, 147:14, 182:17, 185:15

**best-case** [1] - 182:17

**better** [5] - 58:3, 79:18, 79:21, 91:4, 91:10

**between** [16] - 42:11, 43:23, 46:10, 48:20, 48:21, 68:16, 74:20, 80:20, 82:1, 82:8,

82:12, 83:3, 91:24, 98:6, 131:5, 140:25

**big** [1] - 127:21

**binary** [1] - 76:12

**binding** [1] - 144:15

**biomechanical** [1] - 14:16

**biomechanics** [3] - 42:9, 42:20, 77:21

**biomedical** [1] - 14:19

**bit** [1] - 183:13

**black** [1] - 159:5

**blank** [2] - 186:8, 186:10

**blaring** [1] - 175:5

**blew** [1] - 26:6

**blind** [1] - 143:9

**boat** [5] - 71:25, 72:2, 73:12, 102:8, 102:22

**book** [2] - 66:25, 71:5

**Bostic** [1] - 11:1

**BOT** [8] - 76:12, 77:1, 77:10, 77:11, 78:2, 78:5, 79:14, 81:16

**BOT-3000** [7] - 77:9, 77:17, 78:9, 78:20, 78:25, 79:9, 79:21

**bottle** [1] - 95:25

**bottom** [4] - 57:25, 155:3, 177:2, 178:11

**bought** [1] - 44:15

**box** [1] - 135:3

**breach** [1] - 71:15

**break** [1] - 75:3

**BREAKAWAY** [21] - 22:22, 31:10, 32:3, 33:11, 33:23, 34:1, 34:4, 34:9, 34:23, 46:3, 69:15, 72:12, 73:25, 86:24, 89:24, 100:24, 135:21, 137:6, 151:3, 151:4, 151:6

**breathalyzer** [5] - 24:22, 25:3, 25:10, 25:13, 26:17

**brief** [3] - 75:5, 136:16, 177:15

**bring** [5] - 20:20, 64:9, 119:11, 126:3, 158:23

**broad** [2] - 121:23, 122:13

**brought** [2] - 6:20, 8:21

**bucket** [7] - 154:11, 168:19, 168:21, 168:22, 168:23, 170:11, 178:7

**buckets** [7] - 168:1,

168:5, 169:3, 169:10, 169:18, 170:4, 170:13

**building** [1] - 13:25

**built** [1] - 72:16

**business** [1] - 6:9

**but..** [1] - 79:2

**button** [1] - 36:1

**buy** [2] - 71:1, 102:14

**buys** [1] - 102:21

**BY** [92] - 5:15, 6:16, 7:8, 8:14, 10:14, 12:1, 14:8, 19:1, 26:1, 26:14, 27:3, 29:1, 31:7, 32:20, 34:16, 47:18, 48:4, 55:19, 56:11, 57:21, 58:8, 59:2, 59:9, 59:14, 60:13, 60:23, 61:17, 62:17, 64:5, 64:12, 64:18, 72:3, 73:18, 74:4, 75:9, 76:7, 82:24, 87:20, 91:8, 93:1, 93:9, 93:16, 102:17, 103:9, 107:21, 108:2, 110:6, 110:15, 111:12, 112:10, 113:14, 114:4, 118:21, 120:24, 123:24, 124:3, 124:15, 125:8, 126:11, 127:10, 128:13, 128:22, 129:12, 130:14, 131:1, 131:17, 133:15, 134:9, 136:20, 138:15, 140:16, 147:16, 153:2, 157:23, 158:4, 161:13, 161:24, 162:25, 163:22, 164:6, 164:10, 166:23, 168:12, 170:9, 170:21, 173:23, 174:7, 176:22, 177:19, 184:13, 185:5, 186:24

**bypass** [3] - 180:21, 181:8, 181:20

## C

**C-O-L-L-A-N-T-E-S** [1] - 171:4

**calculation** [1] - 35:7

**calculations** [1] - 35:19

calibrated [4] - 43:18, 43:20, 43:24, 45:5

**camera** [11] - 29:3, 29:12, 29:19, 29:23, 29:24, 30:4, 30:7, 30:14, 31:1, 108:14, 113:17

**cannot** [8] - 21:23, 71:5, 71:11, 88:25, 104:22, 155:23, 165:12, 171:13

**capabilities** [1] - 170:14

**capacity** [5] - 15:18, 16:2, 16:5, 17:21, 141:1

**capital** [1] - 69:4

**captured** [1] - 36:14

**card** [3] - 30:14, 30:16, 30:17

**Caribbean** [3] - 11:2, 11:13, 12:7

**Carnival** [6] - 10:21, 10:22, 10:25, 12:14, 148:7, 148:12

**Carolyn** [2] - 137:16, 137:17

**Carrasco** [1] - 28:22

**CARRASCO** [6] - 7:6, 28:15, 28:20, 28:22, 28:24, 47:14

**case** [78] - 7:9, 7:11, 7:12, 7:15, 7:17, 7:21, 7:23, 8:16, 8:25, 9:2, 10:7, 11:3, 11:7, 11:21, 12:2, 12:15, 13:20, 15:15, 18:17, 19:7, 19:13, 19:25, 20:12, 21:2, 21:21, 25:4, 32:5, 34:5, 34:9, 38:23, 42:18, 43:2, 46:16, 52:4, 54:16, 54:23, 58:17, 59:8, 65:5, 65:19, 68:2, 69:18, 77:19, 77:23, 79:14, 79:17, 81:6, 81:16, 82:6, 83:10, 84:8, 95:16, 99:21, 100:14, 101:17, 102:1, 102:24, 104:8, 107:11, 114:19, 119:8, 131:3, 133:20, 136:6, 136:7, 136:14, 137:11, 143:19, 146:8, 148:16, 153:6, 155:9, 170:16, 182:17, 184:24,

185:8, 185:12

**cases** [8] - 9:11, 9:13, 9:19, 10:15, 10:18, 133:18, 136:5, 152:1

**CASO** [2] - 5:10, 5:20

**Caso** [8] - 5:19, 19:2, 75:10, 91:9, 93:17, 126:12, 128:14, 128:23

**caused** [3] - 120:15, 131:11, 140:24

**caution** [7] - 159:13, 160:12, 160:21, 161:3, 161:7, 161:18, 161:19

**cautionary** [1] - 161:12

**CCTV** [55] - 19:9, 19:13, 19:20, 19:24, 20:5, 20:17, 21:6, 21:14, 21:20, 22:1, 47:6, 47:11, 47:17, 47:21, 47:23, 50:15, 55:2, 55:5, 55:20, 56:12, 62:18, 62:24, 63:6, 63:9, 91:16, 92:9, 92:13, 92:16, 93:4, 94:17, 105:25, 106:18, 107:2, 107:10, 107:13, 108:6, 109:12, 109:16, 109:19, 110:8, 112:1, 114:14, 115:1, 116:7, 117:13, 118:1, 120:12, 132:6, 156:10, 156:23, 156:24, 157:4, 176:21, 176:23, 187:2

**cerebellar** [1] - 130:11

**certain** [7] - 23:7, 23:16, 55:7, 56:3, 62:24, 78:8, 113:8

**certainty** [8] - 49:10, 56:1, 63:12, 92:2, 92:11, 92:22, 112:17, 155:24

**certification** [1] - 43:6

**certified** [1] - 43:4

**cetera** [3] - 99:13, 102:11

**chance** [3] - 82:11, 116:21, 188:16

**change** [4] - 46:14, 80:1, 92:6, 94:25

**changed** [4] - 44:6, 44:9, 44:17, 102:7, 121:9

**changes** [3] - 79:25,

91:24, 94:18
**Chapter** [2] - 103:16, 103:22
**chapter** [1] - 104:15
**characteristics** [2] - 77:24, 80:2
**characterization** [1] - 111:22
**charged** [1] - 185:11
**charging** [1] - 184:24
**Chau** [1] - 129:19
**cheap** [1] - 128:1
**check** [2] - 12:19, 188:12
**checking** [2] - 36:5, 188:1
**Chiou** [1] - 65:13
**chose** [1] - 72:4
**circular** [11] - 144:2, 144:6, 144:9, 145:2, 145:5, 145:10, 146:1, 146:14, 149:14, 150:11
**circulars** [1] - 144:11
**circumstance** [1] - 79:21
**circumstances** [1] - 79:18
**cite** [5] - 63:24, 65:9, 104:15, 130:1, 144:2
**cited** [5] - 64:21, 65:6, 129:14, 129:23, 131:2
**citing** [1] - 68:3
**civil** [1] - 32:25
**clarification** [1] - 83:5
**clarify** [1] - 177:22
**clarifying** [1] - 85:17
**classification** [11] - 72:7, 72:9, 72:10, 72:13, 72:22, 72:25, 73:3, 73:9, 73:10, 73:11, 73:13
**classified** [4] - 72:20, 80:8, 101:17, 144:25
**classifies** [1] - 88:20
**classify** [2] - 86:23, 87:17
**clean** [3] - 17:21, 17:25, 176:18
**cleaned** [2] - 99:3, 100:18
**cleaner** [2] - 16:5, 156:4
**cleaning** [7] - 16:13, 16:15, 16:18, 16:19, 98:13, 98:20, 100:13
**clear** [7] - 14:13, 31:13, 48:24, 78:17, 123:16, 161:16,

187:2
**clearly** [4] - 55:23, 108:12, 118:2, 160:7
**clogged** [3] - 178:8, 179:23, 180:7
**closely** [1] - 42:8
**Coefficient** [1] - 76:10
**coefficient** [28] - 65:16, 66:19, 68:6, 69:2, 70:20, 74:10, 74:11, 74:14, 74:15, 74:17, 78:4, 80:8, 80:18, 81:3, 81:7, 81:14, 82:1, 82:15, 82:16, 82:17, 82:20, 82:21, 83:2, 83:8, 83:10, 90:13, 90:20, 104:16
**COF** [2] - 74:17, 78:7
**coffee** [2] - 81:1, 81:2
**Cohen** [1] - 65:13
**collaborative** [1] - 83:20
**Collantes** [14] - 59:22, 61:4, 113:24, 156:11, 157:5, 159:21, 162:8, 162:20, 163:25, 164:22, 167:13, 170:25, 171:3, 171:17
**Collantes '** [4] - 158:23, 159:3, 170:10, 171:2
**collapses** [1] - 13:25
**collect** [1] - 36:7
**color** [2] - 92:7, 102:10
**combination** [1] - 48:13
**coming** [4] - 56:25, 86:21, 92:8, 125:14
**comment** [3] - 83:22, 96:16, 163:14
**comments** [1] - 83:24
**committee** [1] - 83:14
**committees** [1] - 83:16
**common** [1] - 127:8
**companies** [2] - 16:13, 16:15
**company** [4] - 16:18, 16:20, 16:22, 16:24
**compare** [6] - 54:15, 90:8, 119:9, 119:17, 121:10, 174:6
**compared** [2] - 119:20, 183:21
**comparing** [6] - 54:6, 94:16, 112:14,

120:13, 121:1, 172:5
**comparison** [4] - 50:23, 51:2, 86:18, 122:4
**complaint** [1] - 50:6
**complement** [1] - 46:6
**complete** [2] - 133:12, 185:7
**computer** [3] - 28:2, 186:12, 186:19
**computes** [1] - 78:6
**concentration** [1] - 127:5
**concerned** [1] - 70:2
**concerning** [3] - 141:19, 167:18, 169:15
**concluded** [1] - 188:24
**concrete** [1] - 17:8
**condition** [21] - 46:22, 80:1, 120:19, 121:4, 121:20, 121:24, 122:8, 122:12, 122:15, 122:22, 122:25, 123:2, 123:5, 123:9, 155:24, 165:1, 165:6, 175:9, 180:10, 183:8, 184:7
**conditioned** [1] - 45:12
**conditions** [19] - 54:6, 54:18, 54:21, 63:10, 65:20, 89:1, 90:1, 99:12, 130:22, 141:9, 142:2, 142:5, 142:23, 167:19, 169:16, 172:15, 172:18, 173:9, 173:10
**conduct** [2] - 51:13, 51:14
**conducted** [1] - 39:18
**conducting** [1] - 109:25
**confirm** [1] - 93:20
**connected** [1] - 187:6
**connection** [2] - 31:2, 72:12
**consciously** [1] - 143:8
**conservative** [1] - 182:14
**considered** [8] - 65:17, 87:4, 89:24, 89:25, 90:5, 149:16, 180:6
**consistent** [2] - 96:6, 119:15

**consult** [2] - 34:11, 87:6
**consultant** [1] - 7:24
**consulted** [1] - 11:21
**consumed** [2] - 129:4, 132:2
**consumption** [5] - 126:24, 127:18, 128:24, 129:7, 130:11
**contacted** [1] - 167:10
**contain** [1] - 93:21
**contained** [5] - 8:20, 9:1, 28:9, 93:18, 93:24
**contains** [1] - 89:13
**contaminant** [2] - 100:12, 162:3
**contaminants** [2] - 98:25, 99:13
**context** [12] - 121:17, 122:17, 127:3, 148:25, 149:11, 155:12, 161:2, 161:4, 161:5, 161:16, 166:15, 166:19
**continue** [1] - 75:4
**contrast** [12] - 55:24, 91:18, 91:23, 91:24, 94:17, 94:25, 112:16, 140:24, 143:7, 161:11, 171:9, 171:22
**contrasts** [1] - 63:7
**control** [10] - 52:9, 52:11, 52:17, 73:21, 79:23, 101:8, 103:3, 103:12, 176:1, 177:4
**controlled** [1] - 177:9
**Convention** [1] - 104:10
**conversations** [1] - 83:15
**cooler** [1] - 175:10
**copy** [9] - 18:22, 58:3, 76:14, 91:4, 91:10, 103:15, 103:24, 185:10, 187:13
**copyright** [3] - 71:4, 71:11, 71:15
**copyrighted** [1] - 88:23
**Coral** [1] - 6:10
**corner** [3] - 57:25, 178:18, 180:21
**Corporation** [3] - 10:22, 10:23, 12:14
**correct** [353] - 7:15, 7:16, 8:9, 10:4,

10:16, 12:22, 12:23, 12:25, 13:1, 13:3, 14:4, 14:10, 14:14, 14:17, 14:19, 14:21, 14:24, 14:25, 15:1, 15:2, 15:5, 15:8, 15:11, 15:14, 15:21, 15:22, 15:24, 15:25, 16:3, 16:6, 16:11, 17:13, 18:1, 18:5, 18:18, 18:19, 19:5, 19:8, 19:11, 20:6, 20:9, 20:21, 21:15, 22:8, 22:11, 23:8, 23:9, 23:12, 23:20, 24:5, 24:19, 24:20, 26:2, 26:22, 26:23, 26:24, 27:5, 27:9, 27:12, 29:22, 32:17, 33:3, 33:7, 35:5, 35:6, 37:13, 37:22, 38:7, 38:8, 38:11, 38:12, 38:15, 38:16, 39:9, 39:21, 40:1, 40:4, 40:17, 41:2, 41:3, 41:24, 42:1, 42:14, 42:23, 43:3, 43:12, 44:12, 44:16, 44:21, 46:14, 46:18, 46:19, 46:23, 46:24, 47:19, 47:22, 48:1, 48:11, 49:6, 49:7, 49:11, 49:12, 50:11, 53:22, 53:25, 54:10, 55:8, 55:9, 56:18, 56:19, 56:25, 57:1, 58:11, 58:15, 58:20, 59:11, 59:13, 59:19, 60:3, 60:7, 61:25, 62:7, 62:25, 63:1, 63:25, 64:22, 64:23, 64:25, 65:3, 65:7, 65:8, 65:13, 65:18, 65:24, 66:4, 66:8, 66:14, 66:16, 66:20, 67:11, 73:2, 73:5, 74:10, 74:16, 74:21, 74:22, 74:24, 74:25, 75:12, 75:16, 75:23, 75:24, 76:25, 77:6, 77:9, 77:10, 77:12, 77:13, 78:2, 78:10, 78:11, 78:19, 79:7, 79:8, 79:10, 79:11, 79:13, 80:6, 80:10, 80:12, 80:13, 80:15, 82:2, 82:16, 82:25, 83:1, 83:18, 84:13, 84:14, 85:6, 85:7, 86:17, 92:4, 95:19, 97:20, 97:25, 98:2,

101:22, 102:19, 103:1, 103:5, 103:10, 103:11, 105:16, 105:21, 105:22, 106:7, 106:12, 107:14, 107:15, 107:17, 109:17, 109:18, 110:23, 112:20, 113:1, 114:1, 114:3, 114:23, 115:7, 115:19, 115:22, 115:24, 117:10, 117:11, 117:14, 118:10, 118:12, 118:13, 118:16, 119:2, 119:4, 120:20, 121:5, 121:21, 122:9, 122:23, 123:6, 123:12, 123:13, 123:15, 124:11, 124:20, 126:15, 126:17, 126:24, 127:11, 127:19, 128:25, 129:24, 130:4, 130:17, 131:3, 131:12, 132:2, 132:21, 132:24, 136:1, 137:21, 138:8, 138:11, 138:13, 139:3, 139:4, 139:5, 139:6, 139:8, 139:9, 139:16, 140:5, 140:6, 140:18, 141:1, 141:2, 141:7, 141:8, 141:14, 141:15, 141:25, 142:11, 142:12, 142:21, 142:25, 143:1, 143:5, 144:1, 144:3, 144:9, 144:12, 144:13, 144:15, 144:17, 147:3, 147:5, 147:9, 149:7, 150:1, 151:17, 153:15, 153:17, 154:2, 154:7, 154:8, 154:24, 156:1, 156:2, 156:16, 156:18, 157:2, 157:9, 157:13, 157:17, 157:25, 159:3, 159:4, 159:7, 159:8, 159:22, 160:13, 160:17, 160:22, 162:4, 162:5, 162:9, 162:21, 164:8,

165:3, 166:1, 167:3, 167:7, 167:9, 167:15, 167:16, 168:2, 169:4, 170:12, 171:19, 172:3, 173:9, 173:15, 173:21, 174:2, 174:9, 174:15, 174:18, 176:10, 176:13, 177:7, 177:13, 178:1, 178:2, 178:17, 178:23, 179:2, 179:3, 180:11, 180:12, 182:8, 182:9, 183:10, 183:11, 185:2, 185:25
**corrected** [1] - 152:22
**correctly** [6] - 77:2, 86:5, 95:25, 136:2, 161:17, 174:20
**correspond** [1] - 171:21
**corresponding** [2] - 40:2, 67:23
**corresponds** [1] - 69:1
**corridor** [28] - 97:3, 104:9, 115:19, 115:23, 115:24, 117:6, 139:11, 141:10, 144:20, 144:22, 144:25, 145:4, 145:6, 145:10, 145:11, 145:13, 146:15, 147:12, 147:21, 148:1, 148:3, 148:21, 149:14, 149:16, 156:12, 160:15, 160:18
**corridors** [4] - 145:3, 145:25, 146:18, 147:1
**counsel** [4] - 25:18, 128:11, 133:2, 187:21
**counsel 's** [2] - 111:22, 171:2
**Counsel 's** [1] - 163:14
**country** [1] - 70:10
**couple** [9] - 15:5, 21:7, 117:18, 117:20, 117:22, 122:5, 133:21
**course** [3] - 34:14, 43:6, 97:18
**COURT** [3] - 5:2, 10:10, 188:22

**court** [6] - 8:11, 12:3, 14:14, 126:4, 126:6, 165:15
**covered** [3] - 90:4, 118:18
**coverings** [1] - 88:1
**cracked** [1] - 57:24
**created** [1] - 29:4
**creating** [1] - 29:12
**Crew** [1] - 156:11
**crew** [43] - 15:23, 37:17, 37:21, 46:3, 46:6, 53:8, 55:3, 55:17, 56:8, 57:5, 60:2, 60:6, 60:17, 60:19, 92:17, 105:20, 106:3, 106:18, 106:25, 107:12, 108:9, 108:18, 108:20, 108:25, 109:1, 109:9, 109:19, 109:23, 110:8, 111:16, 112:1, 113:7, 113:20, 114:6, 114:19, 116:10, 132:9, 158:12, 167:13, 171:18, 173:13, 176:4, 176:15
**cross** [3] - 28:18, 47:6, 188:18
**cross-referencing** [1] - 47:6
**cross-talk** [1] - 28:18
**cruise** [14] - 15:10, 15:13, 15:21, 15:24, 16:1, 18:6, 18:9, 69:14, 69:15, 69:22, 69:24, 157:17, 157:25, 176:9
**Cruises** [4] - 10:23, 11:1, 11:2, 11:14
**cup** [3] - 81:1, 81:4, 81:8
**curled** [1] - 58:1
**current** [1] - 185:14
**curving** [1] - 108:15
**cut** [1] - 39:1
**CV** [1] - 10:6
**cycle** [13] - 119:17, 119:19, 119:22, 120:2, 120:6, 120:7, 120:14, 121:1, 121:8, 121:13, 122:4

---

**D**

---

**D-I-N** [1] - 69:4
**damage** [1] - 150:5

**dark** [1] - 140:25
**data** [2] - 36:7, 37:10
**date** [17] - 7:18, 25:14, 26:7, 43:10, 46:10, 128:1, 155:25, 162:8, 162:20, 163:25, 164:23, 165:1, 165:2, 165:4, 180:10, 184:8
**dated** [2] - 123:17, 126:16
**Daubert** [1] - 163:21
**DE** [2] - 5:10, 5:19
**De** [8] - 5:19, 19:2, 75:10, 91:9, 93:17, 126:12, 128:14, 128:23
**deals** [1] - 77:5
**deciding** [1] - 51:12
**deck** [3] - 38:17, 137:13, 138:3
**declared** [1] - 22:20
**deemed** [1] - 65:24
**defendant** [2] - 9:14, 10:2
**Defendant** [1] - 5:11
**Defendant 's** [1] - 136:23
**defense** [1] - 10:1
**deficiency** [1] - 14:7
**deficient** [1] - 101:10
**define** [12] - 13:4, 64:16, 99:15, 119:3, 123:2, 134:3, 144:21, 145:4, 145:6, 145:12, 145:14, 179:19
**defined** [5] - 74:17, 89:6, 89:7, 145:1, 145:13
**defines** [1] - 145:10
**definition** [15] - 80:7, 80:19, 80:22, 81:19, 87:16, 88:5, 89:14, 104:18, 104:19, 104:23, 105:3, 105:4, 119:7, 121:7, 144:20
**definitions** [9] - 87:6, 87:13, 88:2, 88:15, 89:16, 90:6, 90:7, 104:21, 145:14
**deformations** [2] - 100:2, 100:3
**degree** [7] - 63:11, 63:12, 92:1, 92:22, 112:17, 131:15
**degrees** [4] - 15:4, 35:4, 37:7, 38:6
**deleted** [3] - 30:8,

30:11, 31:16
**denies** [1] - 125:18
**depicted** [4] - 21:25, 107:13, 108:7, 170:22
**depo** [4] - 47:16, 106:9, 157:15, 159:24
**depos** [1] - 116:15
**deposited** [24] - 57:4, 95:5, 95:9, 95:11, 95:17, 96:12, 105:20, 107:4, 132:8, 155:17, 158:12, 159:19, 167:22, 168:10, 169:20, 171:13, 172:6, 172:10, 172:21, 178:6, 179:9, 180:18, 180:19
**depositing** [3] - 106:4, 106:19, 155:13
**deposition** [38] - 6:19, 8:11, 21:3, 22:24, 22:25, 23:3, 23:8, 23:21, 24:17, 25:8, 47:25, 48:6, 55:3, 55:16, 59:4, 59:21, 60:17, 99:4, 106:2, 106:17, 110:19, 112:3, 116:12, 132:6, 132:20, 133:12, 134:21, 135:1, 157:1, 158:24, 159:3, 168:14, 170:11, 170:23, 171:2, 186:6, 188:7, 188:24
**depositions** [6] - 24:3, 24:7, 25:1, 47:8, 54:23, 176:17
**deposits** [1] - 98:24
**depth** [2] - 63:21, 70:19
**derived** [2] - 9:7, 88:7
**describe** [1] - 117:6
**described** [16] - 30:9, 41:11, 51:21, 119:2, 173:4, 176:17
**description** [1] - 87:15
**design** [5] - 31:9, 32:2, 32:9, 153:1, 182:24
**designed** [7] - 18:6, 18:8, 18:11, 18:14, 33:23, 33:25, 150:17
**designer** [1] - 102:12
**desktop** [4] - 186:14, 186:19, 187:6,

187:11
**detail** [2] - 23:5, 82:11
**detailed** [1] - 32:10
**details** [2] - 26:10, 140:14
**determination** [1] - 48:10
**determine** [15] - 40:12, 47:4, 47:20, 48:8, 50:25, 51:25, 52:7, 63:7, 67:5, 77:24, 120:14, 142:18, 169:1, 173:1, 179:9
**determined** [1] - 50:20
**determining** [1] - 51:22
**Deutsch** [2] - 69:6, 101:24
**device** [10] - 30:22, 35:20, 37:8, 37:10, 43:13, 45:3, 77:15, 78:6, 79:10, 79:18
**devices** [1] - 42:15
**Di** [3] - 70:18, 150:15, 161:9
**DI** [1] - 70:18
**Diane** [1] - 10:25
**difference** [4] - 74:20, 112:16, 152:8, 185:22
**different** [28] - 32:14, 41:14, 41:21, 47:1, 51:11, 63:7, 67:25, 70:19, 70:22, 73:20, 78:6, 85:12, 87:14, 88:2, 88:16, 90:5, 90:19, 90:20, 95:6, 96:10, 102:9, 130:3, 145:24, 148:10, 151:1, 173:5, 174:17, 185:21
**differentiate** [1] - 131:4
**differently** [1] - 78:7
**difficult** [3] - 113:13, 113:15, 170:8
**difficulties** [1] - 126:15
**difficulty** [5] - 124:10, 124:18, 125:13, 126:14, 141:11
**DIN** [26] - 67:24, 68:4, 68:13, 68:14, 68:24, 69:3, 69:8, 69:13, 69:21, 70:1, 70:2, 71:19, 71:23, 71:25, 84:19, 85:11, 85:23, 86:22, 87:6, 87:14, 87:23, 88:8, 89:3,

89:12, 90:16, 101:23
**dinner** [1] - 127:22
**DIRECT** [1] - 5:14
**direction** [3] - 97:5, 97:9, 160:16
**directions** [1] - 53:2
**directly** [5] - 86:1, 86:10, 154:17, 181:14, 182:12
**dirt** [1] - 98:25
**disability** [2] - 22:13, 22:17
**disabled** [1] - 22:20
**disagree** [1] - 25:16
**discern** [1] - 141:12
**discounting** [1] - 172:2
**discriminate** [1] - 82:12
**discuss** [1] - 157:3
**discussed** [5] - 64:3, 64:10, 65:5, 77:14, 115:14
**discusses** [4] - 66:18, 70:19, 76:23, 90:17
**discussing** [2] - 94:15, 175:18
**discussion** [1] - 31:5
**disinfected** [1] - 98:24
**disinfecting** [2] - 98:14, 98:20
**Disney** [1] - 148:6
**displacing** [1] - 81:5
**dispute** [1] - 12:18
**distance** [2] - 98:6, 98:7
**distinction** [1] - 81:25
**distort** [1] - 133:5
**distribute** [1] - 88:25
**disturb** [1] - 130:3
**docs** [1] - 38:19
**doctor** [8] - 14:21, 14:22, 119:2, 122:10, 123:11, 125:1, 125:15, 127:7
**document** [18] - 24:14, 26:10, 27:2, 27:10, 40:7, 48:7, 57:15, 61:4, 66:24, 86:1, 88:24, 104:3, 124:23, 125:3, 125:21, 126:16, 144:6, 185:10
**documentation** [8] - 45:4, 54:24, 84:8, 101:17, 133:20, 136:6, 136:8, 136:14
**documents** [11] - 7:23, 8:25, 9:1, 21:2, 32:5, 38:23, 69:18,

74:3, 104:1, 134:20, 145:6
**done** [10] - 72:11, 89:1, 100:23, 121:15, 150:22, 151:2, 153:5, 160:25, 173:1, 179:10
**Donna** [1] - 10:22
**door** [13] - 96:23, 97:1, 97:9, 97:14, 97:15, 97:22, 97:23, 98:2, 98:4, 98:6, 117:13, 146:10, 146:16
**dots** [1] - 100:8
**down** [12] - 92:8, 94:19, 94:20, 100:4, 117:5, 178:15, 179:5, 181:17, 184:20, 186:6
**download** [1] - 89:3
**Dr** [10] - 19:2, 27:14, 75:10, 91:9, 93:17, 123:17, 124:7, 126:12, 128:14, 128:23
**drain** [58] - 95:11, 96:22, 105:19, 154:16, 154:19, 154:20, 154:22, 155:2, 155:7, 155:11, 155:17, 158:21, 168:11, 177:21, 178:6, 178:24, 179:1, 179:5, 179:11, 179:16, 179:22, 179:24, 179:25, 180:9, 180:13, 180:15, 180:17, 180:18, 180:21, 181:1, 181:8, 181:9, 181:12, 181:15, 181:20, 181:21, 181:24, 182:3, 182:4, 182:7, 182:16, 182:20, 182:23, 183:1, 183:3, 183:7, 183:14, 183:17, 183:18, 183:20, 183:23, 183:24, 184:12, 184:19, 184:22
**drainage** [26] - 94:5, 94:6, 94:24, 95:2, 105:11, 105:15, 153:13, 153:24, 154:21, 155:22, 158:6, 169:1,

170:14, 177:21, 177:23, 177:25, 178:5, 178:8, 178:10, 179:20, 180:6, 181:24, 182:17, 182:21, 183:15, 183:19
**drained** [2] - 105:15, 167:22
**draining** [6] - 178:25, 179:13, 179:17, 179:18, 179:20, 180:7
**drains** [20] - 95:3, 95:14, 153:17, 154:2, 154:7, 154:10, 154:17, 155:14, 168:7, 169:21, 179:10, 179:11, 180:14, 180:16, 182:22, 182:23, 182:25, 183:24, 184:7
**drawing** [1] - 33:18
**drawings** [7] - 31:9, 32:2, 32:9, 33:3, 33:5, 33:7, 33:10
**dried** [1] - 62:3
**dries** [1] - 167:14
**drive** [4] - 180:5, 187:4, 187:7, 187:8
**dry** [22] - 17:21, 54:1, 54:9, 54:14, 60:7, 60:11, 61:5, 61:6, 61:7, 61:9, 61:11, 61:12, 61:20, 109:24, 141:12, 157:6, 160:1, 167:18, 169:16, 172:14, 173:14, 176:19
**drying** [2] - 60:12, 176:3
**due** [6] - 55:23, 63:9, 95:3, 131:16, 180:21, 183:24
**duly** [1] - 5:12
**dump** [2] - 169:3, 170:11
**dumped** [5] - 168:5, 168:6, 168:22, 170:4, 170:13
**dumping** [2] - 168:1, 169:10
**during** [27] - 27:16, 28:6, 29:2, 30:19, 30:22, 37:11, 41:10, 54:7, 77:18, 93:21, 95:17, 107:4, 107:5, 112:15, 142:23,

151:24, 162:10, 162:18, 163:5, 165:16, 167:21, 168:10, 169:20, 173:11, 174:13, 176:17
**During** [1] - 169:19
**duties** [3] - 112:2, 113:22, 181:23
**Dynamic** [1] - 76:9
**dynamic** [13] - 74:10, 74:14, 78:4, 80:6, 80:7, 80:9, 81:7, 81:20, 82:1, 82:7, 82:16, 82:20, 83:9

**E**

**E-tran** [1] - 188:21
**easier** [1] - 182:16
**Edition** [1] - 66:11
**education** [1] - 14:23
**effectiveness** [1] - 161:10
**effects** [2] - 127:9, 128:9
**egress** [4] - 104:7, 144:23, 149:17
**eight** [1] - 123:20
**either** [6] - 7:7, 32:13, 87:11, 90:10, 143:11, 145:15
**elaborate** [1] - 16:10
**electronic** [4] - 7:23, 8:20, 28:10, 71:7
**electronically** [3] - 6:22, 20:22, 20:25
**element** [1] - 14:1
**elevated** [2] - 181:10, 181:21
**elicit** [1] - 134:24
**emergency** [1] - 104:8
**employed** [12] - 5:21, 5:23, 15:13, 15:21, 16:1, 16:17, 16:19, 16:21, 16:23, 133:23, 134:12, 157:24
**employment** [1] - 6:3
**empty** [1] - 127:22
**end** [8] - 36:13, 50:8, 95:4, 97:3, 139:10, 154:24, 156:12, 184:19
**engineer** [6] - 6:7, 12:24, 14:16, 14:19, 18:4, 32:25
**engineering** [3] - 13:8, 33:6, 33:10
**engines** [1] - 102:10

**English** [17] - 42:6, 42:17, 42:25, 43:5, 43:13, 43:21, 44:6, 66:3, 77:15, 77:18, 77:21, 78:2, 79:6, 79:13, 133:7, 139:5, 168:10

**enter** [1] - 97:12

**entered** [1] - 97:10

**entering** [1] - 141:10

**enters** [1] - 96:24

**entire** [8] - 20:20, 23:22, 35:15, 145:20, 146:9, 146:24, 147:4, 148:20

**entirety** [6] - 19:12, 19:24, 23:2, 23:15, 23:18, 24:2

**entitled** [2] - 65:10, 76:8

**entrance** [11] - 96:22, 104:7, 139:11, 143:25, 144:19, 144:22, 147:20, 148:21, 149:16, 152:20, 160:14

**entrances** [1] - 148:4

**entry** [1] - 97:1

**entryway** [1] - 98:4

**envisioned** [1] - 182:24

**equipment** [3] - 41:9, 78:15, 79:6

**equivalent** [3] - 135:20, 138:22, 139:23

**especially** [1] - 79:25

**essentially** [1] - 144:22

**established** [3] - 157:6, 157:14, 158:1

**et** [3] - 99:13, 102:10

**et.al** [1] - 119:12

**etiology** [1] - 130:10

**European** [3] - 67:24, 69:8, 70:6

**evaluate** [2] - 96:18, 126:7

**evaluated** [3] - 131:7, 183:4, 184:20

**evaluating** [1] - 105:13

**evaluation** [9] - 86:6, 98:22, 99:23, 100:15, 117:2, 117:4, 153:5, 172:21, 184:10

**evaluations** [1] - 181:13

**evaporate** [1] - 172:23

**evaporation** [3] - 39:8, 173:1, 173:5

**event** [5] - 77:4, 80:6, 80:9, 81:24, 89:4

**eventually** [1] - 179:22

**everyday** [1] - 17:17

**everywhere** [1] - 161:7

**evidence** [14] - 57:1, 102:1, 112:21, 116:7, 133:20, 135:22, 135:23, 143:16, 143:19, 155:9, 155:16, 170:16, 182:6, 183:23

**evident** [1] - 157:5

**exact** [17] - 7:18, 26:9, 46:22, 73:8, 138:24, 139:19, 139:21, 140:4, 158:19, 162:8, 162:19, 164:11, 164:19, 165:1, 166:17, 173:9, 178:7

**exactly** [8] - 49:4, 49:10, 66:24, 71:17, 89:15, 113:23, 115:13, 115:15

**EXAMINATION** [1] - 5:14

**examination** [3] - 62:20, 63:3, 63:14

**examined** [1] - 5:12

**example** [3] - 89:23, 90:2, 123:16

**examples** [1] - 88:9

**except** [3] - 118:17, 118:23, 133:11

**excluded** [5] - 12:3, 12:6, 12:11, 12:15

**excuse** [1] - 25:23

**executive** [1] - 16:2

**exemplar** [1] - 164:7

**exhibit** [17] - 25:8, 26:3, 47:13, 47:25, 49:15, 49:19, 106:8, 106:15, 116:12, 116:13, 116:14, 116:20, 132:20, 157:1, 170:24, 171:1, 187:14

**Exhibit** [57] - 6:12, 6:15, 6:18, 8:7, 8:8, 8:9, 8:12, 18:24, 19:2, 26:12, 26:16, 26:18, 27:6, 48:2, 48:6, 49:17, 49:20, 55:16, 56:23, 57:12,

57:17, 57:23, 75:14, 76:5, 78:3, 86:3, 91:4, 91:5, 91:6, 92:16, 93:14, 94:15, 112:13, 115:19, 116:22, 123:21, 124:5, 125:11, 158:23, 159:3, 160:19, 160:20, 160:23, 168:14, 168:18, 170:10, 170:22, 171:3, 171:6, 185:3, 185:6, 186:22, 187:17, 187:18, 188:3, 188:6, 188:7

**exhibits** [7] - 25:1, 25:5, 34:13, 47:7, 47:9, 54:22, 54:25

**exist** [2] - 29:17, 30:24

**existed** [4] - 167:19, 169:16, 172:15, 173:6

**existence** [1] - 20:5

**exists** [1] - 29:22

**exit** [1] - 104:8

**expedited** [1] - 188:23

**expeditious** [1] - 133:13

**experience** [2] - 16:8, 157:12

**expert** [18] - 6:5, 9:8, 13:11, 13:22, 15:7, 15:9, 15:16, 15:19, 19:4, 27:14, 64:19, 83:4, 87:5, 89:19, 131:3, 150:3, 151:11, 185:17

**expertise** [2] - 25:22, 125:25, 128:3

**explain** [1] - 83:3

**explicit** [5] - 72:14, 79:4, 90:3, 95:16, 123:3

**explicitly** [10] - 60:10, 63:8, 80:3, 83:8, 88:19, 96:17, 104:13, 130:24, 138:3, 150:18

**extending** [1] - 138:5

**extent** [2] - 143:16, 143:17

**Extrinsic** [1] - 129:18

**extrinsic** [1] - 131:5

**eyes** [7] - 57:7, 100:20, 110:8, 110:23, 111:25, 112:24, 113:1

**F**

**F-116** [1] - 80:24

**F-1166** [4] - 67:2, 74:8, 74:23, 81:25

**F-1666** [1] - 83:12

**facilities** [2] - 108:11, 166:21

**facility** [2] - 170:15, 176:2

**fact** [16] - 12:10, 46:25, 91:23, 93:3, 94:22, 98:19, 99:2, 99:6, 99:8, 113:6, 129:13, 147:13, 160:16, 163:24, 179:14, 180:1

**factor** [1] - 130:2

**factors** [5] - 15:5, 15:7, 15:9, 38:4, 131:5

**Factors** [1] - 129:18

**Fahrenheit** [3] - 35:4, 174:19, 175:15

**failed** [4] - 14:3, 101:10, 157:5, 176:2

**failure** [3] - 13:24, 14:12

**Fall** [2] - 65:10, 138:21

**fall** [32] - 24:19, 38:7, 38:11, 38:14, 41:2, 41:23, 46:23, 49:14, 71:20, 105:18, 108:7, 108:8, 114:17, 115:11, 116:5, 118:8, 128:24, 129:8, 130:4, 131:6, 131:12, 133:17, 133:18, 134:17, 135:6, 135:19, 136:5, 136:10, 138:20, 143:21, 150:21

**falling** [2] - 122:23, 123:6

**falls** [1] - 150:13

**Falls** [1] - 129:17

**familiar** [15] - 33:8, 66:9, 75:15, 75:18, 75:21, 75:22, 75:25, 76:15, 76:17, 76:19, 76:21, 78:15, 129:20, 130:12, 130:16

**far** [2] - 23:21, 70:1

**fast** [2] - 167:18, 169:15

**features** [1] - 32:16

**fee** [1] - 186:3

**fell** [59] - 37:22, 39:21, 46:18, 46:21, 50:10, 55:22, 56:5, 57:3, 57:13, 58:11, 58:20, 59:5, 59:11, 59:17, 60:10, 60:24, 62:6, 62:11, 62:12, 62:22, 63:5, 91:15, 92:12, 93:5, 96:25, 97:15, 98:5, 106:23, 107:1, 107:8, 107:17, 108:19, 109:21, 110:3, 110:9, 111:17, 112:9, 114:1, 115:12, 115:14, 115:16, 115:22, 138:11, 138:25, 139:18, 139:20, 139:22, 139:23, 139:24, 140:1, 141:20, 146:10, 149:16, 160:22, 172:13, 179:2

**felt** [1] - 59:17

**few** [4] - 7:4, 117:25, 120:4, 120:12

**Figure** [14] - 96:15, 96:21, 100:8, 120:1, 120:11, 122:3, 155:4, 162:3, 168:9, 172:20, 178:12, 178:16, 183:16

**figure** [7] - 8:10, 13:19, 94:14, 97:5, 118:2, 181:4, 181:5

**file** [8] - 8:21, 9:2, 20:21, 20:24, 22:13, 28:10, 28:16, 29:9, 29:16, 29:20, 31:19, 34:11, 134:24

**files** [8] - 11:11, 21:3, 31:12, 31:14, 31:22, 148:16, 187:15, 187:16

**finalizing** [1] - 110:2

**findings** [1] - 99:20

**fine** [3] - 124:4, 128:12, 187:24

**finish** [4] - 97:16, 109:4, 119:25, 149:1

**finished** [3] - 158:12, 167:24, 169:22

**finishes** [1] - 102:10

**firm** [3] - 9:4, 12:20, 18:21

**first** [15] - 5:12, 48:15, 48:16, 48:19, 68:8, 106:6, 107:6, 125:3, 125:9, 135:16,

141:17, 159:5,
168:1, 179:1, 183:6
**five** [1] - 113:3
**fixture** [1] - 45:16
**flip** [2] - 140:7, 140:10
**flip-flops** [2] - 140:7,
140:10
**flooded** [2] - 180:2,
180:4
**floor** [91] - 17:8, 39:17,
42:4, 42:9, 42:20,
46:13, 46:15, 46:18,
46:21, 51:3, 53:5,
53:13, 54:5, 54:14,
54:18, 54:20, 56:4,
57:3, 57:7, 57:12,
58:11, 58:20, 59:5,
59:11, 61:5, 61:6,
61:7, 62:2, 62:3,
62:11, 62:22, 67:6,
71:24, 77:16, 77:25,
78:5, 80:2, 80:10,
80:11, 91:14, 93:4,
94:18, 94:22, 99:23,
101:11, 104:12,
105:11, 105:13,
106:3, 106:11,
106:19, 108:5,
108:9, 108:21,
112:4, 112:6, 112:7,
112:11, 135:20,
135:23, 137:20,
138:3, 138:22,
139:18, 141:13,
156:12, 157:6,
157:7, 159:25,
160:8, 160:21,
165:10, 167:14,
167:18, 168:2,
168:6, 168:20,
168:23, 169:4,
170:12, 170:17,
173:14, 174:13,
174:20, 174:23,
175:11, 175:14,
176:3, 181:6, 181:24
**Flooring** [1] - 76:10
**flooring** [1] - 76:24
**floors** [7] - 17:16,
17:20, 17:25,
113:23, 175:2,
176:19
**flops** [2] - 140:7,
140:10
**Florida** [1] - 6:11
**flow** [8] - 96:18,
169:15, 180:20,
181:8, 181:17,
182:10, 182:16,
184:21

**flowed** [1] - 184:22
**flowing** [1] - 96:21
**flows** [2] - 155:14,
182:12
**flush** [1] - 181:24
**follow** [3] - 12:20,
52:1, 105:8
**following** [1] - 146:1
**follows** [1] - 5:13
**food** [1] - 127:5
**foot** [18] - 44:5, 44:11,
44:14, 44:25, 45:2,
45:10, 45:11, 45:12,
45:19, 48:14, 48:16,
48:19, 48:25, 49:10,
104:12, 104:17,
104:20, 175:22
**footage** [23] - 19:10,
19:13, 19:24, 20:11,
20:14, 20:15, 20:17,
21:6, 21:24, 47:6,
47:12, 55:20, 62:19,
62:21, 62:25, 63:2,
92:9, 105:25, 112:1,
117:5, 117:9, 118:1,
120:5
**force** [7] - 80:20,
80:21, 81:4, 81:6,
81:11, 81:14, 128:6
**Force** [1] - 156:4
**forces** [5] - 80:25,
82:4, 82:12, 83:3
**forensic** [3] - 62:20,
63:3, 63:14
**forget** [3] - 91:3,
127:25, 148:6
**form** [52] - 25:15, 26:8,
32:18, 55:13, 56:6,
58:22, 59:6, 59:12,
60:8, 60:22, 61:13,
64:1, 64:8, 64:15,
71:21, 73:16, 74:1,
82:22, 87:12, 92:14,
93:6, 102:5, 107:18,
107:24, 110:25,
113:2, 114:2, 124:2,
124:12, 127:1,
128:12, 130:13,
130:18, 130:25,
131:13, 133:3,
134:7, 138:12,
140:12, 147:10,
152:16, 157:18,
161:8, 163:13,
164:9, 166:16,
168:3, 170:20,
173:18, 174:3,
176:11, 184:9
**Form** [1] - 14:5
**formal** [2] - 8:3, 14:23

**format** [3] - 29:18,
30:15, 30:16
**Forney** [1] - 27:14
**forwards** [2] - 108:10,
112:5
**four** [11] - 11:4, 19:18,
19:21, 50:8, 53:1,
110:12, 111:9,
111:23, 115:1,
115:10, 176:23
**FRANCISCO** [1] - 5:10
**Francisco** [1] - 5:19
**frank** [1] - 28:22
**Frank** [1] - 28:23
**free** [4] - 104:12,
104:17, 104:20,
105:2
**frequency** [1] - 35:21
**frequent** [1] - 130:10
**Friction** [1] - 76:10
**friction** [27] - 65:16,
66:19, 69:2, 70:21,
74:10, 74:12, 74:14,
74:15, 74:17, 78:4,
80:8, 80:19, 81:3,
81:7, 81:14, 82:1,
82:15, 82:16, 82:18,
82:20, 82:21, 83:2,
83:8, 83:11, 90:13,
90:20, 104:16
**front** [17] - 20:25,
21:22, 26:11, 27:7,
27:10, 28:2, 38:21,
49:25, 53:3, 87:24,
89:11, 91:1, 113:17,
114:22, 154:22,
158:25, 170:1
**front-back** [1] - 53:3
**Fu** [1] - 65:12
**Fu-Tien** [1] - 65:12
**full** [4] - 5:17, 140:13,
147:20, 187:7
**function** [1] - 179:21

**G**

**Gables** [1] - 6:10
**gait** [32] - 56:18,
116:25, 117:4,
117:9, 117:12,
117:25, 118:5,
118:9, 119:1, 119:3,
119:7, 119:8,
119:13, 119:16,
119:17, 119:19,
119:22, 120:7,
120:13, 121:1,
121:8, 121:24,
122:1, 122:4,
122:19, 124:10,

124:18, 125:16,
126:15, 128:21
**gallon** [5] - 179:6,
179:8, 182:5
**gallons** [5] - 154:12,
154:13, 155:6,
155:10, 179:25
**Gauchard** [1] - 129:19
**general** [5] - 51:14,
123:4, 127:17,
129:6, 130:20
**generally** [1] - 38:25
**generated** [5] - 18:17,
29:5, 29:12, 30:3,
30:7
**generic** [5] - 32:14,
79:3, 80:21, 127:2,
130:20
**geometric** [1] - 152:25
**geometry** [1] - 161:10
**German** [6] - 69:7,
69:9, 69:11, 70:4,
70:5, 70:9
**GERSON** [95] - 6:24,
7:2, 7:4, 10:12,
11:19, 14:5, 25:15,
25:19, 25:25, 26:8,
26:25, 28:17, 28:21,
28:23, 32:18, 34:11,
55:13, 56:6, 57:18,
58:22, 59:6, 59:12,
60:8, 60:22, 61:13,
62:13, 64:1, 64:8,
64:15, 71:21, 73:16,
74:1, 82:22, 87:12,
92:14, 93:6, 102:5,
103:7, 107:18,
107:24, 110:11,
110:25, 111:4,
111:9, 111:21,
113:2, 114:2,
118:18, 120:21,
124:2, 124:12,
125:7, 125:19,
125:24, 126:3,
126:6, 127:1, 128:2,
128:5, 128:17,
129:9, 130:13,
130:18, 131:13,
132:5, 133:10, 134:7,
138:12, 140:12,
147:10, 152:13,
152:16, 152:21,
157:18, 158:2,
161:8, 162:22,
163:13, 164:2,
164:9, 166:16,
168:3, 169:24,
170:5, 170:20,

173:18, 174:3,
176:11, 184:9,
187:20, 187:25,
188:9, 188:13,
188:18
**Gerson** [3] - 7:12, 9:3,
187:13
**Gerson 's** [2] - 31:24,
93:19
**GETAWAY** [2] -
135:22, 137:8
**given** [10] - 10:19,
11:4, 13:10, 14:13,
27:4, 35:23, 52:1,
83:4, 96:11, 104:18,
130:25, 166:21,
187:4, 188:13
**glass** [2] - 127:25,
175:6
**God** [1] - 5:7
**Goldstein** [1] - 10:25
**Google** [1] - 104:3
**Gordon** [1] - 163:16
**GORDON** [126] - 5:15,
6:14, 6:16, 7:1, 7:3,
7:7, 7:8, 8:14, 10:14,
12:1, 14:8, 19:1,
25:18, 25:23, 26:1,
26:14, 27:3, 29:1,
31:4, 31:7, 32:20,
34:16, 47:18, 48:4,
55:19, 56:11, 57:21,
58:5, 58:8, 59:2,
59:9, 59:14, 60:13,
60:23, 61:17, 62:17,
64:5, 64:12, 64:18,
72:3, 73:18, 74:4,
75:2, 75:9, 76:7,
82:24, 87:20, 91:8,
92:23, 93:1, 93:9,
93:16, 102:17,
103:9, 107:21,
108:2, 110:4, 110:6,
110:15, 111:2,
111:7, 111:11,
111:12, 112:10,
113:14, 114:4,
118:21, 120:24,
123:24, 124:3,
124:15, 125:8,
125:22, 126:1,
126:5, 126:9,
126:11, 127:10,
128:11, 128:13,
128:20, 128:22,
129:12, 130:14,
131:1, 131:17,
133:2, 133:8,
133:14, 133:15,
134:9, 136:20,

138:15, 140:16, 147:16, 152:15, 153:2, 157:23, 158:4, 161:13, 161:20, 161:24, 162:24, 162:25, 163:19, 163:22, 164:6, 164:10, 166:23, 168:12, 170:7, 170:9, 170:21, 173:23, 174:7, 176:22, 177:19, 184:13, 185:5, 186:24, 187:23, 188:1, 188:5, 188:11, 188:15, 188:23

**grabbed** [1] - 149:23

**grabbing** [1] - 81:9

**gravity** [1] - 94:20

**gray** [1] - 168:21

**greater** [2] - 82:18, 83:11

**Grey** [7] - 137:25, 139:12, 139:20, 139:25, 140:4, 140:7, 140:10

**Grey's** [1] - 139:7

**Grill** [1] - 10:24

**Grimson** [1] - 119:12

**grinding** [1] - 180:22

**ground** [1] - 61:24

**grout** [5] - 91:24, 92:7, 92:8, 94:18, 94:25

**guess** [4] - 8:7, 135:18, 137:3, 180:22

**guests** [2] - 108:10, 114:18

**guidelines** [1] - 148:18

## H

**half** [5] - 43:16, 96:1, 96:3, 175:9

**hand** [5] - 5:3, 81:8, 81:9, 97:2, 108:16

**handbook** [4] - 70:18, 70:19, 70:24, 150:16

**handed** [1] - 165:17

**handrail** [32] - 143:25, 144:4, 144:19, 145:15, 145:17, 145:20, 146:3, 146:9, 146:17, 146:21, 146:23, 147:4, 147:20, 148:20, 148:22, 149:4, 149:6,

149:18, 149:20, 149:23, 150:13, 151:8, 151:10, 151:16, 151:18, 151:23, 151:25, 152:13, 152:19, 152:23, 152:25, 153:9

**handrails** [12] - 144:8, 145:25, 146:17, 147:12, 148:2, 148:3, 149:14, 150:4, 150:10, 150:16, 150:20, 150:23

**harassment** [1] - 128:18

**Hard** [1] - 76:10

**hard** [3] - 76:24, 77:6, 78:5

**Harvey** [1] - 65:13

**hazard** [1] - 158:7

**hazardous** [1] - 159:12

**head** [3] - 44:4, 76:2, 90:23

**health** [1] - 98:16

**hear** [3] - 52:22, 66:22, 83:14

**hearing** [1] - 22:17

**heat** [2] - 173:14, 175:4

**heated** [7] - 37:22, 37:25, 167:15, 174:16, 174:21, 174:23, 175:1

**heating** [1] - 175:2

**heavy** [1] - 29:20

**heel** [7] - 42:10, 42:11, 42:21, 77:21, 80:9, 80:11, 81:16

**height** [3] - 152:2, 153:6, 153:11

**held** [3] - 31:5, 149:6, 149:9

**Helen** [2] - 137:25, 139:12

**help** [3] - 5:6, 21:2, 150:21

**helps** [1] - 81:23

**herself** [1] - 126:12

**high** [4] - 63:11, 92:1, 140:24, 143:7

**higher** [4] - 68:6, 68:7, 69:1, 86:7

**hired** [1] - 12:20

**history** [2] - 118:15, 119:20

**hitting** [1] - 175:7

**hold** [6] - 13:13,

13:16, 15:4, 39:3, 41:8, 145:17

**Hold** [1] - 39:2

**holding** [1] - 108:16

**holds** [1] - 46:3

**home** [1] - 186:18

**homogeneous** [3] - 100:9, 100:12, 100:15

**homogeneousness** [1] - 45:17

**hope** [2] - 81:23, 85:17

**horizontal** [2] - 80:20, 81:6

**hot** [4] - 152:11, 154:23, 154:25, 155:3

**hour** [3] - 175:9, 185:18, 185:24

**hourly** [1] - 185:16

**House** [1] - 10:24

**housekeeper** [2] - 16:3, 157:25

**housekeeping** [4] - 157:13, 157:16, 157:21, 176:9

**human** [4] - 15:4, 15:7, 15:9, 77:23

**hypothetically** [2] - 183:12, 184:3

## I

**I'** [1] - 61:15

**ideal** [1] - 181:23

**ideally** [1] - 166:19

**identification** [13] - 6:13, 8:13, 18:25, 26:13, 48:3, 76:6, 91:7, 93:15, 123:22, 185:4, 186:23, 187:19, 188:4

**identified** [2] - 28:19, 154:18

**ignore** [2] - 28:18, 161:6

**image** [2] - 107:2, 108:6

**images** [2] - 106:17, 107:10

**imaging** [1] - 99:18

**immediate** [1] - 116:6

**immediately** [2] - 62:6, 119:9

**IMO** [6] - 144:2, 144:12, 145:2, 145:3, 145:10, 146:1

**impact** [1] - 39:8

**impaired** [4] - 127:15,

127:16, 131:11, 131:15

**imperfections** [1] - 99:12

**implement** [1] - 157:5

**important** [3] - 81:13, 121:9, 150:2

**Improve** [1] - 66:11

**in-depth** [1] - 63:21

**inability** [1] - 131:22

**inadequate** [4] - 101:9, 119:13, 135:24, 153:21

**inadvertently** [2] - 30:12, 30:13

**inappropriate** [2] - 73:24, 126:9

**incident** [72] - 8:18, 21:8, 21:9, 22:21, 25:14, 26:7, 42:5, 46:10, 50:14, 54:4, 54:5, 54:7, 54:19, 54:21, 55:20, 56:18, 60:4, 69:19, 106:12, 109:14, 110:10, 112:23, 118:3, 118:8, 119:10, 119:21, 119:23, 120:6, 120:8, 120:13, 121:2, 122:5, 126:20, 128:10, 137:10, 137:23, 138:7, 138:20, 138:21, 139:7, 139:12, 140:8, 140:11, 140:18, 142:10, 142:16, 142:25, 143:4, 149:7, 155:11, 156:1, 162:9, 162:21, 164:1, 164:13, 164:14, 164:23, 165:3, 165:5, 165:13, 167:20, 170:19, 172:16, 172:18, 173:7, 174:2, 174:6, 174:14, 175:17, 180:11, 182:8, 183:8

**incidental** [1] - 18:3

**incidents** [7] - 13:24, 133:17, 134:17, 135:6, 135:20, 136:10, 137:2

**include** [2] - 29:21, 76:25

**included** [2] - 29:13, 103:14

**including** [2] - 138:4,

146:15

**income** [1] - 9:7

**incorrect** [5] - 67:13, 67:14, 68:3, 73:4, 102:3

**increased** [1] - 141:11

**independent** [1] - 6:5

**indicate** [1] - 20:11

**indicated** [4] - 39:22, 40:24, 104:13, 158:19

**indicating** [1] - 49:20

**individual** [6] - 29:16, 29:25, 91:20, 127:21, 157:16, 159:21

**Individuals** [1] - 129:17

**individuals** [1] - 115:16

**industry** [1] - 51:8

**infer** [6] - 49:13, 58:2, 92:21, 93:2, 98:23, 171:14

**inferred** [6] - 27:7, 27:8, 91:25, 109:3, 109:25, 110:20

**inferring** [4] - 110:22, 149:13, 161:17, 172:4

**informally** [1] - 163:11

**information** [8] - 34:2, 46:5, 55:11, 71:16, 130:21, 134:25, 136:21, 166:22

**initial** [1] - 184:21

**Initial** [1] - 136:24

**injuries** [1] - 150:8

**injury** [1] - 150:14

**inlets** [1] - 179:11

**inspect** [6] - 34:3, 34:8, 34:17, 73:1, 90:9, 166:5

**inspected** [11] - 72:17, 73:15, 92:5, 146:14, 153:17, 155:23, 162:1, 162:18, 163:24, 174:18, 174:21

**inspecting** [2] - 98:21, 154:2

**inspection** [40] - 8:17, 8:23, 27:17, 28:7, 29:2, 30:19, 30:22, 35:10, 35:13, 35:15, 36:12, 36:13, 37:11, 41:4, 42:2, 93:22, 94:17, 95:14, 98:15, 99:10, 107:4, 107:5, 112:15, 138:4,

141:23, 142:24, 155:25, 162:10, 162:19, 163:6, 165:2, 165:16, 165:22, 171:23, 172:4, 172:6, 173:11, 175:10, 183:9, 184:8

**inspections** [2] - 25:22, 73:21

**install** [1] - 146:3

**installed** [4] - 71:24, 101:21, 145:25, 149:18

**instance** [5] - 90:3, 127:24, 146:15, 148:2, 183:16

**instead** [3] - 41:17, 77:2, 85:21

**institute** [2] - 69:7, 101:24

**Institute** [3] - 69:6, 69:9, 75:20

**instrument** [13] - 36:21, 36:22, 40:8, 40:9, 40:10, 40:11, 42:3, 42:7, 42:8, 43:1, 43:23, 44:15, 100:20

**instruments** [4] - 41:21, 42:14, 42:18, 42:22

**insure** [3] - 45:17, 98:16, 176:3

**intent** [4] - 96:15, 96:16, 119:17, 155:12

**intentionally** [1] - 30:11

**interest** [1] - 18:21

**interested** [1] - 41:18

**interior** [2] - 102:10, 102:12

**international** [1] - 70:12

**International** [2] - 104:10, 146:13

**internet** [1] - 31:2

**interrogatories** [1] - 134:18

**Interrogatories** [1] - 136:25

**interrogatory** [1] - 139:13

**intoxicated** [2] - 131:11, 131:15

**Intrinsic** [1] - 129:18

**intrinsic** [1] - 131:5

**invented** [1] - 66:6

**investigated** [1] -

13:19

**invoice** [2] - 184:25, 185:10

**invoices** [1] - 185:7

**involve** [1] - 13:9

**involved** [2] - 14:2, 24:18

**involving** [4] - 13:24, 24:22, 164:1, 183:8

**iPad** [2] - 169:25, 170:2

**issue** [5] - 14:7, 71:4, 71:11, 143:20, 159:14

**issued** [1] - 86:4

**issues** [2] - 71:16, 119:1

**items** [2] - 6:21, 137:6

**itself** [9] - 47:17, 70:3, 73:14, 81:5, 88:18, 95:3, 133:1, 145:6, 170:6

## J

**janitor** [1] - 16:9

**janitorial** [2] - 16:21, 16:24

**janitors** [1] - 16:11

**January** [4] - 76:1, 123:18, 124:9, 126:17

**Jean** [1] - 65:12

**Jemalyn** [1] - 59:24

**job** [4] - 16:25, 17:24, 109:25, 159:24

**Jose** [1] - 5:19

**Judith** [1] - 10:24

**jump** [1] - 86:1

**jumping** [2] - 72:24, 86:10

## K

**Kessler** [75] - 7:14, 21:25, 22:3, 22:10, 22:19, 23:22, 24:22, 37:22, 39:21, 46:18, 46:21, 47:20, 48:5, 48:14, 49:14, 55:22, 56:5, 56:21, 57:3, 58:9, 59:3, 62:6, 62:11, 80:14, 91:15, 92:12, 93:5, 96:25, 97:15, 98:5, 105:19, 106:22, 107:1, 107:8, 107:17, 108:19, 109:21, 110:3, 110:9, 111:17, 112:8,

114:1, 114:16, 115:6, 115:12, 115:22, 116:5, 119:1, 124:9, 126:12, 131:10, 131:24, 137:20, 138:11, 138:25, 139:18, 139:24, 140:17, 140:19, 141:12, 141:20, 143:3, 143:20, 145:21, 146:10, 149:5, 149:12, 149:22, 160:13, 160:22, 164:1, 172:13, 175:21, 179:2, 183:9

**Kessler 's** [43] - 22:12, 22:16, 23:3, 24:17, 25:8, 25:13, 38:7, 38:10, 38:14, 41:2, 41:23, 46:10, 47:25, 48:19, 48:25, 50:3, 56:18, 60:4, 62:19, 71:20, 106:12, 114:17, 116:25, 117:4, 117:9, 117:25, 118:12, 120:19, 142:9, 142:16, 142:25, 155:11, 156:1, 162:9, 162:20, 165:3, 167:20, 170:18, 173:7, 174:2, 174:14, 180:11, 182:8

**kind** [4] - 78:11, 100:7, 108:9, 108:14

**knowledge** [13] - 11:5, 11:24, 12:4, 12:8, 12:9, 12:12, 12:16, 29:6, 30:20, 127:8, 143:22, 163:2, 185:15

**known** [6] - 84:11, 86:13, 101:11, 155:13, 172:24, 176:3

**Ko** [1] - 10:23

## L

**lab** [3] - 17:4, 17:5, 17:17

**lack** [2] - 100:13, 180:22

**laser** [1] - 40:7

**last** [11] - 11:3, 43:7, 43:17, 43:23, 44:6, 99:3, 113:21, 115:5,

161:21, 173:19, 185:9

**Latin** [1] - 10:24

**law** [4] - 7:12, 9:4, 12:19, 14:14

**lay** [2] - 129:9, 157:20

**lead** [1] - 140:25

**leading** [3] - 146:16, 148:1, 155:3

**leads** [1] - 97:24

**least** [1] - 55:7

**Lee** [2] - 65:12, 119:12

**Lee-Jean** [1] - 65:12

**left** [3] - 48:16, 48:19, 48:25

**length** [4] - 146:24, 147:4, 147:20, 148:20

**Lenoso** [1] - 59:24, 167:14

**Leonardo** [1] - 6:10

**less** [7] - 96:8, 100:11, 100:12, 115:3, 117:23, 182:11, 183:24

**letters** [1] - 69:4

**letting** [1] - 119:25

**level** [4] - 100:6, 150:17, 162:2, 171:12

**levels** [2] - 130:3, 135:23

**lie** [3] - 87:7, 90:10, 91:2

**Life** [1] - 104:11

**light** [2] - 32:15, 140:25

**lighting** [4] - 63:10, 141:19, 142:22, 143:20

**likely** [3] - 90:11, 98:13, 174:16

**limited** [2] - 12:15, 173:10

**Lin** [1] - 65:12

**line** [9] - 15:10, 15:14, 15:21, 16:2, 61:21, 91:24, 92:8, 94:19, 94:25

**lines** [2] - 58:13, 132:4

**link** [8] - 6:24, 18:20, 21:4, 28:5, 29:7, 93:19, 134:20, 186:7

**liquid/contaminants** [1] - 132:8

**list** [3] - 10:6, 19:6, 90:2

**listed** [1] - 23:10

**listen** [2] - 22:15, 83:14

**literature** [10] - 51:8, 51:20, 51:23, 52:2, 52:13, 52:15, 54:9, 67:16, 70:16, 88:10

**litigation** [2] - 9:8, 9:12

**lobbies** [1] - 90:3

**local** [1] - 49:21

**located** [10] - 97:1, 124:14, 139:14, 152:3, 152:19, 153:7, 155:2, 168:21, 178:11, 180:21

**location** [54] - 39:23, 41:19, 47:5, 47:8, 48:18, 48:23, 49:1, 50:19, 51:1, 52:7, 52:8, 52:25, 53:1, 53:20, 56:10, 63:5, 69:19, 70:2, 92:20, 93:12, 95:5, 96:4, 96:25, 105:18, 105:19, 110:21, 112:8, 112:18, 114:16, 115:16, 138:10, 139:19, 139:21, 140:4, 142:12, 142:18, 145:20, 146:4, 152:10, 155:4, 155:19, 159:14, 175:8, 178:7, 178:9, 179:5, 180:15, 181:16, 181:17, 181:18, 181:20, 183:7

**locations** [8] - 39:25, 40:25, 50:21, 50:22, 51:5, 51:22, 52:21, 96:7

**locker** [1] - 97:12

**logs** [1] - 142:17

**look** [14] - 31:17, 61:11, 70:2, 70:17, 89:18, 90:7, 91:10, 99:11, 134:19, 134:23, 136:13, 148:16, 150:15, 161:5

**looked** [7] - 48:8, 48:9, 55:10, 71:13, 71:14, 100:16, 100:18

**looking** [14] - 31:18, 48:17, 57:11, 91:17, 97:2, 98:8, 100:4, 135:1, 136:22, 170:10, 171:22, 178:13, 180:18,

183:16
**looks** [4] - 53:21, 70:3, 93:24, 94:2
**low** [2] - 92:22, 112:17
**lower** [1] - 49:20
**lunch** [2] - 127:22, 129:4

## M

**machine** [7] - 36:5, 44:12, 45:5, 45:8, 45:10, 77:9, 77:11
**magnification** [1] - 100:22
**maintained** [1] - 100:16
**maintaining** [3] - 60:3, 106:11, 177:6
**maintenance** [5] - 98:15, 100:14, 176:2, 177:4, 177:12
**management** [4] - 133:24, 133:25, 134:3, 134:4
**manager** [3] - 134:2, 134:6, 134:13
**Mandara** [14] - 33:14, 33:25, 34:4, 34:8, 37:18, 73:25, 87:10, 103:1, 103:5, 141:19, 151:5, 153:19, 156:5, 166:1
**mandatory** [3] - 144:17, 147:5, 147:8
**manner** [1] - 51:21
**manuals** [1] - 177:8
**manufactured** [1] - 45:20
**manufacturer** [10] - 45:6, 45:13, 67:19, 67:22, 68:9, 68:10, 101:4, 102:22, 166:18, 167:11
**manufacturers** [2] - 70:11, 70:13
**marine** [1] - 65:20
**maritime** [2] - 18:12, 18:15
**Maritime** [1] - 146:13
**mark** [9] - 18:22, 25:20, 48:5, 75:13, 91:5, 155:5, 186:25, 187:16, 188:5
**marked** [30] - 6:12, 6:15, 6:17, 8:6, 8:12, 18:24, 19:2, 26:12, 26:15, 26:18, 27:2, 34:12, 39:23, 47:25, 48:2, 75:11, 76:5,

91:6, 93:14, 123:21, 158:7, 160:24, 168:14, 182:3, 185:3, 185:6, 186:22, 187:14, 187:18, 188:3
**markers** [1] - 181:6
**marking** [2] - 93:18, 159:12
**Marshall** [5] - 11:8, 11:9, 11:13, 11:16, 12:6
**match** [1] - 176:20
**material** [5] - 6:8, 13:24, 32:25, 69:18, 78:12
**Materials** [1] - 76:11
**materials** [9] - 14:2, 19:7, 71:2, 71:10, 72:22, 76:24, 78:5, 185:19, 186:7
**matter** [8] - 12:7, 64:3, 64:10, 69:25, 82:6, 89:14, 155:13, 162:3
**matters** [5] - 9:4, 9:9, 9:12, 121:17, 166:19
**maximum** [1] - 35:22
**mean** [10] - 19:17, 35:17, 49:9, 50:6, 89:9, 121:22, 132:16, 133:3, 147:23, 149:5
**meaning** [5] - 81:1, 85:10, 119:22, 125:16, 161:6
**means** [6] - 104:6, 144:22, 144:23, 149:16, 175:10, 186:17
**meant** [2] - 50:22, 52:11
**measure** [12] - 40:5, 42:14, 42:16, 42:23, 43:1, 66:18, 77:15, 79:7, 96:23, 98:3, 98:7, 151:19
**Measure** [1] - 66:10
**measured** [4] - 82:18, 151:18, 152:24, 153:11, 175:11
**measurement** [1] - 65:18
**measurements** [2] - 104:16, 141:18
**Measuring** [1] - 76:9
**measuring** [2] - 76:23, 153:3
**medical** [25] - 14:21, 14:22, 14:23, 22:9, 118:12, 118:15,

119:2, 119:20, 120:19, 121:3, 121:20, 121:23, 122:7, 122:10, 122:14, 122:22, 122:25, 123:2, 123:5, 123:9, 123:11, 123:14, 123:17, 125:1, 127:7
**meet** [5] - 28:24, 67:6, 69:1, 104:10, 183:2
**meets** [2] - 44:19, 152:25
**member** [25] - 15:23, 55:17, 56:8, 106:3, 106:18, 106:25, 107:13, 108:9, 108:18, 108:20, 108:25, 109:1, 109:9, 109:19, 109:23, 110:8, 110:17, 110:19, 111:16, 112:2, 113:7, 113:20, 114:6, 116:11, 176:15
**members** [13] - 37:18, 37:21, 46:3, 53:8, 55:3, 57:5, 60:2, 60:6, 60:17, 60:19, 167:13, 171:18, 173:13
**mention** [3] - 74:9, 84:17, 121:6
**mentioned** [17] - 22:25, 30:3, 42:19, 59:1, 77:20, 84:15, 84:18, 84:24, 88:8, 92:2, 112:14, 114:6, 116:19, 121:13, 122:5, 165:12, 186:5
**mentioning** [1] - 80:24
**MEP** [2] - 32:15, 32:16
**met** [3] - 22:6, 102:16, 151:25
**Method** [1] - 76:9
**method** [1] - 76:23
**methodologies** [1] - 70:20
**methodology** [1] - 77:23
**methods** [1] - 61:5
**Miami** [3] - 5:25, 142:3, 142:13
**Michael** [1] - 59:22
**microscope** [1] - 100:21
**microscopic** [4] - 98:22, 99:10, 99:17, 99:18

**middle** [1] - 52:10
**might** [25] - 14:7, 30:10, 30:25, 46:16, 46:25, 79:18, 80:1, 87:5, 88:10, 96:13, 102:13, 112:17, 112:20, 119:13, 120:15, 121:12, 127:6, 150:7, 150:9, 157:22, 159:14, 159:15, 163:11, 182:11, 186:13
**Mike** [2] - 163:16, 188:9
**mimics** [3] - 42:8, 42:19, 77:21
**minimum** [4] - 35:22, 67:18, 90:10, 104:25
**minute** [2] - 35:21, 75:3
**minutes** [14] - 7:5, 19:18, 19:21, 21:7, 108:8, 115:1, 115:6, 115:10, 167:24, 169:22, 176:23, 180:3, 188:12, 188:14
**mistaken** [1] - 126:20
**misunderstood** [1] - 23:25
**mitigate** [1] - 150:5
**mode** [2] - 13:19, 14:12
**moment** [3] - 11:25, 21:13, 60:25
**monitor** [3] - 79:24, 155:19, 176:8
**monitoring** [1] - 80:3
**moon** [1] - 70:1
**Moreover** [1] - 158:5
**Most** [1] - 98:13
**most** [4] - 90:10, 130:10, 180:1, 181:7
**mostly** [1] - 181:20
**motion** [2] - 42:10, 81:18
**move** [7] - 28:4, 57:20, 92:23, 110:4, 111:21, 128:7, 163:13
**movement** [1] - 81:11
**moving** [3] - 81:5, 81:10, 81:12
**MR** [227] - 5:15, 6:14, 6:16, 6:24, 7:1, 7:2, 7:3, 7:4, 7:6, 7:7, 7:8, 8:14, 10:12, 10:14, 11:19, 12:1, 14:5, 14:8, 19:1, 25:15, 25:18, 25:19,

25:23, 25:25, 26:1, 26:8, 26:14, 26:25, 27:3, 28:15, 28:17, 28:20, 28:21, 28:22, 28:23, 28:24, 29:1, 31:4, 31:7, 32:18, 32:20, 34:11, 34:16, 47:14, 47:18, 48:4, 55:13, 55:19, 56:6, 56:11, 57:18, 57:21, 58:5, 58:8, 58:22, 59:2, 59:6, 59:9, 59:12, 59:14, 60:8, 60:13, 60:22, 60:23, 61:13, 61:17, 62:13, 62:17, 64:1, 64:5, 64:8, 64:12, 64:15, 64:18, 71:21, 72:3, 73:16, 73:18, 74:1, 74:4, 75:2, 75:9, 76:7, 82:22, 82:24, 87:12, 87:20, 91:8, 92:14, 92:23, 93:1, 93:6, 93:9, 93:16, 102:5, 102:17, 103:7, 103:9, 107:18, 107:21, 107:24, 108:2, 110:4, 110:6, 110:11, 110:15, 110:25, 111:2, 111:4, 111:7, 111:9, 111:11, 111:12, 111:21, 112:10, 113:2, 113:14, 114:2, 114:4, 118:18, 118:21, 120:21, 120:24, 123:24, 124:2, 124:3, 124:12, 124:15, 125:7, 125:8, 125:19, 125:22, 125:24, 126:1, 126:3, 126:5, 126:6, 126:9, 126:11, 127:1, 127:10, 128:2, 128:5, 128:11, 128:13, 128:17, 128:20, 128:22, 129:9, 129:12, 130:13, 130:14, 130:18, 131:1, 131:13, 131:17, 132:25, 133:2, 133:5, 133:8, 133:10, 133:14, 133:15, 134:7, 134:9, 136:20, 138:12, 138:15, 140:12, 140:16,

147:10, 147:16, 152:13, 152:15, 152:16, 152:21, 153:2, 157:18, 157:23, 158:2, 158:4, 161:8, 161:13, 161:20, 161:24, 162:22, 162:24, 162:25, 163:13, 163:19, 163:22, 164:2, 164:6, 164:9, 164:10, 166:16, 166:23, 168:3, 168:12, 169:24, 170:5, 170:7, 170:9, 170:20, 170:21, 173:18, 173:23, 174:3, 174:7, 176:11, 176:22, 177:19, 184:9, 184:13, 185:5, 186:24, 187:20, 187:23, 187:25, 188:1, 188:5, 188:9, 188:11, 188:13, 188:15, 188:18, 188:23

**MS** [1] - 11:1
**MSC** [1] - 10:23
**Mur** [1] - 129:19
**must** [1] - 104:12

# N

**N-A-I-K** [1] - 47:14
**Naik** [2] - 47:12, 167:13
**Naik's** [4] - 168:14, 168:18, 170:22, 188:6
**name** [7] - 5:17, 28:21, 52:3, 52:18, 69:5, 106:1, 148:7
**National** [2] - 75:20, 76:9
**natural** [1] - 95:3
**naval** [2] - 12:21, 12:24
**NCL's** [1] - 27:13
**near** [1] - 139:7
**necessary** [1] - 98:16
**need** [14] - 10:12, 11:11, 12:19, 20:15, 31:2, 44:2, 51:25, 82:12, 108:1, 135:15, 147:11, 148:16, 182:25, 183:2
**needed** [4] - 17:14,

54:11, 83:7, 172:25
**needs** [1] - 183:1
**neighborhood** [1] - 51:7
**Neolite** [1] - 44:11
**Neurologic** [2] - 124:17, 125:12
**never** [20] - 14:13, 15:10, 15:13, 15:20, 15:23, 16:1, 17:24, 44:17, 79:12, 117:8, 125:21, 133:23, 134:12, 139:2, 140:3, 157:24, 165:7, 165:9, 165:25, 176:7
**next** [3] - 158:6, 168:20, 178:23
**nice** [1] - 28:24
**non** [1] - 65:20
**nonbinding** [1] - 144:12
**noncontact** [2] - 40:8, 40:10
**nonregular** [1] - 119:16
**northeast** [1] - 53:2
**Norwegian** [20] - 31:10, 32:3, 33:11, 33:23, 34:1, 34:9, 34:22, 37:17, 37:21, 46:3, 50:4, 73:25, 86:24, 89:23, 102:2, 102:21, 148:7, 151:2, 151:4, 151:6
**Norweigian** [1] - 34:4
**notes** [11] - 24:6, 24:9, 24:10, 35:18, 37:11, 37:12, 40:15, 40:16, 186:5, 188:2, 188:12
**nothing** [5] - 5:6, 69:12, 78:18, 128:18, 132:22
**nuisance** [3] - 80:16, 80:17, 81:19
**number** [32] - 27:21, 27:24, 39:3, 44:3, 48:22, 48:23, 49:1, 49:4, 49:11, 52:6, 76:2, 95:5, 104:25, 116:20, 123:23, 155:5, 178:23, 180:20, 181:1, 181:6, 181:7, 181:12, 181:14, 181:15, 181:16, 181:21, 182:3, 183:17, 183:18, 183:21
**numerous** [1] - 156:10

# O

**Oasis** [1] - 156:3
**Oberg** [1] - 119:12
**object** [53] - 25:15, 26:8, 32:18, 55:13, 56:6, 58:22, 59:6, 59:12, 60:8, 60:22, 61:13, 64:1, 64:8, 64:15, 71:21, 73:16, 74:1, 81:12, 82:22, 87:12, 92:14, 93:6, 102:5, 107:18, 107:24, 110:25, 111:21, 113:2, 114:2, 124:2, 124:12, 127:1, 128:12, 130:13, 130:18, 131:13, 133:2, 134:7, 138:12, 140:12, 147:10, 152:16, 157:18, 161:8, 163:13, 164:9, 166:16, 168:3, 170:20, 173:18, 174:3, 176:11, 184:9
**objecting** [1] - 128:17
**objection** [11] - 57:18, 62:13, 103:7, 110:11, 120:21, 125:23, 126:2, 126:10, 158:2, 162:22, 164:2
**observation** [1] - 108:4
**observe** [4] - 63:4, 100:19, 110:7, 143:13
**observed** [9] - 56:4, 92:12, 109:11, 156:10, 156:23, 162:3, 162:6, 176:20, 181:20
**observing** [2] - 116:10, 143:3
**obtain** [1] - 54:12
**obtained** [2] - 35:19, 167:8
**obviously** [5] - 8:24, 102:6, 165:5, 179:23, 182:22
**occasion** [1] - 17:12
**occasionally** [3] - 84:12, 86:14, 89:10
**occasions** [1] - 156:11
**occupation** [2] - 6:6, 32:23
**occurred** [10] - 50:14,

54:5, 135:20, 137:13, 137:19, 138:21, 138:24, 139:13, 141:23, 172:22
**office** [6] - 7:13, 31:24, 93:19, 186:18, 187:3, 187:10
**officer** [1] - 106:7
**officially** [1] - 63:6
**often** [1] - 36:5
**old** [1] - 45:18
**once** [3] - 57:23, 129:3, 186:25
**one** [50] - 9:5, 12:10, 15:15, 23:19, 25:10, 35:21, 38:22, 38:23, 39:2, 41:7, 41:17, 48:7, 52:3, 52:18, 58:6, 67:4, 67:10, 79:18, 85:24, 86:12, 104:7, 110:13, 119:16, 119:21, 122:18, 129:13, 131:6, 134:10, 135:3, 137:15, 137:18, 139:24, 143:7, 144:23, 145:17, 146:15, 148:10, 148:23, 149:5, 162:11, 163:17, 163:25, 164:5, 164:14, 164:16, 166:20, 170:25, 177:11, 178:9, 180:15
**one-shot** [1] - 41:7
**ones** [1] - 67:4
**ongoing** [2] - 155:19, 181:18
**online** [1] - 31:19
**onset** [1] - 120:15
**onwards** [1] - 96:19
**open** [8] - 20:15, 85:24, 97:23, 98:1, 106:16, 108:1, 116:14, 171:1
**operate** [2] - 174:23, 175:2
**operation** [1] - 38:3
**opinion** [22] - 48:24, 67:12, 79:20, 101:22, 101:23, 104:5, 107:7, 117:24, 120:3, 124:25, 135:18, 144:3, 145:16, 145:19, 146:5, 146:8, 146:11,

146:19, 157:4, 177:20, 178:4, 178:24
**opinions** [18] - 8:18, 12:2, 12:5, 12:14, 14:14, 56:17, 64:25, 83:22, 99:20, 122:19, 128:8, 128:21, 130:25, 137:10, 153:24, 163:20, 165:20, 177:25
**opposed** [2] - 9:14, 89:10
**opposite** [6] - 11:12, 122:16, 122:24, 149:8, 151:17, 160:14
**order** [20] - 29:4, 40:12, 42:11, 45:17, 51:2, 52:16, 61:6, 71:15, 80:1, 80:3, 104:8, 109:23, 120:14, 128:7, 130:21, 131:4, 169:1, 170:14, 179:9, 180:3
**ordered** [1] - 188:20
**ordering** [1] - 188:22
**organization** [2] - 75:18, 75:21
**Organization** [1] - 146:13
**orientation** [1] - 142:18
**original** [4] - 44:14, 45:2, 45:22, 172:12
**orthogonal** [1] - 53:2
**otherwise** [2] - 65:6, 102:7
**ounce** [1] - 95:24
**ounces** [2] - 96:2, 96:3
**outlet** [4] - 180:17, 181:1, 181:9, 184:22
**outlets** [1] - 179:11
**output** [1] - 76:13
**outside** [8] - 63:21, 100:24, 125:24, 128:3, 142:2, 166:7, 166:14, 168:25
**overall** [5] - 53:22, 72:20, 72:25, 73:22, 142:7
**overcast** [1] - 142:8
**own** [14] - 43:13, 57:7, 78:20, 78:24, 100:19, 110:8, 110:23, 111:25, 112:25, 130:1,

130:15, 166:14, 166:25
**owned** [1] - 43:15

# P

**p.m** [16] - 25:14, 26:7, 26:23, 49:21, 50:5, 50:11, 50:15, 75:6, 75:8, 114:10, 136:17, 136:19, 142:11, 177:16, 177:18, 188:24
**Padula** [2] - 10:22, 12:13
**page** [56] - 19:6, 23:10, 24:3, 24:24, 35:3, 36:16, 37:1, 38:22, 39:12, 40:25, 46:7, 50:13, 53:21, 61:11, 61:12, 61:16, 61:21, 61:23, 65:15, 66:24, 84:10, 84:22, 86:5, 88:6, 94:4, 94:7, 95:21, 98:8, 101:7, 105:7, 116:24, 124:17, 125:11, 130:6, 132:5, 132:11, 132:12, 133:16, 135:19, 140:21, 140:24, 143:24, 153:23, 156:7, 161:25, 175:25, 177:3, 178:11, 178:14, 181:2, 181:4, 181:5, 182:3, 186:9, 186:10, 186:11
**paper** [1] - 86:1
**paragraph** [1] - 96:17
**parallel** [2] - 81:12, 81:21
**pardon** [5] - 5:22, 13:15, 68:22, 140:9, 167:4
**Part** [2] - 103:16, 103:22
**part** [38] - 7:23, 18:8, 18:14, 21:1, 21:2, 21:6, 24:25, 32:4, 37:25, 68:11, 69:17, 90:15, 91:16, 94:11, 95:13, 98:15, 101:16, 102:11, 104:22, 107:11, 132:10, 133:19, 134:1, 134:4, 134:18, 136:6,

147:12, 159:12, 167:23, 169:1, 169:21, 171:20, 172:21, 182:24, 184:21
**partake** [1] - 83:21
**partial** [1] - 39:1
**partially** [1] - 142:8
**particles** [1] - 51:12
**particular** [2] - 48:7, 69:15, 79:1
**parts** [2] - 13:9, 23:25
**passage** [1] - 146:24
**passengers** [2] - 46:2, 46:6
**past** [2] - 79:15, 101:2
**patient** [1] - 125:17
**Patricia** [1] - 138:2
**Pause** [1] - 188:8
**PDF** [3] - 29:9, 29:16
**Pedestrian** [1] - 66:10
**peer** [2] - 83:16, 83:19
**peer-reviewed** [2] - 83:16, 83:19
**pen** [3] - 187:4, 187:7, 187:8
**Pennsylvania** [1] - 22:17
**people** [9] - 38:2, 46:8, 73:1, 83:21, 114:16, 115:5, 115:21, 146:9, 161:5
**per** [4] - 35:21, 81:20, 185:18, 185:24
**percent** [7] - 9:7, 9:10, 9:13, 9:24, 9:25, 10:3, 93:11
**percentage** [1] - 9:22
**perfectly** [1] - 81:21
**perform** [2] - 8:17, 182:25
**performance** [8] - 68:17, 75:1, 165:23, 166:4, 180:6, 182:13, 183:2, 184:12
**performed** [4] - 96:9, 155:15, 166:21, 169:13
**performing** [5] - 112:2, 113:21, 166:14, 181:23, 185:17
**perhaps** [1] - 113:4
**period** [4] - 35:23, 41:10, 41:16, 172:22
**permanently** [1] - 22:20
**perpendicular** [2] - 81:15, 81:17

**Perrin** [1] - 129:19
**person** [13] - 16:6, 22:6, 42:9, 42:20, 69:5, 115:11, 119:14, 127:4, 128:24, 129:3, 129:9, 157:13, 157:21
**person 's** [1] - 126:24
**personal** [2] - 16:8, 88:25
**personally** [6] - 63:18, 71:6, 110:7, 111:15, 111:25, 150:22
**personnel** [1] - 176:9
**perspiration** [1] - 175:22
**pertaining** [1] - 22:9
**PH.D** [1] - 5:10
**phone** [1] - 30:23
**photo** [1] - 47:24
**photocopy** [1] - 71:5
**photograph** [5] - 36:23, 58:4, 91:11, 97:7, 180:23
**photographs** [15] - 9:1, 27:16, 29:4, 29:8, 29:11, 29:15, 29:25, 30:1, 37:10, 40:18, 47:21, 47:22, 93:18, 93:21, 172:8
**photos** [1] - 48:13
**physically** [1] - 90:9
**picture** [11] - 95:9, 97:2, 97:4, 97:8, 97:9, 168:16, 168:17, 171:8, 171:14, 178:22, 179:14
**pictures** [4] - 28:14, 31:21, 93:23, 172:5
**Pilla** [3] - 70:18, 150:15, 161:9
**PILLA** [1] - 70:18
**place** [9] - 70:1, 86:16, 98:14, 98:20, 147:22, 147:23, 159:13, 159:18, 182:11
**placed** [8] - 69:24, 69:25, 86:23, 109:6, 147:13, 181:14, 181:15, 181:19
**placement** [2] - 161:10, 161:19
**places** [3] - 147:19, 147:25
**placing** [3] - 55:17, 81:10, 92:19
**plain** [1] - 133:6

**plaintiff** [7] - 9:14, 9:25, 10:3, 10:4, 19:25, 89:20, 128:10
**Plaintiff 's** [1] - 136:24
**plaintiff 's** [5] - 8:18, 18:21, 159:6, 185:12, 186:20
**plan** [2] - 38:18, 183:17
**plans** [5] - 32:4, 32:6, 32:7, 32:14, 32:16
**plenty** [1] - 52:15
**point** [28] - 8:7, 32:11, 36:3, 36:9, 36:21, 37:3, 37:5, 52:13, 60:15, 62:9, 69:13, 69:21, 70:9, 70:15, 82:7, 98:4, 98:7, 100:9, 100:13, 103:20, 107:6, 113:8, 122:2, 124:13, 138:23, 151:11, 180:24, 182:17
**points** [1] - 105:15
**policies** [4] - 176:16, 176:19, 177:5
**policy** [2] - 176:18, 177:12
**polls** [1] - 52:20
**pool** [6] - 38:3, 87:7, 89:24, 139:8, 139:9, 139:15, 151:17, 178:11
**porosity** [2] - 99:11, 100:7
**Port** [2] - 142:3, 142:13
**portion** [2] - 19:14, 168:23
**portions** [3] - 23:3, 23:16, 55:7
**position** [6] - 6:1, 96:19, 108:14, 133:24, 134:1, 176:8
**positions** [2] - 32:15, 176:16
**positively** [1] - 92:10
**possibilities** [1] - 150:9
**possibility** [1] - 150:2
**possible** [16] - 55:23, 57:15, 58:2, 63:11, 92:8, 92:20, 93:7, 96:20, 98:23, 109:14, 112:17, 115:13, 119:24, 119:25, 129:10, 129:11
**postural** [1] - 130:3

**poured** [1] - 154:15
**pouring** [2] - 154:6, 154:10
**practical** [1] - 70:17
**Practice** [1] - 65:11
**practice** [5] - 67:9, 99:22, 146:3, 147:14, 150:16
**practices** [3] - 51:15, 51:24, 146:19
**present** [1] - 141:10
**presented** [2] - 27:6, 116:14
**press** [1] - 36:1
**prevented** [1] - 166:12
**Prevention** [1] - 65:11
**previous** [3] - 31:11, 86:12, 169:11
**previously** [3] - 77:14, 77:20, 78:14
**principal** [3] - 6:2, 6:7, 32:24
**printed** [5] - 28:5, 37:10, 57:14, 91:4, 186:7
**printouts** [1] - 40:13
**priors** [2] - 133:19, 135:4
**problem** [2] - 182:21, 183:15
**problems** [2] - 143:3, 183:18
**procedures** [2] - 157:6, 176:4
**Proceedings** [3] - 75:7, 136:18, 177:17
**process** [5] - 13:9, 78:16, 83:20, 83:21, 177:10
**processes** [1] - 177:4
**procure** [1] - 102:8
**produced** [1] - 25:3
**prohibited** [2] - 165:11, 166:2
**proper** [3] - 51:21, 101:20
**properly** [2] - 176:2, 180:15
**properties** [3] - 42:11, 77:16, 80:4
**protective** [1] - 128:7
**protocol** [1] - 74:24
**provide** [20] - 8:17, 36:8, 36:9, 51:2, 51:3, 52:11, 52:17, 65:4, 67:20, 68:4, 71:5, 71:12, 74:23, 83:5, 83:22, 83:24, 86:11, 130:21, 131:21, 144:8

**provided** [57] - 10:5, 19:21, 20:12, 23:7, 23:13, 23:15, 24:25, 25:2, 25:5, 26:3, 29:9, 29:10, 29:15, 32:4, 38:19, 47:7, 50:3, 53:16, 54:4, 54:23, 55:21, 57:11, 57:24, 62:19, 63:10, 64:21, 67:8, 68:11, 71:9, 84:7, 84:25, 88:11, 93:19, 103:25, 106:1, 106:9, 106:16, 109:22, 113:1, 114:14, 115:8, 116:8, 120:12, 122:3, 124:24, 125:1, 125:17, 129:14, 130:19, 134:20, 136:7, 137:6, 144:6, 150:4, 164:7, 164:12, 178:12
**provides** [7] - 35:22, 67:25, 75:18, 77:22, 87:14, 88:18, 101:24
**providing** [4] - 68:24, 71:14, 122:18
**public** [5] - 46:4, 83:22, 83:24, 98:16, 104:3
**publication** [2] - 66:1, 66:9
**published** [2] - 66:13, 83:25
**pull** [4] - 60:25, 84:22, 85:24, 170:24
**pulling** [1] - 186:3
**pulls** [1] - 94:20
**purchasing** [1] - 166:13
**purportedly** [2] - 67:6, 102:3
**purpose** [4] - 17:9, 99:9, 121:14, 182:9
**purposes** [15] - 6:13, 8:13, 18:25, 26:13, 48:3, 50:23, 76:6, 79:23, 91:7, 93:15, 123:22, 185:4, 186:23, 187:19, 188:4
**push** [3] - 109:20, 110:9, 183:13
**pushed** [3] - 107:7, 108:4, 182:20
**pushing** [2] - 108:18, 159:21
**put** [16] - 29:4, 53:4,

72:4, 73:2, 73:24, 95:23, 96:3, 144:11, 147:4, 147:15, 155:7, 155:10, 179:4, 181:11, 182:2, 182:7

## Q

**quality** [5] - 57:14, 58:1, 63:9, 73:21, 79:23
**quantity** [3] - 127:20, 155:13, 182:10
**quarter** [4] - 154:11, 179:7, 179:8, 182:5
**questioner** [1] - 27:1
**questions** [9] - 28:18, 122:19, 128:6, 133:4, 133:12, 133:21, 135:7, 156:20, 187:25
**quick** [1] - 124:7
**quickly** [3] - 167:14, 172:14, 173:14
**quite** [1] - 100:14
**quote** [5] - 88:14, 104:22, 125:12, 138:20
**quoted** [1] - 131:21
**quoting** [2] - 130:9, 132:7

## R

**R-A-M-P** [1] - 70:7
**R11** [21] - 67:21, 68:12, 68:21, 84:2, 84:6, 84:9, 84:10, 84:19, 84:24, 85:4, 85:13, 85:21, 86:13, 87:17, 88:10, 90:14, 90:18, 101:6, 101:18, 101:19
**R12** [20] - 68:21, 69:1, 84:15, 84:18, 85:1, 85:9, 85:20, 85:24, 86:19, 87:1, 87:3, 87:7, 87:11, 87:19, 89:7, 89:24, 90:5, 90:10, 90:18, 101:19
**R13** [18] - 69:1, 84:18, 85:1, 85:9, 85:20, 86:19, 87:1, 87:3, 87:7, 87:11, 87:19, 89:7, 89:25, 90:1, 90:5, 90:11, 90:18
**rag** [1] - 157:7
**Raise** [1] - 5:2
**ramp** [4] - 70:7,

154:24, 155:3, 178:12
**range** [4] - 67:20, 68:9, 68:15, 117:14
**ranges** [3] - 67:25, 90:19, 91:2
**rated** [2] - 87:11, 102:4
**rates** [4] - 173:1, 173:5, 184:23, 185:16
**rather** [1] - 125:15
**rating** [7] - 84:3, 85:13, 87:18, 89:7, 90:12, 101:20
**ratings** [6] - 85:12, 85:14, 87:8, 87:15, 87:16, 88:3
**ratio** [4] - 80:20, 80:24, 82:4, 83:2
**ray** [1] - 113:10
**reach** [1] - 96:10
**read** [17] - 10:15, 22:24, 27:5, 36:16, 82:10, 82:11, 86:18, 88:8, 90:25, 125:9, 132:1, 136:2, 161:20, 161:22, 167:12, 176:5, 188:19
**reading** [14] - 27:1, 35:11, 36:20, 37:8, 41:6, 41:7, 84:10, 86:8, 103:18, 125:20, 130:6, 156:13, 170:1, 188:25
**readings** [2] - 40:14, 40:19
**ready** [2] - 125:10, 135:13
**real** [2] - 49:22, 124:7
**really** [4] - 67:10, 81:17, 81:19, 115:4
**Realtime** [1] - 169:25
**reason** [7] - 12:18, 14:3, 29:14, 54:3, 64:24, 78:22, 78:24
**reasonably** [1] - 65:17
**received** [1] - 62:24
**recent** [1] - 148:10
**recess** [3] - 75:5, 136:16, 177:15
**recite** [1] - 76:20
**recognized** [1] - 70:12
**recollection** [7] - 19:22, 21:12, 58:12, 58:25, 59:7, 62:15, 105:1
**recommendation** [10]

- 68:21, 144:7, 144:13, 144:16, 147:3, 147:6, 147:18, 148:18, 148:24, 149:17
**recommendations** [7] - 67:8, 144:5, 146:1, 146:12, 146:20, 147:1, 152:1
**recommended** [1] - 150:10
**recommends** [1] - 149:14
**recondition** [1] - 44:19
**reconditioned** [1] - 44:18
**reconstruct** [1] - 14:11
**reconstructing** [1] - 14:10
**reconstruction** [2] - 13:7, 13:11
**reconstructionist** [5] - 13:3, 13:5, 13:14, 13:17, 13:22
**record** [14] - 26:22, 28:19, 31:4, 31:6, 31:14, 36:2, 39:3, 39:4, 123:17, 124:6, 125:19, 159:2, 169:24, 170:6
**recorded** [1] - 161:23
**recording** [1] - 41:16
**recordings** [1] - 30:19
**records** [5] - 22:9, 35:20, 118:12, 123:14, 126:13
**recreate** [1] - 151:9
**reduce** [2] - 141:1, 150:5
**refer** [7] - 73:10, 95:1, 103:2, 115:18, 116:3, 139:10, 154:4
**reference** [41] - 39:11, 52:9, 52:11, 65:9, 67:1, 67:5, 67:17, 68:2, 68:23, 68:24, 70:25, 71:15, 78:5, 89:2, 94:5, 101:7, 103:19, 103:21, 104:24, 105:10, 105:17, 106:14, 106:15, 116:24, 119:11, 130:16, 130:21, 132:6, 133:16, 135:5, 136:7, 140:23, 140:24, 143:6, 143:12, 143:23,

144:18, 153:12, 156:9, 161:25, 175:25
**referenced** [9] - 19:9, 24:3, 24:24, 31:14, 84:16, 118:6, 130:24, 168:9, 177:8
**references** [9] - 65:16, 67:3, 69:17, 71:14, 88:19, 89:13, 104:15, 130:2, 133:1
**referencing** [6] - 47:6, 47:10, 67:17, 84:2, 137:2, 158:11
**referred** [2] - 70:6, 103:12
**referring** [25] - 38:25, 39:16, 47:20, 50:15, 51:17, 54:25, 60:16, 62:5, 66:25, 73:4, 73:13, 73:14, 87:21, 94:11, 94:13, 95:13, 97:19, 105:23, 105:25, 106:8, 134:16, 136:10, 138:19, 147:25, 153:22
**refers** [4] - 74:16, 95:2, 104:17, 145:3
**regard** [3] - 63:15, 104:5, 153:9
**regarding** [26] - 39:12, 45:5, 72:11, 114:6, 116:10, 116:25, 117:25, 127:8, 132:7, 132:19, 135:19, 143:24, 151:22, 152:4, 152:7, 153:12, 153:24, 156:9, 156:16, 157:1, 157:4, 160:25, 176:1, 177:12, 177:21, 177:25
**regardless** [3] - 140:3, 160:10, 183:19
**regular** [1] - 53:7
**regulation** [1] - 130:3
**Regulation** [1] - 103:16
**Regulations** [1] - 65:12
**reiterate** [1] - 120:11
**relate** [2] - 51:24, 99:20
**related** [3] - 8:18, 9:9, 9:12
**relative** [3] - 43:18, 44:6, 100:1
**relatively** [5] - 100:3,

100:5, 100:9, 140:25, 142:8
**released** [1] - 76:1
**relevance** [1] - 64:10
**relevant** [3] - 54:14, 64:3, 133:11
**relying** [4] - 67:11, 137:9, 137:23, 144:9
**remained** [4] - 105:14, 107:5, 167:23, 169:21
**remains** [1] - 30:13
**remember** [11] - 43:10, 44:4, 58:12, 58:16, 58:17, 59:16, 86:5, 95:25, 135:2, 165:12, 174:20
**remove** [1] - 17:10
**repeat** [7] - 7:10, 13:15, 34:6, 52:22, 62:23, 135:10, 169:9
**rephrase** [4] - 17:22, 17:23, 56:7, 169:8
**replaced** [2] - 45:23, 45:24
**replacing** [2] - 177:6, 177:13
**replied** [1] - 41:25
**report** [87] - 10:9, 18:17, 19:4, 19:6, 21:2, 23:11, 24:4, 24:11, 25:11, 27:13, 34:12, 35:3, 36:15, 37:1, 39:12, 39:23, 40:25, 45:14, 46:7, 47:3, 48:17, 49:5, 50:7, 50:13, 53:17, 53:23, 56:17, 63:25, 64:22, 65:9, 84:9, 84:21, 85:24, 86:3, 86:19, 88:6, 94:4, 94:12, 94:14, 95:2, 98:8, 100:8, 102:3, 103:14, 103:18, 104:6, 116:3, 116:25, 118:6, 119:4, 119:8, 121:10, 122:3, 124:14, 129:15, 130:1, 130:23, 131:3, 131:7, 131:21, 132:10, 135:25, 136:11, 138:21, 140:21, 141:16, 142:7, 144:14, 144:17, 144:21, 147:7, 150:20, 154:18, 156:7, 157:10, 161:15, 161:18,

162:1, 165:21, 165:24, 166:6, 169:2, 171:9, 173:10, 180:24, 181:2
**reported** [7] - 50:9, 53:23, 124:10, 133:19, 136:6, 159:23, 169:2
**REPORTER** [3] - 5:2, 10:10, 188:22
**reporter** [4] - 8:11, 161:23, 187:22, 187:24
**reports** [2] - 25:3, 101:24
**represent** [1] - 7:14
**representative** [1] - 50:23
**reproduce** [2] - 89:12, 172:19
**reproduces** [1] - 42:10
**request** [2] - 38:18, 133:20
**requested** [1] - 6:21
**require** [2] - 78:1, 81:4
**required** [3] - 13:5, 13:9, 17:1
**requirement** [1] - 90:13
**requirements** [4] - 44:20, 152:1, 152:2, 152:25
**requires** [3] - 77:8, 78:8, 83:20
**rereviewing** [1] - 61:3
**Research** [1] - 65:11
**research** [4] - 51:14, 51:24, 72:11, 160:25
**resistance** [18] - 42:4, 42:14, 42:16, 42:23, 43:1, 65:18, 67:7, 67:18, 76:24, 77:5, 79:7, 90:18, 95:7, 95:15, 95:18, 95:22, 104:25, 150:23
**Resistance** [1] - 66:10
**respect** [6] - 33:13, 46:17, 52:4, 102:25, 150:23, 156:4
**respectively** [1] - 86:20
**respond** [2] - 28:17, 135:8
**responsibilities** [3] - 18:4, 134:1, 134:4
**responsibility** [2] - 17:25, 176:15
**responsible** [2] - 60:2, 106:11

**rest** [1] - 176:5
**restroom** [1] - 53:11
**result** [4] - 25:13, 26:18, 53:15, 68:5
**resulted** [2] - 141:11, 150:8
**results** [2] - 24:22, 121:24
**resumed** [3] - 75:7, 136:18, 177:17
**retained** [7] - 7:9, 7:11, 7:17, 7:21, 9:3, 9:12, 9:19
**retainer** [2] - 8:3, 75:10
**Review** [1] - 65:11
**review** [25] - 7:20, 19:12, 20:14, 21:17, 22:12, 23:2, 23:22, 24:2, 24:21, 32:2, 33:17, 44:3, 50:2, 55:21, 71:1, 91:16, 112:13, 123:14, 124:21, 124:24, 125:3, 125:4, 130:23, 156:22, 185:19
**reviewed** [46] - 8:20, 19:7, 19:9, 20:12, 21:6, 21:21, 21:24, 22:9, 23:4, 23:25, 24:1, 24:7, 24:16, 25:6, 25:7, 26:2, 26:4, 26:5, 26:17, 27:13, 31:9, 33:9, 55:5, 55:12, 56:13, 56:15, 56:24, 59:21, 63:18, 65:20, 83:16, 83:19, 107:10, 107:12, 109:16, 112:22, 114:15, 117:8, 118:11, 118:24, 131:23, 142:17, 173:12, 176:24, 176:25, 187:3
**reviewing** [7] - 37:17, 37:20, 61:3, 63:6, 63:17, 124:23, 134:22
**RFP** [3] - 38:19, 135:2
**rhythm** [3] - 119:14, 119:15, 119:22
**right-hand** [1] - 97:2
**risk** [7] - 133:24, 133:25, 134:2, 134:3, 134:6, 134:13
**Role** [1] - 129:18
**roles** [3] - 134:5, 134:10, 176:14

**room** [5] - 97:12, 138:5, 138:8, 139:3, 168:25
**rotational** [1] - 81:18
**routine** [1] - 98:15
**routinely** [1] - 99:5
**Royal** [3] - 11:1, 11:13, 12:7
**rule** [2] - 175:20, 175:23

**S**

**safe** [2] - 65:17, 101:11
**Safety** [1] - 104:11
**safety** [3] - 67:23, 147:14, 153:1
**sail** [1] - 73:15
**sample** [1] - 130:20
**samples** [1] - 51:25
**sampling** [3] - 51:3, 51:12, 51:24
**sand** [2] - 45:8, 45:19
**sandpaper** [5] - 45:15, 45:16, 45:18, 45:21, 45:22
**Sara** [1] - 11:1
**saving** [1] - 18:22
**saw** [8] - 57:4, 93:3, 111:25, 113:5, 115:21, 142:23, 172:5, 184:8
**scenario** [1] - 182:17
**scene** [1] - 139:18
**schematic** [2] - 32:8, 32:13
**Schwartz** [3] - 9:4, 123:17, 124:7
**science** [1] - 6:8
**scientist** [4] - 6:2, 6:7, 32:24, 33:1
**scroll** [2] - 178:15, 180:25
**scrolling** [1] - 61:15
**SD** [2] - 30:14, 30:16
**se** [1] - 81:20
**Sea** [1] - 104:11
**sealed** [4] - 33:2, 33:4, 33:6, 33:9
**Second** [2] - 66:11, 136:24
**second** [6] - 27:4, 39:2, 85:24, 136:13, 145:18, 178:9
**seconds** [12] - 7:25, 21:8, 26:21, 27:5, 41:8, 117:17, 117:18, 117:20, 117:21, 118:1,

120:4, 120:12
**section** [7] - 86:2, 94:13, 104:13, 104:21, 130:25, 153:22, 178:10
**Section** [5] - 86:6, 86:10, 95:1, 96:16, 138:20
**sections** [1] - 86:11
**Security** [3] - 22:13, 22:16, 22:21
**security** [1] - 106:7
**see** [74] - 26:20, 36:6, 38:25, 55:21, 56:21, 57:2, 57:6, 57:12, 57:16, 58:10, 58:18, 58:19, 59:4, 59:10, 62:21, 63:3, 91:14, 91:17, 91:22, 91:23, 94:24, 97:6, 98:17, 98:25, 100:7, 101:13, 101:14, 104:2, 106:3, 108:8, 108:12, 108:17, 108:20, 108:24, 109:8, 109:14, 109:19, 110:17, 110:23, 111:15, 112:11, 112:23, 112:25, 113:11, 113:16, 113:19, 113:20, 114:15, 115:10, 116:4, 124:7, 125:2, 125:3, 132:10, 155:14, 156:13, 157:8, 158:8, 159:6, 160:20, 165:18, 167:23, 169:21, 171:9, 171:14, 172:14, 172:22, 177:7, 182:10, 182:12, 182:13, 183:20, 186:6
**seeing** [5] - 92:6, 92:7, 114:18, 168:11, 179:12
**seizures** [1] - 125:18
**selected** [6] - 47:8, 101:10, 102:18, 102:21, 102:25, 103:5
**send** [14] - 7:1, 31:23, 63:20, 186:20, 186:21, 187:13, 187:16, 187:20, 187:21, 187:23
**sense** [2] - 151:12, 182:14
**sent** [1] - 6:24

September [2] - 168:15

services [1] - 184:24

serving [1] - 9:8

sets [1] - 73:15

seven [1] - 95:24

seven-ounce [1] - 95:24

several [7] - 21:8, 27:20, 108:8, 112:6, 170:13, 173:8, 187:15

shadow [1] - 171:18

shall [4] - 82:18, 83:11, 89:17, 104:20

shape [1] - 150:17

share [1] - 137:12

shared [3] - 31:21, 31:22, 138:6

shares [2] - 138:14, 139:17

sharing [1] - 138:25

sheet [1] - 186:4

ship [34] - 8:23, 15:24, 18:6, 18:9, 27:17, 30:19, 49:23, 49:25, 69:14, 69:15, 69:22, 69:24, 71:19, 72:12, 72:16, 72:20, 72:24, 72:25, 73:1, 73:14, 73:22, 102:25, 141:23, 142:15, 142:17, 142:19, 142:23, 148:19, 157:17, 157:25, 166:8, 166:15, 176:9

ships [2] - 148:8, 151:1

shoot [1] - 40:11

short [1] - 77:1

shot [3] - 41:7, 116:16, 116:18

show [12] - 26:15, 36:21, 37:9, 49:15, 69:21, 71:17, 76:14, 87:21, 100:13, 106:18, 123:17, 168:13

showers [1] - 89:25

showing [9] - 6:17, 32:14, 39:4, 91:9, 113:8, 124:5, 159:2, 159:11, 171:5

shown [1] - 95:10

shows [11] - 55:16, 111:1, 111:2, 111:4, 111:5, 121:25, 171:8, 179:14, 183:17, 183:23

sic [1] - 81:2

side [8] - 10:13, 53:3, 97:3, 151:17, 152:20, 160:14, 160:18

side-side [1] - 53:3

sign [5] - 159:13, 159:18, 160:12, 160:21, 161:19

signed [1] - 8:4

significant [4] - 132:7, 150:14, 162:2, 171:15

significantly [1] - 183:21

signing [1] - 188:25

signs [5] - 161:1, 161:3, 161:7, 161:12, 161:18

similar [6] - 41:11, 75:23, 147:1, 151:10, 162:13, 166:13

simple [1] - 111:14

simply [1] - 125:20

sink [1] - 180:5

sit [9] - 19:23, 21:5, 21:19, 38:5, 40:23, 46:20, 88:13, 89:4, 90:24

site [1] - 64:13

sitting [2] - 81:2, 188:10

size [4] - 73:5, 73:12, 161:11, 184:4

skills [2] - 13:5, 13:8

slightly [2] - 181:9, 181:21

Slip [2] - 65:10, 66:10

slip [40] - 42:4, 42:14, 42:16, 42:23, 43:1, 65:18, 67:6, 67:18, 76:23, 77:5, 77:23, 79:7, 90:17, 95:7, 95:15, 95:18, 95:22, 104:12, 104:17, 104:20, 104:25, 105:2, 105:18, 115:11, 116:5, 120:15, 131:6, 131:22, 133:17, 133:18, 134:17, 135:6, 135:19, 136:5, 136:10, 150:6, 150:7, 150:21, 150:23, 151:24

slip-and-fall [9] - 105:18, 131:6, 133:17, 133:18, 134:17, 135:6,

135:19, 136:5, 136:10

slip-free [4] - 104:12, 104:17, 104:20, 105:2

slipness [1] - 159:14

slipped [17] - 47:20, 48:8, 48:14, 48:16, 48:19, 48:25, 49:10, 50:4, 50:24, 51:7, 92:20, 106:22, 139:25, 140:2, 140:4, 149:25, 175:21

slipping [2] - 91:19, 152:9

slope [6] - 94:5, 94:6, 94:22, 95:2, 95:3, 169:1

slopes [1] - 94:19

sloping [1] - 94:23

slowly [1] - 179:18

SLS [1] - 77:2

small [1] - 100:6

smaller [1] - 91:12

smells [1] - 127:25

Smith [1] - 10:21

smooth [2] - 100:3, 100:5

smoothness [1] - 100:1

snapshots [1] - 47:11

soapy [1] - 78:12

Social [3] - 22:13, 22:16, 22:21

societies [2] - 72:10, 72:14

society [2] - 72:8, 72:9

SOLAS [6] - 103:15, 103:19, 103:21, 104:11, 104:14, 105:5

solid [1] - 41:17

solids [1] - 41:19

Sololow [1] - 10:24

solution [1] - 78:9

someone [11] - 16:2, 62:10, 108:4, 121:20, 122:7, 122:21, 123:6, 129:8, 150:13, 151:24, 152:9

somewhere [1] - 36:14

Soo [1] - 10:23

soon [1] - 76:4

sorry [20] - 8:9, 9:16, 10:10, 30:16, 31:11, 34:6, 55:1, 66:22, 84:20, 86:8, 94:1,

114:11, 128:4, 141:6, 145:17, 155:1, 168:15, 177:5, 178:13, 180:23

sort [18] - 20:10, 29:18, 30:21, 31:17, 62:20, 63:3, 63:14, 63:21, 100:20, 119:14, 133:23, 141:18, 153:4, 167:17, 169:14, 172:7, 176:8, 183:14

sounds [1] - 11:5

source [1] - 159:15

southwest [1] - 53:2

spa [57] - 32:7, 33:18, 37:18, 37:25, 52:10, 56:25, 71:24, 72:5, 84:6, 85:5, 86:23, 87:7, 87:16, 89:23, 90:8, 96:22, 96:24, 97:10, 97:24, 98:21, 101:8, 101:19, 103:3, 103:13, 104:7, 104:9, 106:11, 135:20, 135:23, 137:13, 138:22, 139:11, 139:15, 141:10, 143:4, 143:14, 143:21, 143:25, 144:19, 144:22, 145:22, 146:16, 147:21, 148:1, 156:12, 164:16, 167:3, 167:6, 170:14, 170:18, 171:16, 173:15, 174:16, 175:5, 176:2, 177:4, 182:24

Spa [14] - 33:14, 33:25, 34:4, 34:9, 37:18, 73:25, 87:10, 103:1, 103:5, 141:19, 151:5, 153:19, 156:5, 166:1

space [3] - 5:20, 70:18

spaces [2] - 32:15, 140:25

spas [2] - 148:2, 148:5

speaking [2] - 125:22, 126:1

speaks [2] - 132:25, 170:6

spec [3] - 68:17, 75:1, 85:10

specialized [1] - 13:6

specific [35] - 37:9, 38:4, 39:7, 41:19,

44:8, 45:16, 51:4, 52:8, 52:12, 60:15, 65:19, 68:18, 68:19, 78:3, 83:7, 84:6, 85:5, 88:15, 90:13, 91:2, 101:1, 102:25, 104:15, 104:24, 105:3, 134:24, 136:9, 137:1, 137:9, 149:15, 156:4, 158:5, 158:18, 179:5, 181:5

specifically [27] - 7:20, 8:15, 33:13, 43:8, 47:9, 48:22, 48:25, 49:4, 51:16, 52:3, 52:18, 55:12, 57:11, 74:13, 76:22, 82:19, 87:9, 89:5, 96:13, 103:4, 105:23, 130:1, 145:1, 145:9, 151:5, 157:16, 158:10

specification [9] - 68:11, 69:17, 70:13, 84:25, 85:1, 85:2, 85:5, 85:8, 85:21

specifications [5] - 38:1, 67:22, 68:12, 72:1, 84:18

specifics [1] - 21:10

specified [3] - 67:20, 86:7, 102:13

specify [2] - 102:9, 102:23

speck [3] - 183:13, 184:17, 184:18

specs [2] - 102:15, 102:16

speculate [1] - 128:2

spell [1] - 69:3

Spencer [1] - 11:15

spilled [1] - 180:2

spoken [1] - 22:3

spot [1] - 138:24

squeegee [41] - 17:1, 17:5, 18:1, 18:3, 61:24, 107:13, 108:15, 108:18, 109:10, 111:16, 112:4, 132:9, 157:7, 159:19, 162:1, 162:6, 162:8, 162:16, 162:18, 162:19, 163:3, 163:8, 163:24, 164:8, 164:11, 164:12, 164:20, 165:9, 165:13, 165:25, 166:4,

166:7, 166:13, 173:16, 173:21, 173:25, 177:6, 177:9, 177:10, 184:3
**squeegeed** [5] - 55:17, 106:4, 106:25, 107:3, 109:9
**squeegeeing** [27] - 17:16, 17:20, 56:9, 61:7, 61:19, 92:17, 92:18, 106:3, 106:18, 106:20, 108:9, 108:20, 108:25, 109:4, 109:11, 110:1, 110:18, 110:21, 112:6, 113:18, 113:25, 114:7, 116:11, 156:11, 158:13, 159:24, 160:4
**squeegees** [7] - 109:2, 109:23, 110:19, 112:7, 113:22, 160:8, 177:13
**squeeze** [2] - 107:16, 165:10
**stable** [3] - 120:2, 121:14, 121:24
**stack** [1] - 186:6
**stagnant** [3] - 105:14, 107:5, 179:15
**stamp** [1] - 39:5
**stand** [1] - 152:22
**standard** [35] - 50:1, 67:9, 67:24, 68:14, 68:25, 69:13, 69:22, 70:5, 70:9, 70:12, 70:14, 74:16, 74:18, 75:25, 76:16, 76:17, 76:22, 77:5, 77:8, 78:1, 78:3, 83:12, 83:17, 83:19, 84:19, 85:1, 85:11, 86:22, 87:23, 88:15, 88:18, 89:1, 89:12, 89:17, 90:17
**Standard** [1] - 76:9
**standards** [5] - 69:7, 75:16, 75:19, 83:5, 91:1
**Standards** [2] - 69:9, 75:20
**start** [5] - 81:4, 86:12, 105:10, 138:17, 180:5
**starting** [1] - 80:19
**starts** [1] - 81:10
**state** [17] - 5:17, 12:9,

35:3, 66:21, 74:13, 82:14, 83:9, 84:9, 88:5, 88:19, 92:10, 105:13, 112:18, 118:7, 138:3, 141:7, 142:6
**statement** [21] - 50:3, 56:5, 56:8, 67:11, 99:4, 101:15, 121:23, 122:13, 123:4, 127:3, 127:17, 129:6, 132:18, 135:25, 136:4, 136:11, 137:10, 143:9, 156:16, 174:25, 176:21
**statements** [1] - 177:8
**states** [9] - 51:9, 51:20, 54:9, 66:23, 104:11, 113:22, 125:12, 130:10, 150:16
**static** [11] - 65:16, 66:19, 74:9, 74:14, 80:25, 81:3, 82:1, 82:7, 82:15, 82:20, 83:9
**stating** [7] - 58:13, 61:4, 73:8, 73:24, 138:23, 159:17, 161:15
**steady** [3] - 121:14, 121:24, 121:25
**steam** [4] - 138:5, 138:8, 139:3, 168:25
**step** [1] - 168:4
**stepping** [1] - 91:18
**still** [17] - 29:19, 29:23, 30:24, 31:12, 47:22, 47:24, 48:5, 50:15, 56:21, 106:17, 116:16, 116:18, 121:25, 149:25, 167:23, 172:23, 173:25
**stills** [2] - 47:17, 55:2
**stipulate** [1] - 126:5
**stitched** [2] - 29:11, 30:2
**stitches** [1] - 29:3
**stop** [2] - 110:14, 166:10
**stopping** [4] - 108:15, 108:21, 110:3, 112:8
**strange** [1] - 119:13
**Street** [1] - 6:10
**strike** [28] - 17:19, 23:14, 35:17, 36:3, 37:4, 37:19, 39:19,

56:2, 78:23, 80:9, 80:11, 81:17, 92:23, 96:11, 101:6, 110:4, 111:21, 117:2, 120:17, 130:15, 141:22, 152:6, 157:11, 160:11, 163:14, 164:18, 165:8, 180:13
**strike-off** [1] - 96:11
**striking** [8] - 42:9, 42:12, 42:20, 44:23, 77:22, 81:12, 81:21, 82:8
**strip** [1] - 50:24
**structural** [3] - 6:8, 13:23, 32:25
**structure** [1] - 14:1
**sub** [1] - 91:20
**subcontract** [1] - 91:21
**subject** [2] - 22:21, 163:20
**submitted** [1] - 10:7
**subpoena** [3] - 6:14, 6:18, 6:21
**subscribed** [1] - 83:13
**subsequent** [2] - 34:25, 84:19
**substance** [6] - 17:10, 53:4, 53:12, 59:4, 59:10, 77:2
**suffer** [1] - 150:13
**sufficient** [2] - 65:24, 66:19
**suitable** [5] - 84:11, 86:13, 86:19, 87:1, 87:18
**suite** [1] - 139:14
**summarize** [1] - 121:18
**summarized** [1] - 24:11
**summary** [1] - 28:13
**summer** [2] - 43:9, 43:11
**sun** [2] - 175:5, 175:7
**Sunday** [1] - 34:15
**sunny** [2] - 142:6, 142:8
**supervise** [1] - 176:8
**Supplemental** [1] - 136:24
**supplementary** [1] - 140:15
**support** [7] - 64:25, 71:18, 87:10, 136:11, 137:10, 144:3, 144:5
**supporting** [2] - 55:3,

70:16
**supports** [3] - 37:4, 37:6, 107:7
**supposedly** [1] - 67:22
**surface** [82] - 17:6, 39:13, 39:15, 39:17, 40:2, 40:5, 40:11, 40:24, 41:6, 41:17, 41:22, 42:12, 44:19, 44:22, 46:9, 46:13, 46:15, 46:18, 46:21, 54:6, 56:10, 58:18, 60:12, 68:18, 70:3, 71:24, 76:24, 77:16, 77:22, 79:24, 79:25, 81:13, 81:21, 86:6, 89:22, 92:17, 94:16, 94:18, 94:22, 95:2, 95:3, 95:23, 99:1, 99:3, 99:11, 99:24, 100:2, 100:3, 100:6, 100:9, 101:11, 105:11, 105:14, 106:19, 108:25, 109:24, 110:1, 110:18, 110:20, 135:21, 135:23, 137:14, 137:20, 138:6, 138:22, 139:1, 139:18, 141:13, 156:12, 160:8, 166:1, 166:4, 166:8, 169:13, 171:10, 172:21, 172:25, 174:13, 174:20, 181:22, 181:25
**Surface** [1] - 76:10
**surfaces** [7] - 68:25, 82:8, 85:3, 85:25, 86:6, 104:12, 174:23
**surveillance** [1] - 171:9
**Susan** [1] - 10:25
**susceptible** [3] - 122:23, 123:1, 123:6
**swear** [1] - 5:4
**swimming** [3] - 139:8, 139:15
**sworn** [1] - 5:12
**symptoms** [1] - 124:24
**synced** [1] - 186:13
**syndromes** [1] - 130:11
**system** [3] - 153:13, 154:21, 155:22

# T

**Table** [1] - 53:16
**table** [5] - 81:2, 81:10, 90:22, 91:2, 135:4
**talks** [5] - 74:11, 78:4, 80:24, 120:12, 131:7
**tap** [4] - 53:7, 53:13, 78:17, 96:3
**tear** [3] - 99:12, 99:14, 99:15
**technical** [3] - 80:17, 80:18, 83:15
**Tellez** [5] - 47:16, 55:15, 106:2, 106:6, 106:10
**Tellez's** [2] - 116:11, 157:1
**temperature** [40] - 35:4, 35:12, 35:19, 36:6, 36:10, 36:12, 37:6, 37:24, 38:3, 38:4, 38:6, 38:10, 38:14, 39:8, 39:13, 39:15, 39:17, 40:3, 40:6, 40:12, 41:6, 41:7, 41:9, 41:12, 41:15, 41:18, 41:19, 41:20, 41:23, 172:24, 173:6, 174:1, 174:5, 174:10, 174:17, 174:24, 175:3, 175:8, 175:14, 175:17
**temperatures** [3] - 40:24, 41:4, 42:2
**temporarily** [1] - 141:1
**ten** [3] - 115:6, 117:21, 117:23
**tends** [1] - 117:22
**term** [1] - 103:12
**terms** [1] - 21:10, 21:20, 33:17, 51:18, 66:20, 67:23, 68:23, 79:6, 80:7, 120:19, 180:5
**terrible** [1] - 127:24
**Test** [1] - 76:9
**test** [57] - 24:22, 25:13, 26:17, 27:4, 42:4, 44:5, 44:11, 44:14, 44:19, 44:21, 44:25, 45:2, 45:10, 45:11, 45:12, 45:19, 46:9, 47:5, 48:18, 48:23, 50:18, 50:21, 50:22, 50:25, 51:13, 51:22, 52:1, 52:6, 52:7, 52:17, 52:24,

53:1, 53:18, 54:1,
54:9, 70:7, 70:20,
76:23, 88:15, 88:18,
95:11, 95:17, 96:6,
96:13, 96:14,
139:19, 152:14,
155:12, 166:3,
166:4, 166:7,
170:14, 173:17,
173:22, 173:25
**tested** [21] - 39:20,
39:22, 49:11, 51:10,
52:14, 53:1, 55:18,
94:24, 95:14, 95:15,
99:3, 101:1, 101:4,
139:2, 140:3,
141:22, 165:7,
165:25, 180:9,
183:25
**testified** [24] - 5:13,
24:18, 33:17, 58:10,
58:14, 58:17, 59:3,
60:7, 60:19, 62:10,
79:5, 107:16,
107:20, 107:23,
109:1, 109:16,
110:2, 113:24,
115:2, 118:17,
118:23, 132:1,
160:1, 173:13
**testifies** [2] - 112:3,
160:3
**testify** [1] - 163:17
**testifying** [3] - 60:18,
61:8, 163:19
**testimony** [38] - 5:4,
10:6, 10:19, 11:4,
11:7, 11:20, 11:22,
13:10, 22:16, 23:17,
37:17, 37:21, 59:22,
62:10, 85:19,
106:24, 108:17,
109:22, 116:9,
116:10, 131:23,
132:6, 143:2,
143:13, 146:7,
160:5, 160:8,
160:11, 167:12,
170:2, 171:24,
172:2, 173:12,
185:20, 185:21,
185:23, 186:1
**testing** [37] - 17:14,
42:18, 46:11, 46:23,
52:4, 53:5, 66:20,
67:25, 74:24, 77:5,
77:18, 78:9, 78:13,
78:14, 82:15, 88:1,
95:7, 95:18, 95:23,
100:23, 150:22,

151:22, 152:4,
152:7, 152:24,
153:4, 156:3,
166:14, 166:24,
167:17, 167:21,
167:25, 169:15,
169:19, 169:23,
172:14, 179:15
**tests** [9] - 39:18,
51:13, 54:14, 54:15,
96:9, 96:10, 168:8,
168:10, 169:12
**THE** [56] - 5:2, 5:8,
10:10, 11:23, 14:6,
26:9, 32:19, 34:14,
47:15, 55:15, 56:7,
58:7, 58:24, 59:7,
59:13, 60:9, 61:15,
62:15, 64:2, 64:9,
64:16, 71:22, 74:2,
75:4, 87:13, 92:15,
93:7, 102:6, 107:19,
107:25, 111:24,
113:5, 114:3,
123:23, 124:13,
127:2, 128:4,
129:11, 130:19,
131:14, 138:13,
140:13, 147:11,
152:18, 152:23,
157:20, 161:9,
164:4, 166:17,
168:4, 170:3,
173:20, 174:4,
176:13, 184:10,
188:22
**therefore** [16] - 41:18,
42:10, 65:2, 71:25,
77:22, 78:6, 81:18,
83:10, 109:6,
118:14, 131:22,
143:16, 147:18,
149:17, 166:3,
176:21
**Thereupon** [5] - 31:5,
75:5, 136:16,
161:22, 177:15
**THEREUPON** [2] -
5:1, 5:9
**thermal** [5] - 37:18,
96:24, 97:24,
139:14, 145:21
**thermometer** [2] -
35:8, 35:9
**third** [1] - 103:12
**three** [8] - 82:23, 96:1,
96:3, 103:8, 110:12,
114:23, 183:24,
184:19
**throughout** [7] - 21:3,

35:14, 36:11, 41:16,
147:4, 171:15, 175:9
**thumb** [1] - 184:18
**thumbnail** [1] - 184:4
**Tien** [1] - 65:12
**tile** [66] - 44:21, 67:19,
67:24, 68:8, 68:10,
68:25, 69:16, 69:24,
69:25, 70:3, 70:11,
70:13, 72:2, 72:4,
72:23, 73:24, 76:25,
77:6, 80:4, 84:3,
84:6, 84:16, 84:17,
84:25, 85:4, 85:5,
85:13, 85:21, 86:16,
86:23, 87:10, 87:17,
90:12, 90:14, 90:18,
98:23, 99:3, 99:10,
100:1, 100:4,
100:17, 100:24,
101:2, 101:6,
101:10, 101:17,
101:18, 101:20,
101:21, 102:3,
102:4, 102:18,
102:21, 103:1,
103:5, 112:16,
137:20, 138:6,
139:1, 139:23,
156:4, 167:2, 167:5,
167:14
**tiles** [6] - 85:2, 90:20,
91:2, 91:24, 101:3,
167:8
**timer** [1] - 35:24
**timestamp** [2] - 20:10,
114:5
**timestamps** [2] -
21:15, 21:20
**title** [2] - 134:11,
134:13
**today** [14] - 7:2, 8:21,
19:23, 20:18, 20:19,
21:5, 21:19, 40:23,
46:20, 60:18, 71:3,
89:4, 173:8, 185:14
**today's** [1] - 6:18
**together** [2] - 10:8,
172:24
**Tong's** [1] - 132:19
**tonnage** [2] - 73:5,
73:12
**took** [9] - 29:2, 40:19,
43:6, 53:10, 93:21,
98:14, 98:20, 172:6,
180:3
**tool** [1] - 80:3
**top** [6] - 44:3, 57:25,
76:2, 90:23, 178:11,
178:18

**total** [2] - 23:13, 46:5
**totality** [4] - 19:20,
20:5, 73:22, 117:24
**totally** [3] - 22:20,
126:8, 128:6
**toward** [1] - 160:13
**towards** [3] - 97:2,
112:7, 139:14
**towel** [2] - 108:16,
177:10
**toxicologist** [4] - 15:1,
15:3, 25:17, 27:14
**toxicology** [1] - 128:9
**tracking** [3] - 108:11,
113:9, 113:16
**traction** [1] - 135:24
**trade** [1] - 6:8
**train** [2] - 176:3, 176:8
**training** [1] - 13:6
**tran** [1] - 188:21
**transcript** [8] - 23:16,
23:18, 23:22, 24:17,
106:2, 110:19,
169:25
**transcripts** [4] - 23:8,
106:17, 112:22,
135:2
**transfer** [1] - 144:24
**transferred** [1] - 24:10
**transferring** [1] -
30:15
**transiting** [1] - 144:24
**transitional** [3] -
84:11, 86:14, 88:21
**translated** [1] - 69:10
**transmit** [1] - 31:24
**transmitted** [1] - 29:7
**trench** [8] - 154:20,
155:2, 158:6,
180:18, 181:17,
181:18, 182:5,
184:22
**trial** [1] - 186:1
**tribometer** [3] - 42:5,
66:6, 76:13
**tried** [1] - 47:19
**tries** [1] - 96:18
**trip** [1] - 150:21
**true** [9] - 46:17, 56:5,
59:5, 59:20, 122:16,
122:24, 149:8,
163:10, 173:7
**truth** [3] - 5:5, 5:6
**try** [2] - 33:19, 48:9
**trying** [27] - 49:13,
51:19, 63:7, 72:23,
73:9, 83:3, 85:15,
85:23, 88:4, 89:15,
99:16, 119:9, 121:6,
121:18, 122:16,

125:2, 134:19,
135:4, 135:6, 135:8,
136:3, 136:4,
153:23, 170:8,
171:1, 183:3, 184:20
**tub** [4] - 152:11,
154:23, 154:25,
155:3
**tummy** [1] - 127:23
**Tung** [3] - 106:6,
106:10, 116:11
**turn** [1] - 38:24
**turning** [2] - 113:12,
113:17
**two** [20] - 9:17, 9:18,
19:10, 41:21, 51:4,
60:2, 74:21, 75:3,
82:8, 86:11, 112:24,
112:25, 117:23,
126:19, 180:3,
181:13, 183:24,
184:19, 188:11,
188:14
**two-minute** [1] - 75:3
**type** [25] - 13:18,
18:11, 42:3, 52:1,
53:4, 70:22, 72:10,
73:6, 79:9, 82:8,
83:1, 83:7, 83:10,
100:23, 101:2,
101:10, 127:4,
135:21, 137:13,
138:14, 138:22,
139:17, 166:8,
167:2, 167:5
**types** [5] - 13:21,
73:20, 73:21, 85:12,
181:13
**typical** [1] - 98:24
**typically** [2] - 70:6,
146:3, 159:13

## U

**ultimately** [2] -
102:14, 102:21
**unable** [1] - 31:3
**unaware** [3] - 33:24,
34:2, 139:21
**under** [11] - 65:19,
87:17, 103:19,
104:12, 104:17,
104:20, 108:13,
117:21, 124:17,
125:11, 175:22
**understood** [1] -
164:13
**undertaken** [1] -
112:15
**unfortunately** [1] -

112:22
**University** [1] - 5:25
**unknown** [5] - 137:17, 137:18, 137:19, 177:3, 177:14
**unless** [1] - 113:10
**up** [15] - 10:11, 10:13, 12:20, 23:6, 43:24, 44:24, 71:13, 71:14, 97:24, 98:4, 154:25, 172:14, 182:1, 184:19, 188:2
**upper** [1] - 178:22
**Urbina** [1] - 138:2
**Urbina's** [1] - 138:7
**USB** [1] - 100:21
**uses** [1] - 41:15
**UTC** [1] - 50:15
**utility** [1] - 16:6

## V

**VALOR** [2] - 148:10, 148:12
**valuable** [2] - 65:4, 166:22
**value** [4] - 84:10, 86:7, 86:13
**values** [5] - 68:1, 68:4, 69:2, 86:19, 88:16
**variable** [1] - 42:5
**variance** [1] - 68:6
**varies** [2] - 67:20, 68:12
**various** [3] - 47:21, 63:24, 64:22
**vary** [2] - 41:20, 96:13
**vendor** [1] - 63:21
**verbatim** [2] - 58:16, 104:23
**version** [1] - 71:7
**versus** [11] - 10:21, 10:22, 10:23, 10:24, 10:25, 11:1, 11:13, 12:6, 12:13, 42:17
**vertical** [1] - 80:21
**vessel** [11] - 18:12, 18:15, 34:18, 53:6, 101:8, 102:23, 103:3, 103:13, 135:21, 145:25, 147:13
**vessels** [6] - 145:23, 146:14, 147:2, 147:15, 148:3
**video** [36] - 21:24, 28:6, 28:13, 29:2, 29:5, 29:7, 29:10, 29:13, 29:17, 29:18, 30:2, 30:6, 31:12,

31:14, 40:21, 56:24, 57:10, 108:4, 108:14, 109:10, 109:20, 111:15, 111:16, 112:12, 113:1, 114:6, 114:22, 114:24, 116:16, 116:17, 116:18, 117:5, 120:4, 120:9
**videos** [3] - 28:16, 30:15, 55:1
**view** [7] - 20:15, 32:11, 100:10, 100:13, 151:12, 182:18, 183:17
**viewed** [1] - 110:8
**vision** [1] - 113:10
**visited** [1] - 148:3
**visual** [3] - 99:23, 141:1, 165:22
**visually** [2] - 63:17, 166:5
**volume** [3] - 171:12, 172:9, 184:11

## W

**waived** [1] - 188:25
**walk** [10] - 80:12, 81:20, 104:9, 120:20, 121:4, 121:21, 122:8, 122:15, 131:22, 146:9
**walked** [6] - 46:8, 115:5, 115:15, 115:17, 117:13, 145:21
**walking** [10] - 50:24, 80:5, 80:8, 114:16, 115:21, 117:5, 119:23, 139:14, 160:13, 160:17
**walks** [1] - 119:14
**wall** [1] - 183:20
**warning** [2] - 160:11, 161:1
**water** [151] - 39:8, 53:6, 53:7, 53:13, 55:17, 55:21, 56:4, 56:9, 57:2, 57:4, 57:6, 57:12, 57:16, 58:2, 58:10, 58:18, 58:19, 62:21, 63:4, 63:8, 77:3, 78:11, 78:18, 91:14, 92:4, 92:8, 92:11, 92:19, 92:21, 93:3, 93:11, 94:15, 94:19, 94:23,

95:5, 95:8, 95:10, 95:16, 95:17, 95:23, 96:4, 96:12, 96:13, 96:18, 105:14, 105:18, 106:4, 106:20, 106:25, 107:3, 107:4, 107:7, 107:17, 108:4, 108:11, 108:18, 109:2, 109:3, 109:6, 109:9, 109:11, 109:20, 109:23, 110:2, 110:9, 110:21, 111:3, 111:16, 112:11, 112:18, 112:20, 113:9, 113:16, 113:19, 113:25, 114:7, 116:11, 154:6, 154:9, 155:6, 155:10, 155:13, 155:17, 158:7, 159:15, 159:19, 159:22, 165:10, 167:22, 167:23, 168:2, 168:5, 168:9, 168:11, 168:19, 168:22, 168:23, 169:3, 169:9, 169:10, 169:18, 169:20, 169:21, 170:4, 170:11, 170:13, 170:17, 171:10, 171:12, 171:15, 171:18, 172:3, 172:6, 172:10, 172:20, 172:23, 178:6, 179:4, 179:15, 179:25, 180:1, 180:2, 180:17, 180:19, 180:20, 181:7, 181:11, 181:14, 181:15, 181:19, 181:22, 182:2, 182:7, 182:10, 182:11, 182:12, 182:15, 182:16, 182:19, 182:23, 183:3, 183:13, 183:19, 183:24, 184:3, 184:11, 184:17, 184:18, 184:21
**wear** [4] - 99:12, 99:14, 99:15, 162:2
**wearing** [2] - 140:7, 140:10
**weather** [2] - 142:1, 142:4
**website** [2] - 31:17,

89:3
**welcome** [1] - 70:25
**well-maintained** [1] - 100:16
**wet** [66] - 53:5, 53:19, 54:5, 54:15, 54:18, 54:21, 59:17, 60:19, 60:21, 62:2, 62:3, 62:11, 66:20, 68:5, 68:18, 68:19, 68:20, 68:25, 82:18, 84:12, 85:2, 85:25, 86:15, 86:19, 86:20, 87:1, 87:3, 87:4, 88:5, 88:7, 88:20, 89:5, 89:9, 89:10, 89:22, 91:25, 92:6, 92:7, 92:9, 101:12, 108:12, 109:24, 110:20, 112:4, 113:23, 141:12, 158:20, 159:12, 159:25, 160:4, 160:9
**whatnot** [1] - 129:5
**white** [1] - 186:11
**whole** [2] - 5:5, 82:7
**wife** [1] - 127:24
**William** [1] - 66:3
**Williford** [1] - 10:25
**wine** [1] - 127:25
**wipe** [1] - 157:7
**wise** [1] - 9:22
**WITNESS** [53] - 5:8, 11:23, 14:6, 26:9, 32:19, 34:14, 47:15, 55:15, 56:7, 58:7, 58:24, 59:7, 59:13, 60:9, 61:15, 62:15, 64:2, 64:9, 64:16, 71:22, 74:2, 75:4, 87:13, 92:15, 93:7, 102:6, 107:19, 107:25, 111:24, 113:5, 114:3, 123:23, 124:13, 127:2, 128:4, 129:11, 130:19, 131:14, 138:13, 140:13, 147:11, 152:18, 152:23, 157:20, 161:9, 164:4, 166:17, 168:4, 170:3, 173:20, 174:4, 176:13, 184:10
**witness** [12] - 5:11, 9:8, 15:19, 27:1, 39:3, 39:4, 125:20, 128:8, 128:19, 163:15, 170:1,

188:18
**word** [2] - 105:2, 145:11
**words** [5] - 61:10, 83:2, 148:25, 180:19, 181:8
**wrapping** [1] - 188:2
**write** [2] - 83:12, 83:17
**writing** [2] - 71:17, 83:23
**written** [6] - 50:3, 65:12, 83:6, 129:18, 159:6, 161:17
**wrote** [1] - 186:6

## X

**X-ray** [1] - 113:10
**XL** [17] - 42:6, 42:17, 42:25, 43:5, 43:13, 43:21, 44:6, 44:25, 66:6, 77:15, 77:18, 77:21, 78:2, 79:6, 79:13, 139:5, 168:10

## Y

**year** [2] - 43:7, 43:16
**years** [2] - 11:4, 126:19
**yell** [1] - 109:5
**yellow** [2] - 160:21, 181:6
**yourself** [4] - 13:13, 13:16, 165:18, 167:9